UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 9:16-cv-80424-WJZ

WILLIAM DAVID WILCOX, JR.,
a/k/a DAVID WILCOX,
an individual, and MEGAN DANIELLE LUCHEY,
an individual,

    Plaintiffs,

v.

LA PENSEE CONDOMINIUM ASSOCIATION,
INC., A Florida Not-For-Profit Corporation,
MARY MCFADDEN, an individual,
MAC RESIDENTIAL MANAGEMENT SERVICES, LLC,
A Florida Limited Liability Company, and
DAVID WOLFF a/k/a DAVID WOLF, an individual,

    Defendants.
_____/



FILED BY __MK__ D.C.

JUL 12 2022

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

## FIRST AMENDED COMPLAINT

Plaintiff, William David Wilcox, Jr., a/k/a David Wilcox ("David"), and Plaintiff, Megan Danielle Luchey ("Megan" and together with David, "Plaintiffs"), hereby sue Defendant, La Pensee Condominium, Association, Inc. (the "Association"), Defendant, Mary McFadden ("McFadden"), Defendant, MAC Residential Management Services, LLC ("MAC"), and Defendant, David Wolff a/k/a David Wolf ("Wolff") and together with the Association, McFadden, and MAC, "Defendants"), and allege as follows:

### PARTIES

1.     The Association is a Florida Not-for-Profit Corporation, condominium association that operates a multi-story residential building located at 4000 South Ocean Boulevard, South Palm

Beach, FL 33480 (the "Building"), pursuant to the Association's governing documents, and Chapter 718 of the Florida Statutes.

2. The Association is governed by a Board of Directors (the "Board") that is empowered to, among other things, oversee the management, and operation, of the Association.

3. MAC is a Florida Limited Liability Company with a Principal Address of 1153 Hillsboro Mile, Suite 6, Hillsborough Beach, FL 33062.

4. McFadden is a natural person, and a citizen, and resident, of the State of Florida.

5. MAC, through its principal, McFadden, acts as the Association's property manager.

6. Therefore, all conduct complained of herein by MAC was perpetrated by and through McFadden, its authorized agent.

7. McFadden is individually liable to Plaintiffs for all claims asserted herein, because McFadden either committed, or participated in the commission of, said claims.

8. MAC is liable to Plaintiffs for all of McFadden's conduct complained of herein, because at all times relevant hereto, McFadden was the authorized agent for MAC, and such conduct was engaged in while in the scope of her authorized duties to act on behalf of MAC.

9. As discussed in greater detail below, McFadden violated the FHA (defined below), because McFadden personally implemented and enforced the Association's retaliatory conduct towards Plaintiffs.

10. Wolff is a natural person, and a citizen, and resident, of the State of Florida.

11. Wolff is a member of the Board, and the Association's Secretary.

12. Wolff is individually liable to Plaintiffs for all claims asserted herein, because Wolff either committed, or participated in the commission of, said claims.

13. The Association is liable to Plaintiffs for all of Wolff's conduct complained of herein, because at all times relevant hereto, Wolff was an authorized agent for the Association, and such conduct was engaged in while in the scope of his authorized duties to act on behalf of the Association.

14. As discussed in greater detail below, Wolff violated the FHA (defined below), because Wolff personally implemented and enforced the Association's retaliatory conduct towards Plaintiffs.

15. David is a natural person, and a citizen, and resident, of the State of Florida.

16. Megan is a natural person, and a citizen, and resident, of the State of Florida.

## JURISDICTION AND VENUE

17. This Court has original jurisdiction pursuant to 11 U.S.C. §1331, and 42 U.S.C. §3613, because this lawsuit is being brought under the Fair Housing Act, 42 U.S.C. §3601 et seq. (the "FHA").

18. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to §28 U.S.C §1367.

19. Venue is proper pursuant to §28 U.S.C §1391(b), as the events or omissions giving rise to the causes of action set forth herein occurred in this district.

## FACTS COMMON TO ALL COUNTS

20. This lawsuit is predicated upon Defendants' premeditated, diabolical actions of coercion, threats, and intimidation in order to ensure that David, and Megan, would be removed from their home, because David has a service dog named Zeus that the Association previously approved to reside in the subject unit, and because Megan is African-American.

