Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 9:21-CV-81565-DMM

---

WILLIAM DAVID WILCOX, JR. a/k/a
DAVID WILCOX, an individual, and
MEGAN DANIELLE LUCHEY, an individual,

       Plaintiffs,

vs.

LA     PENSEE     CONDOMINIUM,
ASSOCIATION, INC., a Florida Not-For-
Profit Corporation, MARY McFADDEN, an
individual,    MAC   RESIDENTIAL
MANAGEMENT SERVICES, LLC, a Florida
Limited Liability Company, and
DAVID WOLFF a/k/a DAVID WOLF, an individual,

       Defendants.

---

VIDEOCONFERENCE DEPOSITION OF
VALERIE MANZO


Taken on Behalf of the Defendants/Mary McFadden and
MAC Residential Management Services, LLC


DATE TAKEN: April 26, 2022

TIME:      9:30 A.M. - 12:20 P.M.
         12:55 P.M. -  3:10 P.M.

PLACE:    REMOTELY


Examination of the witness taken before:
Laurie Susskind, Registered Professional Reporter
United Reporting, Inc.
1218 Southeast 3rd Avenue
Fort Lauderdale, Florida 33316
954-525-2221

APPEARANCES FOR THE PLAINTIFFS

LUBLINER LAW,
By:  RICHARD S. LUBLINER, ESQ.
1645 Palm Beach Lakes Boulevard, Suit 1200
West Palm Beach, Florida 33401


 APPEARANCES FOR THE DEFENDANT/LA PENSEE CONDOMINIUM
          ASSOCIATION, INC. and DAVID WOLF


MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
By:  ANDREW JAMES MARCHESE, ESQ.
100 Northeast 3rd Avenue, Suite 1100
Fort Lauderdale, Florida 33301


APPEARANCES FOR THE DEFENDANTS/MARY McFADDEN and MAC
RESIDENTIAL MANAGEMENT SERVICES, LLC

ISRAEL, ISRAEL & ASSOCIATES, P.A.
By: DAVID B. ISRAEL, ESQ.
6099 Stirling Road, Suite 211
Davie, Florida 33314

APPEARANCES FOR THE DEFENDANT/MAC RESIDENTIAL
MANAGEMENT SERVICES, LLC

LIEBLER, GONZALEZ & PORTUONDO
By: MICHAEL D. STARKS, ESQ.
44 West Flagler Street, 25th Floor
Miami, Florida 33130

ALSO PRESENT:

WILLIAM DAVID WILCOX, JR.
MEGAN DANIELLE LUCHEY
DAVID WOLF

                    - - - - -

7b52fb0a-6c70-4996-ae26-fc24236ecc16

```
                                            Page  3

                    INDEX


WITNESS:                              PAGE

VALERIE MANZO

Direct Examination by Mr. Israel:          4


                    -  -  -

                 EXHIBITS

DEFENDANTS'            DESCRIPTION          PAGE

    1                 SunBiz              10
    2              warranty deed          12
Comp.  3        Lepselter's production     26
    4                complaint           113



                    -  -  -
```

United Reporting, Inc.
(954) 525-2221

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 4

1  Thereupon:

2                        VALERIE MANZO,

3  a witness, remotely appeared before me and, being first

4  duly sworn in the above-entitled cause, testified under

5  oath as follows:

6             THE WITNESS:  So help me God.

7                   DIRECT EXAMINATION

8       Q.   (By Mr. Israel) Good morning, Ms. Manzo.  My

9  name is David Israel.  I represent Mary McFadden and

10 MAC Residential Services in a federal lawsuit that has

11 been filed, and I am here to ask you some deposition

12 questions for discovery purposes.  So I know you are a

13 lawyer, but I just want to make sure that it's based on

14 the background and the rules for a deposition.

15             I'm going to ask you a series of

16 questions.  I need you to answer them audibly.  If

17 you answer them, I will presume that you understood

18 the question and will give me an answer to that

19 question.

20             Nods of the head the court reporter can't

21 take down, especially in this virtual setting, so

22 audible answers all the time.

23             If you need a break, let us know.  As long

24 as there is no question pending, taking a break is

25 not a problem.

Page 5

1            Ever so often there will be objections.

2 Let us lawyers work out the objections, and unless

3 you are instructed not to answer by somebody, you

4 are to answer.

5            Are those rules clear?

6      A.   Yes.

7      Q.   One more thing.  If I ask you something

8 that's not clear, please don't hesitate to ask me to

9 rephrase it.

10     A.   Yes.

11     Q.   Can you give me a little bit of your

12 background, where you went to law school?

13     A.   Sure.  I went to St. John Law School,

14 graduated in 1979.  I was admitted on March 19,

15 1980.

16     Q.   What kind of practice do you have?

17     A.   Predominantly elder law, estate planning,

18 real estate and small business representation for

19 LLC, things like that.

20     Q.   What did you do prior to --

21          When did you set up your firm?

22     A.   My firm?  Well, in 1983, I was an

23 assistant town attorney in Smithtown, and that

24 particular job permitted private practice.  Prior to

25 that, I was a prosecutor, no private practice.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 6

```
 1              So in 1980, I became a prosecutor.   In
 2  1980, I became a prosecutor in Suffolk County.   In
 3  1983, I became an assistant county attorney to the
 4  Town of Smithtown where I now live, and they let me
 5  set up a private practice.
 6      Q.    You were working as a town attorney and
 7  also had a private practice?
 8      A.    Yes.  Assistant county attorney, assistant
 9  to the county.
10      Q.    And you had your own private practice?
11      A.    Yes, small.  Yes.
12      Q.    Which I presume is the same practice that
13  you have today, more or less?
14      A.    Yes.  Correct.  Now it is not -- now it is
15  full-time.
16      Q.    Okay.  You are familiar with legal
17  proceedings, lawsuits, depositions, discovery and
18  the like, correct?
19              MR. LUBLINER:  Form.
20      A.    More or less, yes.
21      Q.    You've been involved in litigation prior
22  to -- I'm not talking about as a party to a lawsuit.
23  As a lawyer, you've been involved in litigation
24  previously, right?
25              MR. LUBLINER:  Form.
```

```
 1     A.   Yes.
 2     Q.   And have you ever sued anybody prior to
 3 these lawsuits associated with -- to this unit at
 4 La Pensee Condominium?
 5          MR. LUBLINER:  Form.
 6     A.   Once I sued someone who -- in small claim
 7 court.
 8     Q.   Was it a landlord/tenant matter?
 9     A.   No.  Never brought a landlord/tenant
10 matter.
11     Q.   I'm sorry?
12     A.   I never brought as plaintiff a
13 landlord/tenant matter.
14     Q.   I'll presume as a lawyer, as a town
15 attorney, you participated in lawsuits involving
16 different issues, litigation of sorts in different
17 courts?
18          MR. MARCHESE:  Form.
19     A.   That's correct.  I participated mostly --
20 largely defending the Town of Smithtown.
21     Q.   Prior to --
22          Let me back up.  Other than in New York,
23 do you hold any license in any other state?
24     A.   No.
25     Q.   You are not licensed in Florida to
```

1 practice law?

2     A.   I am not.

3     Q.   Okay.  So let's talk a little bit about

4 La Pensee and La Pensee Realty, LLC.

5          Let me share the screen.  Bear with me

6 when I do this.

7     A.   I'm going to grab a pen.

8          What is that?

9     Q.   Give me one second.  I'm having a little

10 trouble sharing.

11          MR. LUBLINER:  Going off?

12          MR. ISRAEL:  I need a minute or two.

13          MR. LUBLINER:  Okay.

14     Q.   Everybody see that now?

15     A.   Yes, I can see it.

16     Q.   Okay.  Perfect.

17          This has previously been marked as an

18 exhibit to a deposition, but I want to show you a

19 host of e-mails.  Before we do that --

20          Do you remember setting up La Pensee 303,

21 LLC?

22     A.   Yes.

23     Q.   And do you recall when that was set up,

24 what year?

25     A.   2018 I set up 303.  I believe it was prior

Page 9

1  to purchase.

2       Q.   Was there a particular reason that you

3  purchased the property as an LLC as opposed to in

4  your name?

5       A.   There was no specific reason.  It was in

6  part because it was 10/31, so I knew I would be

7  renting, and that's, generally speaking, kind of

8  acceptable practice.

9       Q.   Did you purchase the property for

10  investment purposes or to use it?

11       A.   I purchased the property to retire and

12  become a snowbird.

13       Q.   That hasn't happened yet, correct?

14       A.   It hasn't happened yet.  It hasn't

15  happened that I have become a snowbird yet.

16       Q.   The mailing address, the Smithtown

17  address, that's your home address in New York listed

18  on here?

19       A.   De Mont Street is my home address.

20       Q.   And you are the only member listed on

21  this?

22       A.   Yes.  Per the Federal rules, Section 1031,

23  I had to be the sole member.

24            MR. LUBLINER:  Let him finish asking his

25       questions.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 10

1          THE WITNESS:  I'm sorry.

2              Is there another question?

3      Q.   (By Mr. Israel) No, no.  It shows up as you

4  as a member, and you are the only one other than the

5  registered agent, correct

6      A.   I am the sole member of La Pensee 303,

7  LLC.

8      Q.   So this document that was obtained from

9  the Secretary State of Florida, Division of

10 Corporations would be generally active as the

11 information that's available publicly for La Pensee

12 Realty?

13          MR. LUBLINER:  Form.

14     A.   I can't see the very bottom.

15     Q.   Yes.

16     A.   Yes.  It shows annual report, yes.  Yes.

17          MR. ISRAEL:  Madam Court Reporter, let's

18     mark this as Exhibit Number 1.

19          (Defendants' Exhibit 1 was marked for

20      Identification.)

21     Q.   Now, let me show you what we're going to

22 mark as Exhibit 2.  It's a warranty deed.

23          Does this document look familiar to you?

24     A.   This document looks familiar to me.  It

25 appears to be the deed from Allison Landon to me.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 11

1       Q.    That's the purchase of the Unit 303 of

2  La Pensee Condominium, correct?

3       A.    Can't tell because I don't see the address

4  of mine yet.

5       Q.    Let's -- we'll scroll it down a little

6  bit.

7             There is a description of the legal

8  address.

9       A.    Thank you.

10      Q.    Legal description.

11      A.    Correct.  That appears to be the deed from

12  Allison Landon for La Pensee 303, LLC.

13      Q.    And the second page is a signature from

14  Ms. Landon to transfer the property to you?

15      A.    That's correct.  That appears to be Page 2

16  of the deed.

17      Q.    And the last page is La Pensee

18  Condominiums Certificate of Approval for the

19  purchase, correct?

20      A.    I haven't looked at these for a while.

21  Yes.  Yes.  This appears to be the last page.

22  Robert Rosati seems to have signed for the board.

23      Q.    Do you know Mr. Rosati?

24      A.    He's a member of the board.  Mr. Rosati is

25  a member of the board.

Page 12

1          MR. ISRAEL:  We're going to mark this as

2     Exhibit 2, Madam Court Reporter.

3               (Defendants' Exhibit 2 was marked for

4       Identification.)

5     **Q.   Now, this deed is dated the 30th day of**

6 **April, 2018?**

7     A.   That's correct, dated April 30th.

8     **Q.   How is it that you arrived at La Pensee**

9 **Condominium to purchase this unit?  How did you get**

10 **to this particular property?**

11          MR. LUBLINER:  Form.

12    A.   I got to the property with a realtor.

13    **Q.   Who was that?**

14    A.   Ed Lepselter.

15    **Q.   How did you meet Mr. Lepselter?**

16    A.   I met Mr. Lepselter through a mutual

17 friend.

18    **Q.   That would have been when, in 2018?**

19    A.   Correct.  In 2018, I was introduced to Ed

20 Lepselter, who works with his wife, Elly Lepselter.

21    **Q.   And how long had you been looking for a**

22 **property prior to purchasing Unit 303 in La Pensee?**

23    A.   I'm not really certain, a few months, and

24 then Ed was searching online for us; and then at one

25 point, we went to Florida, and then we looked at

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 13

1  apartments with Ed.

2      Q.   **You actually came down and looked at the**
3  **property yourself?**

4      A.   Correct, I did.  I came down to Florida
5  with my husband, and we looked at apartments
6  together with Ed.

7      Q.   **After you purchased the property, did you**
8  **use it and come down from New York and visit South**
9  **Florida or did you rent it?**

10     A.   After we purchased the property, we listed
11  it for rent with Mr. Lepselter.

12     Q.   **How long after you purchased the property**
13  **did you do that?**

14     A.   I believe it was within a month.
15  Approximately.  I'm not certain, but shortly after
16  the purchase, we told Mr. Lepselter that per the
17  rules we had to rent it per -- I'm sorry, per the
18  tax rules, we had to rent it.

19     Q.   **Do you recall who your first tenants were**
20  **when you first rented this property?**

21     A.   My first -- my first tenants were Eva and
22  Stefan Sigloch, S-I-G-L-O-C-H.

23     Q.   **And do you know who approved it from the**
24  **Association?**

25     A.   Eva and Stefan Sigloch were approved by

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 14

1  the board for residence in La Pensee 303, LLC.

2      **Q.   Do you know when they moved into Unit 303**

3  **at La Pensee Condominium?**

4      A.   I'm not great with the dates.  They moved

5  in shortly after -- I think they moved in -- either

6  in the summer or the fall that same year.  They

7  moved in 2018.

8      **Q.   How long did they stay?**

9      A.   You know what, actually, they must have

10  moved in earlier.  They moved in -- I'm sorry.  I

11  think they must have moved in earlier than summer.

12  They moved in, and then they left because they were

13  having construction done.  So they moved in and -- I

14  think in the spring, actually.

15          What was the question, I'm sorry?

16      **Q.   How long did they stay?**

17      A.   They stayed until just before -- they

18  stayed until October, and then they moved out, and

19  then their temporary quarters were terminated, and

20  they moved back in.

21      **Q.   They moved in in the spring, and they**

22  **stayed until October --**

23      A.   Right.

24      **Q.   -- when they left?**

25      A.   And their builder --

7b52fb0a-6c70-4996-ae26-fc24236ecc16

1          The reason they were in the home was --

2  they were constructing a brand new home, so they

3  needed a temporary quarters, so they moved in.  And

4  they moved out because their builder said we are

5  almost there, move here, so they moved out; and then

6  they weren't there, and they had to move back in.

7  They came and went.

8          Q.   How much longer did they stay after --

9          A.   I believe they --

10         Q.   -- they went away from the property?

11         A.   A very short period of time.  About a

12  month.  They were only away that month.

13         Q.   And then they moved back in you said.  Do

14  you recall until when they stayed at that time?

15         A.   Yes.  They stayed until February.  So they

16  basically -- we viewed it as a continuation of the

17  same lease because no one else had moved in in the

18  interim.  And we received a telephone call on

19  Thanksgiving that they were homeless, so we got

20  permission and let them move back in.

21         Q.   And they moved back in.  Did you have to

22  ask the Association for permission for them to move

23  back in?

24         A.   Yes, we did.  We had to ask permission

25  from the board.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 16

1      Q.    Anybody at the Association object to them

2  moving back in?

3      A.    I wouldn't know.  I only know that they

4  said it was all right for them to move back in.

5  That's all I know.

6      Q.    And they actually moved back in?

7      A.    Yes, they did.

8      Q.    Subsequent to Mr. and Mrs. Sigloch, did

9  you rent the property again after they moved out in

10 February of 2019?

11     A.    Yes.

12     Q.    Who did you rent the property at that time

13 to?

14     A.    Diane Hayes and Amy Lipfavitz.

15     Q.    Say that one more time.

16     A.    Diane Hayes and Amy Lipfavitz rented next.

17     Q.    Do you recall when they moved in?

18     A.    I'm not great with the dates.  Obviously,

19 we tried to get people to move in right away because

20 it is costly.

21          Diane and Amy moved in -- they moved in

22 probably sometime in 2019, and they, too, were

23 having construction.

24     Q.    Do you recall whether the unit remained

25 empty after Mr. and Mrs. Sigloch moved out for a

Page 17

1  period of time?

2      A.   Yes.

3      Q.   And how did you find Diane Hayes and Amy

4  Lipfavitz to rent the unit?

5      A.   We called Ed Lepselter to rent it for us,

6  and he listed it, and that's how we found them.

7      Q.   And do you recall how long Diane Hayes and

8  Amy Lipfavitz stayed in the unit?

9      A.   I think they stayed about seven or eight

10 months.

11     Q.   And then they moved out?

12     A.   Yes.   Then their construction was

13 completed, and they moved into their home.

14     Q.   The Sigloch lease -- I presume you had a

15 written lease with them, correct?

16     A.   I had a written lease with the Siglochs,

17 yes.

18     Q.   That was a one-year lease?

19     A.   I believe it was under a year because they

20 wanted it to be as long as the construction were to

21 take place.   I don't know when, but it was a little

22 under a year.

23     Q.   So it was less than a year lease?

24     A.   Correct.

25     Q.   And do you know if Diane Hayes and Amy

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 18

1  Lipfavitz's lease was for a year or less?

2       A.    It was a little under as well.

3       Q.    Also less than a year?

4       A.    One year as well.

5             Pardon me, sir?

6       Q.    Also under a one-year lease, correct?

7       A.    Correct.

8       Q.    Is that a yes?

9       A.    That's a yes.  Yes.

10      Q.    Thank you.

11            Do you recall the specific month that

12 Diane Hayes and Amy Lipfavitz moved out?

13      A.    I don't.  I do not recall the exact month

14 they moved out.

15      Q.    What happened after they moved out?

16      A.    Once again, I listed it with Ed.

17      Q.    Diane Hayes and Amy Lipfavitz had to be

18 approved by the Association prior to them moving in?

19      A.    Yes.  Yes.  Diane and Amy had to be and

20 were approved.

21      Q.    Do you remember any issues with the

22 Association approving Diane Hayes or Amy Lipfavitz

23 to move into the unit?

24      A.    No one on the board ever spoke to me in

25 any instance with Diane and Amy.  I always talked

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 19

1  with Mary, and if there were issues, they were not

2  described to me.

3       Q.   Did Mary ever describe any issues with

4  either the Siglochs, the Hayes or Lipfavitz?

5       A.   No.  No issues as far as them living

6  there.  There was some -- there was a little bit of

7  a discussion about whether or not the board would

8  let them move back in.  It revolved around how long

9  people were there and whether they should come back

10  and whether that was permissible, but I don't recall

11  Mary telling -- Mary telling me anything about the

12  actual residence, the Siglochs and Diane Hayes and

13  Amy Lipfavitz.

14       Q.   Would you describe your relationship over

15  the years that you dealt with Mary McFadden as

16  business friendly?

17       A.   Yes.

18       Q.   She was always polite to you?

19       A.   Yeah.  For the first few years, yes.

20       Q.   And she was generally responsive to your

21  requests?

22       A.   In the beginning, yes, she was responsive.

23       Q.   After Diane Hayes and Amy Lipfavitz moved

24  out, you said you gave the property back for market

25  rental once again, correct?

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 20

1      A.    That's correct.  Mr. Lepselter listed it

2  once again for rental.

3      **Q.    And is that the time that he found**

4  **Mr. Wilcox and Ms. Luchey, the tenants for the**

5  **property?**

6      A.    Well, he actually found another person

7  before he found Mr. Wilcox and Ms. Luchey.

8      **Q.    Tell me about that.**

9      A.    He found us a dentist who wanted to move

10 in with his nine-year-old son.  He was newly

11 divorced and needed a place to be with his son.  He

12 seemed terrific, but we couldn't -- the board would

13 not allow him to move upon his timetable.

14     **Q.    What was that?**

15     A.    The board -- someone on the board told me

16 they discussed it, and Mary told me he can't move in

17 when he needs to move in, so we lost him.

18     **Q.    Was it -- was it a timing issue?**

19     A.    Yes.

20     **Q.    Was the board's issue that you can only**

21 **have one tenant per year?**

22     A.    I believe that was the board's issue, but,

23 again, I only spoke to Mary, so Mary McFadden said

24 to me he can't move in in December of 2020, and

25 that's what he needed, so away he went.

United Reporting, Inc.
(954) 525-2221

7b52fb0a-6c70-4996-ae26-fc24236ecc16

1     Q.   Was that because the year from the prior

2  tenant had not -- even though they were not there,

3  had not been completed?  Is that the reason they

4  gave you?

5     A.   That is what I understood to be the

6  reason, yes.

7     Q.   And you understood what Ms. McFadden was

8  telling you, the information that she obtained from

9  the board with regards to your request, right?

10    A.   Don't know where she got the information.

11 I can't speak for her.  I don't know what was in her

12 mind.  All I know, she told me the dentist can't

13 move in.

14    Q.   Do you know if she was speaking for

15 herself or giving you information that she had

16 obtained from the board as to what?

17         MR. LUBLINER:  Form.

18    A.    I don't know.  I couldn't tell you,

19 Mr. Israel, whether she conferred with the board or

20 just had institutional memory.  I don't know.  She

21 told me no.  She just told me no, and I accepted

22 that as a fact.

23    Q.   Did you ever ask to speak with anybody on

24 the board with regard to the issue of the tenant

25 moving in?

1      A.   I did not ask to speak with anyone on the

2  board.

3      **Q.   So the dentist, the prospective tenant --**

4  **I don't know if you gave me the gentleman's name or**

5  **not, but he didn't work out, so he went away,**

6  **correct?**

7      A.   The dentist went away because he needed to

8  move in in December, and Mary told me they can't

9  move in until January 25th.

10      **Q.   So January 25th -- would it be fair to say**

11  **that January 25th would have been the completion of**

12  **the one-year period for the prior tenant?**

13          MR. LUBLINER:  Form.

14      A.   I can't answer that question, Mr. Israel.

15  I don't know what they were doing in terms of

16  calculations.  I made a probably incorrect

17  assumption that they knew what they were doing.

18      **Q.   You said that no conversations were had**

19  **with anybody on the board regarding allowing an**

20  **earlier move in time for the tenant?**

21      A.   You asked me if I had any conversations

22  with anyone on the board, and I did not.

23      **Q.   Did anybody on your behalf have any**

24  **conversations with any member on the board?**

25      A.   I believe my husband had a conversation

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 23

1 with Mr. Lawson, who was then the president of the

2 board.

3     Q.   **And do you recall the extent of the**

4 **conversation your husband relayed to you as to what**

5 **was discussed with Mr. Lawson regarding an earlier**

6 **move-in date?**

7     A.   I believe that Mr. Lawson said it wasn't

8 up to the board, which I don't believe to be true,

9 but I believe that Mr. Lawson said it is not up to

10 the board, and there was some confusion because

11 Mary -- so all we knew is that we kept getting no,

12 no, no, no.

13     Q.   **Now, if there was a disagreement --**

14     A.   We don't know.  We just know we were not

15 given a green light.

16     Q.   **You understand that Ms. McFadden works for**

17 **the board of the Association, right?**

18     A.   It is my understanding that Ms. McFadden's

19 company is hired by the board, and then she is the

20 chief executive of MAC.  That's my understanding.

21     Q.   **And she works under -- she works for the**

22 **company who has a contract with the Association,**

23 **correct?**

24     A.   I'm not aware of that.  I can't answer

25 that.  I never read her documents.  All I know is

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 24

1 that when we purchased, we were informed by our

2 realtor and by Allison Landon that we were to deal

3 with Mary McFadden.

4      **Q.   You do understand that Ms. McFadden**

5 **doesn't make decisions on behalf of the board and**

6 **that the board is the one that makes the decisions?**

7      A.   I don't understand the relationship

8 between Mary McFadden and the board because I'm not

9 privy to the contract between Mary and the board.

10 What the board lets her do on her own and what she

11 actually does on her own, I'm not advised.  I

12 haven't read their contract.  I don't know what she

13 does that's permitted or not permitted.  I can't

14 answer that question.

15      **Q.   You have no understanding as to what the**

16 **parameters are of management responsibility for**

17 **Ms. McFadden or her company and the board of the**

18 **Association?**

19      A.   I didn't read the contract, so I don't

20 know what sort of latitude she has and whether or

21 not she agrees or disagrees with what it says in the

22 contract.  I don't know the answer to that.

23      **Q.   When the respective tenant who was a**

24 **dentist didn't move in, I guess Mr. Lepselter**

25 **continued to market the property; is that accurate?**

Page 25

```
 1      A.   Yes, I would assume so.  We instructed him
 2  to keep looking because --
 3      Q.   Do you know how long after that Mr. Wilcox
 4  arrived at the scene for the purpose of renting the
 5  property?
 6      A.   I would say at some point in the latter
 7  part of December.  Well, he started looking --
 8           I'm sorry.  Can you repeat the question?
 9      Q.   Do you know --
10           MR. ISRAEL:  Madam Court Reporter, can you
11      just reread the question?
12           (The pending question was read by the
13      reporter as recorded above.)
14      A.   No, I don't know when Mr. Wilcox arrived
15  on the scene because I know he was working with his
16  own realtor, I was working with Ed, and the point
17  of -- which point he first contacted Roy Gelber, I
18  don't know where exactly.  I don't know.
19      Q.   Okay.
20      A.   At some point.
21      Q.   Did you have any contact with Mr. Gelber
22  once Mr. Wilcox came on the scene or was all the
23  communication through Mr. Lepselter?
24      A.   There may have been one e-mail with
25  Mr. Gelber.  I was working with Mr. Lepselter and
```

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 26

1  only Mr. Lepselter.  I worked with Ed.  Mr. Wilcox

2  dealt with Mr. Gelber.

3      Q.   Let's look at what we're going to mark as

4  Composite Exhibit 3, and I want to go through some

5  e-mails on this exhibit.  I'll tell you these

6  e-mails came from Mr. Lepselter.

7           Let's start with this e-mail from -- it

8  starts on Page 22.  Is that e-mail address,

9  valmanzo@aol.com, your e-mail address?

10     A.   Valmanzo@aol.com is my e-mail address,

11 yes.

12     Q.   Did you send an e-mail to -- do you

13 recognize that as Mary McFadden's e-mail?

14     A.   Yes.  That's Mary McFadden's e-mail.

15           (Defendants' Composite Exhibit 3 was

16      marked for Identification.)

17     Q.   The cc e-mails, is that your husband's

18 e-mail?

19     A.   Tdemarinis is my husband's e-mail, and

20 elelep@aol.com is Ed Lepselter's e-mail.

21     Q.   So do you recall what this e-mail dated

22 December 8th, 2020, 9:49 a.m. was about?

23     A.   It would be helpful to see what she sent

24 me.

25     Q.   We can go further down.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 27

```
 1      A.   She gave me that date.  Yeah, your husband
 2 spoke to --
 3           I'm sorry, what is the question?
 4      Q.   I guess the e-mails, the last one is on
 5 the top.
 6      A.   Right.
 7      Q.   9:47.  Just later produced --
 8      A.   I understand.  I didn't know -- yeah.
 9      Q.   So this is Ms. McFadden writing to you on
10 December 8th at 9:47 a.m. saying that your husband
11 spoke to John Lawson and he was told that the unit
12 could not be occupied until January 25th?
13      A.   Yes.  I had been previously informed there
14 was a conversation between my husband and
15 Mr. Lawson.  We were told January 25th.
16      Q.   So the next e-mail from 9:49 a.m. that
17 same day, you heard from Mary?
18      A.   Correct.  Reconfirming that's the best
19 they can do for us.
20      Q.   This was a previous e-mail from you to I
21 guess Mary at 9:31 a.m.?
22      A.   Uh-huh.
23      Q.   I guess this is the first of the grouping
24 of the e-mails?
25      A.   This is us saying -- me saying to Mary
```

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 28

1 McFadden that now we have a new candidate, and

2 unless and until we get an exact fee, we don't know

3 if we can satisfy this candidate.

4   **Q.   But you -- you received that information**

5 **on the same date you asked for it?**

6   A.   Looks that way.  Looks like Mary answered

7 me as to the date after she spoke to Mr. Lawson I

8 would imagine.  I don't know.  I don't know what she

9 did.

10      MR. LUBLINER:  David, just for the record,

11      I apologize.  When you say from Ed Lepselter,

12      for record clarification, you are referring to

13      this composite exhibit that was produced by

14      Mr. Lepselter as part of the document

15      production, correct?

16      MR. ISRAEL:  That is correct.  I think it

17      was marked at his deposition, the original

18      deposition, the first one --

19      MR. LUBLINER:  Yes.

20      MR. ISRAEL:  -- as Exhibit 15.  We're

21      going to mark it Composite Exhibit 3 for our

22      purposes today.  At the bottom, they are marked

23      Edward Lepselter.

24      MR. LUBLINER:  I wanted to clarify it for

25      the record.

United Reporting, Inc.
(954) 525-2221

Page 29

```
 1            MR. ISRAEL:  Thank you.  Everybody should
 2     I presume have this.
 3            MR. LUBLINER:  There we go.
 4     A.    Okay.
 5     Q.    (By Mr. Israel) So 9:31 a.m. on December 8th,
 6  you asked Mary McFadden a question, and by 9:47 a.m. on
 7  December 8th, Ms. McFadden had responded to you the
 8  earliest possible date, correct?
 9     A.    Yes, that's correct.
10     Q.    By the way, a question, Ms. Manzo; is your
11  husband a lawyer also?
12     A.    He's not, no.  He's a retired senior vice
13  president of a cable company.
14     Q.    On December 8th at 6:46 p.m., your husband
15  wrote and copied you I guess, Ms. McFadden and
16  Mr. Lawson.
17            Are you familiar with this particular
18  e-mail?
19            I'll let you read it.  Just tell me when
20  you are finished.
21     A.    I'm still reading.
22            Okay.  Yes.  This is Tom explaining his
23  conversation with Mr. Lawson and the rather
24  interesting situation that each of them said it was
25  up to the other, which really didn't make a whole
```

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 30

1  lot of sense then and doesn't make a whole lot of

2  sense now to me.

3       Q.   Okay.  So does this e-mail seem to suggest

4  that Mr. Lawson, John, indicated that he would not

5  have been the decision-maker?

6       A.   Yes, which I find rather incredible given

7  that he was the president of the board.

8       Q.   Did he indicate who the decision-maker

9  would have been as to a move-in date?

10       A.   I truly only recall this e-mail.  I don't

11  recall any private conversations about this subject.

12  So it looks to me like he didn't indicate anything

13  other than bill the management.  My husband is a

14  very thorough individual.  If he knew more, he

15  probably would have put more in there at that point.

16       Q.   According to this e-mail, Mr. Lawson

17  supposedly said that the building's board of

18  directors couldn't decide to make an exception as to

19  when this type of tenant could move in and only

20  building management could approve this?

21       A.   I believe that's what he was stating.

22  That's what he is saying.  That's what he said to

23  everyone involved, that it is up to management, it's

24  not up to the board.

25       Q.   Was the date ever changed from the 25th to

United Reporting, Inc.
(954) 525-2221

7b52fb0a-6c70-4996-ae26-fc24236ecc16

1  any earlier date or the 25th was the final date that

2  permission was given for the new tenant to move in?

3      A.   That was the final date, January 25th.

4      Q.   Eventually, Mr. Wilcox and Ms. Luchey did

5  move in on January 25th, correct?

6      A.   Mr. Wilcox and Ms. Luchey moved in on

7  January 25th.

8      Q.   Now, during this time, you were in the

9  process of negotiating lease terms with Mr. Wilcox,

10  is that correct, January 2021?

11      A.   That's correct.

12      Q.   Here is an e-mail, Page 27 of this

13  composite, from Mr. Lepselter to you and your

14  husband, and there are some handwritten notes.

15          Do you know whose handwriting that is?

16      A.   That's my handwriting.

17      Q.   Would you go through what was being

18  discussed?

19          And I think that was January 4th, 2021; is

20  that correct?

21      A.   Looks that way.  Looks like on

22  January 4th, 2021, I was attempting to respond to an

23  e-mail from Mr. Lepselter to both Tom and myself.

24  And I was instructing him to get additional security

25  if they smoke and advising him to tell them they can

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 32

1  only smoke on the balcony, which was irrelevant

2  because they don't smoke; and then I wanted

3  security -- dog security, but I later found out it's

4  not permitted when it is a service animal.  I was

5  instructed that the laws do not permit security for

6  a service animal.

7           "Here are our thoughts."

8      Q.   Can you read what is the handwriting here

9  to make sure we have are here?

10     A.   "Here are our thoughts.  See annotations.

11 Tom had to run out; I am here.  But -- but with two

12 staffers who work part-time.  Call Tom in his car.

13 Okay, Val."

14     Q.   You were speaking to Mr. Lepselter about

15 additional terms or conditions regarding the lease,

16 the final lease that was going to be entered into

17 eventually for this property, correct?

18     A.   This was early on in the discussions, yes.

19     Q.   I guess Mr. Lepselter had prepared what is

20 called a contract to lease.  It is a form that

21 realtors use.  Basically, it is a contract to enter

22 into a lease agreement; is that correct?

23     A.   That is the case.  It looks like

24 Mr. Lepselter created what Florida Realtors created

25 initially and sent it to me.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 33

1              I lost my reading glasses.  Just give me

2  one second.

3         **Q.    Sure.  No problem.**

4         A.    I see the Florida Realtors --

5         **Q.    Tell me if I should move it up or down.**

6         A.    Depends on what the question is.  I don't

7  know what I'm looking for.

8         **Q.    Okay.  So you recall this document**

9  **prepared by Mr. Lepselter as a form realtors use,**

10 **correct?**

11             MR. LUBLINER:  Form.

12        A.    To be truthful, I don't actually remember

13 seeing this, but, obviously, I did.

14        **Q.    Well, let's look to see.  Do you know**

15 **whose handwriting that is on --**

16        A.    That's my handwriting.  I'm sorry.  Yes,

17 that's my handwriting next to Number 8 on balcony

18 change here.

19        **Q.    Those are your initials at the bottom with**

20 **respect to landlord?**

21        A.    That is correct.  Those are my initials.

22        **Q.    And next to it, the last where it says**

23 **respective tenant, do you recognize that to be**

24 **Mr. Wilcox's initials?**

25        A.    No.  I actually do not recognize those to

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 34

1  be his initials.  They are so tiny.  I don't know.

2           This was done, the document.  We never --

3  this never became a document we relied on.

4      Q.   I'm just curious.  On the next page, do

5  you recognize that to be Mr. Wilcox's signature?

6      A.   Actually, not his signature.  That's an

7  electronic signature that was created by

8  Mr. Lepselter's firm, and I assume realtors in

9  general in Florida use electronic signatures.  So

10  that's an electronic signature, but mine is an

11  actual signature.

12      Q.   That's your signature there?

13      A.   That's correct.

14      Q.   You don't have any reason to believe that

15  Mr. Lepselter -- that it wasn't Mr. Wilcox who

16  electronically signed this document, correct?

17      A.   I don't know.  I didn't know it wasn't

18  him.

19      Q.   So let's look at what generally this

20  document -- I guess this was the starting point of

21  the negotiations.  Is that a fair statement?

22      A.   I would say that this was an offer by

23  Mr. Wilcox to realtor, to La Pensee 303, LLC.

24      Q.   Ms. Luchey's name is not on this document,

25  correct?

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 35

A.   Correct.   Ms. Luchey is not part of this
particular document, that is correct.

**Q.   And she did not sign this document?**

A.   That's correct.   Ms. Luchey did not sign.

**Q.   And the term of this lease was from**
**January 25th, 2021 to January 24, 2022, correct?**

A.   That's the first offer.

MR. LUBLINER:   Form.   Sorry.

A.   These terms was the opening discussion.

**Q.   Would have been for a one-year lease,**
**correct?**

MR. LUBLINER:   Form.

A.   Yes, it would have been for a one-year
lease.

**Q.   Were any of your prior tenants there in**
**your leases for more?**

A.   No, they were not, but -- well, they were
not.

**Q.   And the money for the occupancy was**
**$50,700 in Paragraph 1, correct?**

MR. LUBLINER:   Form.

A.   That was for -- yes, the 50,700 income
offered by Mr. Wilcox was for the initial one year,
and it included 3900 in security deposits for
himself and later himself and Ms. Luchey.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

1    Q.    I'm sorry.  What was the last thing that

2 you said?

3    A.    The 3900 was the security deposit

4 initially offered by him to me for himself, and

5 later that security deposit was offered to me, to my

6 corporation, from him and Luchey, yes.

7    Q.    Do you know what Page 30 of this composite

8 exhibit is?

9    A.    Certificate of authenticity.  It appears

10 to be a document saying that Roy is the owner of a

11 company, Value Realty, and that his connection to

12 this deal is through David.

13         I don't really remember this document, to

14 be honest with you.

15    Q.    If I were to tell you that it's a

16 confirmation of Mr. Wilcox's electronic signature

17 and it provides the time and other confirmation --

18         MR. LUBLINER:  Objection.

19    A.    Yes.

20    Q.    -- do you understand it to be an accurate

21 statement?

22         MR. LUBLINER:  Form.

23    A.    No, I don't actually have any knowledge of

24 what it is, but it appears to be what you just

25 described.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 37

1           Can I see the whole thing?

2      **Q.    Absolutely.  Tell me so I can --**

3      A.    You can scroll.

4      **Q.    The signer information, it gives you the**

5  **date and time and IP address where the computer was**

6  **signed and so on?**

7      A.    Yes.

8      **Q.    You see that?**

9      A.    I see that.

10     **Q.    You have no reason to state that this is**

11 **not a confirmation of Mr. Wilcox's electronic**

12 **signature, correct?**

13          MR. LUBLINER:  Form.

14     A.    I have no information about this form.  To

15 be honest with you, I'm not familiar with this form,

16 but it appears to indicate that there was

17 communication between Mr. Wilcox and Mr. Gelber.  It

18 seems to be a form created by someone in Florida to

19 indicate to the reader that someone needs an

20 electronic signature and gives a date.

21          I'm just reading it the way any layperson

22 would read it.

23     **Q.    Understood.**

24          **Do you recall whether that was the**

25 **proposal to lease contract when you received it and**

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 38

1  **signed it?**

2      A.   No, I did not recall it at all.  It is

3  interesting.  It may have been, but I don't remember

4  that -- seeing that.  Perhaps that was --

5          How did you get this?  Was this

6  Lepselter's package or Mr. Gelber's package?

7      **Q.   These documents came from Mr. Lepselter.**

8      A.   Oh, maybe I saw it then.  I really don't

9  know.  I don't remember, to be honest.

10          I had dealt with Mr. Lepselter, you know.

11      **Q.   This e-mail is on Page 33.  Is that an**

12  **e-mail from you -- that's that your e-mail address,**

13  **right?**

14      A.   This appears to be an e-mail from Val to

15  Mary wishing her happy New Year and asking her a

16  question.