21. Unfortunately for Defendants, while it may appear to be 1956 in the fiefdom that is the association they govern, and operate, it is 2021, and the deplorable acts of the Defendants, acting in concert, with the sole and exclusive purpose of ousting David, and Megan, from their home, is not tolerated under the law.

22. Non-party La Pensee 303, LLC ("303") owns unit 303 of the Building (the "Unit"), and therefore is a member of the Association.

23. 303's principal is Valerie S. Manzo, Esq. ("Manzo").

24. Manzo is an attorney admitted to practice in the State of New York since 1980.

25. Manzo is a former prosecutor for Suffolk County, New York.

26. In late December, 2020, 303 was contemplating leasing the Unit, as 303's lease with its prior tenants expired.

27. David, through his real estate broker, Roy Gelber ("Gelber"), reached out to 303's real estate broker, Ed Lepsetler ("Lepselter"), in connection with David's potential lease of the Unit.

28. Eventually, 303, and David, entered into that certain Standard Lease Agreement (the "Original Lease"), and that certain First Amendment to Standard Lease Agreement (the "First Amendment" and together with the Original Lease, the "Lease"). A copy of the Lease is attached hereto at Exhibit "A."

29. While the Lease contemplated that 303, and David, would execute a Second Amendment to the Lease, such was never executed and made part of the Lease.

30. While the Lease contemplated that Megan was also going to be a signatory, Megan never executed the Lease.

31. Pursuant to the Lease, 303 leased the Unit to David for the period of January 25, 2021, to January 24, 2023 (the "Lease Term").

32. Pursuant to the Lease, David was required to pay a lump sum payment in the amount of $50,700.00 to 303, which such amount represented rent in the amount of $46,800.00 for the first year of the lease, and a $3,900.00 security deposit, and $46,800.00 for the second year of the Lease Term if paid up front, or $4,000.00 if paid monthly.

33. Page 11 of the Lease entitled "Security and full rental fee Deposit Receipt" (the "Deposit Receipt"), which was executed by David, is a document that, once executed by Manzo, would acknowledge receipt 303's receipt of $50,700.00 from David for the first year of the Lease Term.

34. On or about January 8, 2021, a copy of the Lease, with page 2 left inadvertently blank due to an apparent scanning error, was sent to McFadden, for approval by the Association (the "Blank Page 2 Lease"). A copy of the Blank Page Lease is attached hereto at Exhibit "B."

35. All other pages of the Lease, including the Deposit Receipt which set forth that rent for the first year of the Lease Term would be $46,800.00, were included in the Blank Page 2 Lease.

36. On or about January 8, 2021, McFadden received a document that she advised the Association required both David, and 303, had to execute (the "David Approval Document"), as well as a check in the amount of $150.00 payable to the Association (the "David Application Check"), both of which McFadden advised were required in order for David to be approved as a tenant of the Unit. A copy of the David Approval Document, and the David Application Check, are attached hereto at composite Exhibit "C."

37. Also, on or about January 8, 2021, McFadden received a document that she

advised the Association required both Megan, and 303, had to execute (the "Megan Approval Document"), as well as a check in the amount of $150.00 payable to the Association (the "Megan Application Check"), both of which McFadden advised were required in order for Megan to be permitted to reside in the Unit without being characterized as a guest, and to have full access to the Building, including all amenities. A copy of the Megan Approval Document, and the Megan Application Check, are attached hereto at composite Exhibit "D."

38.     On the Megan Application Check, adjacent to the word "MEMO," is the verbiage "303 LUCHEY Application," Luchey, of course, being Megan's last name.

39.     On or about January 8, 2021, after receiving the David Approval Document, the David Application Check, the Megan Approval Document, and the Megan Application Check, McFadden called Manzo and advised her that the Association had performed a background check on David, and Megan, and that there was a potential issue with respect to Megan's credit.

40.     Manzo advised McFadden that she was not concerned, because the rent for the first year of the Lease Term was going to be paid upfront prior to occupancy.