17      **Q.   Is there a particular reason that you were**

18  **wishing her a happy New Year?**

19      A.   I always wished her a happy New Year.  It

20  was a time -- we just had Christmas, but, you know,

21  circumstances changed.

22          "Sorry to be late.  Tom and I were working

23  with Ed."

24          I was expressing to her -- You can scroll

25  up.

Page 39

1          What date?  This is on New Year's Eve,

2   okay.  We are still looking, right.  This is --

3   yeah.  I remember this.

4        **Q.   Tell me about this e-mail.  Why -- what**

5   **was the reason of asking --**

6            **First of all, you didn't have a set of**

7   **rules and regulations, bylaws with the Association?**

8        A.   I did.

9            MR. LUBLINER:  Val, let him finish the

10       question.

11       A.   I'm sorry.  He said you didn't have the

12  rules, and I said, no, we did have the rules.

13           I said in this e-mail that the rules that

14  I had I received when I purchased in 2018, and on

15  them was the date 2015, and they were provided to me

16  by Ms. McFadden prior to purchase.  And I was asking

17  Ms. McFadden to share with me the most recent

18  version so that I could share it with my prospective

19  tenant.  No surprises, a fee or rules about pets and

20  other matters.

21           So this e-mail was an effort to be a

22  responsible landlord and get the latest rules and

23  regs so that a prospective tenant wouldn't be

24  shocked by something that he could not do after they

25  signed the lease.  It's my obligation to know what

Page 40

1  the current rules -- to get in my hand current

2  rules, give them to Ed and let him deal with it.

3      Q.   You wanted to know if there had been

4  updates since 2018?

5      A.   Yes, correct.

6      Q.   And were you given any updates?

7      A.   Yes, I believe I was given paperwork.

8      Q.   You provided that to Mr. Lepselter to

9  provide it to the prospective tenant?

10     A.   Yes.

11          Wait.

12     Q.   Tell me when you are done.

13          You stated there were some new updates,

14  rules and regulations that you were provided to

15  provide to Mr. Lepselter and the prospective tenant?

16     A.   I don't know when I got them.  I expect in

17  advance I think.  I don't know.

18     Q.   You eventually -- did you eventually get

19  updated rules?

20     A.   I believe I did.  I believe I got what

21  Mary told me were updated rules.  I don't know

22  whether they were, but I got them.

23     Q.   You got something from Mary as updated

24  rules?

25     A.   I got something.

Page 41

1       Q.    Would that be a fair statement?

2       A.    I got something from Mary that she stated

3   were updated rules, that is correct.

4       Q.    Do you have any reason to believe that

5   those were not updated rules?

6       A.    There were a lot --

7             MR. LUBLINER:   Form.

8       A.    -- and I'm not really certain what were --

9   they weren't all dated.   Looked suspicious, all the

10  rules and regs.   They were probably gotten -- I did

11  receive something from her, yes.

12      Q.    Did you question the rules that you

13  received as to whether they were properly by the

14  board?

15            MR. LUBLINER:   Form.

16      A.    I don't know if I did at that time.

17      Q.    You say "at that time."   Did you ever do

18  that?

19      A.    I find some of the rules -- some of the --

20  at this time, I'm not certain that all of the rule

21  changes were properly adopted, and I'm not -- that

22  every time there is a new rule making it has been

23  properly done, because in my experience, there is

24  still a lot of things done that may or may not be

25  per the rules -- per, actually, the bylaws.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

1           So, right now, I can't say with

2  100 percent certainty what Mary gave me in January

3  '21 were, in fact, rules that were properly adopted.

4  I can't say that.  I don't know.  Properly adopted,

5  I cannot say they were.

6       **Q.   Did you receive the rules from Mary**

7  **that --**

8           **I want to make sure I understand.  Did you**

9  **receive rules from Mary after requesting updated --**

10 **whatever updates were available?**

11      A.   I'm sorry?

12      **Q.   You can't confirm whether they were**

13 **properly adopted or not?**

14      A.   That is correct.  I received an e-mail,

15 which I believe I forwarded.

16      **Q.   Did you respond to Ms. McFadden and ask if**

17 **those rules were properly adopted?**

18      A.   I don't know.  I don't remember if I asked

19 that question.

20      **Q.   Did she forward those rules to**

21 **Mr. Lepselter to provide to the prospective tenant,**

22 **Mr. Wilcox?**

23      A.   Yes.  I absolutely am certain that I

24 consider it my duty and always give the rules and

25 regulations as I understand them to any prospective

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 43

1  tenant so that they can see the limitations while

2  living there before they sign the lease.  That's my

3  custom.  I believe that was the case.

4       Q.   Do you know whose job it was to adopt the

5  new rules and regulations?  Was it Mary McFadden and

6  her company or was it the board of directors?

7            MR. LUBLINER:  Form.

8       A.   I think it was the board's obligation to

9  adopt new rules and hold a meeting, and you have to

10 have 14 days after notifying all the owners that you

11 are going to adopt new rules so that if they want to

12 confirm them, they can confirm them.  I am not

13 100 percent sure of that.  I'm pretty sure it is up

14 to the board of directors.

15      Q.   You are not saying that Mary did anything

16 improper with regards to new rules and regulations

17 that she provided to you, correct?

18      A.   I don't know.  She might have done

19 something improper.

20      Q.   What is that?

21      A.   Well --

22           MR. LUBLINER:  Form.

23      A.   -- I got a lot of information that seems a

24 little concerning, rules and regs that were

25 purported to be enclosed that had no date, so it

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 44

1   made me now suspicious.  Maybe in January it wasn't.

2        **Q.   Are you just basing your suspicions on**

3   **things that have transpired since January 2021 or on**

4   **some actual factual information you have that raises**

5   **that suspicion?**

6             MR. LUBLINER:  Form.

7        A.   From January of '21 to now, there have

8   been a number of sets of rules and regs circulated,

9   and I'm not certain which were in place when right

10  now.  Was not being clear -- wasn't made clear upon

11  adoption when they were adopted.  So I'm not certain

12  that what Mary was telling me was accurate because

13  things were not dated always.  Things were not

14  always dated.

15       **Q.   In your mind, the fact that rules may not**

16  **have had a date next to them was suspicious as to**

17  **their validity?**

18            MR. LUBLINER:  Form.

19       A.   Correct.  I find it compounding to read

20  the rules that have no date on them.  No -- you

21  should study them.  The point being when somebody

22  gives you rules, it has no date, you don't know if

23  they are from the board or not.  You can't make a

24  decision, so I find them suspicious.

25       **Q.   And you testified you never expressed that**

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 45

1  to anybody either at the Association or to

2  Ms. McFadden that you did not believe the rules were

3  properly adopted?

4       A.   I learned a lot this past year.

5       Q.   Are you basing your suspicion of the rules

6  that Ms. McFadden provided to you based on what has

7  transpired among some of these parties since

8  Mr. Wilcox rented the unit or are you basing it on

9  actual information that you know that meetings were

10 not properly called or rules were not properly

11 followed?

12            MR. LUBLINER:   Form.

13      A.   I don't know if meetings were properly

14 called.  We are not -- as an owner, we are not

15 always informed, so we are not always advised.  So

16 now I have become suspicious of rule making rules

17 that may have been done without proper authority,

18 without notice.  I can't tell you this rule making

19 was not properly done, but I have asked the current

20 manager, Ms. Childrey, about this question, and I

21 never received an answer.  I don't know when rules

22 were properly adopted and when they were improperly

23 adopted.

24      Q.   Are you saying that you are not getting

25 notices to meetings or meetings are not being

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 46

1  noticed?

2      A.   I'm saying that if we were to go back in

3  time to every set of rules, I don't know that they

4  were properly adopted per the bylaws -- the

5  declaration and bylaws in the State of Florida.  I

6  don't know that.  I would love to see that

7  information.

8      Q.   Are you alluding to Ms. McFadden having

9  done something wrong with regards to these new rules

10 and regulations or is this something that was --

11          MR. LUBLINER:  Form.

12     A.   Could not tell you whose responsibility it

13 is.  All I know is that there seems to be things

14 going on that may not be authorized.  Whether it is

15 the board doing it, whether it was Mary doing it, I

16 don't know.

17     Q.   Can you give me an example more

18 specifically of what you are referring to, things

19 that were not authorized?

20          MR. LUBLINER:  I'm going to object for the

21      record.  While Ms. Manzo is an attorney, she is

22      a third-party lay witness, and she is a fact

23      witness and not testifying with respect to

24      whether or not something was or was not

25      noticed.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

1           MR. ISRAEL:  I'm not asking her as an

2      expert whether things were properly passed or

3      not.  I'm asking what her factual knowledge is.

4      She is suspicious of the rule.  I'm trying to

5      figure out which ones, which ones she believes

6      are problematic.

7           MR. LUBLINER:  She said she couldn't point

8      to any of them.

9      **Q.   (By Mr. Israel) Is that your testimony,**

10 **Ms. Manzo?  So you can't pinpoint to any particular**

11 **rule or regulation that you now find to be in your mind**

12 **problematic in how they may have been passed?**

13      A.   I can't point to any specific rule or

14 regulation that wasn't properly authorized.

15 Information is not always shared.  Whether or not

16 they were properly adopted would require some

17 background documentation, and I have not seen, so I

18 can't point and say these were not done properly or

19 these were done properly.

20      **Q.   As we sit here today -- Sorry.  Go ahead.**

21      A.   Because I don't have the background

22 information, so I don't know.  All I'm saying is

23 that I'm suspicious and it bears further research.

24      **Q.   As we sit here today, you have a hunch**

25 **that some of the rules may not be proper, but you**

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 48

1  don't have any specific information or instances to

2  provide us with any specific rule that you believe

3  or know factually to be not properly passed?

4          MR. LUBLINER:  Form.

5      A.   I can't point to a specific thing because

6  the board and Mary had all the information, and I do

7  not.  They would know.  They or maybe Donna

8  Childrey, the new manager, might know.  When I

9  asked, I didn't get it, so I don't know.

10     Q.   So did you make a formal request for

11 documents to the new property management company?

12     A.   I did.  I did.

13     Q.   You did?

14     A.   Yes.

15     Q.   Okay.  You didn't get a response?  This is

16 your position?

17     A.   Not to that part of my question.

18     Q.   Okay.

19     A.   I can't see you anymore.  I'm still

20 looking at your screen, but I can't see people.

21         MR. LUBLINER:  When it is appropriate, I

22     don't want to interrupt your questioning, but

23     can we take a five-minute bathroom break?

24         MR. ISRAEL:  Absolutely.  Just do it now.

25     Be back in five minutes.  Thank you.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 49

1              (Recess taken from 10:48 a.m. until 10:57

2       a.m.)

3       Q.    (By Mr. Israel) Ms. Manzo, are you ready?

4       A.    Yes.

5       Q.    Let me ask you a question.  I should have

6  asked you earlier.  What did you do to prepare for

7  this deposition?

8       A.    I spoke to my lawyer and --

9       Q.    Who's that?

10             MR. LUBLINER:  Val, I instruct you not to

11      answer the question.

12             MR. ISRAEL:  I don't want to know what you

13      spoke about.  She spoke to her lawyer.

14      A.    Yeah, Mr. Lubliner.

15      Q.    (By Mr. Israel) You spoke to Mr. Lubliner.

16  Don't tell me what you said.  I'm not asking you that.

17  Anything else?

18      A.    I looked through some of the e-mails.

19      Q.    So let's go on.  I think we discussed the

20  issue of the rules, if I understood your testimony

21  correctly, that you have some issues with some of

22  the rules and whether they are outdated or properly

23  passed or not.

24      A.    Yes.

25      Q.    Would that be accurate?

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 50

1      A.    Yes.

2      Q.    Now, on January 4th, I guess your

3 husband -- his name is Tom?  Is that his name?

4      A.    Yes, Tom.

5      Q.    Is it okay if I call him Tom?

6      A.    Okay with me.

7      Q.    Tom wrote to Mr. Lepselter.  I guess you

8 were negotiating with Mr. Wilcox the lease terms.

9 Is that what this e-mail would be about?

10     A.    This was a very early on negotiation, yes.

11     Q.    And in this negotiation, there was a

12 discussion, number three, for renewal option,

13 correct?

14     A.    Correct, which was changed at the time we

15 were discussing this.

16     Q.    Say that one more time.

17     A.    Number three and number four were early

18 iterations of the negotiation.

19     Q.    Those eventually changed, correct?

20     A.    Correct.

21     Q.    Did you -- since you testified earlier

22 that you never had a two-year lease, did you ever

23 ask anybody at the Association whether two-year

24 leases were permitted?

25     A.    I never -- I only spoke to Mary about

United Reporting, Inc.
(954) 525-2221

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 51

1  anything.

2       Q.   Did you ever ask Ms. McFadden whether

3  two-year leases were permitted?

4       A.   I did not ask May that, no, as I recall.

5       Q.   Some of these items later on changed,

6  right?

7       A.   Correct.  They changed later on.

8       Q.   Were you concerned about an early

9  termination by the tenant?

10       A.   No.

11       Q.   Was there any suggestion that he was only

12  going to be there for a limited period of time?

13       A.   No, there was no concern.

14       Q.   Why was four being discussed?

15       A.   In the past when I was a landlord in other

16  cases, at times we negotiated the tenant's time for

17  a mutually agreeable early termination option.  That

18  did not become the case here where either could

19  terminate on 90 days' notice because things happen.

20  And although it might be unusual, it was always my

21  belief that as long as you work together, sometimes

22  the tenant can get out, sometimes the landlord needs

23  to get out for good reasons, so perhaps that's a

24  negotiated item that the tenant can get out.  He

25  gives me 90 days, I find the next tenant, he can get

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 52

```
 1  out.  If I need to sell, I give him 90 days' notice

 2  to find a new place to live, I can get out.

 3          So in the past, I built in 90-day outs

 4  because I thought that was fair.  As long as it was

 5  negotiated, it was fair for both sides.

 6      Q.   Such as was your experience as a landlord?

 7      A.   That's correct.

 8      Q.   To have that kind of language in the

 9  lease, correct?

10      A.   That is correct.

11      Q.   And here there is a note I guess we

12  alluded to about service dogs couldn't -- you

13  couldn't charge a deposit for a service animal?

14      A.   It was Tom who found out that there are

15  special rules about service animals and fees.

16      Q.   When did you first find out that

17  Mr. Wilcox had an animal or dog with him?

18      A.   I believe I found out quite early in the

19  negotiation that he had a service animal because he

20  had that service animal before he became interested

21  in 303.

22      Q.   And do you know what Mr. Wilcox's service

23  animal does for him?

24      A.   No, I don't.

25      Q.   Did you ever ask?
```

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 53

1     A.   No.  I don't know if it is lawful to ask.

2     **Q.   Do you know what to this day the service**

3 **animal does for Mr. Wilcox?**

4     A.   I still do not know what the service

5 animal does.

6     **Q.   And this is a service animal, emotional**

7 **animal?**

8     A.   That's correct.

9     **Q.   Do you know, were you ever told what**

10 **training this animal had in order to assist**

11 **Mr. Wilcox?**

12     A.   I know that Mr. Wilcox still does 14-page

13 documents detailing everything and submitted it.

14 You know, I believe he submitted it in advance, and

15 it was -- I was told by Mary that it was approved,

16 and I was also told by Mary that it would be better

17 by a lawyer of her choosing or the board's choosing.

18 I didn't know which, and I left it in their hands.

19     **Q.   So in your mind, you knew that there would**

20 **be an animal and as long as the Association approved**

21 **it, you didn't object to the animal?**

22     A.   It is unlawful to object.

23     **Q.   I'm sorry?**

24     A.   It would have been unlawful for me to

25 object to a tenant service animal.  It would have

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 54

1  been a violation of federal law, so I didn't.  Once

2  he got permission, he was good to go.

3       Q.   And that animal didn't -- did Mary --

4            Did you have a conversation with Mary

5  where Mary advised you that the Association's

6  attorney was reviewing the service animal

7  obligation?

8       A.   There were many e-mails back and forth

9  about the animal.  Many.  And I'm sure you have them

10  all.

11      Q.   And you recall where you were told that

12  the association's attorney was doing that?

13      A.   When we found out that Mr. Wilcox had a

14  service animal, I informed Mary.  That was -- it was

15  my duty to inform Mary.  I did not speak with anyone

16  on the board about the animal.  I informed her and

17  said to her in many e-mails what do you need from me

18  for Mr. Wilcox, and on many instances there was

19  discussion back and forth almost always in e-mail

20  about the animal, about what it meant, and there was

21  one -- it was either a phone call or e-mail where

22  she said to me there is a process.  We have a

23  lawyer.  We will speak to the lawyer.  He

24  investigates and then he reports to us.

25            Again, I don't know who reported to Mary,

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 55

1  who reported to the board.  I wasn't involved in

2  that level of discussion.  He lets us know that this

3  is a legitimate service animal, and then will tell

4  you he may -- your tenant, your prospective tenant

5  may have the animal.

6       **Q.    There is an e-mail from Mary to you?**

7       A.    I didn't say it was in an e-mail.  It

8  could have been a phone call.  I could look at my

9  e-mails.  You have my e-mails to Mary.  We produced

10 them.  You got the production.

11           It could have been a phone call.  It could

12 have been an e-mail, but she told me about the

13 process, and they followed the process.

14      **Q.    On January 5th, you got a confirmation.**

15 **This is an e-mail I guess from Roy Gelber to**

16 **Lepselter where they confirmed that neither**

17 **Mr. Wilcox nor Ms. Luchey are smokers, don't plan to**

18 **smoke in the unit, correct?**

19      A.    That's correct.

20      **Q.    That was taken off the negotiations?**

21      A.    Uh-huh, yes.

22      **Q.    That was on or about January 5th, 2021,**

23 **correct?**

24      A.    Correct.

25      **Q.    Now, up until January 5th, 2021, the**

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 56

1  starting date for Mr. Wilcox to move in is

2  January 25th, but there is no signed lease up to

3  that point, right?

4       A.   There could be no signed lease because we

5  still didn't know about the dog.

6       Q.   You are still negotiating, correct?

7       A.   And we were still negotiating, that's

8  correct.

9       Q.   Okay.  So here is an e-mail in the morning

10  of 9:48 a.m. from you to Mr. Lepselter.

11            Who is mmpfeiff?

12       A.   That's my of counsel.

13       Q.   That's a lawyer in your firm?

14       A.   She is in her firm.  She is of counsel to

15  me.

16       Q.   She was helping you with this transaction

17  or this lease?

18       A.   On occasion, she was consulted.

19       Q.   And this is to advise Mr. Lepselter how

20  payments were going to be made, correct?

21       A.   Yeah.  I wanted to assure him that he

22  would be paid.

23       Q.   The money was -- Mr. Wilcox was paying

24  under the lease, it was coming to La Pensee 303,

25  LLC, and La Pensee was going to make payment to the

Page 57

1  realtor?

2       A.    That's correct.

3       Q.    **Going to an escrow account?**

4       A.    Yes.

5       Q.    **Was Ms. Luchey going to be a tenant under**

6  **the lease or was she just going to be a guest of**

7  **Mr. Wilcox?**

8       A.    Initially, I was under the impression she

9  would be a tenant.  It later became that she was not

10  a tenant, but she was a legal resident because she

11  submitted an application, she paid the $150 fee.

12  She was given a pool pass, a parking pass, all the

13  authority of a resident.  She was never a guest.

14  She was also never a tenant.

15       Q.    **She was not a party to the lease?**

16       A.    That's correct.

17       Q.    **And why was Ms. Luchey not a party of the**

18  **lease?**

19       A.    I don't know.

20       Q.    **Is that something that was requested by**

21  **your side or something that was requested by**

22  **Wilcox's side?**

23       A.    I would -- I requested that she sign, and

24  she did not.  What -- how it came to be, I don't

25  know.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 58

1     Q.   You would have preferred Ms. Luchey sign

2 on the lease if she was going to be residing in the

3 unit, correct?

4     A.   Yes.

5     Q.   That's not what eventually happened?

6     A.   That is correct.

7     Q.   But as of January 5th, 2021 when

8 negotiations were going on regarding the lease, you

9 expected Ms. Luchey to be a tenant under the lease?

10    A.   Yes, that is correct.  That's correct.  I

11 expected in the process, yes, to be a tenant.

12    Q.   Were you also asking for Ms. Luchey's

13 current address prior to La Pensee?

14    A.   Current -- I don't follow you.

15    Q.   There is an e-mail here from January 5th.

16    A.   Right.

17    Q.   Last name and address as well.

18    A.   Correct.

19    Q.   Was there a reason you needed Ms. Luchey's

20 then current address?

21    A.   Well, on January 5th, I thought she was a

22 tenant.  I still thought that, so I would have put

23 her in the tenant space, her name and address.

24    Q.   On January 5th, you were asking for an

25 application for Mr. Wilcox and Ms. Luchey to fill

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 59

1   out to move into -- to be approved to move into

2   La Pensee Condominium?

3        A.   Yes.

4        Q.   And you eventually did receive that from

5   Ms. McFadden?

6        A.   No.

7        Q.   You never received the application?

8        A.   Eventually, I did, but I believe the blank

9   one, which is what we were looking for, was given

10  either to Mr. Gelber or directed to Mr. Wilcox.  I

11  don't know how he got it, but we got it and he

12  filled it out.  Eventually, I did receive a filled

13  out one.

14       Q.   Let me show you --

15       A.   Must have put her address.  I thought she

16  would --

17            I'm sorry.  You don't have a question for

18  me.

19       Q.   This is -- it is called Standard Lease

20  Agreement.

21       A.   Yes.

22       Q.   And was this an iteration of a lease that

23  was prepared for the 303 condominium unit with

24  Mr. Wilcox?

25            MR. LUBLINER:  Show us the whole document,

United Reporting, Inc.
(954) 525-2221

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 60

1      please.

2      A.   Up until that point, it is an early

3  unsigned version of the lease.

4      **Q.   This was prepared by you or your office?**

5      A.   That is correct.

6      **Q.   This was sent to Mr. Lepselter, and he**

7  **sent it over to Mr. Gelber for Mr. Wilcox to review,**

8  **correct?**

9      A.   I assume that's what it is.  I don't know

10  for a fact, but it ended up in the hands of

11  Mr. Wilcox I would imagine.

12     **Q.   It is an early draft document, and every**

13  **page seems to be in this draft lease, correct?**

14     A.   Correct.  It seems to be, yes.

15     **Q.   This is dated January 25th, 2021, and it**

16  **has La Pensee 303 as the landlord and Mr. Wilcox and**

17  **Ms. Luchey as tenants, correct?**

18     A.   Correct.

19     **Q.   In this iteration, there is a**

20  **January 25th, 2021 start date and an end date of**

21  **January 24th, 2022, correct?**

22     A.   Correct.

23     **Q.   And the total amount for this lease paid**

24  **January 15 -- by January 15, 2021 was $46,800 plus**

25  **$3,900, correct?**

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 61

 1        A.   Correct.

 2        Q.   **Now, this particular document was not**

 3  **actually signed, correct?**

 4        A.   That's correct.

 5        Q.   **There were further negotiations and**

 6  **changes, right?**

 7        A.   That's correct.

 8        Q.   **And you had an early termination provision**

 9  **in here?**

10        A.   Yes, that's correct.

11        Q.   **I highlighted it.**

12             **In any event, early termination talks**

13  **about domestic violence.**

14             **Why would you have domestic violence?   Is**

15  **there a reason why you have domestic violence, early**

16  **termination by one of the tenants?**

17        A.   Not for these two.  Just in general.  I

18  think in New York State you have to let a tenant out

19  if they have been subject to domestic violence.  So

20  I think this is just as a matter of routine I put it

21  into all of my leases, and I certainly would let a

22  victim of domestic violence out of a lease she had

23  with me or he.  So I think I just include that all

24  the time.

25        Q.   **It wasn't in -- I'm sorry.  Go ahead.**

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 62

1      A.   I think in New York it might be required,

2 and that is why I put it in.

3      **Q.   It wasn't anything in particular that you**

4 **suspected or knew at the time you put this in?**

5      A.   Oh, no.  No, no.  Nothing -- I knew

6 nothing to make me put that in.  I would imagine if

7 I look at the other two leases, it probably has

8 that, too.  I don't know.

9      **Q.   Do you know if there's any domestic**

10 **violence issues between Ms. Luchey and Mr. Wilcox?**

11      A.   No.  None at all.

12      **Q.   Nobody has informed you of any such thing,**

13 **correct?**

14      A.   No, no.  Definitely not.

15      **Q.   This version of the lease has a provision**

16 **for renewal?**

17           MR. LUBLINER:  Form.

18      A.   I don't -- I don't know.  I have to look.

19 I'm sorry, I have to look at it again.  I don't

20 remember.

21      **Q.   I was looking for it, too.**

22      A.   I was always interested in keeping the

23 same tenant, but I don't remember if this particular

24 iteration provided such.

25      **Q.   I'm going to scroll down slowly, and you**

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 63

1  tell me --

2       A.   I think it might be above.  You scrolled a

3  little too quickly.

4            Oh, this provides for possible extension,

5  which this paragraph got changed completely.  But,

6  initially, we offered to extend it, the option of

7  both.

8       Q.   So the lease contemplated a possible

9  extension at or before the conclusion of this term,

10 the current term?

11      A.   Yes.

12      Q.   That was eventually negotiated

13 differently, right?

14           MR. LUBLINER:  Form.

15      A.   It was negotiated to end in a different

16 fashion.

17      Q.   Were any of these terms reviewed by the

18 Association prior to execution of the lease?

19           MR. LUBLINER:  Form.

20      A.   I wouldn't know the answer to that.

21      Q.   Do you know if --

22      A.   Oh, wait a minute.  I do know the answer.

23 I think Mr. Rosati may have had a copy of it when he

24 met with Mr. Wilcox, but I don't know.  You have to

25 ask Mr. Rosati.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 64

1       Q.   Do you know what version Mr. Rosati would

2  have had --

3       A.   No.

4       Q.   -- before he met Mr. Wilcox?

5       A.   No, I would not know.

6       Q.   You weren't at that meeting?

7       A.   No, I wasn't involved at all.

8       Q.   There is a retaliation provision in this

9  lease.  Can you tell me why you put that in the

10 lease, what for?

11      A.   I think this is standard information for

12 me.  You know, I've been practicing 42 years.  You

13 end up with paragraphs from -- as you well know,

14 from all kinds of agreements, and, you know, other

15 lawyers' documents and so on.  There wasn't anything

16 anticipated that would make me put that in.  For me,

17 that was a standard paragraph.

18      Q.   You weren't expecting to decrease or

19 cancel services?

20      A.   No.  I have never done that.  I've been a

21 landlord since 1985, and I've never ever done that.

22 And I have a hunch this is also a requirement in New

23 York that you are not permitted to do retaliatory

24 things, utilities increasing, failure to repair.  I

25 believe that this is probably a New York thing.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 65

1      Q.   You didn't expect that you were going to

2  do that?

3      A.   No.  I certainly wouldn't do that, no.

4      Q.   And Mr. Wilcox, did he ask you to put this

5  provision in?

6      A.   No, he did not.

7      Q.   There is this thing in here, and it is in

8  bold.  I presume this was added by you?

9      A.   Yes.

10      Q.   "Mary McFadden will, per La Pensee rules,

11  submit medical records provided by tenant

12  establishing need for this animal to be a service

13  animal to a lawyer hired by the board for

14  confirmation of same."

15      A.   There is no question.  What is the

16  question?

17      Q.   What was the reason to add this in?

18      A.   This was to clarify what I had been told

19  by Ms. McFadden that she told me per the rules --

20  again, I don't know if she was right or wrong, but

21  she had told me per the rules she was to submit

22  whatever Mr. Wilcox gave her to an attorney of the

23  choosing of the board or our choosing, I don't know

24  who, to establish the need for the animal and that

25  she would let me know the end result.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 66

1          I was telling -- I put it in there so he

2 would know there is a process of which I'm not

3 involved.  It involves the board and Mary and a

4 lawyer, not me.

5     **Q.   You said the board and Mr. Wilcox filled**

6 **out an application for the service animal.  Do you**

7 **know if he provided medical records also?**

8     A.   You have to ask him that, but I believe

9 so.  I believe he did.  Although I have since

10 learned that inquiring as to the medical needs may

11 be prohibited by federal law, but I don't know.  I'm

12 not an expert in this area, so I don't know if he

13 did or he didn't.  I think he did.  You have to ask

14 him.

15    **Q.   Whatever he provided, the Association**

16 **eventually approved the animal, correct?**

17    A.   Yes.

18    **Q.   So on January 6, the tenant's application**

19 **was obtained and sent by your husband, Tom, to**

20 **Mr. Lepselter, correct?  Is that what this is?**

21    A.   This appears to be so, yes.  This appears

22 to be Tom assisting Ed by forwarding a better

23 version of the renter's application, which I believe

24 was generated by La Pensee.

25    **Q.   So by January -- it appears on January 5th**

7b52fb0a-6c70-4996-ae26-fc24236ecc16

1  your application has been requested.  By January 6,

2  you have obtained a copy of the application,

3  correct?

4       A.   Yeah.   That is why I remember it, because

5  Tom did it, yeah.

6       Q.   And do you recall whether this is an

7  accurate copy of the application that was found in

8  Mr. Lepselter's files, production?

9       A.   I couldn't tell you what was in

10  Mr. Lepselter's file.  It appears to be the one

11  that -- that much later, we did get a copy of it

12  filled out, but, initially, once we forwarded it

13  empty, we sent it to Ed and didn't ask for it back

14  because it was meant to go to the Association -- to

15  Mary.  It was meant to go to Mary McFadden.

16       Q.   You did not see the filled out application

17  at the time, but later on you received a copy of it,

18  the filled out application?

19       A.   Yeah.  I believe I had it at some point.

20  Not on January 6th, 7th or 8th, but at some point it

21  comes to us.  I couldn't tell you when.  I don't

22  remember when.

23       Q.   Do you recall having to sign the last page

24  of the application?

25       A.   No, I don't, but I'm sure if Ed told me to

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 68

1  do it, I did it.

2       Q.   You would have done that and confirmed it?

3       A.   Yes.

4       Q.   Here is the signature page; is that

5  correct?

6       A.   Yes.

7       Q.   And just the application, was Mr. Wilcox

8  and Ms. Luchey's names on it, correct?

9       A.   Correct.  Correct.

10       Q.   That is your signature, right?

11       A.   Yes.  That is my signature and Mr. Wilcox.

12       Q.   This application, it doesn't have a

13  signature for Ms. Luchey, correct?

14       A.   Correct.

15            Well, I believe they each signed a

16  separate one perhaps.  There is only room for one

17  signature here.  Maybe she filled out a different

18  one.

19       Q.   Do you recall signing her application as

20  well?

21       A.   No, I don't recall, but I know she paid a

22  separate fee.  They each paid a fee.

23       Q.   Those fees were paid directly by

24  Mr. Wilcox and Ms. Luchey?

25       A.   That's correct.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

1      **Q.    How do you know they paid a fee?**

2      A.    I think I saw checks, and I was told by

3  Mary they paid.

4      **Q.    On January 6, I guess you were back and**

5  **forth with Mr. Lepselter regarding some changes to**

6  **the draft lease, correct?**

7      A.    Right.  Yes.  I remember this.

8      **Q.    Tell me about this.**

9      A.    Well, Mr. Wilcox, as it says here, he

10  wanted a guarantee that the rent would stay at four,

11  and I said, well, if that's what he wants, it can't

12  be that optional.  If it were strictly an option to

13  renew, then I would maybe raise the rent.  So I said

14  if he wants the rental at a rate to remain fixed, he

15  has to sign a two-year lease and then forget the

16  90-day out.

17          So if he wants the current rate -- and it

18  could have gone the other way.  When you exercise an

19  option to renew, the new rate applies then.

20          So he wanted security, I wanted a longer

21  term.  Knowing this one-year rule, I didn't want to

22  get caught up again with the one-year rule.  So I

23  figured it is cheaper for me to just go two years.

24      **Q.    At this time, you did not have a**

25  **conversation with anybody at the Association**

Page 70

1  regarding the two-year lease, right?

2      A.   No, I did not.  I never talked to the

3  Association.  I mean --

4           You mean the board or who do you mean?

5      Q.   Let's start with did you ever talk to --

6           You said most of your conversations were

7  with Mary McFadden.  Did you ever speak to Mary

8  McFadden about how long the term could be for this

9  lease?

10     A.   I don't think I did.

11     Q.   Did you ever read the Association's rules

12 and regulations or bylaws dealing with rentals?

13     A.   I did.

14     Q.   Prior to the execution of the final lease

15 agreement with this unit with Mr. Wilcox?

16     A.   I reviewed the rules and regs when I

17 purchased in great detail.  If I got new ones from

18 Mary, each time I got new ones, I read them.

19          Did I memorize the rules?  No, probably

20 not.

21          I never saw the limitation, and you can't

22 have a two-year lease, ever.

23     Q.   Do you recall seeing anything regarding --

24     A.   Just the once a year part.  I remember

25 seeing that.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 71

1          I think right now there is no limitation

2 on two-year leases.

3      **Q.   Did you ever find that out with either**

4 **Ms. McFadden or anyone on the board?**

5      A.   Did I ever think it?  No, no, because I

6 never paid attention.  Why would they care?

7          I think they would like the stability of

8 the person that sticks around instead of having

9 transients.  That's the whole point of the one-year

10 lease.  It's not an airbnb.  You don't have

11 transients coming and going, which nobody likes.

12         Me as an owner, I still live there.  I

13 don't want transients coming and going.  So I am an

14 owner.  I am going to live there after we rent.  So

15 I was all for the no transient idea.  To me, two

16 years is stability.  That's the same person for two

17 years as an owner and as a landlady.  As an owner,

18 that's a good thing in my opinion.

19     **Q.   That's your opinion, correct?**

20     A.   That's my opinion.

21     **Q.   Your view?**

22     A.   My view.

23     **Q.   Never --**

24     A.   As a landlord.

25     **Q.   I'm sorry?**

United Reporting, Inc.
(954) 525-2221

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 72

1      A.   My view as a landlord in a multiple

2 dwelling is stability.  It is better than

3 transients.  My personal opinion.

4      **Q.   You never verified, though, whether the**

5 **board allowed your lease; would that be a fair**

6 **statement?**

7      A.   It would a fair statement that I have

8 never seen a limitation in any of the iterations of

9 rules and regs that have ever been sent.  Never been

10 a rule that says you can't have a two-year lease.

11 There was no lease requirement.

12      **Q.   So is it your position that the lease**

13 **could be indefinite or five years maybe?**

14      A.   Is it my position now?  I think, yeah.  I

15 think so.  I think if I can find somebody that

16 wanted a five-year lease, they checked out and I

17 vetted them, I would sign them because the rules

18 don't say that.

19      **Q.   You just said it's your position now.**

20 **What was your position in early January of --**

21      A.   The same.

22      **Q.   -- of 2021?**

23      A.   Yes.  I'm sorry.  What was my position as

24 to --

25      **Q.   On January 5th or 6th of 2021, the same?**

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 73

1    A.   The same.

2    **Q.   No limitations?**

3    A.   No limitations.

4    **Q.   Once the Association approved the tenant,**

5  **whether a term -- you and the tenant, you as**

6  **landlord and the tenant decided that's what the**

7  **tenant would stay, that's your position?**

8    A.   That's my position.

9    **Q.   Do you recall this e-mail to Ed -- I**

10 **believe it's the same one we just looked at,**

11 **correct?**

12   A.   A little different, but I do recall having

13 a further conversation.  There was a lot of

14 conversations back and forth in e-mail, yes.

15   **Q.   There was a lot of negotiating going on**

16 **regarding the term, the renewal, the price and so**

17 **on, correct?**

18   A.   You are correct.

19   **Q.   The Association or Mary McFadden were not**

20 **involved in any negotiation or changes to the lease**

21 **or terms that were changed or moved or modified**

22 **between you and Mr. Wilcox, correct?**

23        MR. LUBLINER:  Form.

24   A.   I don't know what the board knew or what

25 Mary knew, because this was a third lease with

United Reporting, Inc.
(954) 525-2221

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 74

1 Mr. Lepselter, and all of my discussions were had

2 with Mr. Lepselter.  He then conveyed this

3 presumably, and I don't know this, to Gelber and

4 then to Mr. Wilcox.  I only spoke with Mary and Ed

5 and her.

6     Q.   Did she ever have a conversation with Mary

7 McFadden regarding the terms of the lease that were

8 being discussed with Mr. Wilcox?

9     A.   I don't remember a specific conversation

10 with Mary, and I don't think I saw an e-mail -- I

11 produced all the e-mails -- as to the term, but I

12 thought she had -- she had the lease, so she would

13 know.

14     Q.   She had -- she eventually had the lease,

15 but not while when you and Mr. Wilcox were

16 negotiating, correct?

17          MR. LUBLINER:  Form.

18     A.   I don't know when she first got the lease.

19 Right this second, I couldn't tell you when she

20 first got it, but clearly she should have had it by

21 the time he got the key because she gave me the

22 green light to let him move in.  At some point

23 between January 5th and January 25th, Mary McFadden

24 had the lease because she said green light, your guy

25 can move in.  Pool passes.  He got the whole

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 75

1 enchilada.  Everything he had to get.  Two tenants

2 living there.

3     Q.   At some point between the 5th, as you say,

4 and the 25th, Ms. McFadden would have received a

5 lease --

6     A.   Correct.

7     Q.   -- correct?

8     A.   Correct.

9     Q.   But between the beginning of January 2021

10 and the execution of the final lease, Ms. McFadden

11 was not given a copy of the different iterations of

12 the lease, the changes and provisions of the lease;

13 is that correct?

14     A.   I don't know that.  I don't know that.  I

15 don't know what she was getting.  I didn't --

16     Q.   Were you sending her copies of the lease?

17     A.   No.  I wasn't sending her.  Ed was.

18     Q.   She was not --

19     A.   Not from me, but you said she wasn't

20 getting it.  I can't say that.  She dealt with other

21 people.

22     Q.   Other people would have been Ed Lepselter?

23     A.   Ed, Roy, David.  You asked me today if she

24 never got it.  I don't know that she never got it.

25     Q.   From you?

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 76

1      A.    No.   Not from me, no.

2      Q.    **She never got the different iterations of**

3  **the lease from you?**

4      A.    Correct.

5      Q.    **You didn't think it was necessary to**

6  **include either Ms. McFadden or the board in your**

7  **negotiations with Mr. Wilcox; would that be an**

8  **accurate statement?**

9      A.    I was told by Mary McFadden that he had

10  his application waiting on his residence and his

11  animal, and he would be -- and he and she would be

12  investigated.  The credit would be pulled, the

13  animal would be researched, and then they would let

14  me know if he could move in -- if they could move in

15  if they were accepted.