41.     As part of the move-in process, the Association required David to fill out a document entitled "SERVICE ANIMAL/EMOTIONAL SUPPPORT ANIMAL APPLICATION" (the "Service Animal Application"), as David has a service animal named Zeus, and was requesting a reasonable accommodation so that Zeus could reside in the Unit.

42.     David filled out the Service Animal Application, and provided it to McFadden on three (3) separate occasions, but McFadden only confirmed receipt of it once, on January 11, 2021. A copy of the email in which McFadden acknowledges receipt of the Service Animal Application is attached hereto at composite Exhibit "E."

43.     In connection with Zeus' approval to reside in the Unit, at McFadden's request,

on January 8, 2021, David sent McFadden an email attaching Zeus' registration identification (the "Zeus Registration Email"). A copy of the Zeus Registration Email is attached hereto at Exhibit "F."

44. Also, in connection with Zeus' approval to reside in the Unit, at McFadden's request, on January 8, 2021, David sent McFadden an email attaching Zeus' vaccination records (the "Zeus Vaccination Email"). A copy of the Zeus Vaccination Email is attached hereto at Exhibit "G."

45. On January 15, 2021, David received a phone call from McFadden during which she advised him that David, Megan, and Zeus were conditionally approved, pending an interview with a Board member, which was scheduled to occur on January 19, 2021.

46. On January 19, 2021, David, and Megan, participated in an "interview" with Robert Rosati ("Rosati"), a member of the Board, and the Treasurer of the Association.

47. Significantly, the interview was conducted via telephone, and Megan had not visited the Building at this juncture, so neither Rosati, nor the Defendants, knew that she was African-American.

48. During the interview, Rosati, David, and Megan, discussed the lease term of 2 years, the fact that Zeus was going to reside in the Unit as a service animal, Zeus' type, and breed, and the Association's Rules & Regulations.

49. At the conclusion of the interview, Rosati advised David, and Megan, that David's tenancy was approved, that Megan would be permitted to reside in the Unit, not be characterized as a guest, and would have full access to the Building, and its amenities, and that Zeus was approved as a service animal that could reside in the Unit.

50. On January 19, 2021, Lepselter, 303's real estate agent, emailed McFadden inquiring as to whether the Association would issue an approval letter with respect to David's rental of the Unit (the "McFadden-Lepselter Approval Email"). A copy of the McFadden-Lepselter Approval Email is attached hereto at Exhibit "H."

51. On January 19, 2021, McFadden responded to Lepselter advising that the Association "does not issue approval letters" but that she can send Lepselter a Certificate of Approval the following day. *See Exhibit H*.

52. On January 24, 2021, in response to an email from David regarding whether he could move in on the weekend, and in an effort to coordinate David's, Zeus', and Megan's move in, McFadden advised David that no move ins were allowed on weekends (the "McFadden-Wilcox Approval Email"). A copy of the McFadden-Wilcox Approval Email is attached hereto at Exhibit "I."

53. On January 24, 2021, David, and Megan, went to the Building to pick up the keys to the Unit, and provide a $50,700.00 check to Lepselter.

54. A member of the Association named Liza Dunn ("Dunn") was sitting on her balcony with her mother and saw David, and Megan, on January 24, 2021.

55. When Dunn noticed that Megan was African-American, she told her mother "well that ain't going to work," as Dunn had previous knowledge of the Association's prior discrimination including harassing a lesbian couple that resided in the Unit before David, Megan, and Zeus, as well as making racial slurs.

56. Dunn's words would prove to be prophetic, as the Defendants were about to embark on a premeditated slash and burn campaign against David, Megan, and Zeus.

57. On or about February 10, 2021, as Megan was exiting the Building's elevator, Wolff got in Megan's face, and yelled "niggers don't belong here!"

58. Shocked and scared, Megan ran out of the nearest exist of the Building, got in her car, drove away, and called David.

59. David consoled her, and said" let's talk about it when I get home."

60. When David, and Megan, discussed Wolff's abhorrent statement, they initially decided not to do anything, because they did not want to rock the proverbial boat, and make their living situation worse.