16          And at that point, Ms. McFadden would have

17  a lease that was signed by both signers.  When all

18  of those things cleared, he moved in, end.

19      Q.    **My question was a little bit different.**

20      A.    Okay.  What is the question?

21      Q.    **I asked whether you were negotiating with**

22  **Mr. Wilcox, you, not -- I'm not asking what**

23  **Mr. Lepselter was doing.  I'm not asking what the**

24  **lawyer was doing or what Mr. Wilcox was doing.  I**

25  **asked a different time.**

7b52fb0a-6c70-4996-ae26-fc24236ecc16

1          **What I'm asking you is you were not**

2  **talking to Mary McFadden or the board with different**

3  **iterations of negotiations of the lease that**

4  **eventually was signed by you and the tenant?**

5      A.   Correct.  I never sent anything directly

6  to the board.  I had been instructed with the other

7  two tenants that my dealings were through Mary

8  McFadden.  She is the one to send it to, not John

9  Lawson, not Mr. Rosati or anybody else on the board.

10 Deal with Mary.  She is our -- she runs the

11 building.  You deal with Mary.  I was told that from

12 2018.

13     **Q.   Okay.  Who told you that, to deal with**

14 **Mary McFadden?**

15     A.   Mr. Lepselter in relation to the purchase

16 said to move, that Alison Landon told Ed that Mary

17 McFadden was the one who would give me all the

18 documentation that I was requesting in my due

19 diligence search to determine whether or not this

20 was the building that I was buying.  So Ed told me

21 Mary McFadden has all the documentation that you

22 need while you are doing your due diligence to

23 purchase.  That's who --

24     **Q.   Ms. McFadden was not making any decisions?**

25     A.   No.  No.  All I know is that he told me

Page 78

1 that this is the person you deal with now.  You talk

2 to Mary or -- whatever.  You talk to Mary McFadden.

3 You want financials, you want the bylaws, you want

4 the declaration, you want to know this or that or

5 the other thing, rules and regs, you talk to Mary,

6 and that never changed.

7      **Q.   But Mr. Lepselter never told you if you**

8 **want someone to make a decision, only go to**

9 **Ms. McFadden to make the decision regarding the**

10 **lease?**

11      A.   I didn't even know who ran the place.  Who

12 else am I going to talk to?  Every decision was

13 conveyed to me by Mary.  I never -- I didn't chat

14 with John Lawson.  I didn't chat with Mr. Rosati.  I

15 only ever spoke to Mary.

16           I remember --

17      **Q.   And --**

18      A.   -- I was not invited to reach out to the

19 board.

20      **Q.   I'm sorry?**

21      A.   I was not invited to reach out to the

22 board.  The one time I recall doing it is when we

23 had a problem with the date, and Tom spoke directly

24 with Mr. Lawson, who basically didn't say anything.

25 He punted it back to Mary.

Page 79

1     Q.   Since you bought the unit in April of

2 2018, did you ever attend any board meeting?

3     A.   Yes.  If I knew about them, I attended

4 them.  I think I pretty much attended them all.

5 Whenever they were properly noticed, I would go.

6 It's my habit.

7     Q.   Did you ever bring up any issues with

8 communication with the board at any of those

9 meetings?

10     A.   No.

11     Q.   Did you bring up any concerns that you

12 had, what was going on in the building, how the

13 Association was being run at any of those meetings?

14     A.   No.

15     Q.   Did you ever volunteer to run for the

16 board --

17     A.   No.

18     Q.   -- when you purchased the unit?

19     A.   No.  No.  I thought about it.

20     Q.   I'm sorry?

21     A.   I thought about it, but I didn't.

22     Q.   You didn't do it.

23          So this is I guess an e-mail from

24 January 7 while you guys are still continuing to

25 finalize --

United Reporting, Inc.
(954) 525-2221

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 80

1       A.    Yes.

2       Q.    -- your --

3       A.    Still negotiating.

4       Q.    -- your lease with Mr. Wilcox.  Your

5  husband to Ed copying you.

6             Can you tell me a little bit about what

7  this e-mail is talking about?

8       A.    This is Tom DeMarinis making it clear this

9  is a two-year lease and saying to -- I believe to

10 Mary -- I don't know, saying to Ed -- saying to Ed

11 and copying me, okay.

12      Q.    Mary is not in this e-mail, correct?

13      A.    No.   Mary is not.  Apparently, Mary is not

14 copied.

15            So we are dealing through our agent who we

16 hired, Ed.  It's been perfectly fine the first two

17 times, so we had no reason not to deal directly

18 through him.  Once you give us the green light, they

19 would sign off the initial document, I will -- I

20 will contact -- he will contact Mary and give her

21 Mr. Wilcox's name and phone number so she can call

22 him to schedule the interview, which we were aware

23 of, and his girlfriend.  I was provided with a copy

24 of the signed lease, didn't have one yet, along with

25 the first amendment.  I will not be sending the

7b52fb0a-6c70-4996-ae26-fc24236ecc16

1 second -- the private document.

2    Q.   **What was the second -- what was the second**

3 **document?**

4    A.   I don't even remember at this point what

5 it was about, but it was something -- it had to do

6 with him -- the signing the lease through his

7 corporation, and then he said forget it, we don't

8 want to cause any delay, we are waiting long enough.

9 Let's just move forward with that.  So we never did

10 that.

11          It is important that we get a copy of

12 the -- oh, right -- service dog certification so

13 that could be forwarded.

14          But before his approval, David and Megan's

15 approval, I don't believe I got the service dog --

16 they got it, but I didn't get it.

17    Q.   **Okay.  You were not involved.  That was**

18 **something between them?**

19    A.   Yes.  He did it directly with Mary, with

20 possibly the board.  I don't know.  I was

21 uninvolved.  I just kept waiting for an answer.

22          The previous e-mail noted that the

23 certification was attached.  I don't have a copy

24 yet.

25          Can you scroll up?

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 82

1           I will wait to hear from you in the

2  meantime.  So, you know, we have a history with Ed.

3  This is the third time around, and that's that.

4       **Q.   At this point on January 7th, though,**

5  **there was no signed lease agreement on that date?**

6       A.   I didn't give Mary the lease, ever, in

7  history since 2018.  This was why I hired Ed.

8       **Q.   There was no signed lease agreement?**

9       A.   No.  No.  We were still negotiating.  No,

10 we were still negotiating.  Work in progress on

11 January 7th I think.

12      **Q.   So according to this e-mail from**

13 **Mr. Lepselter, January 7, his understanding was that**

14 **Mr. Gelber was sending it?**

15      A.   Okay.  That could be.  Again, once I

16 gave -- once I did with Ed, I left it in his hands.

17 So the other realtor was sending everything to Mary.

18 That was Ed's view on January 7th.

19           What about Megan signing the lease?

20           Yeah, which now happened.  Okay.

21           Sending that to Mary, right.

22      **Q.   The application -- the tenancy and the**

23 **application for the service dog was sent directly by**

24 **Mr. Wilcox or his realtor to Mary McFadden, not to**

25 **you?**

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 83

1      A.   It appears that way.  I don't really know

2 that to be so.  It appears from the e-mail.

3      **Q.   You don't have any recollection to say**

4 **otherwise?**

5      A.   I don't have any information.

6      **Q.   This e-mail is regarding the service**

7 **animal, right?**

8           **You had signatures.  It says, by the way,**

9 **note to David.  This is what I was referencing,**

10 **talking to the doc -- I presume it's doctor -- when**

11 **I mentioned medical records.**

12           **What does that mean?**

13      A.   Mary was of the impression that it would

14 be unlawful for her lawyer or the board's lawyer to

15 have a conversation with David's physician regarding

16 his need for a service animal.  I since learned that

17 there are -- there are lots of constraints as to how

18 you can investigate.  Certain things are allowed,

19 certain things are not allowed.  I'm not an expert,

20 but I was repeating what Mary said to me, which is a

21 lawyer would talk to his physician, meaning David's

22 physician, regarding the need for a service animal.

23 I was just repeating what I was told.

24      **Q.   That was a conversation, phone**

25 **conversation, that you had with Ms. McFadden, that**

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 84

1  the Association was speaking to Mr. Wilcox's doctor

2  to confirm the need for a service animal?

3          Is that a yes?

4      A.   Yes.

5      Q.   Do you recall when you had that

6  conversation with Ms. McFadden?

7      A.   As soon as I said there was a service

8  animal, this gentleman had a service animal, I was

9  told, okay, Val, this is the process, from Mary.

10  We're going to do A, B, C and then we are going to

11  let you know.

12     Q.   This was not an e-mail, it was an actual

13  call?

14     A.   I think it was a call.  You have all the

15  e-mails between us from the documentation drop.  I'm

16  pretty sure this was a phone call when she described

17  to me what was about to happen.

18     Q.   And it would have been at or around this

19  sixth or seventh day of January when the call would

20  have taken place, right?

21     A.   I don't know when the call was right now.

22  I don't remember.

23     Q.   In your review of e-mails, you did not

24  find an e-mail to Mary or from Mary regarding the

25  Association's lawyers speaking to Mr. Wilcox's

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 85

1 doctor, correct?

2      A.   I don't know if there have been any

3 e-mails sort of weekly mentioning it.  I know that I

4 had asked several times in e-mails if the process

5 had been completed because we still didn't know if

6 we had a tenant, and the 25th was fast approaching,

7 so I know there were flurry, do you have everything,

8 do you need anything, Val, to Mary's e-mail.

9           Mary, you have everything you need?  Just

10 tell me what you need.  Tell me what you still need.

11           There were several, several e-mails

12 between us because I didn't know if Mr. Wilcox could

13 be my tenant and Ms. Luchey.  Time was wasting.

14      Q.   So on January 8th, there is an e-mail here

15 from Ms. McFadden to you, and it says, "Service

16 animal application is attached and must have his

17 doctor fill out some information on it.  This must

18 be approved before move in."

19           Do you recall that?

20      A.   Yes.

21      Q.   It doesn't say anything about his lawyer

22 reviewing this or discussing anything regarding it.

23      A.   Okay.  Then you might be missing

24 something.  I don't know.

25           Yes.  There is me talking about -- I

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 86

1  wouldn't have made it up.  I know you need to

2  contact a lawyer about looking at the service dog

3  proof because she told me that.

4           She said, no, I don't need to contact a

5  lawyer.  She told me that, and I put it in an e-mail

6  on January 7th.

7       Q.   **This is your response to an e-mail?**

8       A.   Yes.  It looks like I was responding.

9  And, again, my effort was to get them everything

10 they wanted, everything they could possibly want on

11 this gentleman and his girlfriend, so that he could

12 be approved in a timely way and use the 25th as his

13 move-in date or to move on, go to the next step,

14 so --

15      Q.   **Do you know if ultimately the**

16 **Association's lawyer did not look at the service dog**

17 **application?**

18      A.   I don't know because I wasn't involved in

19 it.  Mary didn't tell me, yes, she made a call; yes,

20 she read the documents.  I don't know what happened

21 after that.  All I know is I got the green light.

22 Eventually, I got the green light that he could move

23 in.

24      Q.   **This is the application that was sent that**

25 **eventually made its way to Mr. Wilcox for Mr. Wilcox**

United Reporting, Inc.
(954) 525-2221

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 87

1  to complete, correct?

2       A.    That appears to be the documentation that

3  he filled out and submitted.  I have been told this

4  was a 14-page document.

5       Q.    And this document did not go to you?

6       A.    Not at all.  No, didn't go to me at all,

7  except to provide a blank.  Looks like she sent it

8  to us.  Maybe we sent it to Ed.  I don't even know.

9       Q.    This could have been sent to you from Mary

10 for the prospective tenant to complete and you would

11 have sent it to Lepselter to pass on to Roy Gelber?

12      A.    Correct.

13      Q.    You were not passing it on directly to

14 Mr. Gelber?

15      A.    Oh, no, no.

16      Q.    Here is an e-mail from you to Ms. McFadden

17 thanking her for helping you with the necessary

18 steps to get the dog approved, correct?

19      A.    Correct.

20      Q.    And then you sent the form to the realtor

21 and then, as we discussed, Ed Lepselter?

22      A.    Yes.  Mr. Lepselter took it from there.

23 Once I gave him anything that was required, I -- all

24 I did is ask what happened, and occasionally he told

25 me what happened.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

1     Q.   And then you were asking how she got the

2 application directly from Mr. Wilcox?

3     A.   Yes.  From I guess the 5th to the 25th, I

4 kept asking what is happening, where are we, you

5 know.  I was afraid we were going to lose this

6 tenant, too, and meanwhile we are paying, you know,

7 thousands of dollars.

8     Q.   Do you know whether Mr. Wilcox and

9 Ms. Luchey could move in on the 25th?

10     A.   Very close to it.  It was a very, very

11 long time of not being -- me not being told that he

12 could move in.  I don't remember exactly when we

13 found out, but it was -- it was well into January

14 before we got the green light.

15     Q.   Go to the bottom.

16          This is an e-mail we saw before.  You were

17 asking Mary if she got the application, and

18 Mr. Lepselter says that he sent it off over to the

19 other realtor, and he was going to send it to

20 Mr. Wilcox, correct?

21     A.   Yes.

22     Q.   Then you state to Mr. Lepselter, thanks,

23 Mary is all over it.  All over what?

24     A.   I was assuming that she was going to do

25 what she told me she was going to do and talk to a

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 89

1 lawyer and get paperwork she needed and have him

2 conduct an investigation into the animal and give me

3 a green light if a green light was appropriate.  She

4 was collecting paperwork in my humble opinion, what

5 she was actually doing.  Maybe nothing.  But I was

6 led to believe she was looking into the animal.

7     **Q.   Eventually, Mr. Wilcox was allowed to move**

8 **in with the animal, correct?**

9     A.   That is correct.

10     **Q.   And so the paperwork must have gotten**

11 **processed somehow for him to eventually move in by**

12 **the 25th, correct?**

13     A.   Yeah, but then all of a sudden, they told

14 me it wasn't legit, the dog -- in the middle of July

15 started telling me he fabricated the paperwork.  And

16 I'm thinking how is that possible?  There was a

17 lawyer involved.  What are you talking about?

18     **Q.   You don't know if there was a lawyer**

19 **involved.  He doesn't identify --**

20     A.   What are you talking about?

21     **Q.   You don't know if there is a lawyer.  You**

22 **presumed there was a lawyer?**

23     A.   That's what Mary told me.  Mary told me

24 this is what we're going to do, Val.

25     **Q.   You don't know if that's exactly what**

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 90

1  happened?

2       A.   No.  I don't know exactly what happened.

3  She told me these are the steps -- you have to go --

4  Mr. Wilcox has to go through.  You have to wait, and

5  that's what is going to happen.  And all of a sudden

6  he's okay, and six months later, oh, he made

7  everything up.

8            How is that possible?

9       Q.   Once they approved the dog, is it your

10  position that the Association did not ask for any

11  updates on the condition that the dog is supposed to

12  be helping Mr. Wilcox with?

13       A.   They were saying this was never good to

14  begin with in the middle of July.  After they

15  decided that they didn't like him, they said, oh, he

16  made up everything about the animal.  There was no

17  service animal all of a sudden.

18       Q.   And who wrote that letter?

19       A.   I don't remember who wrote the letter.

20       Q.   It wasn't Mary McFadden?

21       A.   Maybe it was JoAnn Burnett.

22       Q.   Who does JoAnn Burnett represent?

23            She is a lawyer, right?

24       A.   JoAnn Burnett is a lawyer, yes.

25       Q.   Do you know who she represents?

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 91

1          A.    I think I thought she represented the

2   Association, the board.

3          Q.    **She doesn't represent Mary McFadden, does**

4   **she?**

5          A.    No.

6          Q.    **Doesn't represent MAC Residential**

7   **Services?**

8          A.    No.  That I know of, no.

9                Do you?

10         Q.    **So --**

11         A.    Do you represent MAC, Mr. Israel?

12         Q.    **I represent Mary McFadden and MAC**

13  **Residential Services and Michael.**

14         A.    I didn't hear that.  Would you repeat

15  that?

16               MR. LUBLINER:  Michael Sparks and

17      Mr. Israel represent MAC.

18               MR. ISRAEL:  I said it at the beginning,

19      but no problem.

20               THE WITNESS:  He did.

21         Q.    **(By Mr. Israel) I represent Mary McFadden and**

22  **MAC Residential.**

23         A.    Okay, both.

24         Q.    **And my co-counsel represents MAC**

25  **Residential.  It is Michael Sparks, okay, in this**

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 92

1   particular case.

2        A.   Okay.  Understood.  Okay.

3             Go ahead.

4        Q.   **New question.  I'm sorry?**

5        A.   Nothing.

6        Q.   **Is there somebody else in the room with**

7   **you?**

8        A.   No.

9             MR. MARCHESE:  I'm getting feedback before

10       she responds.

11       A.   There was no one here.

12            MR. MARCHESE:  Anyone else getting that

13       same feedback?

14            THE WITNESS:  Could be my pearls making

15       noise.

16            MR. SPARKS:  Still going on.

17            MR. LUBLINER:  I don't hear it.

18            MR. MARCHESE:  I heard some.

19            MR. ISRAEL:  I heard some noise.  The

20       other people are on mute.

21            MR. SPARKS:  Sounds like a kitchen faucet.

22

23            THE WITNESS:  No kitchen faucet.

24            MR. MARCHESE:  Seemed to be stuff with

25       last iteration.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

1      Q.    (By Mr. Israel) Okay.

2      A.    I don't hear anything.

3      Q.    Let's go back to -- the next line here on

4  this e-mail says, "Any word on Megan?"

5            What does that mean?  What did you mean by

6  that?

7      A.    Whether or not Megan would sign.

8      Q.    You were still unsure whether Ms. Luchey

9  was going to sign the lease or not?

10     A.    Correct.

11     Q.    This is midmorning or afternoon,

12 basically, early afternoon, January 8th, 2021?

13     A.    Correct.

14     Q.    So it wasn't only, as you first stated, an

15 issue that the Association was taking whatever time

16 to process the paperwork; you at that point on

17 January 8th did not have a signed lease, right?

18     A.    I don't think I had a signed lease.  I

19 just sent it on I believe the 6th.

20     Q.    You could have had a signed lease subject

21 to Mr. Wilcox and Ms. Luchey being approved,

22 correct?

23     A.    Yes.

24     Q.    You did not have to wait until he got

25 approved to get the lease signed?

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 94

1      A.    I don't think so, but until they were

2  approved, they couldn't move in.

3          Q.    **Those are two different things, correct?**

4      A.    Yes.

5          Q.    **By January 8th, there was no signed lease?**

6      A.    I think that's correct.

7          Q.    **Do you know if any doctor signed off on**

8  **Mr. Wilcox's service animal application?**

9      A.    What sort -- I don't understand your

10 question, any doctor.

11         Q.    **I guess this is an e-mail from January**

12 **10th from Mr. Lepselter to you?**

13     A.    Uh-huh.

14         Q.    **And he's talking about the service animal**

15 **application, and he says, "I did forward the dog**

16 **application paperwork to the other realtor when I**

17 **received it, which I think was only on Friday, if I**

18 **remember correctly, so the chances of all that being**

19 **filled out and to Mary at this point, I am only**

20 **guessing probably not happened yet, especially if**

21 **the doctor needs to sign off on it."**

22             **Do you know if any doctor signed off on**

23 **the application?**

24     A.    No.  It sounds like Ed thought -- and,

25 again, I can't get into Ed's mind.  It looks like he

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 95

1  thinks Mr. Wilcox needed to reach out to his own

2  doctor to fill out part of this.  I don't know if

3  that's true, but it looks like Ed thinks it has to

4  go through him before it gets back to Mary.  I think

5  what he's saying here, I don't think it got back to

6  her that fast if someone else had to sign off on it.

7  I don't know if that's true he signed off on it.  I

8  don't know who's correct.

9      **Q.   Okay.  But did you ever see any doctor's**

10  **note or sign off on a letter or affidavit or**

11  **anything notating the service dog application?**

12      A.   I didn't see anything to do with the

13  service dog application until long after they moved

14  in.

15      **Q.   So the first time you saw the complete**

16  **application was after they had moved in.  You said**

17  **long after they moved in, not before?**

18      A.   I don't remember when.  Yeah, I did see it

19  eventually.

20      **Q.   Would it be fair to say you really weren't**

21  **too concerned about the service dog application as**

22  **long as Mr. Wilcox completed it and the Association**

23  **approved it?**

24      A.   Yes, that would be a fair statement.

25      **Q.   So this is you responding to**

Page 96

1  Mr. Lepselter?

2       A.   Yes.

3       Q.   Let's go back because I believe it starts

4  earlier on January 10th further down.

5            Here we go.

6            Mr. Lepselter sends you an e-mail on

7  January 10th at 8:45 a.m. that says, "Good morning,

8  Tom and Val.  In setting up your file for the

9  office, it appears Page 2 is missing from the lease.

10 If you can forward that page, we would appreciate

11 it.  Have a wonderful day.  Mary may require it

12 also."

13           Do you remember that?

14      A.   Uh-huh.

15      Q.   That was on the 10th of January.

16           So then you responded when you were at

17 your home office and said don't have a hard copy?

18      A.   Correct.

19      Q.   So far, you have not sent Mary the lease.

20 She hasn't asked for it, correct?

21      A.   Correct.

22      Q.   So at this point, the application for the

23 tenancy was in.  The dog application was in.  Not

24 the lease, correct?

25      A.   I don't know if the lease was in because

Page 97

1 all I have --

2      Q.   As of January 10th, you had not sent it to

3 Mary and she hasn't asked for it?

4      A.   No, I hadn't sent it.

5      Q.   Correct.

6      A.   He sent it because I don't send it.  I

7 don't ever send it.  It is always sent by the

8 realtor or by the tenant.

9      Q.   The realtor is telling you that he is

10 missing Page 2.

11      A.   That is correct.  That is correct.

12      Q.   And Mary may require it also?

13      A.   Correct.

14      Q.   Did you send Mr. Lepselter at that

15 point --

16           When you respond, you say so far we have

17 not sent it to Mary -- did not send Mary the lease

18 and she hasn't asked for it.

19      A.   Correct.  So I answered you.

20      Q.   The only thing that Mary would have at

21 that point is a tenant application and probably the

22 dog application?

23      A.   No, that's not correct.

24      Q.   What else would she have had?

25      A.   She could have had the lease from someone

Page 98

1  else.   I never give her the lease, ever.   This is my

2  third time, and it's not my job to give her the

3  lease.

4      Q.   You don't know whether Mr. Lepselter, who

5  did not have a complete lease, missing Page 2, had

6  provided Ms. McFadden a copy of the lease?

7            MR. LUBLINER:   Form.

8      A.   He testified in the date -- I don't

9  remember what he said, but all I know is that he had

10  it minus the missing page, and it was his job to get

11  it to -- either to Roy or to Mary.   But, ultimately,

12  the realtors give Mary the lease, and that has been

13  the practice -- that has been their practice, Ed's

14  practice in the past two cases.   I have no reason to

15  think he wouldn't give it to Mary now.   I assumed he

16  gave it to her.   He gave her everything she needed,

17  but we acknowledged that it was a standing error and

18  Page 2 did not go through.   It had blank documents,

19  and then I sent him the whole thing.   I expected him

20  to give it to Mary, like he had done in every other

21  case.

22      Q.   Let me make sure I understand.   You don't

23  send Mary or any property manager the lease because

24  that's the realtor's job?

25      A.   That is correct.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 99

1      Q.    Mary did not ask you for a copy of the

2  lease, correct?

3      A.    Had she asked me, I would have sent it.

4      Q.    She was -- you were expecting one or both

5  of the realtors getting a copy of the lease to Mary

6  as part of their job?

7      A.    Correct.

8      Q.    As of January 10th -- was there a signed

9  lease as of January 10th, do you recall?

10     A.    I think, yes.  I have to look.

11     Q.    We're going to look at the lease a little

12  bit later.  We can verify that date.

13     A.    I think both of us -- I think both of us

14  had signed -- I don't know.  We have to look at the

15  actual documents.

16          I beg your pardon?

17          MR. LUBLINER:  I was going to ask from a

18      housekeeping perspective.  I want to ask when

19      we can take a break for lunch.

20          THE WITNESS:  Whatever you-all decide.  I

21      don't care.  I'm fine.

22          MR. LUBLINER:  I expect --

23          MR. ISRAEL:  I don't know.  I mean, we can

24      take a break.  It is not a problem.  It's going

25      to take me -- I'm still not finished, and I

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 100

1       have more stuff, more e-mails to go through,

2       but I need to be finished around 3:30 because I

3       have to take my daughter to an important

4       doctor's appointment.

5            THE WITNESS:  Why don't we break now?

6            MR. LUBLINER:  I don't know if Andrew is

7       asking questions or if co-counsel is.

8            MR. ISRAEL:  I think everybody is going

9       to.  We can go off.  We can break.

10           MR. LUBLINER:  Half hour, is that okay?

11           THE WITNESS:  That's fine with me.

12           MR. ISRAEL:  Can we take -- let's take a

13      half hour.  And then -- is that okay with

14      everybody?

15           MR. LUBLINER:  Fine with me.

16           THE WITNESS:  Yes.

17           MR. ISRAEL:  Then we'll come back and

18      we'll continue.

19           THE WITNESS:  Return at 12:45?

20           MR. ISRAEL:  Thank you.

21              (A luncheon recess was taken at 12:20

22        p.m., and the deposition resumed at 1:00 p.m.)

23

24

25

Page 101

1                     AFTERNOON SESSION

2        Q.    (By Mr. Israel) Ready, Ms. Manzo?

3        A.    Yes.

4        Q.    We were discussing --

5              MR. ISRAEL:   Back on the record?

6              THE REPORTER:   Yes.

7        Q.    (By Mr. Israel) Ms. Manzo, so we were talking

8    about this e-mail, an exchange with Mr. Lepselter on

9    January 10th, 2021.  I think you told me a couple of

10   things.  I wanted to make sure that we are all on the

11   same page.

12             So it was your testimony, if I understood

13   it correctly, that you would not have sent a lease

14   to the Association for their records; that was the

15   realtor's job to do, correct?

16       A.    Correct.

17       Q.    And that in the past Mr. Lepselter had

18   sent copies of the lease to the Association for the

19   prior tenants that you had in the unit; is that

20   correct?

21       A.    Correct.  That is correct.

22       Q.    And on January 10th, the previous e-mail,

23   Mr. Lepselter is telling you that he is missing

24   Page 2 from the lease and asking you to forward it

25   to him, correct?

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 102

1      A.   Yes, which I did.

2      Q.   **In your e-mail response, it does provide**

3  **that you had not sent it to Mary and she has not**

4  **asked you for it, correct?**

5      A.   That's correct.

6      Q.   **But I think you also testified that as of**

7  **January 10, it may have been signed, the lease**

8  **already?**

9      A.   Yes, I think it was, but to the degree

10  that we were still discussing things, we crossed

11  things out, and, you know -- and also, I didn't --

12  it was subject to approval of the animal by the

13  board.

14      Q.   **Okay.**

15      A.   Whether they had done it --

16      Q.   **This e-mail says you are going to send it**

17  **back, the page that's missing from the lease?**

18      A.   I sent him the whole thing.  I didn't just

19  send him one page.

20      Q.   **I'm sorry?**

21      A.   I sent him the whole thing.

22      Q.   **You sent him the whole thing, and you have**

23  **an e-mail showing that you sent him the whole thing?**

24      A.   Yes, and you have it -- you-all have it.

25      Q.   **Mr. Lepselter doesn't seem to have an**

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 103

1  e-mail of receiving a copy.

2      A.   Is that so?  He doesn't have an e-mail of

3  receiving it?

4      Q.   Not according to what he produced.

5           Also, this e-mail from Mr. Lepselter makes

6  inquiry about Mr. Wilcox having filled out the dog

7  application and sending it back to Ms. McFadden for

8  lawyer review.  That's correct, right?

9      A.   There is a reference to that, yes.

10     Q.   And you are asking again if Mr. Luchey is

11 going to sign the lease and that the board is going

12 to require that, and that's going to create a delay,

13 correct?

14     A.   No, I wasn't concerned about delay.  The

15 delay I was concerned about was for a different

16 reason.  I didn't know if the board cared whether

17 Ms. Luchey signed or not.  I didn't have an opinion.

18     Q.   Okay.  But you state here in this

19 e-mail --

20     A.   If it is the board's policy and she is not

21 going to do so, then we'll cross that bridge.

22     Q.   What it actually says if it is required by

23 board policy and she is not doing it, we may have an

24 issue?

25     A.   Yes.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

1     Q.   If the board had required Ms. Luchey to

2 sign the lease and you couldn't get her to sign,

3 then that would have been an issue with regard to

4 Mr. Wilcox having tenancy, right?

5          MR. LUBLINER:  Form.

6     A.   Could have been.  Could have been an

7 issue, but it was not.

8     Q.   Right.  It actually wasn't.

9          The requirement was that he signed on the

10 lease, right?

11    A.   Well, all I know is he was approved to

12 move in and so was she.

13    Q.   Eventually, on January 25th, Mr. Wilcox

14 and Ms. Luchey were approved, and they moved into

15 the unit, correct?

16    A.   Correct.

17    Q.   They did not prevent them from moving in?

18    A.   Did not prevent them from moving in.

19    Q.   Ms. McFadden did not do anything to

20 prevent them from moving in, correct?

21    A.   She did not.

22    Q.   In fact, she provided them with whatever

23 passes or security cards, the pool, the parking

24 garage, all the other facilities of the unit,

25 correct?

7b52fb0a-6c70-4996-ae26-fc24236ecc16

 1    A.    Correct, which is why I assumed she had

 2  the entire lease, because she facilitated the

 3  movement.

 4         So if she didn't have the entire lease,

 5  what did she do?  I don't understand.

 6    **Q.    Okay.  You left it upon Mr. Lepselter to**

 7  **make sure she had the lease.  You presumed she had**

 8  **the lease.  Then nobody verified whether she had the**

 9  **lease or not?**

10         MR. LUBLINER:  Form.

11    A.    But as you can see in our previous e-mail

12  communication, we were cordial.  If she needed

13  something from me -- and you'll see in later

14  e-mails, I kept saying do you need anything, do you

15  need anything, what do you need over and over again,

16  so I could move it along and make it happen.

17         She never ever said to me I need Page 2.

18  She never ever said to me I don't have the lease.

19  And then she gave them the key or she authorized

20  that he get it.

21    **Q.    It's possible that Mr. Lepselter gave her**

22  **a copy of the lease with Page 2 missing and she did**

23  **not have it?**

24    A.    She never pursued it.  He had the full

25  lease, and they spoke directly to one another at

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 106

1 various points, as he had done in the past for me

2 with the other two tenants.

3      Q.   Okay.  But at some point, at least as of

4 January 10th, Mr. Lepselter did not have a complete

5 lease?

6      A.   He got it on the 19th, the complete lease.

7 Not just Page 2, the entire lease.  The one

8 that's --

9      Q.   Do you know whether he forwarded that

10 completed lease?

11      A.   Go ahead.

12      Q.   Do you know whether --

13           You weren't involved in the process of

14 providing the lease on the 19th when you say he had

15 the complete full lease, provided that lease to

16 Ms. McFadden?

17      A.   I don't know that, but I do know she got

18 it in July.

19      Q.   On January 19, there's an e-mail to

20 Mr. Lepselter from Eleanor Lepselter asking

21 Ms. McFadden for a certificate of approval?

22      A.   Right.

23      Q.   And she states that they don't issue

24 approval letters, they provide a certificate of

25 approval, correct?

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 107

1      A.   That's what she said.

2      **Q.   There is nothing in here about sending a**

3  **complete lease by Mr. Lepselter, correct?**

4      A.   No.  No communication, no mention.  No

5  mention of anything missing either.

6      **Q.   There is no e-mail so far that you have**

7  **seen, as I'm scrolling down, from Lepselter's**

8  **production that states here is the signed lease?**

9      A.   That is correct, but Mr. Lepselter isn't

10 the only person who could have given the complete

11 lease.  He could have given it to Roy.  He could

12 have given it to Engram.  Any one of the three could

13 have given it to Mary, which I would assume when

14 they gave David the green light.

15         Mr. Lepselter doesn't own there at all.

16     **Q.   Roy Gelber doesn't own there either?**

17     A.   No.  Only --

18     **Q.   The only entity that owns Unit 303 of**

19 **La Pensee Condominium is La Pensee Realty, LLC?**

20     A.   Yes.

21     **Q.   Of which you are the only member, correct?**

22     A.   Correct.

23     **Q.   You as the owner of the unit did not**

24 **provide the Association and did not ensure that a**

25 **fully executed lease had been provided to Mary?**

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 108

1      A.    I hired an agent, and I paid him.  I also

2 paid a second agent.  Their job was to get Mary

3 everything that was required and get them through

4 the process.  That's their job.

5      **Q.   As you sit here today, you don't know**

6 **whether they did that because you told me you don't**

7 **know whether Mr. Lepselter eventually, ultimately,**

8 **provided a fully signed lease to Mary McFadden,**

9 **correct?**

10      A.    That's correct.

11            Why did Mary tell me it was approved?  I

12 don't understand why she would say green light, Val,

13 he's okay, he can move in.  If she is missing

14 something, all she had is to do was send me an

15 e-mail.  At that time, everything was very cordial.

16            Val, I need a full copy of the lease, Val,

17 I need Page 2.  Nothing.  Had nothing.

18      **Q.   You don't know that she didn't get a lease**

19 **without Page 2?**

20      A.    I don't know what she did.  All I know --

21      **Q.   You don't know what she did.**

22      A.    I don't know what she did, because in

23 July, she was still looking for a lease.

24      **Q.   Right.  You don't know what she did or**

25 **what she didn't do, and you are just speculating as**

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 109

1  to what she should have done or could have done,

2  that she may or may not have done?

3            MR. LUBLINER:  Form.

4       A.   She was the manager.  She was -- I was

5  instructed to deal with her.  I had been dealing

6  with her for three solid years.  There was no reason

7  for me to know she wasn't going to do her job this

8  time, as she did the last two times.

9       Q.   So all along, you were instructed to deal

10 with her except when it came time to provide a copy

11 of the full lease, that you relied on somebody else?

12      A.   That wasn't my job to provide it.  That

13 was the realtor's job and she.

14      Q.   You are the owner.

15      A.   She had -- I'm sorry.

16      Q.   You are the owner of the unit, not the

17 realtor.

18            MR. LUBLINER:  Objection.

19      A.   I'm the owner of the unit, that's correct.

20      Q.   All right.  This is an e-mail from

21 January 10th from you to Mr. Lepselter.  You are

22 still as of January 10th discussing terms of the

23 lease?

24      A.   Yes.

25      Q.   Are you sure that as of January 10th a

1  lease had been signed?

2       A.   Am I sure?  No.  You have to look at the

3  documents.

4       Q.   We're going to look at the leases in a

5  little bit so we are not guessing.

6       A.   Right.

7       Q.   Okay.  Friday, January 22nd, there is an

8  e-mail here.  I guess you are not copied on it.

9            Did you eventually receive before

10 Mr. Wilcox moved in a check for $50,700?

11      A.   I did.

12      Q.   Was that in the form of a cashier's check?

13      A.   Yes.

14      Q.   That paid for one year's worth of rent,

15 correct?

16      A.   Twelve months plus security.

17      Q.   How come you only got the first year

18 up-front, not the two years?

19      A.   Nobody offered me two years.  If I had

20 been offered two years up-front, I would have taken

21 it in a hot second.

22      Q.   It wasn't part of the negotiation?

23      A.   No.

24      Q.   You didn't ask for it?

25      A.   I did not ask for two years up-front, no.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 111

1 That would have been an extraordinary amount of

2 money.  100,000 up-front, no.  I thought I was doing

3 well getting 50 up-front, but -- 50,700.

4      **Q.   Did you ever receive any of the**

5 **information for Zeus, the dog?**

6      A.   Yes.

7      **Q.   At the time of -- before Mr. Wilcox moved**

8 **in or later on?**

9      A.   Some of it came to me before and some of

10 it came to me later.

11           I did see this.  I saw a picture of Zeus.

12 I actually met Zeus, had a FaceTime interview with

13 him.  I met the whole family.

14      **Q.   Okay.  And --**

15      A.   I saw these two.

16      **Q.   You saw the registration card?**

17      A.   Yes.  Beforehand, yes.

18      **Q.   Did you ask when these registration cards**

19 **were obtained?**

20      A.   No, I did not.

21      **Q.   Do you know if they were obtained from**

22 **some other source?**

23      A.   I didn't ask any questions.  I didn't feel

24 it was my place to question it because if it was a

25 lawful service animal, they would let him move in.

United Reporting, Inc.
(954) 525-2221

7b52fb0a-6c70-4996-ae26-fc24236ecc16

1    **Q.   How do you know it was a lawful service**
2  **animal?**

3    A.   If he was -- I said if he was a lawful
4  service animal, then he would be able to rent, and
5  the board said it was.  So I left it to them.  They
6  were supposed -- Mary or Ed together, they were
7  supposed to conduct research and find out if he was
8  a legal service animal.

9    **Q.   You left it up to the Association to**
10 **determine whether there was proof for the service**
11 **animal?**

12   A.   And Mary's, yeah.  The only person I ever
13 talked to was Mary.  Never talked to the
14 Association.  Mary told me the process.  She never
15 changed her song about the process or her
16 statements, her initial statements to me, and I
17 assumed it was followed.

18   **Q.   So let's look at a letter.**

19       **Actually, let's look at the complaint that**
20 **was filed in the state court proceeding by**
21 **Ms. Burnett and attached our multiple iterations of**
22 **leases.  I want to ask you some questions about it,**
23 **okay?**

24   A.   Okay.  Tell me when you get there.  You
25 are making me dizzy.

Page 113

1           MR. LUBLINER:  David, for the record, can

2      you say which iteration it was?

3           MR. ISRAEL:  I think the one that I had.

4      I'll give you the date in a minute.

5               Is this the original complaint?

6           MR. LUBLINER:  Probably.

7               Scroll down.  You can probably see.

8        That's the original.

9           MR. ISRAEL:  Yes.  Is that the original?

10          MR. LUBLINER:  I believe so, yes.

11          MR. ISRAEL:  We are going to mark it as

12     Composite Exhibit 4.

13     A.   This is the first lawsuit, Mr. Israel?

14          MR. MARCHESE:  This is the original

15     lawsuit.