61. On February 13, 2021, at approximately 9:00 a.m., Benjamin Ripstein, a member of the Association, John Lawson ("Lawson"), a member of the Board, and the President of the Association, and John Rahul, a member of the Association, irately banged on the Unit's door.

62. When David opened the door, they barged into the Unit, and out to the balcony, and accused David of having a party during which someone allegedly vomited over the Unit's balcony.

63. David was shocked, and told them they were mistaken - that no one vomited over his balcony, and told the men to leave the Unit.

64. Dunn, who lives below the Unit, saw what the men falsely believed to be vomit, and advised them that it was unprocessed food at a Board meeting, as some of the unprocessed food landed on Dunn's balcony.

65. On February 13, 2021, McFadden emailed Manzo about the alleged vomiting incident, and stated that David "lied about the service animal he has in your unit, which is a Doberman puppy, larger than the building and has everyone frightened."

66. On February 13, 2021, Manzo responded to McFadden, and reminded her "that the lawyer for the Association vetted them. Based on the fact that only service animals would be approved . . . . his animal is legitimate . . . no? the "Zeus Is Legitimate Email"), a copy of which is attached hereto at Exhibit "J."

67. Remarkably, McFadden, doing the Defendants' bidding, was attempting to intimidate Manzo into getting rid of David, Megan, and Zeus, because Zeus was a Dobermann, a fact that was disclosed to the Association, Rosati, and McFadden, in the Service Animal Application, the identification pictures, and the vaccination records, that David provided to McFadden, and in the interview with Rosati.

68. McFadden, and the Association's, harassment continued.

69. On February 18, 2021, McFadden emailed David lying, and asserting that Zeus was barking non-stop, when he was not. (the "McFadden Is Lying Email"), a copy of which is attached hereto at Exhibit "K."

70. On February 18, 2021, David, defending himself, and Megan, against these clearly fabricated allegations, and understandably frustrated, and angry, emailed McFadden back advising that she was lying, and the barking was emanating from the owner of 2 other units located on the same floor of the Unit.

71. David reiterated to McFadden, who was aware of the racist remarks made to Megan, that "[t]he racist shit is being stopped as well and I am getting the police involved. Megan is fearing for her life."

72. On or about February 21, 2021, David, and Megan, ran into Lawson in the Building, and told him about Wolff's appalling, racist conduct.

73. Lawson responded, "I know. He told me he said it. He's just old."

74. Faced with the harassment that magically appeared after Wolff told Megan "niggers don't belong here," and fearful that the Association's retaliatory conduct would continue to escalate, David, and Megan, contacted the Palm Beach County Sherriff's office.

75. On February 24, 2021, Deputy David Hul ("Deputy Hul") was dispatched to the Unit, where David was present, and Megan, was on speakerphone.

76. Megan relayed Wolff's disgusting statement to Deputy Hul, and while Hul said such was obviously offensive, no crime had been committed.

77. Despite the fact that no crime may have been technically committed, the damage done to Megan, and David, was unquantifiable. A copy of the Police Report regarding the incident is attached hereto at Exhibit "L."

78. On February 24, 2021, Dunn, aware of the retaliatory conduct that David, because of his service animal Zeus, and Megan, because of her race, were being subjected to, as well as some of the Defendants' prior discriminatory practices, sent McFadden an email (the "Dunn Email"), and expressed her concern that such harassment was not historically limited to David, and Megan, and requested that each Board member responsible for the harassment resign. A copy of the Dunn Email is attached hereto at Exhibit "M."

79. The harassment continued. The Defendants were fabricating arguments against David, and Zeus, a protected service animal, while ignoring the fact that the barking was emanating from a unit on the same floor as the Unit that is owned by Laurie Marchel ("Marchel"), a member of the Board, and the Vice President of the Association.

80. Significantly, while McFadden, and the Association, harassed David about his

service animal, they flouted the Association's governing documents with respect to Marchel, as the Vice President of the Association has 2 dogs living in her unit, in violation of the Association's governing documents.

81. David responded to multiple emails from McFadden regarding allegations that Zeus was barking providing video evidence proving that the barking was actually coming from Marchel's 2 dogs.