16     A.   She kept changing it.

17          This is the first version?

18     Q.   (By Mr. Israel) Correct.

19          So attached to this is a standard lease

20 agreement.  You see that?

21     A.   I see it.

22          (Defendants' Exhibit 4 was marked for

23     Identification.)

24     Q.   At the top, it says begins 1/25/2021, ends

25 7/24/2021.  Do you know who wrote that?

United Reporting, Inc.
(954) 525-2221

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 114

1      A.    I'm betting it was Mary McFadden because

2 it wasn't me.

3      **Q.    How do you know it was Mary McFadden?  You**

4 **recognize her handwriting?**

5      A.    I don't recognize her handwriting.  She

6 was the one who was in possession of the document.

7      **Q.    Okay.  So you believe without really**

8 **knowing, but it is your belief this was written by**

9 **Mary McFadden, correct?**

10     A.    Yes.  Someday we're going to find out who

11 wrote it.

12     **Q.    Okay.  That's not my question.**

13          **My question is:  It is your belief that**

14 **this was written by Ms. McFadden?**

15     A.    Yes, it is.

16     **Q.    Did you have a conversation with**

17 **Ms. McFadden where you told her the lease was from**

18 **January 25th, 2021 and would end July 24th, 2021?**

19     A.    No, I did not.  I never -- it was never a

20 six-month lease.  Never had such a conversation.

21     **Q.    You never had a conversation with Mary**

22 **where you stated that this was a six-month lease?**

23          MR. LUBLINER:  Asked and answered.

24     A.    Never.  Totally fabricated.

25          Why would I say that?  The man gave me

United Reporting, Inc.
(954) 525-2221

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 115

1  $50,000.

2      Q.   I'm just trying to get your testimony.

3      A.   Okay.  That's my testimony.  We never -- I

4  never wrote that.

5      Q.   Listen to my question.  My question was

6  just to be make sure the record is clear.

7           We know you said you didn't write this.

8      A.   Right.

9      Q.   The question was:  Did you ever have a

10  conversation with Ms. McFadden where you told her

11  this was a six-month lease?

12      A.   No.

13      Q.   So this agreement is dated January 5th,

14  2021 by La Pensee 303, LLC and Mr. Wilcox and

15  Ms. Luchey, correct?

16      A.   That's correct.

17      Q.   Do you know who initialed at the bottom of

18  this Page 1?

19      A.   Those are my initials and David's

20  initials.  The letters at the top had to have been

21  added after the fact because they were not there

22  when he and I -- they were not there when I signed

23  it, those handwritten things at the top.

24      Q.   This document and all these things for

25  that matter were signed in separate places, correct?

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 116

1          Mr. Wilcox would have signed someplace in

2   Florida and you signed them in New York and sent

3   them back, correct?

4       A.   That's correct.

5       Q.   You were not in the same room when these

6   were signed?

7       A.   That is correct.  I was not in the same

8   room with David, no.

9       Q.   This is Page 1, correct?

10      A.   Correct.

11      Q.   Now, this says -- there's some writing on

12   the side.  Can you tell me whose initials those are

13   to start with?

14      A.   VSM is me.

15           The top left-hand margin, I would presume

16   David, although I don't know his writing well enough

17   to say that it is his; but he is the only other

18   person who wrote on the document except for the

19   mystery person that wrote on Page 1.

20      Q.   You initialed this, correct?

21      A.   I initialed this.  So I'm assuming that

22   means I saw that he added it, and I can't even

23   really tell you what it says.

24           At times I was saying to him I see that

25   because he wrote something.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

1     Q.   Did you understand what it was when you

2 initialed it?

3     A.   I'm sure I did.  I can't read it right

4 now.  Can you?

5     Q.   I think it says one of the units --

6     A.   To be -- unit needs to be professionally

7 cleaned, and I agreed to that, and we did that.

8     Q.   You had somebody come in before he moved

9 in to clean it?

10    A.   Yes.

11    Q.   Okay.  So if you go to the bottom, there

12 are a few check marks on here.

13         Do you know who made those check marks?

14    A.   Not me.

15    Q.   And right next to Page 3, is that your

16 initials and Mr. Wilcox's initials, can you tell?

17    A.   Yes.  I believe so.  Yes, definitely, and

18 I think it is David's.

19    Q.   This particular iteration starts from

20 Page 1 to Page 3, right?

21    A.   It looks that way.

22    Q.   So the next page here also had some line

23 through it and some writing on the side, and it has

24 your -- your initials.

25         Are those your initials?

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 118

1    A.   Yes.

2    Q.   It has some check marks.  Do you know who

3 made those?

4    A.   No.  I assume it was David.

5    Q.   And who put proof of negative COVID test

6 within 72 hours?  I can't tell the last few words --

7 the last word.

8    A.   Per something.  I can't read the last word

9 either.  "Performed."  I think it is "performed."

10    Q.   It talks about whoever is going to enter

11 is going to have a COVID test, right?

12    A.   Well, yes.  He added that to right of

13 entry because I was reserving the landlord's right

14 to enter during normal working hours with notice to

15 make repairs, alterations, improvements or to supply

16 services.  Mr. Wilcox mentally was concerned about

17 COVID, so he wanted to make it my obligation that if

18 anyone was to enter the unit while he was at home or

19 maybe even when he wasn't home -- well, no, he

20 shouldn't -- anyway, that I would require service

21 people and myself to prove negative for COVID, and I

22 said fine.  I initialed it.  Yes, initials.

23    Q.   There are some more check marks here.

24 Those are not yours, correct?

25    A.   Correct.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 119

1      Q.    At the bottom Page 4 --

2            We have Page 1, Page 3 and Page 4, and

3  those seem to be yours and Mr. Wilcox's initials,

4  correct?

5      A.    Correct.  That's correct.

6      Q.    Now we have the next page.  Also some

7  writing on the side here.  Your initials?

8      A.    Federal registration attached.

9      Q.    That's about the dog, right?

10     A.    That's correct.  That's about the dog.

11     Q.    There's some more check marks.  That's not

12  yours, right?

13     A.    That's correct.

14     Q.    Were those check marks, if you recall,

15  there on this lease when it was initialed by you,

16  every page?

17     A.    Yes.

18     Q.    Check marks were there?

19     A.    The check marks were there.

20     Q.    And at the bottom of Page 5, there are

21  your initials and Mr. Wilcox's initials?

22     A.    Yes.

23     Q.    There is one correction on this Page 6,

24  COVID negative test in 72 hours, your initials and

25  his initials at the bottom?

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 120

1     A.    Yes, I agreed to it.  Yes.

2     Q.    **Page 7, only your initials and**

3 **Mr. Wilcox's, no changes?**

4     A.    Correct.

5     Q.    **Now, on Page 8, there is a change to a**

6 **paragraph that says Mary McFadden will, per**

7 **La Pensee's rules, submit, and something is crossed**

8 **out, records.  And then it says service animal, and**

9 **it is initialed by you.**

10          **Is that accurate as to the change?**

11     A.    Yes.

12     Q.    **And then further down, again, it requires**

13 **a 72-hour COVID test, and your initials are next to**

14 **it?**

15     A.    Right.

16     Q.    **This version also lined through the**

17 **security deposit disclosure.**

18          **Was there a reason for that?**

19     A.    I don't know why it is crossed out.

20     Q.    **And your initials are next to that**

21 **crossed-out paragraph?**

22     A.    Yeah.

23     Q.    **Further down, next to Page 8, your**

24 **initials and seem to be Mr. Wilcox's, correct?**

25     A.    Yes.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 121

1     Q.   Do you recall whether you signed first or
2 Mr. Wilcox signed first?

3     A.   No.

4     Q.   Next page, it's just a calculation of the
5 different deposits blanked through and your
6 initials, correct?

7          I'm sorry, is that correct?

8     A.   Yes, that's correct.

9     Q.   And then at the bottom of Page 9, it has
10 your initials and Mr. Wilcox's initials?

11     A.   Uh-huh, right, and I referenced that the
12 rules would be provided by Mary.  I don't know if
13 they were, but they were supposed to be provided.
14 I'm not sure if they were.

15     Q.   Weren't you providing the rules or did you
16 provide them to the realtor?

17     A.   I think I gave him a set of rules, but I'm
18 not sure if I gave him the ones that I had from
19 before or if Mary gave me new ones.  I'm not really
20 sure how it went, but I know I asked for them.

21     Q.   When you received them, did you give them
22 to the realtor?

23     A.   I gave them to Ed.  I didn't deal directly
24 with Mr. Wilcox yet.  I was dealing through Ed.  I
25 had an agent and did everything through Ed.  If I

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 122

1  had them, I forwarded them to Ed, whichever

2  iteration, whichever version I had my hands on; and

3  he would have given them to Roy, who would have

4  given them to David I would assume.

5       **Q.   Then January 7th, this lease, 2021,**

6  **correct?**

7       A.   Correct.

8       **Q.   That's your signature on January 7, 2021?**

9       A.   Correct.

10      **Q.   That's Mr. Wilcox's signature as well?**

11      A.   Uh-huh, yes.

12      **Q.   Ms. Luchey did not sign, correct?**

13      A.   Correct.

14      **Q.   Then there is a first amendment.  It talks**

15  **about moving in by the 25th if they are approved by**

16  **the Association?**

17      A.   Yes.

18      **Q.   As of January 7, you had a signed lease?**

19      A.   It looks that way, uh-huh, but still

20  subject to, it's in there, all approvals from the

21  board.  In other words --

22      **Q.   You couldn't sign the lease?**

23      A.   Right.  It was a signed document, but we

24  were still discussing things because we didn't know

25  yet if the dog was approved.  All the other checks,

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 123

1  I don't know if it was done yet.  It was like the

2  first album.

3      Q.   You signed the lease subject to the

4  Association's approval?

5      A.   I believe so.

6      Q.   Okay.  And the approval was as to

7  Mr. Wilcox, Ms. Luchey and the dog, correct?

8      A.   Correct.  Yes.

9      Q.   Once that was approved, this lease should

10 have been in play; would that be a fair statement?

11     A.   No.  This isn't the actual lease.  This is

12 just a mock-up of the lease.  That is still based on

13 this lease, but this is not the lease.

14     Q.   So this document -- it's your testimony --

15 let me make sure I get this straight because there

16 seems to be some confusion which lease is which.

17         But this document that, as you saw before,

18 is missing Page 2 on the initial by you and

19 Mr. Wilcox, modified in certain areas and signed by

20 both you and Mr. Wilcox, including an attachment of

21 an amendment, you are saying it is not the final

22 lease, it's just prior to signing a type of lease?

23     A.   Oh, no.  Actually signed.  It is a

24 combination.  Part of my actual lease, and I drafted

25 and he signed and I signed, and parts of it are made

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 124

1 up.  The writing at the top of Page 1 is made up.

2 Page 2, there is -- I didn't see a Page 2 at all

3 yet.

4      **Q.   This document -- this document --**

5      A.   I don't know what this is.  They sued me

6 based on this document, but this is not my document.

7      **Q.   You are saying that this is not your**

8 **document, even though it contains your initials?**

9           **I understand you are saying handwriting on**

10 **the first page is not yours, okay.**

11      A.   Correct.

12      **Q.   I understand it says it is missing Page 2.**

13      A.   Right.

14      **Q.   Otherwise, I think the rest of the**

15 **document contains your initials and Mr. Wilcox's**

16 **initials?**

17           MR. LUBLINER:  Wait.  Why don't you show

18      her the document?  She can answer that.

19           MR. ISRAEL:  I already went through the

20      document.  I went through every page.

21      A.   That's every page of the document?

22      **Q.   (By Mr. Israel) There is an addendum, if I'm**

23 **not mistaken.**

24           MR. LUBLINER:  Go further up.  Do what you

25      need to do.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 125

1          MR. ISRAEL:  I showed the whole thing.  We

2     already --

3     A.   Exhibit B.  What is Exhibit B?

4     **Q.   Don't worry about Exhibit B.  I'll show**

5 **you B when the time comes.  I'm asking -- you**

6 **answered the question.  Answer with all due respect.**

7     A.   Wait a second.  Please, what happened to

8 the lettering on the front?

9     **Q.   Let's go back.  Let's go back.  We can**

10 **spend time on this so we can get it straight.**

11          **We have a document here.  We went through**

12 **it before, and you testified it has your signature**

13 **and Mr. Wilcox's signature.**

14          **Start from the beginning.  We'll move it**

15 **down.  It has your initials and Mr. Wilcox's**

16 **initials, but you claim this is not the right lease**

17 **because you did not arrive -- you don't know who**

18 **wrote -- you presume Mary wrote that this was a**

19 **six-month lease beginning January 25th, 2021 and**

20 **ends July 24th, 2021 --**

21          MR. LUBLINER:  Form.

22     **Q.   -- correct?**

23     A.   I believe so.  This is not my document.

24 This is not the final document that was agreed to

25 between the parties.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 126

1     Q.   Even though this is a signed document, it

2  is not the final document?

3     A.   That's correct.

4     Q.   It was a subsequent document that you

5  agreed to?

6     A.   Yes.

7     Q.   Different from these documents?

8     A.   That was my document I gave Ed.

9     Q.   This is not --

10         Who do you think put together this lease?

11 It looks like your format.

12    A.   I'm not saying I didn't write some of

13 this.  What I'm saying is it's mish-mosh.  It is not

14 the final document.  It is pieces of my own document

15 in this.  This isn't mine.  And it's not an accurate

16 reflection of the lease I entered into with

17 Mr. Wilcox.

18         You asked did I draft it?  Well, I drafted

19 some of it, but some of it isn't right.  Some of it

20 is not in the agreement.

21    Q.   Okay.  So if we take that handwriting that

22 we are looking at right now out of this agreement,

23 what else is not in the final agreement?

24    A.   Well, Page 2 is missing with how long.  I

25 mean, I would have to --

7b52fb0a-6c70-4996-ae26-fc24236ecc16

1    **Q.   I can scroll down for you.**

2    A.   I would have to put them side by side to

3    tell you what was changed because we -- I believe we

4    kept talking.

5    **Q.   Even though this document was signed on**

6    **January 7th?**

7         MR. LUBLINER:  Form.  Asked and answered

8         five times now.

9         MR. ISRAEL:  I don't think she answered

10        that because she keeps running --

11        MR. LUBLINER:  She said that's not her

12        document even though it is mishmash.  Here are

13        the things that she drafted.

14        MR. ISRAEL:  I'm asking her -- Let's go

15        back.  Let's ask her stuff.

16        MR. LUBLINER:  She testified that's true,

17        but go ahead.

18        MR. ISRAEL:  I understand it is missing

19        Page 2.  She can show me all the differences

20        she finds.  That's fine.

21        **Q.   (By Mr. Israel) Ms. Manzo, are those your**

22   **initials at the bottom of this document?**

23        A.   This page, yes.

24        **Q.   And those are your initials next to some**

25   **revision on the next page?**

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 128

1        A.    Yes.  I okayed those revisions.

2              MR. LUBLINER:  Objection.

3        Q.    At the bottom of Page 3, are those your

4   initials as well?

5        A.    Yes.

6        Q.    Are those your initials next to pets, some

7   handwriting on the next page?

8        A.    Yes, I approved the COVID test.

9        Q.    So at the bottom of Page 4, those are your

10  initials?

11       A.    Yes.

12       Q.    And the next page, are those your initials

13  next to pet, some handwriting as well?

14       A.    Yes.

15       Q.    At the bottom of Page 5, are those your

16  initials?

17       A.    We went through the whole thing.  Yes,

18  those are all my initials.  All I'm saying, it is

19  like cut-and-paste.  She cut-and-paste the whole

20  document.

21             MR. LUBLINER:  Let him go through it.  He

22       wants to clear the record.

23       Q.    At the bottom of Page 6 and revision on

24  Page 6, those are your initials as well, correct?

25       A.    Yes.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 129

1      Q.   And every page is like that, would you

2 agree, based on what you testified to earlier?

3      A.   Yes.

4      Q.   And on Page 10, January 7, 2021, it is

5 signed by you, correct?

6      A.   Correct.

7      Q.   On behalf of La Pensee 303, LLC?

8      A.   That's correct.

9      Q.   Further down, that's Mr. Wilcox's

10 signature, as you know?

11     A.   As I know, yes.

12     Q.   So this document was signed by you and

13 Mr. Wilcox on January 7, 2021, correct?

14          MR. LUBLINER:   Form.

15     A.   It's not the complete document.   I had a

16 checklist attached, so this is not the final

17 iteration.   First of all, it is a cut-and-paste job.

18          Second of all --

19     Q.   What do you mean by a cut-and-paste job?

20     A.   I'm not sure that this is the final

21 version because I don't know -- so far, you asked me

22 about each handwritten change, did I approve it.

23 Yes, I approved the handwritten changes on this

24 document.   But unless I was looking at -- I was

25 looking at it side by side, I can't say this is

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 130

1  mine.

2           For one thing, the walk-through checklist

3  is not attached.  I know for a fact I included one,

4  and Mr. Wilcox engaged in taking the time to sign

5  one.  The final version has this checklist.  He

6  checked off if anything was broken; I wanted to know

7  in advance.

8       **Q.   This is the final signed lease going to**

9  **the realtors, and the realtors finalized the lease,**

10  **not you?**

11      A.   The realtors did the checklist.

12  Mr. Lepselter did the checklist with Mr. Wilcox.

13  When he had the final, final, final version, then

14  the checklist was filled out when he was physically

15  present in the apartment, Mr. Wilcox and Lepselter.

16      **Q.   Okay.  So far, what you are telling me is**

17  **this document, even though there are some changes**

18  **and it has your initials next to it, it has your**

19  **initials at the bottom of each page, and it has your**

20  **signature and Mr. Wilcox's, you know it is him, is**

21  **not your document because it's got handwriting on**

22  **the first page that's not yours, missing the second**

23  **page, and doesn't have the checklist attached to the**

24  **lease; is that correct?**

25      A.   That's correct.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 131

1      Q.    Is there anything else that is not

2  accurate about this document?

3              MR. LUBLINER:  Can you show her the

4        entirety of it?

5              MR. ISRAEL:  I think we've looked at it

6        like three times already.

7              MR. LUBLINER:  I know you went up.  I

8        meant down.

9              MR. ISRAEL:  Keep going.  I did it back

10       and forth.

11     Q.    (By Mr. Israel) We saw your signature before.

12     A.    Yeah.

13     Q.    We saw the first amendment where it is

14  subject to the Association's approval?

15     A.    Right.  That was part of it, yes.

16     Q.    Then there is a portion of a lease, the

17  application?

18     A.    It appears to be so, yes.  Portion of the

19  application.

20     Q.    That's the end of the document.

21     A.    That's the end of the document, yes.

22     Q.    But you are saying that this document is

23  not your document because the handwriting on the

24  first page is not yours, missing the second page,

25  and missing the checklist?

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 132

1    A.    Yes.

2    Q.    Otherwise, initials, the signatures and

3 the changes, the revisions are yours or Mr. Wilcox's

4 and agreed to by both?

5    A.    Yes.

6    Q.    Do you know who --

7          How do you know this was put together by

8 kind of cut and pasted?

9    A.    Because it is not my document.

10   Q.    I'm sorry.  Say that again.

11   A.    Because it's not my document.

12   Q.    It's not your document because of those

13 things that we discussed?

14   A.    Correct.

15   Q.    Otherwise, it is your document, right?

16         MR. LUBLINER:  Asked and answered.

17   Q.    You can answer that.

18   A.    Yes.  Otherwise, it doesn't appear to be

19 my document.  I'd much rather be looking at my

20 actual document.  There is a chance I forgot some

21 changes he made along the way.  For example, Megan

22 never signed.  I don't know.  Anyway --

23   Q.    Let's look at Exhibit B to this document.

24 It is another iteration of this lease.  It also has

25 the handwriting on the front, correct?

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 133

1      A.   Correct.

2      Q.   **You are claiming that's not yours?**

3      A.   No.

4      Q.   **This is also dated January 25th, 2021,**

5  **Mr. Wilcox and Ms. Luchey, correct?**

6      A.   Correct.

7      Q.   **It has your initials at the bottom?**

8      A.   It has a gold border, which I don't know

9  why.  Mine didn't have a border.

10     Q.   **Okay.**

11     A.   Somebody --

12     Q.   **Could that be a copy of a copy?**

13     A.   I don't know.  You tell me that's the

14 thing.

15     Q.   **Huh?**

16     A.   Please repeat the question.

17     Q.   **The border or whatever that is is not all**

18 **around.  I can see the way it was copied.  Is that**

19 **possible?**

20          MR. LUBLINER:  Form.

21     A.   I can't say what is possible.  All I can

22 say is that mine did not have a gold border around

23 it.  That's how I know it is not my document, among

24 other reasons.

25     Q.   **Okay.  You don't know if this was a copy,**

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 134

1  and when it was copied, the border was created as a

2  result of that copy job?

3       A.    I don't know what it is.

4       Q.    So this one also has --

5             Are those your initials?  Some of those

6  are revisions?

7       A.    Yes, those are my initials approving the

8  professional clean -- professional cleaning that I

9  promised to do.

10      Q.    This also has Page 2 missing?

11      A.    Yes.  Yeah.  Another version.

12      Q.    And those are your initials at the bottom?

13      A.    That's correct.

14      Q.    And here is another revision with your

15  initials as well?

16      A.    Correct.

17      Q.    Go to the bottom of Page 4.  It has your

18  initials at the bottom?

19      A.    Correct.

20      Q.    Here is another revision with your

21  initials also on the left side of the document,

22  right?

23      A.    Correct.

24      Q.    And your initials at the bottom where it

25  says Page 5?

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 135

1       A.   Correct.  My initials.

2       Q.   And once again, small revision, your

3  initials and your initials at the bottom?

4       A.   That's correct.

5       Q.   Page 7 at the bottom has your initials as

6  well, correct?

7       A.   Correct.

8       Q.   And this document also has more revisions

9  and your initials next to those revisions, correct?

10      A.   Right.  Yes.  Correct.

11      Q.   And your initials at the bottom of Page 8?

12      A.   Yes.

13      Q.   And at the bottom of Page 9, your initials

14  as well?

15      A.   That's correct.

16      Q.   And this is also dated January 7, 2021.

17  That's your signature?

18      A.   That's my signature, yes.

19      Q.   That's Mr. Wilcox's signature, as you know

20  him?

21      A.   Yes, sir.

22      Q.   And Page 10 has your initials also at the

23  bottom, correct?

24      A.   Correct.

25      Q.   There is a first -- I'm sorry.  Go ahead.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 136

```
 1      A.   That particular page has a gold border.  I
 2 don't know where that came from.
 3      Q.   You mentioned that.
 4      A.   Yes.
 5      Q.   This is the first amendment?
 6      A.   Correct.
 7      Q.   Subjecting the lease to the Association's
 8 approval, right?
 9      A.   Correct.
10      Q.   And your initials at the bottom, correct?
11      A.   Correct.  Correct.
12      Q.   And this is your signature on January 7th,
13 2021 and Mr. Wilcox's signature as you know it to be
14 on January 6, 2021, correct?
15      A.   That's correct.
16      Q.   And then it looks like a page with a
17 La Pensee Condominium Association application?
18      A.   I would say, yes, that's probably so.
19      Q.   And also your signature at the bottom and
20 Ms. Luchey's signature at the bottom?
21      A.   Yes.
22           Oh, this one is -- just go up.  See this
23 is just Ms. Luchey signing, and then there was a
24 different one, just Mr. Wilcox signing.
25      Q.   Okay.
```

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 137

1      A.   This is her separate application to be a

2  resident for the 150 fee, and then there's a

3  separate -- an identical page for Mr. Wilcox's check

4  presumably and signature.

5      **Q.   And then further there is a page that**

6  **starts with lease term.   A different writing**

7  **altogether?**

8      A.   Yeah.

9      **Q.   Not like the others?**

10     A.   This is definitely not my final document.

11 This is -- during the negotiations, this came into

12 somebody's hands, and this is not the final

13 document.   It was 22.

14     **Q.   But you would agree that this -- whatever**

15 **this document is, it starts with lease terms, and**

16 **that the lease term on this document is**

17 **January 25th, 2021 through January 24th, 2022.**

18 **That's what it states, correct?**

19     A.   Yes.   This was an earlier iteration during

20 negotiation when we were still talking about a

21 renewal option, which we ditched and just made it a

22 two-year lease.   So this is -- somebody grabbed an

23 earlier version and slapped it on the back of a

24 lease.   I don't know who.

25     **Q.   Okay.**

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 138

1      A.   Not me.

2      Q.   **This is not something that you prepared,**

3 **correct?**

4      A.   No.   That's not my testimony, no.

5      Q.   **That's not your testimony?**

6      A.   What I'm saying is this is not my lease.

7 This is a version before we negotiated continuously

8 until we reached the point we had a two-year lease.

9 So this was like the first elbow.

10          You are familiar with lease negotiations

11 I'm sure.   You start somewhere and end.

12      Q.   **Who prepared this document?**

13      A.   I prepared it, but then we kept talking,

14 so this was an older version of something that was

15 in motion.

16      Q.   **So you prepared this particular document**

17 **with this form that starts with lease term as an**

18 **early version for negotiation purposes?**

19      A.   Yes.   Then --

20      Q.   **I am sorry.  Go ahead.**

21      A.   Next question.   Sorry.   Go ahead.

22      Q.   **This was just -- this was prepared by you**

23 **actually as you stated.  I want to make sure I**

24 **understand correctly.**

25          **It was an earlier version of the**

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 139

1  negotiating document that continues to evolve?

2       A.   Correct.

3       Q.   **Even though this document is substantially**

4  **different in font and look from the other leases**

5  **that were prepared --**

6       A.   Yes.

7       Q.   **-- your testimony is that you prepared**

8  **this document?**

9       A.   Yes, early on.

10      Q.   **This it says Page 2 at the bottom?**

11      A.   Yes.  That's not my final page.

12           Why would you have Page 2 in the middle of

13  a document?  That is why I'm saying somebody slapped

14  this together.

15      Q.   **That wasn't you?**

16      A.   Not me.  Certainly not me.

17      Q.   **Exhibit C to this lease, it's another**

18  **standard lease agreement.  You see that?**

19      A.   I see that.

20      Q.   **Is this -- the leases that are styled**

21  **standard lease agreement, is that a lease that you**

22  **prepared?**

23      A.   You know, I don't know why it said

24  standard lease agreement.  Somewhere along the way I

25  got a model, and that's what it called itself, and

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 140

1  that's what I called it.

2       Q.   This is something you prepared, correct?

3       A.   Yes.

4       Q.   This particular version, which is similar

5  to the ones we saw earlier, doesn't have the

6  handwriting on the top, right?

7       A.   That's correct.  That's correct.  No

8  handwriting on the top.

9       Q.   But, otherwise -- and I'm not saying it is

10  the same thing.  It looks -- and it has the same

11  type of font and title as the ones we saw earlier,

12  correct?

13       A.   Yes.

14       Q.   And it is dated January 5th, 2021,

15  La Pensee and Mr. Wilcox and Ms. Luchey, correct?

16       A.   Yes.

17       Q.   Were you reading the lease?

18       A.   I was reading it, yes.

19       Q.   Okay.  No problem.  Take your time.

20       A.   I'm waiting for a question.

21       Q.   Okay.  I didn't know whether you were

22  reading it.  So I can ask you a question?

23       A.   No, that's okay.

24       Q.   Take your time.  Not a problem.

25            I'm going to scroll down a little bit.  At

7b52fb0a-6c70-4996-ae26-fc24236ecc16

1  the bottom of this Page 1, those are I presume your

2  initials and what you know to be Mr. Wilcox's

3  initials?

4      A.   That's correct.

5      Q.   Then this one starts the next page with

6  lease term, correct?

7      A.   Correct.

8      Q.   And the lease term was originally

9  January 25th, 2021, ending on January 24th, 2022,

10  and there is a line through it and it says 2023, so

11  it -- and it has your initials next to it, correct?

12      A.   That's correct.  That's my handwriting and

13  that's my initials.

14      Q.   2023 is your handwriting?

15      A.   I'm sorry.  Yes.  The numbers at the top

16  of the page 2023 and VSM, that's me.

17          On the right, those letters after 24, 23,

18  that's me.  On the left is Mr. Wilcox.  The

19  handwriting on the left margin, that's Mr. Wilcox.

20  Handwriting on the right margin, the top paragraph,

21  that's mine.

22      Q.   Is the last handwriting, almost in the

23  circle that says something about amendment

24  attachment I believe, second amendment and

25  attachment --

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 142

1     A.    Yes.

2     **Q.    -- that's Mr. Wilcox?**

3     A.    Yes.  Never did the second amendment.  He

4 wrote that.

5     **Q.    So there is no second amendment?**

6     A.    No.  There isn't a second amendment.

7     **Q.    That was supposed to be transferring the**

8 **lease from Wilcox to his company; am I correct?**

9     A.    Yes.

10     **Q.    But that never materialized?**

11     A.    But that never materialized.

12     **Q.    Who lined through where it starts with an**

13 **option to renew, mutually exercised by landlord and**

14 **tenant, should both be in agreement, said option, if**

15 **exercised by both, to extend one year from**

16 **termination of this lease term?**

17     A.    Me.

18     **Q.    That was you?**

19     A.    We put a line through from 2022 to the end

20 of the sentence as we negotiated a straight two-year

21 lease.  You are going to give me -- you are going to

22 pay me for the first year up-front.  You'll decide

23 if you want to pay me all up-front this year or pay

24 me monthly.  You pay monthly, and we didn't need any

25 of that.  That was the rubbish, as we say.  I'm

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 143

1  pretty sure we made it -- crossed that out.

2      **Q.   So let me ask you this:  This lease**

3  **contemplates a two-year term through January 24th,**

4  **2023, correct?**

5      A.   Uh-huh, yes.

6      **Q.   Did it also contemplate the possibility of**

7  **extending or an option to go beyond 2023?**

8      A.   It doesn't, but if they wanted to stay, I

9  would have investigated the possibility of having

10  them stay.

11      **Q.   So what happens on January 24th, 2023 in**

12  **your mind?  Does this end or a new lease is entered**

13  **into or does the lease continue?**

14      A.   Well, if prior to then, it would be my

15  obligation and Mr. Wilcox's obligation to discuss

16  his plan to remain or to leave.  If he intended to

17  leave at the end of the term, I would call Ed again

18  if I didn't -- and ask him to relist it, and then

19  Mr. Wilcox would cooperate, and he would cooperate

20  with it being shown, and then I would go through the

21  same motion as I went through the last three times

22  to get the new people approved.

23          If he intended to stay, it would be my

24  obligation to find out from the board through Mary,

25  now Donna, what are the -- what are my options as

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 144

1  far as renewal; can I renew or do we have to do the

2  whole lease or what do we have to do.

3      **Q.   And then you said you wrote out here**

4  **January 24th, 2023?**

5      A.   Pardon me?

6      **Q.   On the right-hand side after January 24,**

7  **2023, that's your --**

8      A.   Yes, that's my handwriting.  "The parties

9  hereby acknowledge that there will only be an

10 extension if acknowledged in writing with both

11 parties upon mutually agreed upon rent."

12           Yes, because then we would discuss new

13 rent.

14     **Q.   So after January 24th, 2023, it would be a**

15 **whole new agreement?**

16     A.   I think so.

17     **Q.   At least as to many terms?**

18     A.   Correct.  As to the material terms, yes.

19     **Q.   Further down, January 15 is crossed out**

20 **and 25th is put in.  That was you, your initials are**

21 **next to it?**

22     A.   No.  That 25 is not me.

23     **Q.   Do you know who it is?**

24     A.   I assume it's David.  I don't know for

25 sure, but he's the only other one that was

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 145

1  negotiating, so I think it was probably David.

2      Q.    I did not see Mr. Wilcox's initials as

3  opposed to the other exhibit next to any revision.

4      A.    Yeah, that's true.   That's correct.   I

5  don't know.

6      Q.    Probably your initials, correct?

7      A.    Those are my initials, yes, sir.

8      Q.    There is something added to here I presume

9  because your initials are there.   I don't see

10 Mr. Wilcox's initials.   Following La Pensee bond

11 approval and prior to --

12     A.    Board.   That's board.

13           La Pensee's board approval, right, and

14 prior to tenancy.

15     Q.    And that you wrote in and initialed,

16 correct?

17     A.    No, I did not write.   That's not my

18 writing.

19     Q.    That's your writing?

20     A.    No.

21     Q.    Do you know whose writing that is?

22     A.    I don't know, but I believe David.

23     Q.    His initials are not next to that either.

24     A.    No.   I missed it I guess.

25     Q.    But the line that starts maybe more than

Page 146

1 4,000 a month, no less than 4,000 a month, somebody

2 wrote will be 4,000.

3          I think those are your initials

4 underneath; is that correct?

5     A.   We were talking about the second year of

6 the two-year lease, what would happen.  This

7 paragraph is reflecting you've already paid me for

8 year one.  What happens in year two?  Well, if you

9 pay me monthly, it is 3900.  If you pay me up-front,

10 I mean -- it's the other way around.

11          If you pay me for the whole year, it is

12 3900 a month.  If you pay me monthly, it is 4,000 a

13 month for the second year of the two-year term.

14     Q.   To clarify this 4,000 per month, you

15 changed that and put the 4,000 and initials?

16     A.   Right, which Mr. Wilcox agreed to.

17     Q.   Right.  He did not have a problem?

18     A.   He didn't.  He certainly was aware.

19     Q.   On the left side, your initials are kind

20 of like floating there.  I'm not sure.

21          What do those initials go to?  This one.

22     A.   Just because there were so many lines, you

23 know -- the underlining, I don't usually underline.

24 He underlined, and I think I put a line through it.

25 Maybe it wouldn't work out.  I think I was just

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 147

1  showing him I noticed everything that he did.

2       **Q.   So do you know what this initial was for?**

3       A.   On the left?

4       **Q.   Yes.**

5       A.   No.  I thought we just talked about that.

6  I was just expressing that I see everything.  I see

7  your changes and you see mine, and we are good.

8       **Q.   But Mr. Wilcox's initials are not next to**

9  **any of these changes, correct?**

10      A.   Correct, but he never objected to anything

11 as far as our agreement as to the second year, 3900

12 versus 4,000.  He's paying me 4,000 a month right

13 now.

14      **Q.   He's paying you monthly right now?**

15      A.   He's paying me monthly on time, no

16 problem, and he decided not to pay for the full

17 year.

18      **Q.   On the bottom -- this is Page 2 -- there**

19 **are some initials there, and one is yours and the**

20 **other one you know to be Mr. Wilcox's?**

21      A.   That's correct.

22      **Q.   The next page says changes, which I**

23 **believe are similar to the changes that we saw on**

24 **the previous iterations of the lease.  Is that**

25 **correct?**

Page 148

1      A.   Yeah.

2      Q.   With your initials next to it?

3      A.   Yeah.  Seems to be, yes.  Yes.

4      Q.   And then this is Page 3, and it contains

5  your initials and Mr. Wilcox's initials?

6      A.   Yes.

7      Q.   Now, this change also seems to have been

8  in one of the prior iterations we saw, also

9  initialed by you, correct, the COVID test for

10  entering the property?

11      A.   Right.

12      Q.   It looks like it was one on the prior --

13  one in the prior iterations, correct?

14      A.   Yes, I think so.

15      Q.   At the bottom -- these check marks you

16  said earlier were, at least on the other iterations,

17  you are not sure whose check marks those are?

18      A.   I think it was Mr. Wilcox, but they are

19  not mine.  That's all I can say for sure.

20      Q.   Page 4 at the bottom has your initials,

21  and would you believe -- or noted to be Mr. Wilcox's

22  initials?

23      A.   Correct.

24      Q.   There is also your initials next to a

25  handwriting or handwritten addition to the side of

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 149

1  the lease that seems to be similar to one of the

2  other versions somebody wrote, correct?

3       A.   Yes, correct.

4       Q.   Page 5 at the bottom, those are your

5  initials and Mr. Wilcox's?

6       A.   That's right.  Yes, sir.

7       Q.   And this also discusses the COVID test

8  issue in one of the prior iterations, and it has

9  your initials at the bottom next to the change, and

10 at the bottom your initials and Mr. Wilcox's

11 initials as well?

12      A.   Correct.

13      Q.   Page 7 has your initials and Mr. Wilcox's

14 initials, right?

15      A.   That's correct.

16      Q.   And this change also seems to be similar

17 or the same as prior iterations that we saw, service

18 animal, and it is initialed by you, and then there

19 is another change further down.  It is also

20 initialed by you, COVID testing 72 hours?

21      A.   Yes.

22      Q.   And then the security deposit was a line

23 through as prior iterations?

24      A.   What's that?

25           MR. LUBLINER:  Wait for a question.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 150

```
 1            THE WITNESS:  Okay.

 2       Q.   (By Mr. Israel) At the bottom of Page 8, your

 3  initials are at the bottom or Mr. Wilcox's initials are

 4  on the bottom next to the line through security deposit

 5  disclosure item, correct?

 6       A.   Correct.

 7       Q.   And the next page, your initials are next

 8  to the continued line through of security deposit

 9  disclosure?

10       A.   Yes.

11       Q.   That's yes?

12       A.   Yes.

13       Q.   At the bottom of Page 9, you have your

14  initials and Mr. Wilcox's initials as well, correct?

15       A.   That's correct.

16       Q.   And this document is also dated

17  January 7 -- January 7, 2021, as prior iterations,

18  and it is signed by you as well, correct?

19       A.   Right.  Yes.

20       Q.   And then that other signature purports to

21  be, as you know it, Mr. Wilcox's, correct?

22       A.   Yes.

23       Q.   At the bottom of that Page 10 are your

24  initials and Mr. Wilcox's initials?

25       A.   Correct.
```

1    Q.   Do you know why there is a line kind of

2 across almost all the page numbers?  Do you know who

3 drew that line?

4    A.   Not me.  I think that was just

5 Mr. Wilcox's habit of showing to himself that he saw

6 each page.  That's the initials, no.  Reminded him

7 he saw it.  I don't know.  You have to ask him.  I

8 did not do it.

9    Q.   You didn't do it?

10    A.   No.

11    Q.   So this next page on the document dated

12 January 25th, 2021, final security and full rental

13 fee deposit receipt, is that your handwriting,

14 Ms. Manzo?

15    A.   That's my handwriting.

16    Q.   It is to be signed by the landlord when a

17 bank check is received and keys given 1/25/2021,

18 correct?

19    A.   Correct.

20    Q.   Further down, I believe those are your

21 initials?

22    A.   Appears to be.  48,600 rent.

23    Q.   And this is confirming that you received

24 these funds, correct?