82. On June 22, 2021, David email McFadden providing her a video of, among other things, multiple dogs barking in Marche's unit. A copy of the aforementioned email is attached hereto at Exhibit "N."

83. On June 27, 2021, David, and Lawson, engaged in an email exchange in which David provided Lawson with video evidence that the barking was not emanating from the Unit, but rather Marchel's unit, in which 2 dogs reside, which is a violation of the Association's governing documents (the "Lawson Dog Barking Email"). A copy of the Lawson Dog Barking Email is attached hereto at Exhibit "O."

84. On July 14, 2021, David received a letter from JoAnn Burnett, acting in her capacity as counsel for the Association, (the "First Burnett Letter), in which Ms. Burnett inexplicably requested information related to the Association's approval of Zeus as a service animal, despite the fact that as evidenced by the above, and the attached exhibits, the Association already approved Zeus. A copy of the First Burnett Letter is attached hereto at Exhibit "P."

85. On July 15, 2021, Marchel's dog attempted to attack Zeus as David, and Zeus, were exiting the Building's elevator.

86. After the incident, David called Todd Davis ("Davis"), who, upon information and belief, is an employee of MAC, and serves as the Building's superintendent, and advised

Davis of the incident, and asked him if he could view the security footage from the incident.

87. David went to the Building's office with Davis, and reviewed the footage, which David had to take a video of on his phone, as Davis did not know how to download it.

88. David then went to the Unit and emailed Lawson, and Mary, regarding the incident, and David called the police.

89. While David was waiting for the police to arrive in the Building, he, and others, heard McFadden excoriating Davis for showing David the video footage, yelling "[w]e are fucked Todd . . . how did he get that video? We are trying to get him out!"

90. On July 20, 2021, Ms. Burnett sent a letter (the "Second Burnett Letter"), addressed to undersigned counsel, as counsel for David, and to Megan, Gelber, Lepsetter, and Manzo, among others, in which Ms. Burnett alleged that a purported lease agreement (the "Forged Lease") was sent to McFadden on July 8, 2021, by an unidentified individual, that contains a forged document purporting to be page 2 of David, and 303's lease. A copy of the Second Burnett Letter is attached hereto at Exhibit "Q."

91. The Forged Lease was not a part of the Lease, and was not prepared by Manzo, Lepselter, Gelber, or Manzo.

92. Rather, it was prepared by, or at the behest of, one, or more, of the Defendants, in an attempt to get rid of David, Megan, and Zeus.

93. When undersigned counsel inquired of Ms. Burnett as to who sent McFadden the Forged Lease, she advised that she could not provide that information, because McFadden was on vacation.

94. Other mysteries, such as who (i) put screws into David's vehicle's tires on 2

occasions when it was parked in the Building's parking lot; (ii) put screws into the tires of a vehicle owned by Elias Halvatzis ("Halvatzis"), an individual who has supported David, and Megan, while it was parked in the Building's parking lot; and (iii) put screws into the tires of a vehicle owned by Dunn while it was parked in the Building's parking lot.

95. In the penultimate act of retaliation, the Association filed a state court case (the "State Court Case") against 303, David, Megan, and some unknown individual named Mark McFaddon, in which the Association seeks an order of the Court forcing 303 to evict David, Megan, Zeus, and this unknown McFaddon individual from the Unit. A copy of the Amended Complaint filed in the State Court Case is attached hereto at Exhibit "R."

96. The State Court is predicated on the Forged Lease, and alleges that the Lease Term is only for 6 months, and therefore, David, and Megan, are not authorized to reside in the Unit.

97. The Amended Complaint is replete with lies, and based upon a document that was created by, or at the best of, one or more of the Defendants.

98. Manzo never represented to McFadden that the Lease Term was 6 months.

99. To the contrary, McFadden, like all of the Defendants, were well aware that the Lease Term was 2 years, as evidenced by the above, and the exhibits attached hereto.

100. The lengths to which the Defendants have gone to retaliate against David, and Megan, shocks the conscience.

101. They have, among other things, committed a fraud upon the Court in the State Court Case, and 303, David, and Megan, intend to vigorously defend themselves in the State Court Case, and to assert appropriate counterclaims against the Association.