25    A.   Yes.  This is a receipt that I got a bank

7b52fb0a-6c70-4996-ae26-fc24236ecc16

1  check just for the 12-month period, each 12-month

2  period.  That's what it covered, 12 months.

3       Q.    And this would be Page 11?

4       A.    Uh-huh.

5       Q.    And a signature?

6       A.    Right.

7       Q.    And I believe, although it looks a little

8  different, but would that be Mr. Wilcox's signature?

9       A.    I imagine it is, yes.

10       Q.    And then your initials and Mr. Wilcox's

11  signature?

12       A.    And it was my intention to sign it when I

13  saw the check.

14       Q.    This version is not signed?

15       A.    That's correct, by me.

16       Q.    By you?

17       A.    Correct.  Not by them.

18       Q.    Do you know what this portion of the --

19       A.    I'm assuming it wasn't signed either

20  because he wasn't standing in the unit, you know,

21  checking it out when this was -- when he looked at

22  this.  The intention was for him to hand the money

23  as we hand him the key and give the checklist, and

24  he would do that.

25       Q.    Those are your initials on Page 12, right?

Page 153

1        A.    Yes, sir.

2        Q.    And what you believe to be Mr. Wilcox's

3   initials?

4        A.    Yes.

5        Q.    Okay.  So this one has a move-in

6   checklist?

7        A.    Yes.

8        Q.    And it says to be completed January 25th,

9   2021, yes, and then your initials, correct?

10       A.    That's right.  Yes.  We were on the same

11  page, and I agreed that this was protective of us.

12       Q.    And this version, just a blank, although

13  it has your initials and Mr. Wilcox's?

14       A.    Yes.  My intention was to let him know

15  that we would do this to protect ourselves, and he's

16  agreeing by initialing it that this would be filed

17  with Ed so that both of us know if there is any

18  damage and if he's taking it with damage, I can't

19  claim he did it.  And, likewise, he can't say that I

20  gave him something that is broken because he's going

21  to check it off with Ed.  This was just him saying

22  he'll do it to me.

23       Q.    Okay.  And same thing on the next page,

24  which is also initialed by you and Mr. Wilcox,

25  Page 14?

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 154

1      A.    Correct.

2      Q.    And the next page, Page 15, is also blank

3 and as has your initials and Mr. Wilcox's?

4      A.    That's correct.

5      Q.    It continues -- it seems to be Page 16,

6 exactly the same way, just blank?

7      A.    Correct.

8      Q.    A page with no information other than just

9 specific categories and yours and Mr. Wilcox's

10 initials?

11     A.    Correct.

12     Q.    Next page, exactly the same way with the

13 initials and Mr. Wilcox's, no specific information

14 filled in on Page 17?

15     A.    Correct.

16     Q.    Page 18, though, seems to be the end of

17 this list, and it is signed by -- is that Mr. Wilcox

18 as you know it?

19     A.    I think so, yeah, but then it says TBC, to

20 be continued.  I'm assuming that's what he meant,

21 but it is true.  It was to be continued.  We would

22 actually fill it all out.  He would actually fill it

23 out.

24     Q.    January 25th, 2020 -- I presume it is

25 2021?

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 155

1      A.    Yeah.

2      Q.    The "one" doesn't show up?

3      A.    Yeah.  Correct.

4      Q.    As you said TBC, double underline, those

5 are not your letters, correct?

6      A.    No, not my letters.  Correct.

7      Q.    And it is Page 18, and your initials and

8 Mr. Wilcox's initials?

9      A.    Yes.

10      Q.    Then there is an first amendment dated

11 January 5th 2021, and it's the same thing, subject

12 to, as we saw on previous iteration, the

13 Association's approval, correct?

14      A.    Correct.

15      Q.    No weekend movements permitted, the rules

16 and regulations.  That's also initialed by you and

17 Mr. Wilcox, correct?

18      A.    Yes.

19      Q.    And then the next page is your signature

20 page -- signature page, and it's signed by you on

21 January 7th, 2021, correct?

22      A.    Correct.

23      Q.    And then signed by appears to be I presume

24 Mr. Wilcox or as you know Mr. Wilcox's signature on

25 January 6, 2021, correct?

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 156

1     A.   Correct.

2     Q.   And it is not signed by Ms. Luchey?

3     A.   Correct.

4     Q.   And this -- the number two was added.  Do

5 you know who added that number two at the bottom?

6     A.   Me.

7     Q.   You did?

8     A.   Yes.

9     Q.   Is there a specific reason you added the

10 number two?

11    A.   No.  I don't know.  I don't remember.

12    Q.   Those are your initials down there?

13    A.   Yes.

14    Q.   And what purports to be Mr. Wilcox's,

15 right?

16    A.   Correct.

17    Q.   So would you say that this version, the

18 last version of this, is that the version that you

19 believe to be the correct version to be signed?

20    A.   Yes.

21         MR. ISRAEL:  Let's take a five-minute

22    break if everybody is okay.  Okay, five-minute

23    break.

24         MR. SPARKS:  Yes.

25         MR. ISRAEL:  Come back at 2:20.  Thank

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 157

1      you.

2           (Recess taken from 2:13 p.m. until 2:21

3      p.m.)

4      Q.   (By Mr. Israel) Back on the record.

5           I want to ask you some questions about

6  this exhibit to the complaint in the federal

7  lawsuit, a letter from JoAnn Burnett from Becker,

8  Poliakoff dated July 2021.

9           We were just talking about the leases.  I

10 kind of wanted to continue the same theme, as you

11 would.

12          So Ms. Burnett wrote this letter on July

13 20, 2021.  Did you know who Ms. Burnett was prior to

14 receiving this letter?

15     A.   No.

16     Q.   You had never spoken to her or e-mailed

17 with her prior to July 20, 2021, correct?

18     A.   You know, I did.  She -- I believe she may

19 have e-mailed me prior.  I remember saying I have

20 counsel and you have to speak to counsel.  That is

21 why she wrote to Richard Lubliner.

22     Q.   Okay.  But this letter is addressed to

23 Mr. Lubliner and then Ms. Luchey and Mr. Gelber and

24 Mr. Lepselter and Chad Engram, and then you and then

25 and Mr. Lepselter on behalf of La Pensee 303.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 158

1              My guess is she didn't know at this point

2   you had counsel or it was prior to you getting

3   counsel.

4        A.   Either way, I don't know who she was.   I

5   do recall advising her once I retained my counsel.

6        Q.   Okay.  So it's also addressed to Tom

7   De Marinis, your husband?

8        A.   Correct.

9        Q.   It is to La Pensee Condominium

10  Association, Inc., lease expiration, July 24, 2021.

11             So let's go through this letter.  She

12  talks about Mr. Wilcox leasing Unit 303 owned by

13  La Pensee 303, LLC and managed by you.  And so far

14  the first paragraph, would you say that's an

15  accurate paragraph, the description of who's living

16  there and who owns what?

17             MR. LUBLINER:  Form.

18        A.   I said the paragraph was correct.

19        Q.   And she tells you in paragraph one that

20  she is representing La Pensee Condominium

21  Association, Inc. and just the Association.  She is

22  not representing Ms. McFadden or MAC Residential,

23  correct?

24        A.   That's what she says.

25        Q.   She says that Mr. Wilcox and La Pensee 303

United Reporting, Inc.
(954) 525-2221

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 159

1  entered into a six-month standard lease agreement

2  beginning January 25th, 2021.  The term of the

3  agreement expired July 24, '21.

4          Would you say that's an accurate statement

5  or inaccurate statement?

6      A.   One hundred percent fake.

7      Q.   Fake.  Is that what you said, fake?

8      A.   Yeah, fake.  100 percent not true.

9      Q.   As I am sure you are all aware, the

10 agreement submitted to the Association did not have

11 Page 2.  Do you know whether that's an accurate

12 statement or not in your opinion?

13     A.   No, not aware of that.  It was Mary's job

14 to get it, and if she didn't have it, they are still

15 looking for it in July, somebody didn't do their

16 job, and it wasn't -- Go ahead.

17     Q.   You didn't -- we discussed this earlier.

18 I know your testimony was you did not provide any

19 iteration of the lease to Mary?

20     A.   Correct, I did not, because I never had in

21 the past, and why should I be worried about it in

22 the beginning, the first two tenants?  It wasn't

23 my -- it wasn't my job to give it to her, although I

24 would have had she asked.

25     Q.   You had an old version of the agreement in

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 160

1 your possession, did you?

2      A.    I did.

3      **Q.    You did?**

4      A.    Uh-huh.

5      **Q.    The next sentence here says, "Accordingly,**

6 **Ms. McFadden, the Association's manager, inquired of**

7 **Ms. Manzo, the managing member of La Pensee 303, the**

8 **term of the agreement.  Ms. Manzo advised it was a**

9 **six-month lease agreement."**

10           Is that accurate?

11      A.    No, that's not accurate at all.  That is

12 completely fabricated I would presume by Mary's end.

13 I wasn't part of the conversation.  There was no

14 conversation where I said it was a six-month lease

15 because it never was.  You just went through the

16 iterations.  It was never a six-month lease.  Come

17 on.

18      **Q.    Prior tenants had stayed for shorter**

19 **periods of time.**

20      A.    They were actually -- they were as long as

21 I could talk them into it.  One was actually a

22 one-year lease, and one was a little bit less, but

23 they always wound up extending them because of

24 construction, as you well know.  In order to get

25 construction in New York or Florida, we take longer

United Reporting, Inc.
(954) 525-2221

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 161

1  to inspect.  So as long as we could extend it, they

2  extended it.

3       Q.   So the next sentence here says,

4  "Ms. McFadden wrote the dates on the top right-hand

5  corner of the agreement, that six-month lease" --

6       A.   Excuse me, Mr. Israel.  That's where I got

7  the idea that she wrote the lease.  I figured it.

8       Q.   Do you know where -- you don't know where

9  Ms. Burnett got this information?

10      A.   No.

11      Q.   When you stated earlier you thought

12  Ms. McFadden had provided information to

13  Ms. Burnett, you don't know if that's accurate or

14  not?

15      A.   I was not privy to any conversation

16  between them.

17      Q.   "The six-month lease term was the only

18  lease term approved by the Association."

19           Would you say that's an accurate

20  statement?

21      A.   No.  I said that's a lie.  First, she

22  didn't know the lease term, and then she said it's a

23  six-month.  Even within that one paragraph, there is

24  inconsistencies.

25      Q.   By Ms. Burnett?

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 162

1    A.    In the paragraph.

2    **Q.    In this letter?**

3    A.    No Page 2, but it was a six-month lease.

4 What does that mean?   Page 2, that has the lease

5 term.

6    **Q.    But she is also saying here that you had a**

7 **conversation with Ms. McFadden --**

8    A.    Yes, that's not true.

9    **Q.    Let me finish.**

10    A.    I'm sorry.   Go ahead.

11    **Q.    -- in which you allegedly advised her**

12 **there was a six-month lease.   You are saying that's**

13 **not accurate?**

14    A.    That's a complete fabrication.

15    **Q.    Your position is that never took place?**

16    A.    That conversation never took place.

17    **Q.    What term did the Association ultimately**

18 **approve in your mind for the tenancy by Mr. Wilcox?**

19    A.    I submitted a year lease to Mr. Lepselter

20 in full with every page from the 19th of January.

21 On the 25th, I got a green light for Mr. Wilcox to

22 move in.   I assumed that everything was properly

23 authorized, and that would seem to indicate with a

24 two-year lease from the beginning of the lease term.

25 There was never --

7b52fb0a-6c70-4996-ae26-fc24236ecc16

1     Q.    You negotiated the two-year lease

2 according to you with Mr. Wilcox, and according to

3 you, that's the lease that was signed and in place

4 and that was to be provided to the Association by

5 Mr. Lepselter?

6     A.    That's correct.

7     Q.    Not by you?

8     A.    Not by me.

9     Q.    So if Mr. Lepselter somehow did not

10 provide that lease agreement to the Association

11 and --

12     A.    Go ahead.

13     Q.    Then if he did not provide that lease

14 agreement or provided a lease agreement with a

15 missing second page, then it is not certain they

16 approved the two-year tenancy, correct?

17     A.    Then somebody didn't do their job because

18 they were supposed to have approved the two-year

19 tenancy.  That's what I committed.  They gave him --

20 they let me give him the deed that it facilitated

21 his movement.  Tom worked with him.  We worked on

22 the date.  We worked -- can't move on the weekend.

23 We did everything according to the rules that we

24 knew of.

25     Q.    Do you know why Ms. McFadden would have

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 164

1 **been requesting copies of Page 2 or a complete lease**

2 **from the realtors if she had one in her possession?**

3      A.   No.   No.   I don't know why she would be

4 asking.   She shouldn't have been asking.   She should

5 have had it in her possession before she gave him

6 the keys.

7      Q.   **It's possible that Mr. Lepselter never**

8 **gave it to her, correct?**

9      A.   I don't know what is possible.   All I know

10 is I provided it, and she never picked up the phone

11 and said, Valerie, send me Page 2.   I would have

12 sent it.   We were very cordial.   Did you see I

13 wished her a happy New Year?   There was no reason

14 for me not to give it to her.   She didn't call me

15 once and ask for it because I would have sent it.

16           I'm an attorney.   I have an unblemished

17 record.   Why would I not give her Page 2?   There was

18 no reason to not give her Page 2.

19      Q.   **Well, unless you didn't want the**

20 **Association to know that it was a two-year lease.**

21      A.   No.   That's ridiculous.   Why wouldn't I

22 want them to know?   As I said, as an owner, I would

23 have been thrilled with a two-year lease.   That's

24 stability.   There was no reason --

25      Q.   **That's your opinion, correct?   It is your**

7b52fb0a-6c70-4996-ae26-fc24236ecc16

1  position -- it's your position, correct, that the

2  two-year lease is better than a one-year lease?

3      A.   Yes.

4      Q.   That a five-year lease is better than a

5  two-year lease?

6      A.   That's my opinion.  Not a legal standard.

7  It is my opinion.

8      Q.   That's your opinion.  I'm not asking you

9  for a legal interpretation.

10      A.   As a landlord -- as a landlord for many

11  years, it is my opinion that stability is a good

12  thing in tenants.

13      Q.   Let me ask you a question.  So if the

14  Association had approved a two or three year,

15  four-year lease, five-year lease, whatever the term

16  the landlord and tenant agreed to, and then there

17  are problems with this tenant, but the landlord

18  doesn't agree there are problems with the tenant,

19  what is the Association supposed to do with that?

20          MR. LUBLINER:  Form.

21      A.   I don't know what the Association is

22  supposed to do with that at that point.  If it

23  doesn't rise to the level of a breach of the lease,

24  there is nothing that I can do about it.  He has to

25  breach the lease.  He has rights under the lease and

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 166

1 all other --

2      Q.   Go ahead.

3      A.   All the things that they were complaining

4 about were -- never rose to the level of breach of

5 lease.  So he has rights that I was aware of.

6      Q.   So if, for example, Mr. Wilcox violated

7 the Association's rules and regulations, that's not

8 a breach of the lease?

9           MR. LUBLINER:  Form.

10      A.   I think he was entitled to a hearing if he

11 had violated some rule.  There is a protocol to have

12 been followed.  That was never followed by anybody,

13 including Mary.  First, he gets a warning.  Then he

14 gets an opportunity to be heard, called due process.

15 Just because someone says something doesn't make it

16 so.  And I wrote that to Mary.  I sent different

17 versions of the certified letter, e-mails, phone

18 calls.

19           I would send -- whatever concerns you have

20 about this tenant, I need evidence, actual evidence,

21 documentary evidence.  I'm a former prosecutor.  I

22 know what evidence looks like, and people have a

23 right to be heard.

24      Q.   You know that if that rises --

25           MR. LUBLINER:  I don't know if you are

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 167

1      still answering.  Were you done?

2      **Q.   Were you done?  I am sorry, I didn't mean**

3  **to cut you off.**

4      A.   I'm done.

5           MR. LUBLINER:  Okay.

6      **Q.   Do you know if the right to be heard you**

7  **believe extends to tenants of the unit also or just**

8  **owners of the unit?**

9      A.   I believe it is --

10          MR. LUBLINER:  Form.

11     A.   -- it is tenants.

12     **Q.   So it's your opinion that if a tenant**

13 **violates rules and regulations, he should be given**

14 **an opportunity to explain before the board prior to**

15 **any actions being taken?**

16          MR. LUBLINER:  Form.

17     A.   There is a fine committee that can fine

18 people.

19          They never even fined him or me.  So

20 before you affix a fine for something that was

21 alleged, you have to have some sort of a hearing.

22          Well, I didn't know anything about -- I

23 wasn't living there.  So you have to have the people

24 who were in the know, who saw something happen,

25 testify, but it is alleged.  And then the person who

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 168

1  has alleged to have done something has to have an

2  opportunity to say yes or no or whatever to be

3  heard.

4      Q.   If I understand it correctly -- I'm not

5  asking you for a legal opinion.  I know you don't

6  live in Florida.  I'm not asking that.  I'm asking

7  from your personal belief, understanding, position.

8          It's your position that the Association

9  couldn't take any action against either you or

10 Mr. Wilcox because they didn't give him a fair

11 opportunity for him to present his side of the

12 issues and the facts before they took legal action?

13          MR. LUBLINER:  Form.

14     A.   Yes.  I believe that they would have to

15 have done it that way.  I'm not certain if it's in

16 Florida law or in the declaration or the rules.  I'm

17 not sure where it would be, but I know they had a

18 fine committee, and it was laid out exactly how

19 things were to happen if there was an alleged

20 violation.

21     Q.   So let's continue here.  You told me --

22 so, finally, on or about July 8, 2021, an agreement

23 was sent to Ms. McFadden with a purported Page 2 of

24 the agreement to extend the lease term by an

25 additional six months, or a one-year lease in total.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 169

1            Do you know what lease agreement

2  Ms. McFadden received or who she received it from

3  that had a one-year term lease in the lease?

4       A.   I did not send anything in July.  I did

5  not have a conversation with her in July.  She may

6  have gotten something from Mr. Gelber in July, which

7  was not my document at all.  He testified in the

8  other case about receiving -- about sending

9  something to her.

10       Q.   He sent her allegedly a lease that

11  continued a one-year term, do you know?

12       A.   I don't know what he sent her, but it

13  wasn't my lease.

14       Q.   There were iterations of your lease that

15  contains a one-year term, correct?

16            MR. LUBLINER:  Form.

17       A.   Yes.  In the beginning, it was finalized.

18       Q.   Is it possible that he sent her,

19  Ms. McFadden, one of those iterations of a one-year

20  lease?

21       A.   Yes, it is possible.  You have to question

22  him as to what exactly he sent.

23            Why is she asking for it in July?  I know

24  I'm not supposed to ask you questions.

25       Q.   Okay.  Do you know why Ms. Burnett here is

United Reporting, Inc.
(954) 525-2221

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 170

1  claiming that the lease that was received from

2  somebody by Ms. McFadden had a different font and

3  style than the other leases?

4      A.   No.  I don't know what she did.

5      Q.   Did you ever see the lease that

6  Ms. McFadden received from some third party, whether

7  it was Mr. Gelber or someone else?

8      A.   I think it was the ones we just looked at,

9  but I wasn't part -- he didn't e-mail it to me.  I

10 didn't get it from Roy.

11     Q.   What was your reaction when you received

12 this letter from --

13          And if you had counsel at that point -- I

14 don't need you to tell me what you discussed with

15 counsel -- what was your reaction to receiving this

16 letter from Ms. Burnett?

17          MR. LUBLINER:  I appreciate David's

18     instructions, but if you had a personal

19     reaction that did not involve any communication

20     with me, go ahead and answer.

21     A.   Well, I was horrified.  What are you

22 talking about?  My personal reaction was this was --

23 I don't want to curse, but this is a pile of

24 nonsense.  None of this is true.  I don't know what

25 you are talking about.

Page 171

1       Q.    Go ahead.

2       A.    I referred to my counsel, and I didn't

3  respond at all.

4       Q.    Okay.  That was my next question.

5             Did you reach out to Ms. Burnett and

6  respond in any way at that point other than retain

7  Mr. Lubliner?

8             MR. LUBLINER:  Answer the question.  You

9        are not going beyond saying yes or no.

10      A.    I did not.

11      Q.    You did not respond?

12      A.    No.

13      Q.    Were you aware that the Association was

14  going to file a lawsuit requiring you to remove

15  Mr. Wilcox from the unit prior to the lawsuit being

16  filed?

17      A.    I don't know that they would go so far and

18  sue me.  I knew they were trying to bully me into

19  throwing him out for some transgressions for which

20  they never had a hearing, and I knew that there

21  was -- there was a discussion of things having

22  happened, perhaps having happened, allegedly having

23  happened.  I was not aware they were going to sue

24  me.

25      Q.    Did you -- if they had, in fact, had a

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 172

1  **hearing and found that Mr. Wilcox committed these**

2  **transgressions, would you at that point have removed**

3  **him if they had that hearing?**

4          MR. LUBLINER:  Form.

5      A.   If it was established that he did

6  something that violated my lease, then I would have

7  considered removing him.  I would have had a legal

8  action and the lease --

9      **Q.   What --**

10     A.   It never came, all the allegations.

11     **Q.   I'm sorry.  Go ahead.**

12         MR. LUBLINER:  She did not finish.  I

13     don't know.

14     A.   Ask me the question again, Mr. Israel.

15         MR. ISRAEL:  Madam Court Reporter, could

16     you read the question, please?

17             (The pending question was read by the

18     reporter as recorded above.)

19         MR. LUBLINER:  Form.

20     A.   If I had concluded that what had happened

21  rose to the level of a violation of my lease, I may

22  have taken action against him.  I would imagine I

23  would have researched whether he could be removed

24  based on what had happened, but up until that point,

25  I had no clue that anything happened.  I would have

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 173

1  done whatever the board required of me.

2      Q.   If it was shown that Mr. Wilcox had

3  allegedly violated the Association's governing

4  documents, rules and regulations, bylaws, whichever,

5  would that have been sufficient for a breach of a

6  lease in your mind?

7           MR. LUBLINER:   Form.

8      A.   I was not an expert in this area in

9  Florida, so I would have like hired counsel in

10  Florida who understood the Florida rules.  I would

11  have asked that counsel.  It could have been Mitch,

12  could have been anybody else to review the

13  declaration, the bylaws and the rules and regs that

14  were provided and make a determination as to whether

15  it would be my obligation to bring an action to the

16  board.  And don't forget there were COVID rules at

17  the time.  You couldn't evict federally before the

18  26th of August, and Florida actually had a rule that

19  you couldn't evict until I think the 16th of

20  October.  There were evictions saved that came into

21  play as well.

22      Q.   Let me ask you a question.  If it involved

23  violations of law and not just governing documents,

24  would that be sufficient in your mind for you to

25  remove the tenant from the property?

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 174

```
 1            MR. LUBLINER:  Form.
 2      A.   You mean if he went out and murdered
 3 somebody?
 4      Q.   There are other violations of the law that
 5 don't include murdering people.
 6      A.   I'm sure.
 7      Q.   Kill somebody --
 8      A.   I don't know.  I don't know the answer to
 9 that.
10            MR. LUBLINER:  Form.
11      A.   I don't know if that's a violation.  I
12 would have hired counsel.
13      Q.   Even though there was a violation of the
14 law, that in your mind, without advice of counsel,
15 would not be in and of itself sufficient?  I'm not
16 talking about murdering someone.  I'm talking about
17 other violations of the law that could be much less
18 than murdering somebody.
19      A.   Yeah.
20            MR. LUBLINER:  Form.
21      A.   I don't know what would -- I would have
22 done whatever the law required and permitted.  I
23 mean, black people get arrested for drunk driving.
24 Does that mean he violated my lease?
25            I would tend to doubt it.  I think it
```

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 175

1  would -- I would have to look into it further.  I

2  really don't know the answer to that.

3      **Q.   So if it was a charge of domestic**

4  **violence, would that be sufficient for you to**

5  **believe that there was a basis for removal of the**

6  **tenant?**

7          MR. LUBLINER:  Form.

8      A.   I don't know the answer to that.  All I

9  know is that the victim of the domestic violence in

10 New York is permitted to use that as a reason to

11 leave the premises, abandon the lease.  That is why

12 I had that domestic violence provision in that

13 lease, because I actually agree with that law, that

14 if you are a victim of domestic violence, the

15 landlord shouldn't put your feet to the fire and

16 make you live with the abuser.

17          So I would say that if somebody were a

18 victim of domestic violence -- but if they were the

19 perpetrator, what would I do?  I don't know.  I

20 would have to look into it.

21     **Q.   So if it was -- if it was a domestic**

22 **violence issue, you would let him out of the lease,**

23 **but you would have to determine whether it was**

24 **appropriate to remove them from the property?**

25          MR. LUBLINER:  Form.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 176

1       A.   I don't know.  I don't know what I would

2  have done if they were -- in all these years, I

3  never had a victim of domestic violence living in my

4  units, and that's still the case today, so my

5  premise that I hold as the landlord.  I would have

6  to educate myself on what is the proper reaction if

7  people who are living in a place you own are being

8  domestically violent to each other.  I don't really

9  know what the rules are.  I'm not going to make it

10  up.  I don't know what they are.

11       Q.   So did you ever -- One second.

12            Did you ever see -- can you see the photo

13  I'm sharing with you?

14       A.   Okay.

15       Q.   Do you know what that -- did you ever see

16  that photograph before?

17       A.   No, I don't think so.

18       Q.   Did you ever hear the recording that

19  Mr. Wilcox made, the private meeting behind that

20  closed door?

21            MR. LUBLINER:  Form.

22       A.   I don't think so.  I don't think I have

23  listened, but I know that there was a conversation

24  that could be heard through the door, and I heard

25  about the conversation.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 177

1      Q.   What did you hear about that?

2      A.   I heard that Mary McFadden was screaming

3  at Todd Gates, and she used --

4      Q.   Who did you hear that from?

5      A.   From David Wilcox.

6      Q.   So whatever Mr. Wilcox tells you, you just

7  take it as gospel?

8      A.   No.

9           MR. LUBLINER:   Form.

10     A.   He sent the recording.

11     Q.   He sent the recording?

12     A.   I don't think I listened to it, but he

13  told me about it, and he sent it to me.

14     Q.   Okay.

15     A.   And supposedly --

16     Q.   Go ahead.   I'm sorry.

17     A.   He's standing there.   That's the picture

18  of that.   I don't think I ever saw the picture.

19     Q.   So he sent you the recording of what was

20  said, correct?

21     A.   Yes, I believe that is so.

22     Q.   And are you aware that under Florida law,

23  that could be considered a felony, to record

24  somebody without permission in a private setting?

25           MR. LUBLINER:   Form.

United Reporting, Inc.
(954) 525-2221

```
 1      A.   It's not in a private setting.  He was in
 2 a public space.
 3           He was in a public space.  She was in a
 4 private space, and he was in a public space, and he
 5 could hear it.
 6      Q.   So if I go to your office and there is a
 7 hallway, and I stick my phone on your mail slot and
 8 record you, that would be appropriate even though
 9 you are in your office having a conversation?
10           MR. LUBLINER:  Form.
11      A.   I'm sorry.
12           MR. LUBLINER:  Form.  Go ahead.
13      A.   I believe Mary came to the door.  So if
14 I'm standing around the back and I could hear
15 somebody threatening the bank teller, I'm not
16 allowed to testify in Florida to that?
17      Q.   Testifying is one thing.  Recording is
18 something else.
19           MR. LUBLINER:  She is not a criminal
20      expert.  She is a nonparty witness.
21      A.   I was advised --
22           MR. ISRAEL:  You know, expertise as a
23      lawyer in Florida -- I understand she is not a
24      licensed Florida lawyer.  I'm just asking
25      her --
```

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 179

1          MR. LUBLINER:  You are asking her is it

2      proper.  Inappropriate.  She is a fact witness.

3      **Q.   (By Mr. Israel) Ms. Manzo, so just to go back**

4  **for a second to my line of questioning.  It is 3:00.**

5          **You did not find this to be an issue for**

6  **which you needed to take any action with regards to**

7  **your tenant?**

8          MR. LUBLINER:  Form.

9      A.   No.  Why would I have a problem?

10     **Q.   This is not a breach of the lease,**

11 **correct?**

12     A.   No.

13         MR. LUBLINER:  Form.

14     A.   Correct.  That's correct.  This is not a

15 breach of the lease.

16     **Q.   Let me ask you this so I know.  What would**

17 **be a breach of lease in your mind?**

18         MR. LUBLINER:  Asked and answered.  Form.

19     A.   Well, destruction of property, nonpayment,

20 not letting me know that something broke.  Those are

21 breaches of duties.

22     **Q.   When you say destruction of property, are**

23 **you talking about you doing it or talking about the**

24 **Association?**

25         MR. LUBLINER:  Form.

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 180

1      A.    Destruction of my property, something in

2  the unit.

3      **Q.    Got it.  Got it.**

4           MR. ISRAEL:  All right.  Rich, it is 3:00.

5           MR. LUBLINER:  Okay.  You want to go off?

6           MR. ISRAEL:  I'm sorry?

7           MR. LUBLINER:  You want to go off and have

8      the conversation?  Because I assume it means

9      scheduling.

10          MR. ISRAEL:  That's fine.

11              (Discussion off the record.)

12              (Whereupon, the deposition was adjourned

13        at 3:10 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 181

1  AND FURTHER DEPONENT SAITH NAUGHT

2

3

4

5                                    _____

6                                    VALERIE MANZO

7

8          Sworn to and subscribed in my presence this

9  day of                    , 2022.

10

11

12                         _____

13                             Notary Public
                               State of Florida

14

15

16

17

18

19

20

21

22

23

24

25

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 182

CERTIFICATE OF OATH

STATE OF FLORIDA,

COUNTY OF BROWARD.


        I, Laurie Susskind, Registered Professional

Reporter, and Notary Public, State of Florida, certify

that VALERIE MANZO remotely appeared before me on the

26th day of April, 2022, and was duly sworn.


        Signed this 24th day of May, 2022 

        _Laurie Susskind_

        _____

        LAURIE SUSSKIND, RPR

        Notary Public, State of Florida

        Commission No. HH 003132

        My commission expires: 9/22/24

7b52fb0a-6c70-4996-ae26-fc24236ecc16

Page 183

REPORTER'S DEPOSITION CERTIFICATE


STATE OF FLORIDA)

COUNTY OF BROWARD)


    I, LAURIE SUSSKIND, Registered Professional

Reporter, do hereby certify that I was authorized to

and did stenographically report the deposition of

VALERIE MANZO; that a review of the transcript was

requested; and that the transcript, Pages 1 through

183, is a true record of my stenographic notes.

    I FURTHER CERTIFY that I am not a relative,

employee, attorney or counsel of any of the parties,

nor am I a relative or employee of any of the parties'

attorney or counsel connected with the action, nor am I

financially interested in the action.

    Dated this 24th day of May, 2022, at Fort

Lauderdale, Broward County, Florida.


*Laurie Susskind*

_____

       LAURIE SUSSKIND, R.P.R.

Page 184

```
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
                WEST PALM BEACH DIVISION

                CASE NO. 9:21-CV-81565-DMM
```

WILLIAM DAVID WILCOX, JR. a/k/a
DAVID WILCOX, an individual, and
MEGAN DANIELLE LUCHEY, an individual,

        Plaintiffs,

vs.

LA    PENSEE    CONDOMINIUM,
ASSOCIATION, INC., a Florida Not-For-
Profit Corporation, MARY McFADDEN, an
individual,     MAC    RESIDENTIAL
MANAGEMENT SERVICES, LLC, a Florida
Limited Liability Company, and
DAVID WOLFF a/k/a DAVID WOLF, an individual,

        Defendants.

      To:  LUBLINER LAW
      c/o: Valerie Manzo
      By:  RICHARD S. LUBLINER, ESQ.
           1645 Palm Beach Lakes Boulevard, Suit 1200
           West Palm Beach, Florida 33401

           Your deposition taken in the above
      entitled cause is now ready for signature.
      Please come to this office and sign same; or
      if you wish to waive the signing of the
      deposition, please so advise.
           If this deposition has not been signed
      by June 24, 2022, we shall consider your
      signature waived.
           UNITED REPORTING, INC.