102. All conditions precedent to the filing of this action have been satisfied, excused, or waived.

## COUNT I
### (Retaliation Under the Fair Housing Act)

103. Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 – 102 as though fully set forth hereat.

104. The Fair Housing Act prohibits discrimination in the provision of housing because of, among other things, race, and disability.

105. The Fair Housing Act, 42 U.S.C. § 3617, et seq., makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise of, or on account of, his or her having exercised, or on account of her or his having aided or encouraged any person in the exercise or enjoyment, any right granted or protected by" its provisions.

106. The retaliation provisions of the Fair Housing Act have been broadly applied to all practices which have the effect of interfering with the exercise of rights under the federal fair housing laws.

107. As enumerated in detail above, and confirmed by McFadden when she yelled at Davis on July 15, 2021, Defendants have engaged in multiple, despicable, acts of retaliatory conduct against Plaintiffs including, among other things:

- Wolff yelling at Megan "niggers don't belong here!"

- Making up lies about David violating non-existent rules and regulations of the Association

- Causing Ms. Burnett to demand information from David regarding Zeus in order for him to be approved by the Association as a service animal, when he

was already approved approximately 6 months earlier

- Trying to intimidate Manzo into causing 303 to evict David, and Megan

- Filing the State Court Case

108. Defendants' flagrant acts of intimidation, threats, and interference with David's, and Megan's, exercise of their fair housing rights constitutes a violation of the Fair Housing Act.

WHEREFORE, Plaintiffs seek judgment against Defendants, (i) declaring that the actions of the Defendants violated the Fair Housing Act; (ii) enjoining Defendants from continuing to violate the Fair Housing Act, and retaliating, threatening, and intimidating, David, and Megan; (iii) awarding Plaintiffs compensatory, and punitive damages; (iv) awarding Plaintiffs their attorneys' fees, and costs, incurred in connection with the institution, and prosecution, of this action; and (v) ordering any such other relief as the Court deems just, equitable, and proper.

## COUNT II
### (Interference, Coercion, or Intimidation [Fla. Stat. §760.37]

109. Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 – 102 as though fully set forth here at.

110. Fla. Stat. § 760.37 closely mirrors the language of 42 U.S.C. § 3617, as quoted in Count I, protecting the rights granted under ss. 760.20-760.37.

111. The Defendants, through the actions described above, violated Fla. Stat §760.37 by, among other things:

- Wolff yelling at Megan "niggers don't belong here!"

- Making up lies about David violating non-existent rules and regulations of the

        Association

- Causing Ms. Burnett to demand information from David regarding Zeus in order for him to be approved by the Association as a service animal, when he was already approved approximately 6 months earlier

- Trying to intimidate Manzo into causing 303 to evict David, and Megan

- Filing the State Court Case

WHEREFORE, Plaintiffs seek judgment against Defendants, (i) declaring that the actions of the Defendants violated Fla. Stat §760.37; (ii) enjoining Defendants from continuing to violate the Fla. Stat §760.37, and retaliating, threatening, and intimidating, David, and Megan; (iii) awarding Plaintiffs compensatory, and punitive damages; (iv) awarding Plaintiffs their attorneys' fees, and costs, incurred in connection with the institution, and prosecution, of this action; and (v) ordering any such other relief as the Court deems just, equitable, and proper.

WHEREFORE, Plaintiffs demand judgment against Defendants, for damages, including punitive damages, in an amount to be determined, and for such further relief as the Court deems just and proper.

## PLAINTIFF'S REQUEST FOR JURY TRIAL

Plaintiffs hereby request a jury trial.

Dated: July 10, 2022

*[signature]* July 11, 2022
David Wilcox
4000 South Ocean Blvd., Apt. 303
South Palm Beach, FL 33480

*PRO SE*

*[signature]* July 11, 2022
Megan Luchey
4000 South Ocean Blvd., Apt. 303
South Palm Beach, FL 33480

*PRO SE*

# EXHIBITS

All remain un-changed from original complaint.