           1218 Southeast 3rd Avenue
           Fort Lauderdale, Florida 33316
           (954) 525-2221

            Laurie Susskind, R.P.R.

```

7b52fb0a-6c70-4996-ae26-fc24236ecc16

**A**

**a.m** 1:20 26:22 27:10 27:16,21 29:5,6 49:1,2 56:10 96:7
**a/k/a** 1:5,12 184:5,12
**abandon** 175:11
**able** 112:4
**above-entitled** 4:4
**absolutely** 37:2 42:23 48:24
**abuser** 175:16
**acceptable** 9:8
**accepted** 21:21 76:15
**account** 57:3
**accurate** 24:25 36:20 44:12 49:25 67:7 76:8 120:10 126:15 131:2 158:15 159:4 159:11 160:10,11 161:13,19 162:13
**acknowledge** 144:9
**acknowledged** 98:17 144:10
**action** 168:9,12 172:8 172:22 173:15 179:6 183:15,16
**actions** 167:15
**active** 10:10
**actual** 19:12 34:11 44:4 45:9 84:12 99:15 123:11,24 132:20 166:20
**add** 65:17
**added** 65:8 115:21 116:22 118:12 145:8 156:4,5,9
**addendum** 124:22
**addition** 148:25
**additional** 31:24 32:15 168:25
**address** 9:16,17,17 9:19 11:3,8 26:8,9 26:10 37:5 38:12 58:13,17,20,23 59:15
**addressed** 157:22 158:6
**adjourned** 180:12
**admitted** 5:14
**adopt** 43:4,9,11
**adopted** 41:21 42:3,4

42:13,17 44:11 45:3 45:22,23 46:4 47:16
**adoption** 44:11
**advance** 40:17 53:14 130:7
**advice** 174:14
**advise** 56:19 184:20
**advised** 24:11 45:15 54:5 160:8 162:11 178:21
**advising** 31:25 158:5
**affidavit** 95:10
**affix** 167:20
**afraid** 88:5
**afternoon** 93:11,12 101:1
**agent** 10:5 80:15 108:1,2 121:25
**agree** 129:2 137:14 165:18 175:13
**agreeable** 51:17
**agreed** 117:7 120:1 125:24 126:5 132:4 144:11 146:16 153:11 165:16
**agreeing** 153:16
**agreement** 32:22 59:20 70:15 82:5,8 113:20 115:13 126:20,22,23 139:18,21,24 142:14 144:15 147:11 159:1,3,10 159:25 160:8,9 161:5 163:10,14,14 168:22,24 169:11
**agreements** 64:14
**agrees** 24:21
**ahead** 47:20 61:25 92:3 106:11 127:17 135:25 138:20,21 159:16 162:10 163:12 166:2 170:20 171:1 172:11 177:16 178:12
**airbnb** 71:10
**album** 123:2
**Alison** 77:16
**allegations** 172:10
**alleged** 167:21,25

168:1,19
**allegedly** 162:11 169:10 171:22 173:3
**Allison** 10:25 11:12 24:2
**allow** 20:13
**allowed** 72:5 83:18 83:19 89:7 178:16
**allowing** 22:19
**alluded** 52:12
**alluding** 46:8
**alterations** 118:15
**altogether** 137:7
**amendment** 80:25 122:14 123:21 131:13 136:5 141:23,24 142:3,5,6 155:10
**amount** 60:23 111:1
**Amy** 16:14,16,21 17:3,8,25 18:12,17 18:19,22,25 19:13 19:23
**Andrew** 2:7 100:6
**animal** 32:4,6 52:13 52:17,19,20,23 53:3 53:5,6,7,10,20,21 53:25 54:3,6,9,14 54:16,20 55:3,5 65:12,13,24 66:6,16 76:11,13 83:7,16,22 84:2,8,8 85:16 89:2 89:6,8 90:16,17 94:8,14 102:12 111:25 112:2,4,8,11 120:8 149:18
**animals** 52:15
**annotations** 32:10
**annual** 10:16
**answer** 4:16,17,18 5:3,4 22:14 23:24 24:14,22 45:21 49:11 63:20,22 81:21 124:18 125:6 132:17 170:20 171:8 174:8 175:2,8
**answered** 28:6 97:19 114:23 125:6 127:7 127:9 132:16 179:18

**answering** 167:1
**answers** 4:22
**anticipated** 64:16
**anybody** 7:2 16:1 21:23 22:19,23 45:1 50:23 69:25 77:9 166:12 173:12
**anymore** 48:19
**anyway** 118:20 132:22
**apartment** 130:15
**apartments** 13:1,5
**apologize** 28:11
**Apparently** 80:13
**appear** 132:18
**APPEARANCES** 2:1 2:5,10,14
**appeared** 4:3 182:9
**appears** 10:25 11:11 11:15,21 36:9,24 37:16 38:14 66:21 66:21,25 67:10 83:1 83:2 87:2 96:9 131:18 151:22 155:23
**application** 57:11 58:25 59:7 66:6,18 66:23 67:1,2,7,16 67:18,24 68:7,12,19 76:10 82:22,23 85:16 86:17,24 88:2 88:17 94:8,15,16,23 95:11,13,16,21 96:22,23 97:21,22 103:7 131:17,19 136:17 137:1
**applies** 69:19
**appointment** 100:4
**appreciate** 96:10 170:17
**approaching** 85:6
**appropriate** 48:21 89:3 175:24 178:8
**approval** 11:18 81:14 81:15 102:12 106:21,24,25 123:4 123:6 131:14 136:8 145:11,13 155:13
**approvals** 122:20
**approve** 30:20 129:22 162:18

**approved** 13:23,25 18:18,20 53:15,20 59:1 66:16 73:4 85:18 86:12 87:18 90:9 93:21,25 94:2 95:23 104:11,14 108:11 122:15,25 123:9 128:8 129:23 143:22 161:18 163:16,18 165:14
**approving** 18:22 134:7
**Approximately** 13:15
**April** 1:19 12:6,7 79:1 182:10
**area** 66:12 173:8
**areas** 123:19
**arrested** 174:23
**arrive** 125:17
**arrived** 12:8 25:4,14
**asked** 22:21 28:5 29:6 42:18 45:19 48:9 49:6 75:23 76:21,25 85:4 96:20 97:3,18 99:3 102:4 114:23 121:20 126:18 127:7 129:21 132:16 159:24 173:11 179:18
**asking** 9:24 38:15 39:5,16 47:1,3 49:16 58:12,24 76:22,23 77:1 88:1 88:4,17 100:7 101:24 103:10 106:20 125:5 127:14 164:4,4 165:8 168:5,6,6 169:23 178:24 179:1
**assist** 53:10
**assistant** 5:23 6:3,8,8
**assisting** 66:22
**associated** 7:3
**ASSOCIATES** 2:11
**Association** 1:9 2:5 13:24 15:22 16:1 18:18,22 23:17,22 24:18 39:7 45:1 50:23 53:20 63:18

66:15 67:14 69:25
70:3 73:4,19 79:13
84:1 90:10 91:2
93:15 95:22 101:14
101:18 107:24
112:9,14 122:16
136:17 158:10,21
158:21 159:10
161:18 162:17
163:4,10 164:20
165:14,19,21 168:8
171:13 179:24
184:9
**association's** 54:5,12
70:11 84:25 86:16
123:4 131:14 136:7
155:13 160:6 166:7
173:3
**assume** 25:1 34:8
60:9 107:13 118:4
122:4 144:24 180:8
**assumed** 98:15 105:1
112:17 162:22
**assuming** 88:24
116:21 152:19
154:20
**assumption** 22:17
**assure** 56:21
**attached** 81:23 85:16
112:21 113:19
119:8 129:16 130:3
130:23
**attachment** 123:20
141:24,25
**attempting** 31:22
**attend** 79:2
**attended** 79:3,4
**attention** 71:6
**attorney** 5:23 6:3,6,8
7:15 46:21 54:6,12
65:22 164:16
183:13,15
**audible** 4:22
**audibly** 4:16
**August** 173:18
**authenticity** 36:9
**authority** 45:17
57:13
**authorized** 46:14,19
47:14 105:19
162:23 183:7

**available** 10:11 42:10
**Avenue** 1:24 2:8
184:23
**aware** 23:24 80:22
146:18 159:9,13
166:5 171:13,23
177:22

_____

**B**
**B** 2:12 84:10 125:3,3
125:4,5 132:23
**back** 7:22 14:20 15:6
15:13,20,21,23 16:2
16:4,6 19:8,9,24
46:2 48:25 54:8,19
67:13 69:4 73:14
78:25 93:3 95:4,5
96:3 100:17 101:5
102:17 103:7 116:3
125:9,9 127:15
131:9 137:23
156:25 157:4
178:14 179:3
**background** 4:14
5:12 47:17,21
**balcony** 32:1 33:17
**bank** 151:17,25
178:15
**based** 4:13 45:6
123:12 124:6 129:2
172:24
**basically** 15:16 32:21
78:24 93:12
**basing** 44:2 45:5,8
**basis** 175:5
**bathroom** 48:23
**Beach** 1:2 2:3,3 184:2
184:16,17
**Bear** 8:5
**bears** 47:23
**Becker** 157:7
**beg** 99:16
**beginning** 19:22 75:9
91:18 125:14,19
159:2,22 162:24
169:17
**begins** 113:24
**behalf** 1:17 22:23
24:5 129:7 157:25
**belief** 51:21 114:8,13
168:7

**believe** 8:25 13:14
15:9 17:19 20:22
22:25 23:7,8,9
30:21 34:14 40:7,20
40:20 41:4 42:15
43:3 45:2 48:2
52:18 53:14 59:8
64:25 66:8,9,23
67:19 68:15 73:10
80:9 81:15 89:6
93:19 96:3 113:10
114:7 117:17 123:5
125:23 127:3
141:24 145:22
147:23 148:21
151:20 152:7 153:2
156:19 157:18
167:7,9 168:14
175:5 177:21
178:13
**believes** 47:5
**best** 27:18
**better** 53:16 66:22
72:2 165:2,4
**betting** 114:1
**beyond** 143:7 171:9
**bill** 30:13
**bit** 5:11 8:3 11:6 19:6
76:19 80:6 99:12
110:5 140:25
160:22
**black** 174:23
**blank** 59:8 87:7 98:18
153:12 154:2,6
**blanked** 121:5
**board** 11:22,24,25
14:1 15:25 18:24
19:7 20:12,15,15
21:9,16,19,24 22:2
22:19,22,24 23:2,8
23:10,17,19 24:5,6
24:8,9,10,17 30:7
30:17,24 41:14 43:6
43:14 44:23 46:15
48:6 54:16 55:1
65:13,23 66:3,5
70:4 71:4 72:5
73:24 76:6 77:2,6,9
78:19,22 79:2,8,16
81:20 91:2 102:13
103:11,16,23 104:1

112:5 122:21
143:24 145:12,12
145:13 167:14
173:1,16
**board's** 20:20,22
43:8 53:17 83:14
103:20
**bold** 65:8
**bond** 145:10
**border** 133:8,9,17,22
134:1 136:1
**bottom** 10:14 28:22
33:19 88:15 115:17
117:11 119:1,20,25
121:9 127:22 128:3
128:9,15,23 130:19
133:7 134:12,17,18
134:24 135:3,5,11
135:13,23 136:10
136:19,20 139:10
141:1 147:18
148:15,20 149:4,9
149:10 150:2,3,4,13
150:23 156:5
**bought** 79:1
**Boulevard** 2:3 184:16
**brand** 15:2
**breach** 165:23,25
166:4,8 173:5
179:10,15,17
**breaches** 179:21
**break** 4:23,24 48:23
99:19,24 100:5,9
156:22,23
**bridge** 103:21
**bring** 79:7,11 173:15
**broke** 179:20
**broken** 130:6 153:20
**brought** 7:9,12
**Broward** 182:4 183:4
183:18
**builder** 14:25 15:4
**building** 30:20 77:11
77:20 79:12
**building's** 30:17
**built** 52:3
**bully** 171:18
**Burnett** 90:21,22,24
112:21 157:7,12,13
161:9,13,25 169:25
170:16 171:5

**business** 5:18 19:16
**buying** 77:20
**bylaws** 39:7 41:25
46:4,5 70:12 78:3
173:4,13

_____

**C**
**C** 84:10 139:17
**c/o** 184:15
**cable** 29:13
**calculation** 121:4
**calculations** 22:16
**call** 15:18 32:12 50:5
54:21 55:8,11 80:21
84:13,14,16,19,21
86:19 143:17
164:14
**called** 17:5 32:20
45:10,14 59:19
139:25 140:1
166:14
**calls** 166:18
**cancel** 64:19
**candidate** 28:1,3
**car** 32:12
**card** 111:16
**cards** 104:23 111:18
**care** 71:6 99:21
**cared** 103:16
**case** 1:3 32:23 43:3
51:18 92:1 98:21
169:8 176:4 184:3
**cases** 51:16 98:14
**cashier's** 110:12
**categories** 154:9
**caught** 69:22
**cause** 4:4 81:8 184:18
**cc** 26:17
**certain** 12:23 13:15
41:8,20 42:23 44:9
44:11 83:18,19
123:19 163:15
168:15
**certainly** 61:21 65:3
139:16 146:18
**certainty** 42:2
**certificate** 11:18 36:9
106:21,24 182:1
183:1
**certification** 81:12,23
**certified** 166:17

**certify** 182:8 183:7 183:12
**Chad** 157:24
**chance** 132:20
**chances** 94:18
**change** 33:18 120:5 120:10 129:22 148:7 149:9,16,19
**changed** 30:25 38:21 50:14,19 51:5,7 63:5 73:21 78:6 112:15 127:3 146:15
**changes** 41:21 61:6 69:5 73:20 75:12 120:3 129:23 130:17 132:3,21 147:7,9,22,23
**changing** 113:16
**charge** 52:13 175:3
**chat** 78:13,14
**cheaper** 69:23
**check** 110:10,12 117:12,13 118:2,23 119:11,14,18,19 137:3 148:15,17 151:17 152:1,13 153:21
**checked** 72:16 130:6
**checking** 152:21
**checklist** 129:16 130:2,5,11,12,14,23 131:25 152:23 153:6
**checks** 69:2 122:25
**chief** 23:20
**Childrey** 45:20 48:8
**choosing** 53:17,17 65:23,23
**Christmas** 38:20
**circle** 141:23
**circulated** 44:8
**circumstances** 38:21
**claim** 7:6 125:16 153:19
**claiming** 133:2 170:1
**clarification** 28:12
**clarify** 28:24 65:18 146:14
**clean** 117:9 134:8
**cleaned** 117:7

**cleaning** 134:8
**clear** 5:5,8 44:10,10 80:8 115:6 128:22
**cleared** 76:18
**clearly** 74:20
**close** 88:10
**closed** 176:20
**clue** 172:25
**co-counsel** 91:24 100:7
**COLEMAN** 2:7
**collecting** 89:4
**combination** 123:24
**come** 13:8 19:9 100:17 110:17 117:8 156:25 160:16 184:19
**comes** 67:21 125:5
**coming** 56:24 71:11 71:13
**commission** 182:18 182:19
**committed** 163:19 172:1
**committee** 167:17 168:18
**communication** 25:23 37:17 79:8 105:12 107:4 170:19
**Comp** 3:11
**company** 1:11 23:19 23:22 24:17 29:13 36:11 43:6 48:11 142:8 184:11
**complaining** 166:3
**complaint** 3:11 112:19 113:5 157:6
**complete** 87:1,10 95:15 98:5 106:4,6 106:15 107:3,10 129:15 162:14 164:1
**completed** 17:13 21:3 85:5 95:22 106:10 153:8
**completely** 63:5 160:12
**completion** 22:11
**composite** 26:4,15 28:13,21 31:13 36:7 113:12

**compounding** 44:19
**computer** 37:5
**concern** 51:13
**concerned** 51:8 95:21 103:14,15 118:16
**concerning** 43:24
**concerns** 79:11 166:19
**concluded** 172:20
**conclusion** 63:9
**condition** 90:11
**conditions** 32:15
**condominium** 1:9 2:5 7:4 11:2 12:9 14:3 59:2,23 107:19 136:17 158:9,20 184:9
**Condominiums** 11:18
**conduct** 89:2 112:7
**conferred** 21:19
**confirm** 42:12 43:12 43:12 84:2
**confirmation** 36:16 36:17 37:11 55:14 65:14
**confirmed** 55:16 68:2
**confirming** 151:23
**confusion** 23:10 123:16
**connected** 183:15
**connection** 36:11
**consider** 42:24 184:21
**considered** 172:7 177:23
**constraints** 83:17
**constructing** 15:2
**construction** 14:13 16:23 17:12,20 160:24,25
**consulted** 56:18
**contact** 25:21 80:20 80:20 86:2,4
**contacted** 25:17
**contains** 124:8,15 148:4 169:15
**contemplate** 143:6
**contemplated** 63:8
**contemplates** 143:3
**continuation** 15:16
**continue** 100:18

143:13 157:10 168:21
**continued** 24:25 150:8 154:20,21 169:11
**continues** 139:1 154:5
**continuing** 79:24
**continuously** 138:7
**contract** 23:22 24:9 24:12,19,22 32:20 32:21 37:25
**conversation** 22:25 23:4 27:14 29:23 54:4 69:25 73:13 74:6,9 83:15,24,25 84:6 114:16,20,21 115:10 160:13,14 161:15 162:7,16 169:5 176:23,25 178:9 180:8
**conversations** 22:18 22:21,24 30:11 70:6 73:14
**conveyed** 74:2 78:13
**cooperate** 143:19,19
**copied** 29:15 80:14 110:8 133:18 134:1
**copies** 75:16 101:18 164:1
**copy** 63:23 67:2,7,11 67:17 75:11 80:23 81:11,23 96:17 98:6 99:1,5 103:1 105:22 108:16 109:10 133:12,12,25 134:2
**copying** 80:5,11
**cordial** 105:12 108:15 164:12
**corner** 161:5
**corporation** 1:10 36:6 81:7 184:10
**Corporations** 10:10
**correct** 6:14,18 7:19 9:13 10:5 11:2,11 11:15,19 12:7,19 13:4 17:15,24 18:6 18:7 19:25 20:1 22:6 23:23 27:18 28:15,16 29:8,9 31:5,10,11,20 32:17

32:22 33:10,21 34:13,16,25 35:1,2 35:4,6,11,20 37:12 40:5 41:3 42:14 43:17 44:19 50:13 50:14,19,20 51:7 52:7,9,10 53:8 55:18,19,23,24 56:6 56:8,20 57:2,16 58:3,6,10,10,18 60:5,8,13,14,17,18 60:21,22,25 61:1,3 61:4,7,10 62:13 66:16,20 67:3 68:5 68:8,9,9,13,14,25 69:6 71:19 73:11,17 73:18,22 74:16 75:6 75:7,8,13 76:4 77:5 80:12 85:1 87:1,12 87:18,19 88:20 89:8 89:9,12 93:10,13,22 94:3,6 95:8 96:18 96:20,21,24 97:5,11 97:11,13,19,23 98:25 99:2,7 101:15 101:16,20,21,21,25 102:4,5 103:8,13 104:15,16,20,25 105:1 106:25 107:3 107:9,21,22 108:9 108:10 109:19 110:15 113:18 114:9 115:15,16,25 116:3,4,7,9,10,20 118:24,25 119:4,5,5 119:10,13 120:4,24 121:6,7,8 122:6,7,9 122:12,13 123:7,8 124:11 125:22 126:3 128:24 129:5 129:6,8,13 130:24 130:25 132:14,25 133:1,5,6 134:13,16 134:19,23 135:1,4,6 135:7,9,10,15,23,24 136:6,9,10,11,11,14 136:15 137:18 138:3 139:2 140:2,7 140:7,12,15 141:4,6 141:7,11,12 142:8 143:4 144:18 145:4

145:6,16 146:4
147:9,10,21,25
148:9,13,23 149:2,3
149:12,15 150:5,6
150:14,15,18,21,25
151:18,19,24
152:15,17 153:9
154:1,4,7,11,15
155:3,5,6,13,14,17
155:21,22,25 156:1
156:3,16,19 157:17
158:8,18,23 159:20
163:6,16 164:8,25
165:1 169:15
177:20 179:11,14
179:14
**correction** 119:23
**correctly** 49:21 94:18
101:13 138:24
168:4
**costly** 16:20
**counsel** 56:12,14
157:20,20 158:2,3,5
170:13,15 171:2
173:9,11 174:12,14
183:13,15
**county** 6:2,3,8,9
182:4 183:4,18
**couple** 101:9
**court** 1:1 4:20 7:7
10:17 12:2 25:10
112:20 172:15
184:1
**courts** 7:17
**covered** 152:2
**COVID** 118:5,11,17
118:21 119:24
120:13 128:8 148:9
149:7,20 173:16
**create** 103:12
**created** 32:24,24 34:7
37:18 134:1
**credit** 76:12
**criminal** 178:19
**cross** 103:21
**crossed** 102:10 120:7
120:19 143:1
144:19
**crossed-out** 120:21
**curious** 34:4
**current** 40:1,1 45:19

58:13,14,20 63:10
69:17
**curse** 170:23
**custom** 43:3
**cut** 132:8 167:3
**cut-and-paste** 128:19
128:19 129:17,19

**D**

**D** 2:16
**damage** 153:18,18
**DANIELLE** 1:6 2:19
184:6
**date** 1:19 23:6 27:1
28:5,7 29:8 30:9,25
31:1,1,3 37:5,20
39:1,15 43:25 44:16
44:20,22 56:1 60:20
60:20 78:23 82:5
86:13 98:8 99:12
113:4 163:22
**dated** 12:5,7 26:21
41:9 44:13,14 60:15
115:13 133:4
135:16 140:14
150:16 151:11
155:10 157:8
183:17
**dates** 14:4 16:18
161:4
**daughter** 100:3
**David** 1:5,5,12,12 2:5
2:12,19,20 4:9
28:10 36:12 75:23
81:14 83:9 107:14
113:1 116:8,16
118:4 122:4 144:24
145:1,22 177:5
184:5,5,12,12
**David's** 83:15,21
115:19 117:18
170:17
**Davie** 2:13
**day** 12:5 27:17 53:2
84:19 96:11 181:9
182:10,12 183:17
**days** 43:10 51:25
**days'** 51:19 52:1
**De** 9:19 158:7
**deal** 24:2 36:12 40:2
77:10,11,13 78:1

80:17 109:5,9
121:23
**dealing** 70:12 80:15
109:5 121:24
**dealings** 77:7
**dealt** 19:15 26:2
38:10 75:20
**December** 20:24 22:8
25:7 26:22 27:10
29:5,7,14
**decide** 30:18 99:20
142:22
**decided** 73:6 90:15
147:16
**decision** 44:24 78:8,9
78:12
**decision-maker** 30:5
30:8
**decisions** 24:5,6
77:24
**declaration** 46:5 78:4
168:16 173:13
**decrease** 64:18
**deed** 3:10 10:22,25
11:11,16 12:5
163:20
**DEFENDANT/LA**
2:5
**DEFENDANT/MAC**
2:14
**Defendants** 1:13
184:13
**Defendants'** 3:9
10:19 12:3 26:15
113:22
**Defendants/Mary**
1:17 2:10
**defending** 7:20
**definitely** 62:14
117:17 137:10
**degree** 102:9
**delay** 81:8 103:12,14
103:15
**DeMarinis** 80:8
**DENNEHEY** 2:7
**dentist** 20:9 21:12
22:3,7 24:24
**Depends** 33:6
**DEPONENT** 181:1
**deposit** 36:3,5 52:13
120:17 149:22

150:4,8 151:13
**deposition** 1:15 4:11
4:14 8:18 28:17,18
49:7 100:22 180:12
183:1,8 184:18,20
184:20
**depositions** 6:17
**deposits** 35:24 121:5
**describe** 19:3,14
**described** 19:2 36:25
84:16
**description** 3:9 11:7
11:10 158:15
**destruction** 179:19
179:22 180:1
**detail** 70:17
**detailing** 53:13
**determination** 173:14
**determine** 77:19
112:10 175:23
**Diane** 16:14,16,21
17:3,7,25 18:12,17
18:19,22,25 19:12
19:23
**differences** 127:19
**different** 7:16,16
63:15 68:17 73:12
75:11 76:2,19,25
77:2 94:3 103:15
121:5 126:7 136:24
137:6 139:4 152:8
166:16 170:2
**differently** 63:13
**diligence** 77:19,22
**Direct** 3:5 4:7
**directed** 59:10
**directly** 68:23 77:5
78:23 80:17 81:19
82:23 87:13 88:2
105:25 121:23
**directors** 30:18 43:6
43:14
**disagreement** 23:13
**disagrees** 24:21
**disclosure** 120:17
150:5,9
**discovery** 4:12 6:17
**discuss** 143:15
144:12
**discussed** 20:16 23:5
31:18 49:19 51:14

74:8 87:21 132:13
159:17 170:14
**discusses** 149:7
**discussing** 50:15
85:22 101:4 102:10
109:22 122:24
**discussion** 19:7 35:9
50:12 54:19 55:2
171:21 180:11
**discussions** 32:18
74:1
**DISTRICT** 1:1,1
184:1,1
**ditched** 137:21
**Division** 1:2 10:9
184:2
**divorced** 20:11
**dizzy** 112:25
**doc** 83:10
**doctor** 83:10 84:1
85:1,17 94:7,10,21
94:22 95:2
**doctor's** 95:9 100:4
**document** 10:8,23,24
28:14 33:8 34:2,3
34:16,20,24 35:2,3
36:10,13 59:25
60:12 61:2 80:19
81:1,3 87:4,5 114:6
115:24 116:18
122:23 123:14,17
124:4,4,6,6,8,15,18
124:20,21 125:11
125:23,24 126:1,2,4
126:8,14,14 127:5
127:12,22 128:20
129:12,15,24
130:17,21 131:2,20
131:21,22,23 132:9
132:11,12,15,19,20
132:23 133:23
134:21 135:8
137:10,13,15,16
138:12,16 139:1,3,8
139:13 150:16
151:11 169:7
**documentary** 166:21
**documentation** 47:17
77:18,21 84:15 87:2
**documents** 23:25
38:7 48:11 53:13

64:15 86:20 98:18
99:15 110:3 126:7
173:4,23
**dog** 32:3 52:17 56:5
81:12,15 82:23 86:2
86:16 87:18 89:14
90:9,11 94:15 95:11
95:13,21 96:23
97:22 103:6 111:5
119:9,10 122:25
123:7
**dogs** 52:12
**doing** 22:15,17 46:15
46:15 54:12 76:23
76:24,24 77:22
78:22 89:5 103:23
111:2 179:23
**dollars** 88:7
**domestic** 61:13,14,15
61:19,22 62:9 175:3
175:9,12,14,18,21
176:3
**domestically** 176:8
**Donna** 48:7 143:25
**door** 176:20,24
178:13
**double** 155:4
**doubt** 174:25
**draft** 60:12,13 69:6
126:18
**drafted** 123:24
126:18 127:13
**drew** 151:3
**driving** 174:23
**drop** 84:15
**drunk** 174:23
**due** 77:18,22 125:6
166:14
**duly** 4:4 182:10
**duties** 179:21
**duty** 42:24 54:15
**dwelling** 72:2

**E**

**e-mail** 25:24 26:7,8,9
26:10,12,13,14,18
26:19,20,21 27:16
27:20 29:18 30:3,10
30:16 31:12,23
38:11,12,12,14 39:4
39:13,21 42:14 50:9

54:19,21 55:6,7,12
55:15 56:9 58:15
73:9,14 74:10 79:23
80:7,12 81:22 82:12
83:2,6 84:12,24
85:8,14 86:5,7
87:16 88:16 93:4
94:11 96:6 101:8,22
102:2,16,23 103:1,2
103:5,19 105:11
106:19 107:6
108:15 109:20
110:8 170:9
**e-mailed** 157:16,19
**e-mails** 8:19 26:5,6
26:17 27:4,24 49:18
54:8,17 55:9,9
74:11 84:15,23 85:3
85:4,11 100:1
105:14 166:17
**earlier** 14:10,11
22:20 23:5 31:1
49:6 50:21 96:4
129:2 137:19,23
138:25 140:5,11
148:16 159:17
161:11
**earliest** 29:8
**early** 32:18 50:10,17
51:8,17 52:18 60:2
60:12 61:8,12,15
72:20 93:12 138:18
139:9
**Ed** 12:14,19,24 13:1
13:6 17:5 18:16
25:16 26:1,20 28:11
38:23 40:2 66:22
67:13,25 73:9 74:4
75:17,22,23 77:16
77:20 80:5,10,10,16
82:2,7,16 87:8,21
94:24 95:3 112:6
121:23,24,25 122:1
126:8 143:17
153:17,21
**Ed's** 82:18 94:25
98:13
**educate** 176:6
**Edward** 28:23
**effort** 39:21 86:9
**eight** 17:9

**either** 14:5 19:4 45:1
51:18 54:21 59:10
71:3 76:6 98:11
107:5,16 118:9
145:23 152:19
158:4 168:9
**elbow** 138:9
**elder** 5:17
**Eleanor** 106:20
**electronic** 34:7,9,10
36:16 37:11,20
**electronically** 34:16
**elelep@aol.com**
26:20
**Elly** 12:20
**emotional** 53:6
**employee** 183:13,14
**empty** 16:25 67:13
**enchilada** 75:1
**enclosed** 43:25
**ended** 60:10
**ends** 113:24 125:20
**engaged** 130:4
**Engram** 107:12
157:24
**ensure** 107:24
**enter** 32:21 118:10
118:14,18
**entered** 32:16 126:16
143:12 159:1
**entering** 148:10
**entire** 105:2,4 106:7
**entirety** 131:4
**entitled** 166:10
184:18
**entity** 107:18
**entry** 118:13
**error** 98:17
**escrow** 57:3
**especially** 4:21 94:20
**ESQ** 2:2,7,12,16
184:16
**establish** 65:24
**established** 172:5
**establishing** 65:12
**estate** 5:17,18
**Eva** 13:21,25
**Eve** 39:1
**event** 61:12
**eventually** 31:4 32:17
40:18,18 50:19 58:5

59:4,8,12 63:12
66:16 74:14 77:4
86:22,25 89:7,11
95:19 104:13 108:7
110:9
**everybody** 8:14 29:1
100:8,14 156:22
**evict** 173:17,19
**evictions** 173:20
**evidence** 166:20,20
166:21,22
**evolve** 139:1
**exact** 18:13 28:2
**exactly** 25:18 88:12
89:25 90:2 154:6,12
168:18 169:22
**Examination** 1:22 3:5
4:7
**example** 46:17
132:21 166:6
**exception** 30:18
**exchange** 101:8
**Excuse** 161:6
**executed** 107:25
**execution** 63:18
70:14 75:10
**executive** 23:20
**exercise** 69:18
**exercised** 142:13,15
**exhibit** 8:18 10:18,19
10:22 12:2,3 26:4,5
26:15 28:13,20,21
36:8 113:12,22
125:3,3,4 132:23
139:17 145:3 157:6
**EXHIBITS** 3:8
**expect** 40:16 65:1
99:22
**expected** 58:9,11
98:19
**expecting** 64:18 99:4
**experience** 41:23
52:6
**expert** 47:2 66:12
83:19 173:8 178:20
**expertise** 178:22
**expiration** 158:10
**expired** 159:3
**expires** 182:19
**explain** 167:14
**explaining** 29:22

**expressed** 44:25
**expressing** 38:24
147:6
**extend** 63:6 142:15
161:1 168:24
**extended** 161:2
**extending** 143:7
160:23
**extends** 167:7
**extension** 63:4,9
144:10
**extent** 23:3
**extraordinary** 111:1

**F**

**fabricated** 89:15
114:24 160:12
**fabrication** 162:14
**FaceTime** 111:12
**facilitated** 105:2
163:20
**facilities** 104:24
**fact** 21:22 42:3 44:15
46:22 60:10 104:22
115:21 130:3
171:25 179:2
**facts** 168:12
**factual** 44:4 47:3
**factually** 48:3
**failure** 64:24
**fair** 22:10 34:21 41:1
52:4,5 72:5,7 95:20
95:24 123:10
168:10
**fake** 159:6,7,7,8
**fall** 14:6
**familiar** 6:16 10:23
10:24 29:17 37:15
138:10
**family** 111:13
**far** 19:5 96:19 97:16
107:6 129:21
130:16 144:1
147:11 158:13
171:17
**fashion** 63:16
**fast** 85:6 95:6
**faucet** 92:21,23
**February** 15:15
16:10
**federal** 4:10 9:22

54:1 66:11 119:8
157:6
**federally** 173:17
**fee** 28:2 39:19 57:11
68:22,22 69:1 137:2
151:13
**feedback** 92:9,13
**feel** 111:23
**fees** 52:15 68:23
**feet** 175:15
**felony** 177:23
**figure** 47:5
**figured** 69:23 161:7
**file** 67:10 96:8 171:14
**filed** 4:11 112:20
153:16 171:16
**files** 67:8
**fill** 58:25 85:17 95:2
154:22,22
**filled** 59:12,12 66:5
67:12,16,18 68:17
87:3 94:19 103:6
130:14 154:14
**final** 31:1,3 32:16
70:14 75:10 123:21
125:24 126:2,14,23
129:16,20 130:5,8
130:13,13,13
137:10,12 139:11
151:12
**finalize** 79:25
**finalized** 130:9
169:17
**finally** 168:22
**financially** 183:16
**financials** 78:3
**find** 17:3 30:6 41:19
44:19,24 47:11
51:25 52:2,16 71:3
72:15 84:24 112:7
114:10 143:24
179:5
**finds** 127:20
**fine** 80:16 99:21
100:11,15 118:22
127:20 167:17,17
167:20 168:18
180:10
**fined** 167:19
**finish** 9:24 39:9 162:9
172:12

**finished** 29:20 99:25
100:2
**fire** 175:15
**firm** 5:21,22 34:8
56:13,14
**first** 4:3 13:19,20,21
13:21 19:19 25:17
27:23 28:18 35:7
39:6 52:16 74:18,20
80:16,25 93:14
95:15 110:17
113:13,17 121:1,2
122:14 123:2
124:10 129:17
130:22 131:13,24
135:25 136:5 138:9
142:22 155:10
158:14 159:22
161:21 166:13
**five** 48:25 72:13
127:8
**five-minute** 48:23
156:21,22
**five-year** 72:16 165:4
165:15
**fixed** 69:14
**Flagler** 2:16
**floating** 146:20
**Floor** 2:16
**Florida** 1:1,9,11,24
2:3,8,13,17 7:25
10:9 12:25 13:4,9
32:24 33:4 34:9
37:18 46:5 116:2
160:25 168:6,16
173:9,10,10,18
177:22 178:16,23
178:24 181:13
182:3,8,17 183:3,18
184:1,9,11,17,23
**flurry** 85:7
**follow** 58:14
**followed** 45:11 55:13
112:17 166:12,12
**Following** 145:10
**follows** 4:5
**font** 139:4 140:11
170:2
**forget** 69:15 81:7
173:16
**forgot** 132:20

**form** 6:19,25 7:5,18
10:13 12:11 21:17
22:13 32:20 33:9,11
35:8,12,21 36:22
37:13,14,15,18 41:7
41:15 43:7,22 44:6
44:18 45:12 46:11
48:4 62:17 63:14,19
73:23 74:17 87:20
98:7 104:5 105:10
109:3 110:12
125:21 127:7
129:14 133:20
138:17 158:17
165:20 166:9
167:10,16 168:13
169:16 172:4,19
173:7 174:1,10,20
175:7,25 176:21
177:9,25 178:10,12
179:8,13,18,25
**formal** 48:10
**format** 126:11
**former** 166:21
**Fort** 1:24 2:8 183:17
184:23
**forth** 54:8,19 69:5
73:14 131:10
**forward** 42:20 81:9
94:15 96:10 101:24
**forwarded** 42:15
67:12 81:13 106:9
122:1
**forwarding** 66:22
**found** 17:6 20:3,6,7,9
32:3 52:14,18 54:13
67:7 88:13 172:1
**four** 50:17 51:14
69:10
**four-year** 165:15
**Friday** 94:17 110:7
**friend** 12:17
**friendly** 19:16
**front** 125:8 132:25
**full** 105:24 106:15
108:16 109:11
147:16 151:12
162:20
**full-time** 6:15
**fully** 107:25 108:8
**funds** 151:24

**further** 26:25 47:23
61:5 73:13 96:4
120:12,23 124:24
129:9 137:5 144:19
149:19 151:20
175:1 181:1 183:12

**G**

**garage** 104:24
**Gates** 177:3
**Gelber** 25:17,21,25
26:2 37:17 55:15
59:10 60:7 74:3
82:14 87:11,14
107:16 157:23
169:6 170:7
**Gelber's** 38:6
**general** 34:9 61:17
**generally** 9:7 10:10
19:20 34:19
**generated** 66:24
**gentleman** 84:8 86:11
**gentleman's** 22:4
**getting** 23:11 45:24
75:15,20 92:9,12
99:5 111:3 158:2
**girlfriend** 80:23
86:11
**give** 4:18 5:11 8:9
33:1 40:2 42:24
46:17 52:1 77:17
80:18,20 82:6 89:2
98:1,2,12,15,20
113:4 121:21
142:21 152:23
159:23 163:20
164:14,17,18
168:10
**given** 23:15 30:6 31:2
40:6,7 57:12 59:9
75:11 107:10,11,12
107:13 122:3,4
151:17 167:13
**gives** 37:4,20 44:22
51:25
**giving** 21:15
**glasses** 33:1
**go** 26:4,25 29:3 31:17
46:2 47:20 49:19
54:2 61:25 67:14,15
69:23 78:8 79:5

86:13 87:5,6 88:15
90:3,4 92:3 93:3
95:4 96:3,5 98:18
100:1,9 106:11
117:11 124:24
125:9,9 127:14,17
128:21 134:17
135:25 136:22
138:20,21 143:7,20
146:21 158:11
159:16 162:10
163:12 166:2
170:20 171:1,17
172:11 177:16
178:6,12 179:3
180:5,7
**God** 4:6
**GOGGIN** 2:7
**going** 4:15 8:7,11
10:21 12:1 26:3
28:21 32:16 43:11
46:14,20 51:12
56:20,25 57:3,5,6
58:2,8 62:25 65:1
71:11,13,14 73:15
78:12 79:12 84:10
84:10 88:5,19,24,25
89:24 90:5 92:16
93:9 99:11,17,24
100:8 102:16
103:11,11,12,21
109:7 110:4 113:11
114:10 118:10,11
130:8 131:9 140:25
142:21,21 153:20
171:9,14,23 176:9
**gold** 133:8,22 136:1
**GONZALEZ** 2:15
**good** 4:8 51:23 54:2
71:18 90:13 96:7
147:7 165:11
**gospel** 177:7
**gotten** 41:10 89:10
169:6
**governing** 173:3,23
**grab** 8:7
**grabbed** 137:22
**graduated** 5:14
**great** 14:4 16:18
70:17
**green** 23:15 74:22,24

80:18 86:21,22
88:14 89:3,3 107:14
108:12 162:21
**grouping** 27:23
**guarantee** 69:10
**guess** 24:24 27:4,21
27:23 29:15 32:19
34:20 50:2,7 52:11
55:15 69:4 79:23
88:3 94:11 110:8
145:24 158:1
**guessing** 94:20 110:5
**guest** 57:6,13
**guy** 74:24
**guys** 79:24

———————
**H**
**habit** 79:6 151:5
**half** 100:10,13
**hallway** 178:7
**hand** 40:1 152:22,23
**hands** 53:18 60:10
82:16 122:2 137:12
**handwriting** 31:15,16
32:8 33:15,16,17
114:4,5 124:9
126:21 128:7,13
130:21 131:23
132:25 140:6,8
141:12,14,19,20,22
144:8 148:25
151:13,15
**handwritten** 31:14
115:23 129:22,23
148:25
**happen** 51:19 84:17
90:5 105:16 146:6
167:24 168:19
**happened** 9:13,14,15
18:15 58:5 82:20
86:20 87:24,25 90:1
90:2 94:20 125:7
171:22,22,23
172:20,24,25
**happening** 88:4
**happens** 143:11
146:8
**happy** 38:15,18,19
164:13
**hard** 96:17
**Hayes** 16:14,16 17:3

17:7,25 18:12,17,22
19:4,12,23
**he'll** 153:22
**head** 4:20
**hear** 82:1 91:14
92:17 93:2 176:18
177:1,4 178:5,14
**heard** 27:17 92:18,19
166:14,23 167:6
168:3 176:24,24
177:2
**hearing** 166:10
167:21 171:20
172:1,3
**help** 4:6
**helpful** 26:23
**helping** 56:16 87:17
90:12
**hesitate** 5:8
**HH** 182:18
**highlighted** 61:11
**hired** 23:19 65:13
80:16 82:7 108:1
173:9 174:12
**history** 82:2,7
**hold** 7:23 43:9 176:5
**home** 9:17,19 15:1,2
17:13 96:17 118:18
118:19
**homeless** 15:19
**honest** 36:14 37:15
38:9
**horrified** 170:21
**host** 8:19
**hot** 110:21
**hour** 100:10,13
**hours** 118:6,14
119:24 149:20
**housekeeping** 99:18
**Huh** 133:15
**humble** 89:4
**hunch** 47:24 64:22
**hundred** 159:6
**husband** 13:5 22:25
23:4 27:1,10,14
29:11,14 30:13
31:14 50:3 66:19
80:5 158:7
**husband's** 26:17,19

———————
**I**

**idea** 71:15 161:7
**identical** 137:3
**Identification** 10:20
12:4 26:16 113:23
**identify** 89:19
**imagine** 28:8 60:11
62:6 152:9 172:22
**important** 81:11
100:3
**impression** 57:8
83:13
**improper** 43:16,19
**improperly** 45:22
**improvements**
118:15
**inaccurate** 159:5
**Inappropriate** 179:2
**include** 61:23 76:6
174:5
**included** 35:24 130:3
**including** 123:20
166:13
**income** 35:22
**inconsistencies**
161:24
**incorrect** 22:16
**increasing** 64:24
**incredible** 30:6
**indefinite** 72:13
**INDEX** 3:1
**indicate** 30:8,12
37:16,19 162:23
**indicated** 30:4
**individual** 1:5,6,10
1:12 30:14 184:5,6
184:10,12
**inform** 54:15
**information** 10:11
21:8,10,15 28:4
37:4,14 43:23 44:4
45:9 46:7 47:15,22
48:1,6 64:11 83:5
85:17 111:5 154:8
154:13 161:9,12
**informed** 24:1 27:13
45:15 54:14,16
62:12
**initial** 35:23 80:19
112:16 123:18
147:2
**initialed** 115:17

116:20,21 117:2
118:22 119:15
120:9 145:15 148:9
149:18,20 153:24
155:16
**initialing** 153:16
**initially** 32:25 36:4
57:8 63:6 67:12
116:12 117:16,16
117:24,25 118:22
119:3,7,21,21,24,25
120:2,13,20,24
121:6,10,10 124:8
124:15,16 125:15
125:16 127:22,24
128:4,6,10,12,16,18
128:24 130:18,19
132:2 133:7 134:5,7
134:12,15,18,21,24
135:1,3,3,5,9,11,13
135:22 136:10
141:2,3,11,13
144:20 145:2,6,7,9
145:10,23 146:3,15
146:19,21 147:8,19
148:2,5,5,20,22,24
149:5,9,10,11,13,14
150:3,3,7,14,14,24
150:24 151:6,21
152:10,25 153:3,9
153:13 154:3,10,13
155:7,8 156:12
**inquired** 160:6
**inquiring** 66:10
**inquiry** 103:6
**inspect** 161:1
**instance** 18:25
**instances** 48:1 54:18
**institutional** 21:20
**instruct** 49:10
**instructed** 5:3 25:1
32:5 77:6 109:5,9
**instructing** 31:24
**instructions** 170:18
**intended** 143:16,23
**intention** 152:12,22
153:14
**interested** 52:20
62:22 183:16

**interesting** 29:24
38:3
**interim** 15:18
**interpretation** 165:9
**interrupt** 48:22
**interview** 80:22
111:12
**introduced** 12:19
**investigate** 83:18
**investigated** 76:12
143:9
**investigates** 54:24
**investigation** 89:2
**investment** 9:10
**invited** 78:18,21
**involve** 170:19
**involved** 6:21,23
30:23 55:1 64:7
66:3 73:20 81:17
86:18 89:17,19
106:13 173:22
**involves** 66:3
**involving** 7:15
**IP** 37:5
**irrelevant** 32:1
**Israel** 2:11,11,12 3:5
4:8,9 8:12 10:3,17
12:1 21:19 22:14
25:10 28:16,20 29:1
29:5 47:1,9 48:24
49:3,12,15 91:11,17
91:18,21 92:19 93:1
99:23 100:8,12,17
100:20 101:2,5,7
113:3,9,11,13,18
124:19,22 125:1
127:9,14,18,21
131:5,9,11 150:2
156:21,25 157:4
161:6 172:14,15
178:22 179:3 180:4
180:6,10
**issue** 20:18,20,22
21:24 49:20 93:15
103:24 104:3,7
106:23 149:8
175:22 179:5
**issues** 7:16 18:21
19:1,3,5 49:21
62:10 79:7 168:12
**item** 51:24 150:5

**items** 51:5
**iteration** 59:22 60:19
  62:24 92:25 113:2
  117:19 122:2
  129:17 132:24
  137:19 155:12
  159:19
**iterations** 50:18 72:8
  75:11 76:2 77:3
  112:21 147:24
  148:8,13,16 149:8
  149:17,23 150:17
  160:16 169:14,19

**J**

**JAMES** 2:7
**January** 22:9,10,11
  27:12,15 31:3,5,7
  31:10,19,22 35:6,6
  42:2 44:1,3,7 50:2
  55:14,22,25 56:2
  58:7,15,21,24 60:15
  60:20,21,24,24
  66:18,25,25 67:1,20
  69:4 72:20,25 74:23
  74:23 75:9 79:24
  82:4,11,13,18 84:19
  85:14 86:6 88:13
  93:12,17 94:5,11
  96:4,7,15 97:2 99:8
  99:9 101:9,22 102:7
  104:13 106:4,19
  109:21,22,25 110:7
  114:18 115:13
  122:5,8,18 125:19
  127:6 129:4,13
  133:4 135:16
  136:12,14 137:17
  137:17 140:14
  141:9,9 143:3,11
  144:4,6,14,19
  150:17,17 151:12
  153:8 154:24
  155:11,21,25 159:2
  162:20
**JoAnn** 90:21,22,24
  157:7
**job** 5:24 43:4 98:2,10
  98:24 99:6 101:15
  108:2,4 109:7,12,13
  129:17,19 134:2

159:13,16,23
  163:17
**John** 5:13 27:11 30:4
  77:8 78:14
**JR** 1:5 2:19 184:5
**July** 89:14 90:14
  106:18 108:23
  114:18 125:20
  157:8,12,17 158:10
  159:3,15 168:22
  169:4,5,6,23
**June** 184:21

**K**

**keep** 25:2 131:9
**keeping** 62:22
**keeps** 127:10
**kept** 23:11 81:21 88:4
  105:14 113:16
  127:4 138:13
**key** 74:21 105:19
  152:23
**keys** 151:17 164:6
**Kill** 174:7
**kind** 5:16 9:7 52:8
  132:8 146:19 151:1
  157:10
**kinds** 64:14
**kitchen** 92:21,23
**knew** 9:6 22:17 23:11
  30:14 53:19 62:4,5
  73:24,25 79:3
  163:24 171:18,20
**know** 4:12,23 11:23
  13:23 14:2,9 16:3,3
  16:5 17:21,25 21:10
  21:11,12,14,18,20
  22:4,15 23:14,14,25
  24:12,20,22 25:3,9
  25:14,15,18,18 27:8
  28:2,8,8 31:15 33:7
  33:14 34:1,17,17
  36:7 38:9,10,20
  39:25 40:3,16,17,21
  41:16 42:4,18 43:4
  43:18 44:22 45:9,13
  45:21 46:3,6,13,16
  47:22 48:3,7,8,9
  49:12 52:22 53:1,2
  53:4,9,12,14,18
  54:25 55:2 56:5

57:19,25 59:11 60:9
  62:8,9,18 63:20,21
  63:22,24 64:1,5,12
  64:13,14 65:20,23
  65:25 66:2,7,11,12
  68:21 69:1 73:24
  74:3,13,18 75:14,14
  75:15,24 76:14
  77:25 78:4,11 80:10
  81:20 82:2 83:1
  84:11,21 85:2,3,5,7
  85:12,24 86:1,15,18
  86:20,21 87:8 88:5
  88:6,8 89:18,21,25
  90:2,25 91:8 94:7
  94:22 95:2,7,8
  96:25 98:4,9 99:14
  99:23 100:6 102:11
  103:16 104:11
  106:9,12,17,17
  108:5,7,18,20,20,21
  108:22,24 109:7
  111:21 112:1
  113:25 114:3 115:7
  115:17 116:16
  117:13 118:2
  120:19 121:12,20
  122:24 123:1 124:5
  125:17 129:10,11
  129:21 130:3,6,20
  131:7 132:6,7,22
  133:8,13,23,25
  134:3 135:19 136:2
  136:13 137:24
  139:23,23 140:21
  141:2 144:23,24
  145:5,21,22 146:23
  147:2,20 150:21
  151:1,2,7 152:18,20
  153:14,17 154:18
  155:24 156:5,11
  157:13,18 158:1,4
  159:11,18 160:24
  161:8,8,13,22
  163:25 164:3,9,9,20
  164:22 165:21
  166:22,24,25 167:6
  167:22,24 168:5,17
  169:1,11,12,23,25
  170:4,24 171:17
  172:13 174:8,8,11

174:21 175:2,8,9,19
  176:1,1,9,10,15,23
  178:22 179:16,20
**knowing** 69:21 114:8
**knowledge** 36:23
  47:3

**L**

**La** 1:9 7:4 8:4,4,20
  10:6,11 11:2,12,17
  12:8,22 14:1,3
  34:23 56:24,25
  58:13 59:2 60:16
  65:10 66:24 107:19
  107:19 115:14
  120:7 129:7 136:17
  140:15 145:10,13
  157:25 158:9,13,20
  158:25 160:7 184:9
**laid** 168:18
**Lakes** 2:3 184:16
**landlady** 71:17
**landlord** 33:20 39:22
  51:15,22 52:6 60:16
  64:21 71:24 72:1
  73:6 142:13 151:16
  165:10,10,16,17
  175:15 176:5
**landlord's** 118:13
**landlord/tenant** 7:8,9
  7:13
**Landon** 10:25 11:12
  11:14 24:2 77:16
**language** 52:8
**largely** 7:20
**late** 38:22
**latest** 39:22
**latitude** 24:20
**Lauderdale** 1:24 2:8
  183:18 184:23
**Laurie** 1:23 182:7,16
  183:6,22 184:25
**law** 2:2 5:12,13,17
  8:1 54:1 66:11
  168:16 173:23
  174:4,14,17,22
  175:13 177:22
  184:15
**lawful** 53:1 111:25
  112:1,3
**laws** 32:5

**Lawson** 23:1,5,7,9
  27:11,15 28:7 29:16
  29:23 30:4,16 77:9
  78:14,24
**lawsuit** 4:10 6:22
  113:13,15 157:7
  171:14,15
**lawsuits** 6:17 7:3,15
**lawyer** 4:13 6:23 7:14
  29:11 49:8,13 53:17
  54:23,23 56:13
  65:13 66:4 76:24
  83:14,14,21 85:21
  86:2,5,16 89:1,17
  89:18,21,22 90:23
  90:24 103:8 178:23
  178:24
**lawyers** 5:2 84:25
**lawyers'** 64:15
**lay** 46:22
**layperson** 37:21
**learned** 45:4 66:10
  83:16
**lease** 15:17 17:14,15
  17:16,18,23 18:1,6
  31:9 32:15,16,20,22
  35:5,10,14 37:25
  39:25 43:2 50:8,22
  52:9 56:2,4,17,24
  57:6,15,18 58:2,8,9
  59:19,22 60:3,13,23
  61:22 62:15 63:8,18
  64:9,10 69:6,15
  70:1,9,14,22 71:10
  72:5,10,11,12,16
  73:20,25 74:7,12,14
  74:18,24 75:5,10,12
  75:12,16 76:3,17
  77:3 78:10 80:4,9
  80:24 81:6 82:5,6,8
  82:19 93:9,17,18,20
  93:25 94:5 96:9,19
  96:24,25 97:17,25
  98:1,3,5,6,12,23
  99:2,5,9,11 101:13
  101:18,24 102:7,17
  103:11 104:2,10
  105:2,4,7,8,9,18,22
  105:25 106:5,6,7,10
  106:14,15,15 107:3
  107:8,11,25 108:8

108:16,18,23
109:11,23 110:1
113:19 114:17,20
114:22 115:11
119:15 122:5,18,22
123:3,9,11,12,13,13
123:16,22,22,24
125:16,19 126:10
126:16 130:8,9,24
131:16 132:24
136:7 137:6,15,16
137:22,24 138:6,8
138:10,17 139:17
139:18,21,21,24
140:17 141:6,8
142:8,16,21 143:2
143:12,13 144:2
146:6 147:24 149:1
158:10 159:1,19
160:9,14,16,22
161:5,7,17,18,22
162:3,4,12,19,24,24
163:1,3,10,13,14
164:1,20,23 165:2,2
165:4,5,15,15,23,25
165:25 166:5,8
168:24,25 169:1,3,3
169:10,13,14,20
170:1,5 172:6,8,21
173:6 174:24
175:11,13,22
179:10,15,17
**leases** 35:16 50:24
51:3 61:21 62:7
71:2 110:4 112:22
139:4,20 157:9
170:3
**leasing** 158:12
**leave** 143:16,17
175:11
**led** 89:6
**left** 14:12,24 53:18
82:16 105:6 112:5,9
134:21 141:18,19
146:19 147:3
**left-hand** 116:15
**legal** 6:16 11:7,10
57:10 112:8 165:6,9
168:5,12 172:7
**legit** 89:14
**legitimate** 55:3

**Lepselter** 12:14,15
12:16,20,20 13:11
13:16 17:5 20:1
24:24 25:23,25 26:1
26:6 28:11,14,23
31:13,23 32:14,19
32:24 33:9 34:15
38:7,10 40:8,15
42:21 50:7 55:16
56:10,19 60:6 66:20
69:5 74:1,2 75:22
76:23 77:15 78:7
82:13 87:11,21,22
88:18,22 94:12 96:1
96:6 97:14 98:4
101:8,17,23 102:25
103:5 105:6,21
106:4,20,20 107:3,9
107:15 108:7
109:21 130:12,15
157:24,25 162:19
163:5,9 164:7
**Lepselter's** 3:11
26:20 34:8 38:6
67:8,10 107:7
**let's** 8:3 10:17 11:5
26:3,7 33:14 34:19
49:19 70:5 81:9
93:3 96:3 100:12
112:18,19 125:9,9
127:14,15 132:23
156:21 158:11
168:21
**letter** 90:18,19 95:10
112:18 157:7,12,14
157:22 158:11
162:2 166:17
170:12,16
**lettering** 125:8
**letters** 106:24 115:20
141:17 155:5,6
**letting** 179:20
**level** 55:2 165:23
166:4 172:21
**Liability** 1:11 184:11
**license** 7:23
**licensed** 7:25 178:24
**lie** 161:21
**LIEBLER** 2:15
**light** 23:15 74:22,24
80:18 86:21,22

88:14 89:3,3 107:14
108:12 162:21
**likes** 71:11
**likewise** 153:19
**limitation** 70:21 71:1
72:8
**limitations** 43:1 73:2
73:3
**limited** 1:11 51:12
184:11
**line** 93:3 117:22
141:10 142:19
145:25 146:24
149:22 150:4,8
151:1,3 179:4
**lined** 120:16 142:12
**lines** 146:22
**Lipfavitz** 16:14,16
17:4,8 18:12,17,22
19:4,13,23
**Lipfavitz's** 18:1
**list** 154:17
**listed** 9:17,20 13:10
17:6 18:16 20:1
**Listen** 115:5
**listened** 176:23
177:12
**litigation** 6:21,23
7:16
**little** 5:11 8:3,9 11:5
17:21 18:2 19:6
43:24 63:3 73:12
76:19 80:6 99:11
110:5 140:25 152:7
160:22
**live** 6:4 52:2 71:12,14
168:6 175:16
**living** 19:5 43:2 75:2
158:15 167:23
176:3,7
**LLC** 1:11,17 2:10,14
5:19 8:4,21 9:3 10:7
11:12 14:1 34:23
56:25 107:19
115:14 129:7
158:13 184:11
**long** 4:23 12:21 13:12
14:8,16 17:7,20
19:8 25:3 51:21
52:4 53:20 70:8
81:8 88:11 95:13,17

95:22 126:24
160:20 161:1
**longer** 15:8 69:20
160:25
**look** 10:23 26:3 33:14
34:19 55:8 62:7,18
62:19 86:16 99:10
99:11,14 110:2,4
112:18,19 132:23
139:4 175:1,20
**looked** 11:20 12:25
13:2,5 41:9 49:18
73:10 131:5 152:21
170:8
**looking** 12:21 25:2,7
33:7 39:2 48:20
59:9 62:21 86:2
89:6 108:23 126:22
129:24,25 132:19
159:15
**looks** 10:24 28:6,6
30:12 31:21,21
32:23 86:8 87:7
94:25 95:3 117:21
122:19 126:11
136:16 140:10
148:12 152:7
166:22
**lose** 88:5
**lost** 20:17 33:1
**lot** 30:1,1 41:6,24
43:23 45:4 73:13,15
**lots** 83:17
**love** 46:6
**Lubliner** 2:2,2 6:19
6:25 7:5 8:11,13
9:24 10:13 12:11
21:17 22:13 28:10
28:19,24 29:3 33:11
35:8,12,21 36:18,22
37:13 39:9 41:7,15
43:7,22 44:6,18
45:12 46:11,20 47:7
48:4,21 49:10,14,15
59:25 62:17 63:14
63:19 73:23 74:17
91:16 92:17 98:7
99:17,22 100:6,10
100:15 104:5
105:10 109:3,18
113:1,6,10 114:23

124:17,24 125:21
127:7,11,16 128:2
128:21 129:14
131:3,7 132:16
133:20 149:25
157:21,23 158:17
165:20 166:9,25
167:5,10,16 168:13
169:16 170:17
171:7,8 172:4,12,19
173:7 174:1,10,20
175:7,25 176:21
177:9,25 178:10,12
178:19 179:1,8,13
179:18,25 180:5,7
184:15,16
**Luchey** 1:6 2:19 20:4
20:7 31:4,6 35:1,4
35:25 36:6 55:17
57:5,17 58:1,9,25
60:17 62:10 68:13
68:24 85:13 88:9
93:8,21 103:10,17
104:1,14 115:15
122:12 123:7 133:5
136:23 140:15
156:2 157:23 184:6
**Luchey's** 34:24 58:12
58:19 68:8 136:20
**lunch** 99:19
**luncheon** 100:21

―――――

**M**

**MAC** 1:10,17 2:10
4:10 23:20 91:6,11
91:12,17,22,24
158:22 184:10
**Madam** 10:17 12:2
25:10 172:15
**mail** 178:7
**mailing** 9:16
**making** 41:22 45:16
45:18 77:24 80:8
92:14 112:25
**man** 114:25
**managed** 158:13
**management** 1:11,17
2:10,14 24:16 30:13
30:20,23 48:11
184:11
**manager** 45:20 48:8

98:23 109:4 160:6
**managing** 160:7
**Manzo** 1:15 3:4 4:2,8
    29:10 46:21 47:10
    49:3 101:2,7 127:21
    151:14 160:7,8
    179:3 181:6 182:9
    183:9 184:15
**March** 5:14
**MARCHESE** 2:7
    7:18 92:9,12,18,24
    113:14
**margin** 116:15
    141:19,20
**Marinis** 158:7
**mark** 10:18,22 12:1
    26:3 28:21 113:11
**marked** 8:17 10:19
    12:3 26:16 28:17,22
    113:22
**market** 19:24 24:25
**marks** 117:12,13
    118:2,23 119:11,14
    119:18,19 148:15
    148:17
**MARSHALL** 2:7
**Mary** 1:10 4:9 19:1,3
    19:11,11,15 20:16
    20:23,23 22:8 23:11
    24:3,8,9 26:13,14
    27:17,21,25 28:6
    29:6 38:15 40:21,23
    41:2 42:2,6,9 43:5
    43:15 44:12 46:15
    48:6 50:25 53:15,16
    54:3,4,5,14,15,25
    55:6,9 65:10 66:3
    67:15,15 69:3 70:7
    70:7,18 73:19,25
    74:4,6,10,23 76:9
    77:2,7,10,11,14,16
    77:21 78:2,2,5,13
    78:15,25 80:10,12
    80:13,13,20 81:19
    82:6,17,21,24 83:13
    83:20 84:9,24,24
    85:9 86:19 87:9
    88:17,23 89:23,23
    90:20 91:3,12,21
    94:19 95:4 96:11,19
    97:3,12,17,17,20

98:11,12,15,20,23
    99:1,5 102:3 107:13
    107:25 108:2,8,11
    112:6,13,14 114:1,3
    114:9,21 120:6
    121:12,19 125:18
    143:24 159:19
    166:13,16 177:2
    178:13 184:10
**Mary's** 85:8 112:12
    159:13 160:12
**material** 144:18
**materialized** 142:10
    142:11
**matter** 7:8,10,13
    61:20 115:25
**matters** 39:20
**McFADDEN** 1:10,17
    2:10 4:9 19:15
    20:23 21:7 23:16
    24:3,4,8,17 27:9
    28:1 29:6,7,15
    39:16,17 42:16 43:5
    45:2,6 46:8 51:2
    59:5 65:10,19 67:15
    70:7,8 71:4 73:19
    74:7,23 75:4,10
    76:6,9,16 77:2,8,14
    77:17,21,24 78:2,9
    82:24 83:25 84:6
    85:15 87:16 90:20
    91:3,12,21 98:6
    103:7 104:19
    106:16,21 108:8
    114:1,3,9,14,17
    115:10 120:6
    158:22 160:6 161:4
    161:12 162:7
    163:25 168:23
    169:2,19 170:2,6
    177:2 184:10
**McFadden's** 23:18
    26:13,14
**mean** 70:3,4,4 83:12
    93:5,5 99:23 126:25
    129:19 146:10
    162:4 167:2 174:2
    174:23,24
**meaning** 83:21
**means** 116:22 180:8
**meant** 54:20 67:14,15

131:8 154:20
**medical** 65:11 66:7
    66:10 83:11
**meet** 12:15
**meeting** 43:9 64:6
    79:2 176:19
**meetings** 45:9,13,25
    45:25 79:9,13
**Megan** 1:6 2:19 82:19
    93:4,7 132:21 184:6
**Megan's** 81:14
**member** 9:20,23 10:4
    10:6 11:24,25 22:24
    107:21 160:7
**memorize** 70:19
**memory** 21:20
**mentally** 118:16
**mention** 107:4,5
**mentioned** 83:11
    136:3
**mentioning** 85:3
**met** 12:16 63:24 64:4
    111:12,13
**Miami** 2:17
**Michael** 2:16 91:13
    91:16,25
**middle** 89:14 90:14
    139:12
**midmorning** 93:11
**mind** 21:12 44:15
    47:11 53:19 94:25
    143:12 162:18
    173:6,24 174:14
    179:17
**mine** 11:4 34:10
    126:15 130:1 133:9
    133:22 141:21
    147:7 148:19
**minus** 98:10
**minute** 8:12 63:22
    113:4
**minutes** 48:25
**mish-mosh** 126:13
**mishmash** 127:12
**missed** 145:24
**missing** 85:23 96:9
    97:10 98:5,10
    101:23 102:17
    105:22 107:5
    108:13 123:18
    124:12 126:24

127:18 130:22
    131:24,25 134:10
    163:15
**mistaken** 124:23
**Mitch** 173:11
**mmpfeiff** 56:11
**mock-up** 123:12
**model** 139:25
**modified** 73:21
    123:19
**money** 35:19 56:23
    111:2 152:22
**Mont** 9:19
**month** 13:14 15:12
    15:12 18:11,13
    146:1,1,12,13,14
    147:12
**monthly** 142:24,24
    146:9,12 147:14,15
**months** 12:23 17:10
    90:6 110:16 152:2
    168:25
**morning** 4:8 56:9
    96:7
**motion** 138:15
    143:21
**move** 15:5,6,20,22
    16:4,19 18:23 19:8
    20:9,13,16,17,24
    21:13 22:8,9,20
    24:24 30:19 31:2,5
    33:5 56:1 59:1,1
    74:22,25 76:14,14
    77:16 81:9 85:18
    86:13,22 88:9,12
    89:7,11 94:2 104:12
    105:16 108:13
    111:25 125:14
    162:22 163:22
**move-in** 23:6 30:9
    86:13 153:5
**moved** 14:2,4,5,7,10
    14:10,11,12,13,18
    14:20,21 15:3,4,5
    15:13,17,21 16:6,9
    16:17,21,21,25
    17:11,13 18:12,14
    18:15 19:23 31:6
    73:21 76:18 95:13
    95:16,17 104:14
    110:10 111:7 117:8

**movement** 105:3
    163:21
**movements** 155:15
**moving** 16:2 18:18
    21:25 104:17,18,20
    122:15
**multiple** 72:1 112:21
**murdered** 174:2
**murdering** 174:5,16
    174:18
**mute** 92:20
**mutual** 12:16
**mutually** 51:17
    142:13 144:11
**mystery** 116:19

---

## N

**name** 4:9 9:4 22:4
    34:24 50:3,3 58:17
    58:23 80:21
**names** 68:8
**NAUGHT** 181:1
**necessary** 76:5 87:17
**need** 4:16,23 8:12
    52:1 54:17 65:12,24
    77:22 83:16,22 84:2
    85:8,9,10,10 86:1,4
    100:2 105:14,15,15
    105:17 108:16,17
    124:25 142:24
    166:20 170:14
**needed** 15:3 20:11,25
    22:7 58:19 89:1
    95:1 98:16 105:12
    179:6
**needs** 20:17 37:19
    51:22 66:10 94:21
    117:6
**negative** 118:5,21
    119:24
**negotiated** 51:16,24
    52:5 63:12,15 138:7
    142:20 163:1
**negotiating** 31:9 50:8
    56:6,7 73:15 74:16
    76:21 80:3 82:9,10
    139:1 145:1
**negotiation** 50:10,11
    50:18 52:19 73:20
    110:22 137:20
    138:18

**negotiations** 34:21
55:20 58:8 61:5
76:7 77:3 137:11
138:10
**neither** 55:16
**never** 7:9,12 23:25
34:2,3 44:25 45:21
50:22,25 57:13,14
59:7 64:20,21 70:2
70:21 71:6,23 72:4
72:8,9 75:24,24
76:2 77:5 78:6,7,13
81:9 90:13 98:1
105:17,18,24
112:13,14 114:19
114:19,20,21,24
115:3,4 132:22
142:3,10,11 147:10
157:16 159:20
160:15,16 162:15
162:16,25 164:7,10
166:4,12 167:19
171:20 172:10
176:3
**new** 7:22 9:17 13:8
15:2 28:1 31:2
38:15,18,19 39:1
40:13 41:22 43:5,9
43:11,16,16 46:9 48:8
48:11 52:2 61:18
62:1 64:22,25 69:19
70:17,18 92:4 116:2
121:19 143:12,22
144:12,15 160:25
164:13 175:10
**newly** 20:10
**nine-year-old** 20:10
**Nods** 4:20
**noise** 92:15,19
**nonparty** 178:20
**nonpayment** 179:19
**nonsense** 170:24
**normal** 118:14
**Northeast** 2:8
**Not-For-** 1:9 184:9
**Notary** 181:13 182:8
182:17
**notating** 95:11
**note** 52:11 83:9 95:10
**noted** 81:22 148:21
**notes** 31:14 183:11

**notice** 45:18 51:19
52:1 118:14
**noticed** 46:1,25 79:5
147:1
**notices** 45:25
**notifying** 43:10
**number** 10:18 33:17
44:8 50:12,17,17
80:21 156:4,5,10
**numbers** 141:15
151:2

---

**O**

**oath** 4:5 182:1
**object** 16:1 46:20
53:21,22,25
**objected** 147:10
**Objection** 36:18
109:18 128:2
**objections** 5:1,2
**obligation** 39:25 43:8
54:7 118:17 143:15
143:15,24 173:15
**obtained** 10:8 21:8,16
66:19 67:2 111:19
111:21
**obviously** 16:18
33:13
**occasion** 56:18
**occasionally** 87:24
**occupancy** 35:19
**occupied** 27:12
**October** 14:18,22
173:20
**offer** 34:22 35:7
**offered** 35:23 36:4,5
63:6 110:19,20
**office** 60:4 96:9,17
178:6,9 184:19
**oh** 38:8 62:5 63:4,22
81:12 87:15 90:6,15
123:23 136:22
**okay** 6:16 8:3,13,16
25:19 29:4,22 30:3
32:13 33:8 39:2
48:15,18 50:5,6
56:9 76:20 77:13
80:11 81:17 82:15
82:20 84:9 85:23
90:6 91:23,25 92:2
92:2 93:1 95:9

100:10,13 102:14
103:18 105:6 106:3
108:13 110:7
111:14 112:23,24
114:7,12 115:3
117:11 123:6
124:10 126:21
130:16 133:10,25
136:25 137:25
140:19,21,23 150:1
153:5,23 156:22,22
157:22 158:6 167:5
169:25 171:4
176:14 177:14
180:5
**okayed** 128:1
**old** 159:25
**older** 138:14
**once** 7:6 18:16 19:25
20:2 25:22 54:1
67:12 70:24 73:4
80:18 82:15,16
87:23 90:9 123:9
135:2 158:5 164:15
**one-year** 17:18 18:6
22:12 35:10,13
69:21,22 71:9
160:22 165:2
168:25 169:3,11,15
169:19
**ones** 47:5,5 70:17,18
121:18,19 140:5,11
170:8
**online** 12:24
**opening** 35:9
**opinion** 71:18,19,20
72:3 89:4 103:17
159:12 164:25
165:6,7,8,11 167:12
168:5
**opportunity** 166:14
167:14 168:2,11
**opposed** 9:3 145:3
**option** 50:12 51:17
63:6 69:12,19
137:21 142:13,14
143:7
**optional** 69:12
**options** 143:25
**order** 53:10 160:24
**original** 28:17 113:5

113:8,9,14
**originally** 141:8
**outdated** 49:22
**outs** 52:3
**owned** 158:12
**owner** 36:10 45:14
71:12,14,17,17
107:23 109:14,16
109:19 164:22
**owners** 43:10 167:8
**owns** 107:18 158:16

---

**P**

**P.A** 2:11
**p.m** 1:20,20,20 29:14
100:22,22 157:2,3
180:13
**package** 38:6,6
**page** 3:3,9 11:13,15
11:17,21 26:8 31:12
34:4 36:7 38:11
60:13 67:23 68:4
96:9,10 97:10 98:5
98:10,18 101:11,24
102:17,19 105:17
105:22 106:7
108:17,19 115:18
116:9,19 117:15,20
117:20,22 119:1,2,2
119:2,6,16,20,23
120:2,5,23 121:4,9
123:18 124:1,2,2,10
124:12,20,21
126:24 127:19,23
127:25 128:3,7,9,12
128:15,23,24 129:1
129:4 130:19,22,23
131:24,24 134:10
134:17,25 135:5,11
135:13,22 136:1,16
137:3,5 139:10,11
139:12 141:1,5,16
147:18,22 148:4,20
149:4,13 150:2,7,13
150:23 151:2,6,11
152:3,25 153:11,23
153:25 154:2,2,5,8
154:12,14,16 155:7
155:19,20,20
159:11 162:3,4,20
163:15 164:1,11,17

164:18 168:23
**Pages** 183:10
**paid** 56:22 57:11
60:23 68:21,22,23
69:1,3 71:6 108:1,2
110:14 146:7
**Palm** 1:2 2:3,3 184:2
184:16,17
**paperwork** 40:7 89:1
89:4,10,15 93:16
94:16
**paragraph** 35:20
63:5 64:17 120:6,21
141:20 146:7
158:14,15,18,19
161:23 162:1
**paragraphs** 64:13
**parameters** 24:16
**pardon** 18:5 99:16
144:5
**parking** 57:12 104:23
**part** 9:6 25:7 28:14
35:1 48:17 70:24
95:2 99:6 110:22
123:24 131:15
160:13 170:9
**part-time** 32:12
**participated** 7:15,19
**particular** 5:24 9:2
12:10 29:17 35:2
38:17 47:10 61:2
62:3,23 92:1 117:19
136:1 138:16 140:4
**parties** 45:7 125:25
144:8,11 183:13
**parties'** 183:14
**parts** 123:25
**party** 6:22 57:15,17
170:6
**pass** 57:12,12 87:11
**passed** 47:2,12 48:3
49:23
**passes** 74:25 104:23
**passing** 87:13
**pasted** 132:8
**pay** 142:22,23,23,24
146:9,9,11,12
147:16
**paying** 56:23 88:6
147:12,14,15
**payment** 56:25

**payments** 56:20
**pearls** 92:14
**pen** 8:7
**pending** 4:24 25:12
  172:17
**Pensee** 1:9 2:5 7:4 8:4
  8:4,20 10:6,11 11:2
  11:12,17 12:8,22
  14:1,3 34:23 56:24
  56:25 58:13 59:2
  60:16 65:10 66:24
  107:19,19 115:14
  129:7 136:17
  140:15 145:10
  157:25 158:9,13,20
  158:25 160:7 184:9
**Pensee's** 120:7
  145:13
**people** 16:19 19:9
  48:20 75:21,22
  92:20 118:21
  143:22 166:22
  167:18,23 174:5,23
  176:7
**percent** 42:2 43:13
  159:6,8
**Perfect** 8:16
**perfectly** 80:16
**performed** 118:9,9
**period** 15:11 17:1
  22:12 51:12 152:1,2
**periods** 160:19
**permissible** 19:10
**permission** 15:20,22
  15:24 31:2 54:2
  177:24
**permit** 32:5
**permitted** 5:24 24:13
  24:13 32:4 50:24
  51:3 64:23 155:15
  174:22 175:10
**perpetrator** 175:19
**person** 20:6 71:8,16
  78:1 107:10 112:12
  116:18,19 167:25
**personal** 72:3 168:7
  170:18,22
**perspective** 99:18
**pet** 128:13
**pets** 39:19 128:6
**phone** 54:21 55:8,11

80:21 83:24 84:16
  164:10 166:17
  178:7
**photo** 176:12
**photograph** 176:16
**physically** 130:14
**physician** 83:15,21
  83:22
**picked** 164:10
**picture** 111:11
  177:17,18
**pieces** 126:14
**pile** 170:23
**pinpoint** 47:10
**place** 1:21 17:21
  20:11 44:9 52:2
  78:11 84:20 111:24
  162:15,16 163:3
  176:7
**places** 115:25
**plaintiff** 7:12
**Plaintiffs** 1:7 2:1
  184:7
**plan** 55:17 143:16
**planning** 5:17
**play** 123:10 173:21
**please** 5:8 60:1 125:7
  133:16 172:16
  184:19,20
**plus** 60:24 110:16
**point** 12:25 25:6,16
  25:17,20 30:15
  34:20 44:21 47:7,13
  47:18 48:5 56:3
  60:2 67:19,20 71:9
  74:22 75:3 76:16
  81:4 82:4 93:16
  94:19 96:22 97:15
  97:21 106:3 138:8
  158:1 165:22
  170:13 171:6 172:2
  172:24
**points** 106:1
**Poliakoff** 157:8
**policy** 103:20,23
**polite** 19:18
**pool** 57:12 74:25
  104:23
**portion** 131:16,18
  152:18
**PORTUONDO** 2:15

**position** 48:16 72:12
  72:14,19,20,23 73:7
  73:8 90:10 162:15
  165:1,1 168:7,8
**possession** 114:6
  160:1 164:2,5
**possibility** 143:6,9
**possible** 29:8 63:4,8
  89:16 90:8 105:21
  133:19,21 164:7,9
  169:18,21
**possibly** 81:20 86:10
**practice** 5:16,24,25
  6:5,7,10,12 8:1 9:8
  98:13,13,14
**practicing** 64:12
**Predominantly** 5:17
**preferred** 58:1
**premise** 176:7
**premises** 175:11
**prepare** 49:6
**prepared** 32:19 33:9
  59:23 60:4 138:2,12
  138:13,16,22 139:5
  139:7,22 140:2
**presence** 181:8
**present** 2:18 130:15
  168:11
**president** 23:1 29:13
  30:7
**presumably** 74:3
  137:4
**presume** 4:17 6:12
  7:14 17:14 29:2
  65:8 83:10 116:15
  125:18 141:1 145:8
  154:24 155:23
  160:12
**presumed** 89:22
  105:7
**pretty** 43:13 79:4
  84:16 143:1
**prevent** 104:17,18,20
**previous** 27:20 81:22
  101:22 105:11
  147:24 155:12
**previously** 6:24 8:17
  27:13
**price** 73:16
**prior** 5:20,24 6:21
  7:2,21 8:25 12:22

18:18 21:1 22:12
  35:15 39:16 58:13
  63:18 70:14 101:19
  123:22 143:14
  145:11,14 148:8,12
  148:13 149:8,17,23
  150:17 157:13,17
  157:19 158:2
  160:18 167:14
  171:15
**private** 5:24,25 6:5,7
  6:10 30:11 81:1
  176:19 177:24
  178:1,4
**privy** 24:9 161:15
**probably** 16:22 22:16
  30:15 41:10 62:7
  64:25 70:19 94:20
  97:21 113:6,7
  136:18 145:1,6
**problem** 4:25 33:3
  78:23 91:19 99:24
  140:19,24 146:17
  147:16 179:9
**problematic** 47:6,12
**problems** 165:17,18
**proceeding** 112:20
**proceedings** 6:17
**process** 31:9 54:22
  55:13,13 58:11 66:2
  84:9 85:4 93:16
  106:13 108:4
  112:14,15 166:14
**processed** 89:11
**produced** 27:7 28:13
  55:9 74:11 103:4
**production** 3:11
  28:15 55:10 67:8
  107:8
**professional** 1:23
  134:8,8 182:7 183:6
**professionally** 117:6
**Profit** 1:10 184:10
**progress** 82:10
**prohibited** 66:11
**promised** 134:9
**proof** 86:3 112:10
  118:5
**proper** 45:17 47:25
  176:6 179:2
**properly** 41:13,21,23

42:3,4,13,17 45:3
  45:10,10,13,19,22
  46:4 47:2,14,16,18
  47:19 48:3 49:22
  79:5 162:22
**property** 9:3,9,11
  11:14 12:10,12,22
  13:3,7,10,12,20
  15:10 16:9,12 19:24
  20:5 24:25 25:5
  32:17 48:11 98:23
  148:10 173:25
  175:24 179:19,22
  180:1
**proposal** 37:25
**prosecutor** 5:25 6:1,2
  166:21
**prospective** 22:3
  39:18,23 40:9,15
  42:21,25 55:4 87:10
**protect** 153:15
**protective** 153:11
**protocol** 166:11
**prove** 118:21
**provide** 40:9,15
  42:21 48:22 87:7
  102:2 106:24
  107:24 109:10,12
  121:16 159:18
  163:10,13
**provided** 39:15 40:8
  40:14 43:17 45:6
  62:24 65:11 66:7,15
  80:23 98:6 104:22
  106:15 107:25
  108:8 121:12,13
  161:12 163:4,14
  164:10 173:14
**provides** 36:17 63:4
**providing** 106:14
  121:15
**provision** 61:8 62:15
  64:8 65:5 175:12
**provisions** 75:12
**public** 178:2,3,4
  181:13 182:8,17
**publicly** 10:11
**pulled** 76:12
**punted** 78:25
**purchase** 9:1,9 11:1
  11:19 12:9 13:16

39:16 77:15,23
**purchased** 9:3,11
13:7,10,12 24:1
39:14 70:17 79:18
**purchasing** 12:22
**purported** 43:25
168:23
**purports** 150:20
156:14
**purpose** 25:4
**purposes** 4:12 9:10
28:22 138:18
**pursued** 105:24
**put** 30:15 58:22
59:15 61:20 62:2,4
62:6 64:9,16 65:4
66:1 86:5 118:5
126:10 127:2 132:7
142:19 144:20
146:15,24 175:15

**Q**

**quarters** 14:19 15:3
**question** 4:18,19,24
10:2 14:15 22:14
24:14 25:8,11,12
27:3 29:6,10 33:6
38:16 39:10 41:12
42:19 45:20 48:17
49:5,11 59:17 65:15
65:16 76:19,20 92:4
94:10 111:24
114:12,13 115:5,5,9
125:6 133:16
138:21 140:20,22
149:25 165:13
169:21 171:4,8
172:14,16,17
173:22
**questioning** 48:22
179:4
**questions** 4:12,16
9:25 100:7 111:23
112:22 157:5
169:24
**quickly** 63:3
**quite** 52:18

**R**

**R.P.R** 183:22 184:25
**raise** 69:13

**raises** 44:4
**ran** 78:11
**rate** 69:14,17,19
**reach** 78:18,21 95:1
171:5
**reached** 138:8
**reaction** 170:11,15
170:19,22 176:6
**read** 23:25 24:12,19
25:12 29:19 32:8
37:22 44:19 70:11
70:18 86:20 117:3
118:8 172:16,17
**reader** 37:19
**reading** 29:21 33:1
37:21 140:17,18,22
**ready** 49:3 101:2
184:18
**real** 5:18
**really** 12:23 29:25
36:13 38:8 41:8
83:1 95:20 114:7
116:23 121:19
175:2 176:8
**realtor** 12:12 24:2
25:16 34:23 57:1
82:17,24 87:20
88:19 94:16 97:8,9
109:17 121:16,22
**realtor's** 98:24
101:15 109:13
**realtors** 32:21,24
33:4,9 34:8 98:12
99:5 130:9,9,11
164:2
**Realty** 8:4 10:12
36:11 107:19
**reason** 9:2,5 15:1
21:3,6 34:14 37:10
38:17 39:5 41:4
58:19 61:15 65:17
80:17 98:14 103:16
109:6 120:18 156:9
164:13,18,24
175:10
**reasons** 51:23 133:24
**recall** 8:23 13:19
15:14 16:17,24 17:7
18:11,13 19:10 23:3
26:21 30:10,11 33:8
37:24 38:2 51:4

54:11 67:6,23 68:19
68:21 70:23 73:9,12
78:22 84:5 85:19
99:9 119:14 121:1
158:5
**receipt** 151:13,25
**receive** 41:11 42:6,9
59:4,12 110:9 111:4
**received** 15:18 28:4
37:25 39:14 41:13
42:14 45:21 59:7
67:17 75:4 94:17
121:21 151:17,23
169:2,2 170:1,6,11
**receiving** 103:1,3
157:14 169:8
170:15
**recess** 49:1 100:21
157:2
**recognize** 26:13
33:23,25 34:5 114:4
114:5
**recollection** 83:3
**Reconfirming** 27:18
**record** 28:10,12,25
46:21 101:5 113:1
115:6 128:22 157:4
164:17 177:23
178:8 180:11
183:11
**recorded** 25:13
172:18
**recording** 176:18
177:10,11,19
178:17
**records** 65:11 66:7
83:11 101:14 120:8
**reference** 103:9
**referenced** 121:11
**referencing** 83:9
**referred** 171:2
**referring** 28:12 46:18
**reflecting** 146:7
**reflection** 126:16
**regard** 21:24 104:3
**regarding** 22:19 23:5
32:15 58:8 69:5
70:1,23 73:16 74:7
78:9 83:6,15,22
84:24 85:22
**regards** 21:9 43:16

46:9 179:6
**registered** 1:23 10:5
182:7 183:6
**registration** 111:16
111:18 119:8
**regs** 39:23 41:10
43:24 44:8 70:16
72:9 78:5 173:13
**regulation** 47:11,14
**regulations** 39:7
40:14 42:25 43:5,16
46:10 70:12 155:16
166:7 167:13 173:4
**relation** 77:15
**relationship** 19:14
24:7
**relative** 183:12,14
**relayed** 23:4
**relied** 34:3 109:11
**relist** 143:18
**remain** 69:14 143:16
**remained** 16:24
**remember** 8:20 18:21
33:12 36:13 38:3,9
39:3 42:18 62:20,23
67:4,22 69:7 70:24
74:9 78:16 81:4
84:22 88:12 90:19
94:18 95:18 96:13
98:9 156:11 157:19
**Reminded** 151:6
**remotely** 1:21 4:3
182:9
**removal** 175:5
**remove** 171:14
173:25 175:24
**removed** 172:2,23
**removing** 172:7
**renew** 69:13,19
142:13 144:1
**renewal** 50:12 62:16
73:16 137:21 144:1
**rent** 13:9,11,17,18
16:9,12 17:4,5
69:10,13 71:14
110:14 112:4
144:11,13 151:22
**rental** 19:25 20:2
69:14 151:12
**rentals** 70:12
**rented** 13:20 16:16

45:8
**renter's** 66:23
**renting** 9:7 25:4
**repair** 64:24
**repairs** 118:15
**repeat** 25:8 91:14
133:16
**repeating** 83:20,23
**rephrase** 5:9
**report** 10:16 183:8
**reported** 54:25 55:1
**reporter** 1:23 4:20
10:17 12:22 25:10,13
101:6 172:15,18
182:8 183:7
**REPORTER'S** 183:1
**Reporting** 1:23
184:22
**reports** 54:24
**represent** 4:9 90:22
91:3,6,11,12,17,21
**representation** 5:18
**represented** 91:1
**representing** 158:20
158:22
**represents** 90:25
91:24
**request** 21:9 48:10
**requested** 57:20,21
57:23 67:1 183:10
**requesting** 42:9 77:18
164:1
**requests** 19:21
**require** 47:16 96:11
97:12 103:12
118:20
**required** 62:1 87:23
103:22 104:1 108:3
173:1 174:22
**requirement** 64:22
72:11 104:9
**requires** 120:12
**requiring** 171:14
**reread** 25:11
**research** 47:23 112:7
**researched** 76:13
172:23
**reserving** 118:13
**residence** 14:1 19:12
76:10
**resident** 57:10,13

137:2
**Residential** 1:10,17
  2:10,14 4:10 91:6
  91:13,22,25 158:22
  184:10
**residing** 58:2
**respect** 33:20 46:23
  125:6
**respective** 24:23
  33:23
**respond** 31:22 42:16
  97:16 171:3,6,11
**responded** 29:7 96:16
**responding** 86:8
  95:25
**responds** 92:10
**response** 48:15 86:7
  102:2
**responsibility** 24:16
  46:12
**responsible** 39:22
**responsive** 19:20,22
**rest** 124:14
**result** 65:25 134:2
**resumed** 100:22
**retain** 171:6
**retained** 158:5
**retaliation** 64:8
**retaliatory** 64:23
**retire** 9:11
**retired** 29:12
**Return** 100:19
**review** 60:7 84:23
  103:8 173:12 183:9
**reviewed** 63:17 70:16
**reviewing** 54:6 85:22
**revision** 127:25
  128:23 134:14,20
  135:2 145:3
**revisions** 128:1 132:3
  134:6 135:8,9
**revolved** 19:8
**Rich** 180:4
**Richard** 2:2 157:21
  184:16
**ridiculous** 164:21
**right** 6:24 14:23 16:4
  16:19 21:9 23:17
  27:6 38:13 39:2
  42:1 44:9 51:6 56:3
  58:16 61:6 63:13

65:20 68:10 69:7
  70:1 71:1 74:19
  81:12 82:21 83:7
  84:20,21 90:23
  93:17 103:8 104:4,8
  104:10 106:22
  108:24 109:20
  110:6 115:8 117:3
  117:15,20 118:11
  118:12,13 119:9,12
  120:15 121:11
  122:23 124:13
  125:16 126:19,22
  131:15 132:15
  134:22 135:10
  136:8 140:6 141:17
  141:20 145:13
  146:16,17 147:12
  147:14 148:11
  149:6,14 150:19
  152:6,25 153:10
  156:15 166:23
  167:6 180:4
**right-hand** 144:6
  161:4
**rights** 165:25 166:5
**rise** 165:23
**rises** 166:24
**Road** 2:12
**Robert** 11:22
**room** 68:16 92:6
  116:5,8
**Rosati** 11:22,23,24
  63:23,25 64:1 77:9
  78:14
**rose** 166:4 172:21
**routine** 61:20
**Roy** 25:17 36:10
  55:15 75:23 87:11
  98:11 107:11,16
  122:3 170:10
**RPR** 182:16
**rubbish** 142:25
**rule** 41:20,22 45:16
  45:18 47:4,11,13
  48:2 69:21,22 72:10
  166:11 173:18
**rules** 4:14 5:5 9:22
  13:17,18 39:7,12,12
  39:13,19,22 40:1,2
  40:14,19,21,24 41:3

41:5,10,12,19,25
  42:3,6,9,17,20,24
  43:5,9,11,16,24
  44:8,15,20,22 45:2
  45:5,10,16,21 46:3
  46:9 47:25 49:20,22
  52:15 65:10,19,21
  70:11,16,19 72:9,17
  78:5 120:7 121:12
  121:15,17 155:15
  163:23 166:7
  167:13 168:16
  173:4,10,13,16
  176:9
**run** 32:11 79:13,15
**running** 127:10
**runs** 77:10

————————

## S

**S** 2:2 184:16
**S-I-G-L-O-C-H**
  13:22
**SAITH** 181:1
**satisfy** 28:3
**saved** 173:20
**saw** 38:8 69:2 70:21
  74:10 88:16 95:15
  111:11,15,16
  116:22 123:17
  131:11,13 140:5,11
  147:23 148:8
  149:17 151:5,7
  152:13 155:12
  167:24 177:18
**saying** 27:10,25,25
  30:22 36:10 43:15
  45:24 46:2 47:22
  80:9,10,10 90:13
  95:5 105:14 116:24
  123:21 124:7,9
  126:12,13 128:18
  131:22 138:6
  139:13 140:9
  153:21 157:19
  162:6,12 171:9
**says** 24:21 33:22 69:9
  72:10 83:8 85:15
  88:18 93:4 94:15
  96:7 102:16 103:22
  113:24 116:11,23
  117:5 120:6,8

124:12 134:25
  139:10 141:10,23
  147:22 153:8
  154:19 158:24,25
  160:5 161:3 166:15
**scene** 25:4,15,22
**schedule** 80:22
**scheduling** 180:9
**school** 5:12,13
**screaming** 177:2
**screen** 8:5 48:20
**scroll** 11:5 37:3 38:24
  62:25 81:25 113:7
  127:1 140:25
**scrolled** 63:2
**scrolling** 107:7
**search** 77:19
**searching** 12:24
**second** 8:9 11:13 33:2
  74:19 81:1,2,2
  108:2 110:21 125:7
  129:18 130:22
  131:24 141:24
  142:3,5,6 146:5,13
  147:11 163:15
  176:11 179:4
**Secretary** 10:9
**Section** 9:22
**security** 31:24 32:3,3
  32:5 35:24 36:3,5
  69:20 104:23
  110:16 120:17
  149:22 150:4,8
  151:12
**see** 8:14,15 10:14
  11:3 26:23 32:10
  33:4,14 37:1,8,9
  43:1 46:6 48:19,20
  67:16 95:9,12,18
  105:11,13 111:11
  113:7,20,21 116:24
  124:2 133:18
  136:22 139:18,19
  145:2,9 147:6,6,7
  164:12 170:5
  176:12,12,15
**seeing** 33:13 38:4
  70:23,25
**seen** 47:17 72:8 107:7
**sell** 52:1
**send** 26:12 77:8

88:19 97:6,7,14,17
  98:23 102:16,19
  108:14 164:11
  166:19 169:4
**sending** 75:16,17
  80:25 82:14,17,21
  103:7 107:2 169:8
**sends** 96:6
**senior** 29:12
**sense** 30:1,2
**sent** 26:23 32:25 60:6
  60:7 66:19 67:13
  72:9 77:5 82:23
  86:24 87:7,8,9,11
  87:20 88:18 93:19
  96:19 97:2,4,6,7,17
  98:19 99:3 101:13
  101:18 102:3,18,21
  102:22,23 116:2
  164:12,15 166:16
  168:23 169:10,12
  169:18,22 177:10
  177:11,13,19
**sentence** 142:20
  160:5 161:3
**separate** 68:16,22
  115:25 137:1,3
**series** 4:15
**service** 32:4,6 52:12
  52:13,15,19,20,22
  53:2,4,6,25 54:6,14
  55:3 65:12 66:6
  81:12,15 82:23 83:6
  83:16,22 84:2,7,8
  85:15 86:2,16 90:17
  94:8,14 95:11,13,21
  111:25 112:1,4,8,10
  118:20 120:8
  149:17
**services** 1:11,17 2:10
  2:14 4:10 64:19
  91:7,13 118:16
  184:11
**SESSION** 101:1
**set** 5:21 6:5 8:23,25
  39:6 46:3 121:17
**sets** 44:8
**setting** 4:21 8:20 96:8
  177:24 178:1
**seven** 17:9
**seventh** 84:19

**share** 8:5 39:17,18
**shared** 47:15
**sharing** 8:10 176:13
**shocked** 39:24
**short** 15:11
**shorter** 160:18
**shortly** 13:15 14:5
**show** 8:18 10:21
  59:14,25 124:17
  125:4 127:19 131:3
  155:2
**showed** 125:1
**showing** 102:23
  147:1 151:5
**shown** 143:20 173:2
**shows** 10:3,16
**side** 57:21,22 116:12
  117:23 119:7 127:2
  127:2 129:25,25
  134:21 144:6
  146:19 148:25
  168:11
**sides** 52:5
**Sigloch** 13:22,25 16:8
  16:25 17:14
**Siglochs** 17:16 19:4
  19:12
**sign** 35:3,4 43:2
  57:23 58:1 67:23
  69:15 72:17 80:19
  93:7,9 94:21 95:6
  95:10 103:11 104:2
  104:2 122:12,22
  130:4 152:12
  184:19
**signature** 11:13 34:5
  34:6,7,10,11,12
  36:16 37:12,20 68:4
  68:10,11,13,17
  122:8,10 125:12,13
  129:10 130:20
  131:11 135:17,18
  135:19 136:12,13
  136:19,20 137:4
  150:20 152:5,8,11
  155:19,20,24
  184:18,21
**signatures** 34:9 83:8
  132:2
**signed** 11:22 34:16
  37:6 38:1 39:25

56:2,4 61:3 68:15
76:17 77:4 80:24
82:5,8 93:17,18,20
93:25 94:5,7,22
95:7 99:8,14 102:7
103:17 104:9 107:8
108:8 110:1 115:22
115:25 116:1,2,6
121:1,2 122:18,23
123:3,19,23,25,25
126:1 127:5 129:5
129:12 130:8
132:22 150:18
151:16 152:14,19
154:17 155:20,23
156:2,19 163:3
182:12 184:20
**signer** 37:4
**signers** 76:17
**signing** 68:19 81:6
  82:19 123:22
  136:23,24 184:19
**similar** 140:4 147:23
  149:1,16
**sir** 18:5 135:21 145:7
  149:6 153:1
**sit** 47:20,24 108:5
**situation** 29:24
**six** 90:6 168:25
**six-month** 114:20,22
  115:11 125:19
  159:1 160:9,14,16
  161:5,17,23 162:3
  162:12
**sixth** 84:19
**slapped** 137:23
  139:13
**slot** 178:7
**slowly** 62:25
**small** 5:18 6:11 7:6
  135:2
**Smithtown** 5:23 6:4
  7:20 9:16
**smoke** 31:25 32:1,2
  55:18
**smokers** 55:17
**snowbird** 9:12,15
**sole** 9:23 10:6
**solid** 109:6
**somebody** 5:3 44:21
  72:15 92:6 109:11

117:8 133:11
137:22 139:13
146:1 149:2 159:15
163:17 170:2 174:3
174:7,18 175:17
177:24 178:15
**somebody's** 137:12
**Someday** 114:10
**someplace** 116:1
**son** 20:10,11
**song** 112:15
**soon** 84:7
**sorry** 7:11 10:1 13:17
  14:10,15 25:8 27:3
  33:16 35:8 36:1
  38:22 39:11 42:11
  47:20 53:23 59:17
  61:25 62:19 71:25
  72:23 78:20 79:20
  92:4 102:20 109:15
  121:7 132:10
  135:25 138:20,21
  141:15 162:10
  167:2 172:11
  177:16 178:11
  180:6
**sort** 24:20 85:3 94:9
  167:21
**sorts** 7:16
**sounds** 92:21 94:24
**source** 111:22
**South** 13:8
**Southeast** 1:24
  184:23
**SOUTHERN** 1:1
  184:1
**space** 58:23 178:2,3,4
  178:4
**Sparks** 91:16,25
  92:16,21 156:24
**speak** 21:11,23 22:1
  54:15,23 70:7
  157:20
**speaking** 9:7 21:14
  32:14 84:1,25
**special** 52:15
**specific** 9:5 18:11
  47:13 48:1,2,5 74:9
  154:9,13 156:9
**specifically** 46:18
**speculating** 108:25

**spend** 125:10
**spoke** 18:24 20:23
  27:2,11 28:7 49:8
  49:13,13,15 50:25
  74:4 78:15,23
  105:25
**spoken** 157:16
**spring** 14:14,21
**St** 5:13
**stability** 71:7,16 72:2
  164:24 165:11
**staffers** 32:12
**standard** 59:19 64:11
  64:17 113:19
  139:18,21,24 159:1
  165:6
**standing** 98:17
  152:20 177:17
  178:14
**STARKS** 2:16
**start** 26:7 60:20 70:5
  116:13 125:14
  138:11
**started** 25:7 89:15
**starting** 34:20 56:1
**starts** 26:8 96:3
  117:19 137:6,15
  138:17 141:5
  142:12 145:25
**state** 7:23 10:9 37:10
  46:5 61:18 88:22
  103:18 112:20
  181:13 182:3,8,17
  183:3
**stated** 40:13 41:2
  93:14 114:22
  138:23 161:11
**statement** 34:21
  36:21 41:1 72:6,7
  76:8 95:24 123:10
  159:4,5,12 161:20
**statements** 112:16,16
**states** 1:1 106:23
  107:8 137:18 184:1
**stating** 30:21
**stay** 14:8,16 15:8
  69:10 73:7 143:8,10
  143:23
**stayed** 14:17,18,22
  15:14,15 17:8,9
  160:18

**Stefan** 13:22,25
**stenographic** 183:11
**stenographically**
  183:8
**step** 86:13
**steps** 87:18 90:3
**stick** 178:7
**sticks** 71:8
**Stirling** 2:12
**straight** 123:15
  125:10 142:20
**Street** 2:16 9:19
**strictly** 69:12
**study** 44:21
**stuff** 92:24 100:1
  127:15
**style** 170:3
**styled** 139:20
**subject** 30:11 61:19
  93:20 102:12
  122:20 123:3
  131:14 155:11
**Subjecting** 136:7
**submit** 65:11,21
  120:7
**submitted** 53:13,14
  57:11 87:3 159:10
  162:19
**subscribed** 181:8
**subsequent** 16:8
  126:4
**substantially** 139:3
**sudden** 89:13 90:5,17
**sue** 171:18,23
**sued** 7:2,6 124:5
**sufficient** 173:5,24
  174:15 175:4
**Suffolk** 6:2
**suggest** 30:3
**suggestion** 51:11
**Suit** 2:3 184:16
**Suite** 2:8,12
**summer** 14:6,11
**SunBiz** 3:10
**supply** 118:15
**supposed** 90:11 112:6
  112:7 121:13 142:7
  163:18 165:19,22
  169:24
**supposedly** 30:17
  177:15

**sure** 4:13 5:13 32:9
  33:3 42:8 43:13,13
  54:9 67:25 84:16
  98:22 101:10 105:7
  109:25 110:2 115:6
  117:3 121:14,18,20
  123:15 129:20
  138:11,23 143:1
  144:25 146:20
  148:17,19 159:9
  168:17 174:6
**surprises** 39:19
**suspected** 62:4
**suspicion** 44:5 45:5
**suspicions** 44:2
**suspicious** 41:9 44:1
  44:16,24 45:16 47:4
  47:23
**Susskind** 1:23 182:7
  182:16 183:6,22
  184:25
**sworn** 4:4 181:8
  182:10

**T**

**take** 4:21 17:21 48:23
  99:19,24,25 100:3
  100:12,12 126:21
  140:19,24 156:21
  160:25 168:9 177:7
  179:6
**taken** 1:17,19,22 49:1
  55:20 84:20 100:21
  110:20 157:2
  167:15 172:22
  184:18
**talk** 8:3 70:5 78:1,2,5
  78:12 83:21 88:25
  160:21
**talked** 18:25 70:2
  112:13,13 147:5
**talking** 6:22 77:2
  80:7 83:10 85:25
  89:17,20 94:14
  101:7 127:4 137:20
  138:13 146:5 157:9
  170:22,25 174:16
  174:16 179:23,23
**talks** 61:12 118:10
  122:14 158:12
**tax** 13:18

**TBC** 154:19 155:4
**Tdemarinis** 26:19
**telephone** 15:18
**tell** 11:3 20:8 21:18
  26:5 29:19 31:25
  33:5 36:15 37:2
  39:4 40:12 45:18
  46:12 49:16 55:3
  63:1 64:9 67:9,21
  69:8 74:19 80:6
  85:10,10 86:19
  108:11 112:24
  116:12,23 117:16
  118:6 127:3 133:13
  170:14
**teller** 178:15
**telling** 19:11,11 21:8
  44:12 66:1 89:15
  97:9 101:23 130:16
**tells** 158:19 177:6
**temporary** 14:19
  15:3
**tenancy** 82:22 96:23
  104:4 145:14
  162:18 163:16,19
**tenant** 20:21 21:2,24
  22:3,12,20 24:23
  30:19 31:2 33:23
  39:19,23 40:9,15
  42:21 43:1 51:9,22
  51:24,25 53:25 55:4
  55:4 57:5,9,10,14
  58:9,11,22,23 61:18
  62:23 65:11 73:4,5
  73:6,7 77:4 85:6,13
  87:10 88:6 97:8,21
  142:14 165:16,17
  165:18 166:20
  167:12 173:25
  175:6 179:7
**tenant's** 51:16 66:18
**tenants** 13:19,21 20:4
  35:15 60:17 61:16
  75:1 77:7 101:19
  106:2 159:22
  160:18 165:12
  167:7,11
**tend** 174:25
**term** 35:5 63:9,10
  69:21 70:8 73:5,16
  74:11 137:6,16

138:17 141:6,8
  142:16 143:3,17
  146:13 159:2 160:8
  161:17,18,22 162:5
  162:17,24 165:15
  168:24 169:3,11,15
**terminate** 51:19
**terminated** 14:19
**termination** 51:9,17
  61:8,12,16 142:16
**terms** 22:15 31:9
  32:15 35:9 50:8
  63:17 73:21 74:7
  109:22 137:15
  144:17,18
**terrific** 20:12
**test** 118:5,11 119:24
  120:13 128:8 148:9
  149:7
**testified** 4:4 44:25
  50:21 98:8 102:6
  125:12 127:16
  129:2 169:7
**testify** 167:25 178:16
**testifying** 46:23
  178:17
**testimony** 47:9 49:20
  101:12 115:2,3
  123:14 138:4,5
  139:7 159:18
**testing** 149:20
**Thank** 11:9 18:10
  29:1 48:25 100:20
  156:25
**thanking** 87:17
**thanks** 88:22
**Thanksgiving** 15:19
**theme** 157:10
**thing** 5:7 36:1 37:1
  48:5 62:12 64:25
  65:7 71:18 78:5
  97:20 98:19 102:18
  102:21,22,23 125:1
  128:17 130:2
  133:14 140:10
  153:23 155:11
  165:12 178:17
**things** 5:19 41:24
  44:3,13,13 46:13,18
  47:2 51:19 64:24
  76:18 83:18,19 94:3

101:10 102:10,11
  115:23,24 122:24
  127:13 132:13
  166:3 168:19
  171:21
**think** 14:5,11,14 17:9
  28:16 31:19 40:17
  43:8 49:19 61:18,20
  61:23 62:1 63:2,23
  64:11 66:13 69:2
  70:10 71:1,5,7
  72:14,15,15 74:10
  76:5 79:4 82:11
  84:14 91:1 93:18
  94:1,6,17 95:4,5
  98:15 99:10,13,13
  100:8 101:9 102:6,9
  113:3 117:5,18
  118:9 121:17
  124:14 126:10
  127:9 131:5 144:16
  145:1 146:3,24,25
  148:14,18 151:4
  154:19 166:10
  170:8 173:19
  174:25 176:17,22
  176:22 177:12,18
**thinking** 89:16
**thinks** 95:1,3
**third** 73:25 82:3 98:2
  170:6
**third-party** 46:22
**thorough** 30:14
**thought** 52:4 58:21
  58:22 59:15 74:12
  79:19,21 91:1 94:24
  111:2 147:5 161:11
**thoughts** 32:7,10
**thousands** 88:7
**threatening** 178:15
**three** 50:12,17
  107:12 109:6 131:6
  143:21 165:14
**thrilled** 164:23
**throwing** 171:19
**time** 1:20 4:22 15:11
  15:14 16:12,15 17:1
  20:3 22:20 31:8
  36:17 37:5 38:20
  41:16,17,20,22 46:3
  50:14,16 51:12,16

61:24 62:4 67:17
  69:24 70:18 74:21
  76:25 78:22 82:3
  85:13 88:11 93:15
  95:15 98:2 108:15
  109:8,10 111:7
  125:5,10 130:4
  140:19,24 147:15
  160:19 173:17
**timely** 86:12
**times** 51:16 80:17
  85:4 109:8 116:24
  127:8 131:6 143:21
**timetable** 20:13
**timing** 20:18
**tiny** 34:1
**title** 140:11
**today** 6:13 28:22
  47:20,24 75:23
  108:5 176:4
**Todd** 177:3
**told** 13:16 20:15,16
  21:12,21,21 22:8
  27:11,15 40:21 53:9
  53:15,16 54:11
  55:12 65:18,19,21
  67:25 69:2 76:9
  77:11,13,16,20,25
  78:7 83:23 84:9
  86:3,5 87:3,24
  88:11,25 89:13,23
  89:23 90:3 101:9
  108:6 112:14
  114:17 115:10
  168:21 177:13
**Tom** 29:22 31:23
  32:11,12 38:22 50:3
  50:4,5,7 52:14
  66:19,22 67:5 78:23
  80:8 96:8 158:6
  163:21
**top** 27:5 113:24
  115:20,23 116:15
  124:1 140:6,8
  141:15,20 161:4
**total** 60:23 168:25
**Totally** 114:24
**town** 5:23 6:4,6 7:14
  7:20
**training** 53:10
**transaction** 56:16

**transcript** 183:9,10
**transfer** 11:14
**transferring** 142:7
**transgressions** 171:19 172:2
**transient** 71:15
**transients** 71:9,11,13 72:3
**transpired** 44:3 45:7
**tried** 16:19
**trouble** 8:10
**true** 23:8 95:3,7 127:16 145:4 154:21 159:8 162:8 170:24 183:11
**truly** 30:10
**truthful** 33:12
**trying** 47:4 115:2 171:18
**Twelve** 110:16
**two** 8:12 32:11 61:17 62:7 69:23 71:15,16 75:1 77:7 80:16 94:3 98:14 106:2 109:8 110:18,19,20 110:25 111:15 146:8 156:4,5,10 159:22 165:14
**two-year** 50:22,23 51:3 69:15 70:1,22 71:2 72:10 80:9 137:22 138:8 142:20 143:3 146:6 146:13 162:24 163:1,16,18 164:20 164:23 165:2,5
**type** 30:19 123:22 140:11

**U**

**uh-huh** 27:22 55:21 94:13 96:14 121:11 122:11,19 143:5 152:4 160:4
**ultimately** 86:15 98:11 108:7 162:17
**unblemished** 164:16
**underline** 146:23 155:4
**underlined** 146:24
**underlining** 146:23

**underneath** 146:4
**understand** 23:16 24:4,7 27:8 36:20 42:8,25 94:9 98:22 105:5 108:12 117:1 124:9,12 127:18 138:24 168:4 178:23
**understanding** 23:18 23:20 24:15 82:13 168:7
**understood** 4:17 21:5 21:7 37:23 49:20 92:2 101:12 173:10
**uninvolved** 81:21
**unit** 7:3 11:1 12:9,22 14:2 16:24 17:4,8 18:23 27:11 45:8 55:18 58:3 59:23 70:15 79:1,18 101:19 104:15,24 107:18,23 109:16 109:19 117:6 118:18 152:20 158:12 167:7,8 171:15 180:2
**United** 1:1,23 184:1 184:22
**units** 117:5 176:4
**unlawful** 53:22,24 83:14
**unsigned** 60:3
**unsure** 93:8
**unusual** 51:20
**up-front** 110:18,20 110:25 111:2,3 142:22,23 146:9
**updated** 40:19,21,23 41:3,5 42:9
**updates** 40:4,6,13 42:10 90:11
**use** 9:10 13:8 32:21 33:9 34:9 86:12 175:10
**usually** 146:23
**utilities** 64:24

**V**

**Val** 32:13 38:14 39:9 49:10 84:9 85:8 89:24 96:8 108:12

108:16,16
**Valerie** 1:15 3:4 4:2 164:11 181:6 182:9 183:9 184:15
**validity** 44:17
**valmanzo@aol.com** 26:9,10
**Value** 36:11
**various** 106:1
**verified** 72:4 105:8
**verify** 99:12
**version** 39:18 60:3 62:15 64:1 66:23 113:17 120:16 122:2 129:21 130:5 130:13 134:11 137:23 138:7,14,18 138:25 140:4 152:14 153:12 156:17,18,18,19 159:25
**versions** 149:2 166:17
**versus** 147:12
**vetted** 72:17
**vice** 29:12
**victim** 61:22 175:9,14 175:18 176:3
**VIDEOCONFERE...** 1:15
**view** 71:21,22 72:1 82:18
**viewed** 15:16
**violated** 166:6,11 172:6 173:3 174:24
**violates** 167:13
**violation** 54:1 168:20 172:21 174:11,13
**violations** 173:23 174:4,17
**violence** 61:13,14,15 61:19,22 62:10 175:4,9,12,14,18,22 176:3
**violent** 176:8
**virtual** 4:21
**visit** 13:8
**volunteer** 79:15
**vs** 1:8 184:8
**VSM** 116:14 141:16

**W**

**wait** 40:11 63:22 82:1 90:4 93:24 124:17 125:7 149:25
**waiting** 76:10 81:8,21 140:20
**waive** 184:19
**waived** 184:21
**walk-through** 130:2
**want** 4:13 8:18 26:4 42:8 43:11 48:22 49:12 69:21 71:13 78:3,3,3,4,8 81:8 86:10 99:18 112:22 138:23 142:23 157:5 164:19,22 170:23 180:5,7
**wanted** 17:20 20:9 28:24 32:2 40:3 56:21 69:10,20,20 72:16 86:10 101:10 118:17 130:6 143:8 157:10
**wants** 69:11,14,17 128:22
**WARNER** 2:7
**warning** 166:13
**warranty** 3:10 10:22
**wasn't** 23:7 34:15,17 44:1,10 47:14 55:1 61:25 62:3 64:7,15 75:17,19 86:18 89:14 90:20 93:14 103:14 104:8 109:7 109:12 110:22 114:2 118:19 139:15 152:19,20 159:16,22,23 160:13 167:23 169:13 170:9
**wasting** 85:13
**way** 28:6 29:10 31:21 37:21 69:18 83:1,8 86:12,25 117:21 122:19 132:21 133:18 139:24 146:10 154:6,12 158:4 168:15 171:6
**we'll** 11:5 100:17,18 103:21 125:14
**we're** 10:21 12:1 26:3

28:20 84:10 89:24 99:11 110:4 114:10
**we've** 131:5
**weekend** 155:15 163:22
**weekly** 85:3
**went** 5:12,13 12:25 15:7,10 20:25 22:5 22:7 121:20 124:19 124:20 125:11 128:17 131:7 143:21 160:15 174:2
**weren't** 15:6 41:9 64:6,18 95:20 106:13 121:15
**West** 1:2 2:3,16 184:2 184:17
**whichever** 122:1,2 173:4
**wife** 12:20
**Wilcox** 1:5,5 2:19 20:4,7 25:3,14,22 26:1 31:4,6,9 34:15 34:23 35:23 37:17 42:22 45:8 50:8 52:17 53:3,11,12 54:13,18 55:17 56:1 56:23 57:7 58:25 59:10,24 60:7,11,16 62:10 63:24 64:4 65:4,22 66:5 68:7 68:11,24 69:9 70:15 73:22 74:4,8,15 76:7,22,24 80:4 82:24 85:12 86:25 86:25 88:2,8,20 89:7 90:4,12 93:21 95:1,22 103:6 104:4 104:13 110:10 111:7 115:14 116:1 118:16 121:2,24 123:7,19,20 126:17 129:13 130:4,12,15 133:5 136:24 140:15 141:18,19 142:2,8 143:19 146:16 148:18 153:24 154:17 155:17,24 158:12 158:25 162:18,21

163:2 166:6 168:10
171:15 172:1 173:2
176:19 177:5,6
184:5,5
**Wilcox's** 33:24 34:5
36:16 37:11 52:22
57:22 80:21 84:1,25
94:8 117:16 119:3
119:21 120:3,24
121:10 122:10
124:15 125:13,15
129:9 130:20 132:3
135:19 136:13
137:3 141:2 143:15
145:2,10 147:8,20
148:5,21 149:5,10
149:13 150:3,14,21
150:24 151:5 152:8
152:10 153:2,13
154:3,9,13 155:8,24
156:14
**WILLIAM** 1:5 2:19
184:5
**wish** 184:19
**wished** 38:19 164:13
**wishing** 38:15,18
**witness** 1:22 3:3 4:3,6
10:1 46:22,23 91:20
92:14,23 99:20
100:5,11,16,19
150:1 178:20 179:2
**WOLF** 1:12 2:5,20
184:12
**WOLFF** 1:12 184:12
**wonderful** 96:11
**word** 93:4 118:7,8
**words** 118:6 122:21
**work** 5:2 22:5 32:12
51:21 82:10 146:25
**worked** 26:1 163:21
163:21,22
**working** 6:6 25:15,16
25:25 38:22 118:14
**works** 12:20 23:16,21
23:21
**worried** 159:21
**worry** 125:4
**worth** 110:14
**wouldn't** 16:3 39:23
63:20 65:3 86:1
98:15 146:25

164:21
**wound** 160:23
**write** 115:7 126:12
145:17
**writing** 27:9 116:11
116:16 117:23
119:7 124:1 137:6
144:10 145:18,19
145:21
**written** 17:15,16
114:8,14
**wrong** 46:9 65:20
**wrote** 29:15 50:7
90:18,19 113:25
114:11 115:4
116:18,19,25
125:18,18 142:4
144:3 145:15 146:2
149:2 157:12,21
161:4,7 166:16

**X**

**Y**

**yeah** 19:19 27:1,8
39:3 49:14 56:21
67:4,5,19 72:14
82:20 89:13 95:18
112:12 120:22
131:12 134:11
137:8 145:4 148:1,3
154:19 155:1,3
159:8 174:19
**year** 8:24 14:6 17:19
17:22,23 18:1,3,4
20:21 21:1 35:23
38:15,18,19 45:4
70:24 110:17
142:15,22,23 146:5
146:8,8,11,13
147:11,17 162:19
164:13 165:14
**year's** 39:1 110:14
**years** 19:15,19 64:12
69:23 71:16,17
72:13 109:6 110:18
110:19,20,25
165:11 176:2
**York** 7:22 9:17 13:8
61:18 62:1 64:23,25
116:2 160:25

175:10
**you-all** 99:20 102:24

**Z**

**Zeus** 111:5,11,12

**0**

**003132** 182:18

**1**

**1** 3:10 10:18,19 35:20
115:18 116:9,19
117:20 119:2 124:1
141:1 183:10
**1/25/2021** 113:24
151:17
**1:00** 100:22
**10** 3:10 102:7 129:4
135:22 150:23
**10/31** 9:6
**10:48** 49:1
**10:57** 49:1
**100** 2:8 42:2 43:13
159:8
**100,000** 111:2
**1031** 9:22
**10th** 94:12 96:4,7,15
97:2 99:8,9 101:9
101:22 106:4
109:21,22,25
**11** 152:3
**1100** 2:8
**113** 3:11
**12** 3:10 152:2,25
**12-month** 152:1,1
**12:20** 1:20 100:21
**12:45** 100:19
**12:55** 1:20
**1200** 2:3 184:16
**1218** 1:24 184:23
**14** 43:10 153:25
**14-page** 53:12 87:4
**15** 28:20 60:24,24
144:19 154:2
**150** 57:11 137:2
**16** 154:5
**1645** 2:3 184:16
**16th** 173:19
**17** 154:14
**18** 154:16 155:7
**183** 183:11
**19** 5:14 106:19

**1979** 5:14
**1980** 5:15 6:1,2
**1983** 5:22 6:3
**1985** 64:21
**19th** 106:6,14 162:20

**2**

**2** 3:10 10:22 11:15
12:2,3 96:9 97:10
98:5,18 101:24
105:17,22 106:7
108:17,19 123:18
124:2,2,12 126:24
127:19 134:10
139:10,12 147:18
159:11 162:3,4
164:1,11,17,18
168:23
**2:13** 157:2
**2:20** 156:25
**2:21** 157:2
**20** 157:13,17
**2015** 39:15
**2018** 8:25 12:6,18,19
14:7 39:14 40:4
77:12 79:2 82:7
**2019** 16:10,22
**2020** 20:24 26:22
154:24
**2021** 31:10,19,22
35:6 44:3 55:22,25
58:7 60:15,20,24
72:22,25 75:9 93:12
101:9 114:18,18
115:14 122:5,8
125:19,20 129:4,13
133:4 135:16
136:13,14 137:17
140:14 141:9
150:17 151:12
153:9 154:25
155:11,21,25 157:8
157:13,17 158:10
159:2 168:22
**2022** 1:19 35:6 60:21
137:17 141:9
142:19 181:9
182:10,12 183:17
184:21
**2023** 141:10,14,16
143:4,7,11 144:4,7

144:14
**21** 42:3 44:7 159:3
**211** 2:12
**22** 26:8 137:13
**22nd** 110:7
**23** 141:17
**24** 35:6 141:17 144:6
158:10 159:3
184:21
**24th** 60:21 114:18
125:20 137:17
141:9 143:3,11
144:4,14 182:12
183:17
**25** 144:22
**25th** 2:16 22:9,10,11
27:12,15 30:25 31:1
31:3,5,7 35:6 56:2
60:15,20 74:23 75:4
85:6 86:12 88:3,9
89:12 104:13
114:18 122:15
125:19 133:4
137:17 141:9
144:20 151:12
153:8 154:24 159:2
162:21
**26** 1:19 3:11
**26th** 173:18 182:10
**27** 31:12

**3**

**3** 3:11 26:4,15 28:21
117:15,20 119:2
128:3 148:4
**3,900** 60:25
**3:00** 179:4 180:4
**3:10** 1:20 180:13
**3:30** 100:2
**30** 36:7
**303** 8:20,25 10:6 11:1
11:12 12:22 14:1,2
34:23 52:21 56:24
59:23 60:16 107:18
115:14 129:7
157:25 158:12,13
158:25 160:7
**30th** 12:5,7
**33** 38:11
**33130** 2:17
**33301** 2:8

**33314** 2:13
**33316** 1:24 184:23
**33401** 2:3 184:17
**3900** 35:24 36:3
  146:9,12 147:11
**3rd** 1:24 2:8 184:23

**4**

**4** 3:5,11 113:12,22
  119:1,2 128:9
  134:17 148:20
**4,000** 146:1,1,2,12,14
  146:15 147:12,12
**42** 64:12
**44** 2:16
**46,800** 60:24
**48,600** 151:22
**4th** 31:19,22 50:2

**5**

**5** 119:20 128:15
  134:25 149:4
**50** 111:3
**50,000** 115:1
**50,700** 35:20,22
  110:10 111:3
**525-2221** 184:24
**5th** 55:14,22,25 58:7
  58:15,21,24 66:25
  72:25 74:23 75:3
  88:3 115:13 140:14
  155:11

**6**

**6** 66:18 67:1 69:4
  119:23 128:23,24
  136:14 155:25
**6:46** 29:14
**6099** 2:12
**6th** 67:20 72:25 93:19

**7**

**7** 79:24 82:13 120:2
  122:8,18 129:4,13
  135:5,16 149:13
  150:17,17
**7/24/2021** 113:25
**72** 118:6 119:24
  149:20
**72-hour** 120:13
**7th** 67:20 82:4,11,18
  86:6 122:5 127:6

  136:12 155:21

**8**

**8** 33:17 120:5,23
  135:11 150:2
  168:22
**8:45** 96:7
**8th** 26:22 27:10 29:5
  29:7,14 67:20 85:14
  93:12,17 94:5

**9**

**9** 121:9 135:13
  150:13
**9/22/24** 182:19
**9:21-CV-81565-D...**
  1:3 184:3
**9:30** 1:20
**9:31** 27:21 29:5
**9:47** 27:7,10 29:6
**9:48** 56:10
**9:49** 26:22 27:16
**90** 51:19,25 52:1
**90-day** 52:3 69:16
**954** 184:24
**954-525-2221** 1:25