```
    IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
             IN AND FOR PALM BEACH COUNTY, FLORIDA
              CASE NO.: 50-2021-CA-009343-XXXX-MB


LA PENSEE CONDOMINIUM
ASSOCIATION, INC., a Florida
not-for-profit corporation,


             Plaintiff,

-vs-

LA PENSEE 303, LLC, a New York Limited
liability Company, WILLIAM DAVID WILCOX,
individually, MARK MCFADDON, individually, and
MEGAN DANIELLE LUCHEY,

             Defendants.
_____

             REMOTE VIDEOTAPED DEPOSITION OF
                WILLIAM DAVID WILCOX, JR.
                  VIA ZOOM PLATFORM

                 Friday, March 4, 2022
                   11:09 - 4:47 p.m.




Reported By:
Wendy Beath Anderson, RDR, CRR, CRC
Notary Public, State of Florida
Esquire Deposition Services
West Palm Beach Office    Job #J8479639
```



1 │ APPEARANCES:

2 │ On behalf of the plaintiff:

3 │       JOANN NESTA BURNETT, ESQUIRE
  │       BECKER & POLIAKOFF
4 │       1 East Broward Boulevard
  │       Suite 1800
5 │       Fort Lauderdale, Florida 33301

6 │

7 │ On behalf of Defendants Le Pensee 303, William David
  │ Wilcox and Megan Danielle Luchey:
8 │
  │       RICHARD S. LUBLINER, ESQUIRE
9 │       LUBLINER LAW, PLLC
  │       1645 Palm Beach Lakes Boulevard
10│       Suite 1200
  │       West Palm Beach, Florida 33401
11│

12│ On behalf of Third-Party Defendants:

13│       ANDREW SIMON, ESQUIRE
  │       COLE, SCOTT & KISSANE, P.A.
14│       9150 South Dadeland Boulevard, Suite 1400
  │       Miami, Florida 33156
15│

16│ On behalf of Counter-Defendant and Third-Party Defendant
  │ Wolf:
17│
  │       ANDREW J. MARCHESE, ESQUIRE
18│       MARSHALL DENNEHEY
  │       2400 East Commercial Boulevard, Suite 1100
19│       Fort Lauderdale, Florida 33308

20│

21│ ALSO PRESENT:

22│       MATTHEW LEIVA, REMOTE VIDEOGRAPHER

23│

24│

25│



WILLIAM DAVID WILCOX, JR.                          March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                          3

```
1                           -   -   -

2                        I N D E X

3                           -   -   -

4

5    WITNESS:              DIRECT    CROSS    REDIRECT    RECROSS

6
     WILLIAM DAVID WILCOX, JR.
7
     BY MS. BURNETT:         6
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



WILLIAM DAVID WILCOX, JR.                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                        4

```
 1                          -  -  -

 2                    E X H I B I T S

 3                          -  -  -

 4   PLAINTIFF'S            DESCRIPTION             PAGE

 5   EXHIBIT 1              VIDEO - RETAINED          68

 6   EXHIBIT 2              VIDEO - RETAINED          68

 7   EXHIBIT 3              COMPILATION OF DOCUMENTS  68
                           PROVIDED BY EDWARD
 8                          LEPSELTER - RETAINED

 9   EXHIBIT 4              E-MAIL - RETAINED         73

10   EXHIBIT 5              MOTION TO AMEND WITH THE 107
                           SECOND AMENDED COMPLAINT -
11                          RETAINED

12

13

14                          -  -  -
                C E R T I F I E D   Q U E S T I O N S
15                          -  -  -

16                   PAGE NO.    LINE NO.

17                     165         21

18

19

20

21

22

23

24

25
```



```
 1                   P R O C E E D I N G S

 2                          - - -

 3        Deposition taken before Wendy Beath Anderson,

 4   Registered Diplomate Reporter, Certified Realtime

 5   Reporter and Notary Public in and for the State of

 6   Florida at Large, in the above cause.

 7                        -  -  -

 8             THE VIDEOGRAPHER:  Good morning.  We are now

 9        on video record.  The time is 11:09 a.m. eastern

10        time.  Today's date is March 4th, 2022, in the

11        video deposition of William David Wilcox in the

12        matter of La Pensee Condominium vs. La Pensee 303,

13        LLC, Case No. 50-2021-CA-009343-XXXX-MB.

14             My name is Matthew Leiva and I'm your

15        videographer for today.  Wendy Anderson is your

16        stenographer today and we are both representing

17        Esquire Deposition Solutions.

18             As a courtesy and when you're not talking

19        please mute your audio and when you're ready to

20        speak, please unmute your audio.

21             Will counsel please introduce yourself and

22        thereupon, the witness will be sworn in.

23             MS. BURNETT:  Joann Burnett from Becker on

24        behalf of La Pensee Condominium Association, Inc.

25             MR. SIMON:  Andrew Simon from Cole Scott &
```



```
 1        Kissane on behalf of the third-party plaintiffs.
 2             MR. LUBLINER:  Richard Lubliner on behalf of
 3        Mr. Wilcox and 303, LLC and Megan Luchey.
 4             MR. MARCHESE:  Andrew Marchese on behalf of
 5        David Wolff and the La Pensee Condominium
 6        Association.
 7   Thereupon,
 8             (WILLIAM DAVID WILCOX, JR.)
 9   having been first duly sworn or affirmed, was examined
10   and testified as follows:
11             THE WITNESS:  I do.
12                  DIRECT EXAMINATION
13   BY MS. BURNETT:
14        Q.   Hi, Mr. Wilcox.  My name is Joann Burnett.  I
15   represent La Pensee Condominium Association, Inc. in
16   this matter.  Just a few preliminary things.
17             Have you ever had your deposition taken
18   before?
19        A.   Yes.
20        Q.   How many times?
21        A.   I wouldn't be able to count them.
22        Q.   Okay.  So you're aware of the rules.  We need
23   you to actually give us answers verbally, don't shake
24   your head yes or no, so we have a record of your
25   answers.  If I ask you a question and you answer it, I'm
```



 1  going to assume you understood the question.  If you

 2  need me to repeat or rephrase a question, just let me

 3  know and I'd be happy to do that.  If you need to take a

 4  break at any point in time, let me know and we can do

 5  that as well.

 6          Do you have any questions?

 7      A.  No.

 8      Q.  Okay.  For the record, could you state your

 9  full name?

10      A.  William David Wilcox, Jr.

11      Q.  And your date of birth?

12      A.  September 28th, 1987.

13      Q.  And your current address?

14      A.  4000 South Ocean, Unit 303, South Palm Beach,

15  Florida 33480.

16      Q.  And how long have you lived there?

17      A.  Since January 25th, 2021.

18      Q.  And where did you reside prior to that?

19      A.  Numerous places, London, primarily, 42 Eaton

20  Square.

21      Q.  When were you in London?  What dates?

22      A.  I lived there on and off for about ten years.

23      Q.  Have you lived anywhere else other than London

24  in the last ten years?

25          A.  I've lived in Tennessee; I've lived in



1   Florida; I've lived in Montreal, numerous places.

2        Q.   Okay.  I just want to ask you a few questions

3   about your education.  Where did you go to high school?

4        A.   Memphis University School in Memphis,

5   Tennessee.

6        Q.   That's your high school?

7        A.   That's my high school.

8        Q.   And did you go to college?

9        A.   I did.

10       Q.   Where did you go?

11       A.   University of Tennessee.

12       Q.   Did you graduate?

13       A.   I did.

14       Q.   What was your major?

15       A.   Finance economics, business.

16       Q.   And what year did you graduate?

17       A.   2010.

18       Q.   Did you have any postcollege education?

19       A.   I did.

20       Q.   And can you tell me about that?

21       A.   I went to the University of St. Mary's in

22   Twickenham in London and Twickenham in England.

23       Q.   And what did you study there?

24       A.   Business, master's.

25       Q.   So you are an MBA?



WILLIAM DAVID WILCOX, JR.                          March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                              9

1        A.   It's a little bit different than an MBA.  In

2   England they're called a master's certificate.  So it's

3   not a whole MBA.  It's like an executive MBA.

4        Q.   Okay.  And are you currently employed?

5        A.   I am.

6        Q.   Where are you employed?

7        A.   At my own corporation.

8        Q.   Can you tell me the name of it?

9        A.   Evolution Metals Corp.

10       Q.   Evolution Metals Corp, was that what you said?

11       A.   Correct.

12       Q.   And what type of business is that?

13       A.   Metals trading, primarily battery metals.

14       Q.   When you say trading, what do you mean by

15   that?

16       A.   Do you want the definition of trading?  You

17   move one piece to another piece and you collect a fee

18   for doing it.

19       Q.   So is this like a stock of some type, you're

20   moving -- what do you mean by you're trading metals?

21       A.   Battery metals, you know what's in a

22   telephone.

23       Q.   Okay.  And how long have you owned this

24   company?

25       A.   We incorporated January of 2020.  January 25th



1    I think was the exact date of the incorporation.

2          Q.    January 2020?

3          A.    Yes, correct.

4          Q.    Okay.  And you said "we incorporated."  Are

5    you the -- a joint owner?

6          A.    I'm the primary shareholder; correct.

7          Q.    Are there other shareholders?

8          A.    Of course there are.

9          Q.    How many?

10         A.    I wouldn't be able to say, and it's private

11   information.

12         Q.    Are you publicly traded?

13         A.    No.

14         Q.    Okay.

15         A.    It's a private corporation.

16         Q.    And prior to your work at Evolution Metals,

17   where were you employed prior to that?

18         A.    Deutsche Bank.

19         Q.    And what did you --

20         A.    I worked at Deutsche Bank most of my career.

21   I was a derivatives trader.  I worked on Wall Street and

22   I worked on London Wall.

23         Q.    And there's kind of a delay here, so I

24   apologize if I'm not hearing you correctly.  Did you say

25   this was your entire employment?



1    A.    When I graduated from the university in 2010,

2    I went into the graduate program of Deutsche Bank.  I

3    was in securities lending, then I went over to a

4    derivatives billed out under Dodd Frank on Wall Street

5    and then I went back to London and I ran the Benelux in

6    South Africa desk for derivatives trading and rates.

7         (Discussion off the stenographic record for

8    clarification.)

9    BY MS. BURNETT:

10        Q.    Do you hold any licenses of any kind?

11        A.    So they're inactive now.  I used to hold a

12   CISI license, an FCA license, which is the equivalent of

13   the SEC.  We don't need those in my current trading

14   regime, which is why we're inactive.  You have to have a

15   regulated entity to then reactivate them.

16        Q.    All right.  Any other licenses?

17        A.    Not that I can think of.

18        Q.    Okay.

19        A.    A driver's license, you know, that sort of

20   thing, is that what you're asking?

21        Q.    No, no.  I understand you have a driver's

22   license.  When you said -- I just want to back up one

23   more time.  You said that you --

24        A.    Sorry, one second.  Mr. Burnett, when have you

25   seen my driver's license?



1    Q.   No, I said I don't need to see your driver's

2    license?

3    A.   Okay.  Sorry, I misunderstood you.

4    Q.   You said that you've resided at Unit 303 since

5    January 25th of 2021, right?

6    A.   Correct.

7    Q.   Okay.  Immediately before that, where were you

8    residing?

9    A.   I was residing in London; I was residing in

10   Florida; I was residing in Tennessee.

11   Q.   In that order?

12   A.   No, numerous places.  I was working and

13   traveling and building a business.

14   Q.   Okay.  Did you have a residence?

15   A.   What do you mean, my tax residence?  My tax

16   residence --

17   Q.   No, I mean -- no, no, the place where you

18   lived?

19   A.   Yes.  I just told you I lived in numerous

20   places.

21   Q.   I apologize.  There's this lag.  It sounds

22   like I'm cutting you off and it's not intentional.

23   A.   Okay.

24   Q.   Before -- when you were looking for a place to

25   live in West Palm Beach, where were you residing at that



1    point in time?

2        A.   My primary residence was 365 Houston Hill

3    Road, East Tennessee, 38028, if you're asking from a

4    taxable residence perspective.

5        Q.   Did you -- do you own that home?

6        A.   That home is owned; correct.

7        Q.   Do you own the home?

8        A.   I own -- that home is owned; correct.

9        Q.   Do you own the home?

10       A.   I don't understand your question.

11       Q.   Who is the owner of the home?

12       A.   David Wilcox is the owner of the home.

13       Q.   Is that you or is that your father?  A

14   brother?

15       A.   So it's my family.  We own it collectively.

16       Q.   Do you own any other properties?

17       A.   In the United States?

18       Q.   Yes.

19       A.   No.

20       Q.   Do you own any properties outside the United

21   States?

22       A.   Not in my name, no.

23       Q.   Are they in the name of your company,

24   Evolution Metals?

25       A.   No, no.



1      Q.   Have you ever been a tenant before?

2      A.   A tenant as a resident, of course.

3      Q.   And when were you a tenant?

4      A.   Knoxville, Tennessee, Crown Estates.

5      Q.   When were you a tenant in Knoxville,

6  Tennessee?

7      A.   Oh, let's see.  The first year was 2006.  Like

8  I said, I was a tenant of a dormitory called Reese Hall.

9  I was a tenant there for a year or two semesters, in

10  2007 I guess it would be.

11         Let's see, I was a tenant of a fraternity home

12  for the first semester.  The second semester I was a

13  tenant of a home that I can't remember the residence

14  address.  And then 2009 -- or 2008, '09, '10, until I

15  graduated I was a resident of Crown Estates.  I can't

16  remember the contract apartment number.

17      Q.   Did you say Crown Estates?

18      A.   Crown, yeah, it's called Crown Apartments or

19  something.  It was on 22nd Street and maybe Forest Hill

20  in Knoxville, Tennessee, I think Exit 387 off the

21  interstate, off I-40.  But it was a long time ago.  You

22  know, I'm just telling you my testimony.  This is to the

23  best of my memory.

24      Q.   Absolutely, understood.  And then from --

25  after 2010, where did you move?



```
 1          A.   I moved to London.

 2          Q.   And where did you reside in London?

 3          A.   Ability Towers, 19 Macclesfield Road, and I

 4   can't remember the exact post code and unit number, but

 5   maybe like the 8th floor, 803, something like that.  But

 6   it was 19 Macclesfield Road.

 7          Q.   I'm sorry, can you repeat that?

 8          A.   One nine Macclesfield,

 9   M-A-C-C-L-E-S-F-I-E-L-D, I believe.

10          Q.   And how long did you reside there?

11          A.   Let's see.  From, I had a short-term

12   foundation because I was adjusting, department was

13   getting ready -- maybe October/November 2010 for roughly

14   a year.

15          Q.   Did you sign a lease?

16          A.   Did I sign a lease?  I'm sure I did.  I just

17   don't -- I can't recall and I probably don't have a copy

18   of it.

19          Q.   Okay.  And then from there, where did you go?

20          A.   The company transferred me over to Wall

21   Street.  I had a temporary accommodation in the lower

22   east side in New York City, until I found my home which

23   was 53 Lispenard Street, which was the second floor.  It

24   was a loft.  It was with a couple other finance guys.

25          Q.   And this was --
```



1        A.   And that was the signing --

2        Q.   Go ahead.

3        A.   That was a signing of a lease; correct.

4        Q.   Okay.  Can you repeat the address there, 53?

5        A.   Five three L-I-S-P-E-N-A-R-D Street.  And I

6   couldn't remember -- it's three or four floors.  There's

7   a paint store underneath it, but it was the second

8   floor.

9        Q.   Okay.  And how long were you there?

10       A.   It would be a year, nine months.  Deutsche

11   Bank decided to move me back to London and they paid out

12   the remainder of my lease, because I had signed a lease

13   that I couldn't get out of.  So they paid it out.  I

14   just can't remember.  Maybe nine months, ten months,

15   somewhere around there.

16       Q.   Okay.  So then you went back to London, you

17   said?

18       A.   They sent me back; correct.

19       Q.   And where did you live then?

20       A.   They put me in temporary accommodation in

21   Tower Hill.  Are you familiar with London?

22       Q.   No, not at all.

23       A.   Okay.  So there's a bunch of boroughs where

24   the finance district is with a big bridge that's very

25   famous.  It's blue.  It's an area called Tower Hill.  I



1  was there for, I don't know, a few months until they

2  helped me find a new accommodation, and that was

3  Grosvenor Gardens.

4       Q.   And again, what was the first word, something

5  Gardens?

6       A.   Grosvenor.

7       Q.   Can you spell it?

8       A.   G-R-O-S-V-E-N-O-R.

9       Q.   And how long were you there?

10      A.   Five, six, seven years, somewhere around

11 there.

12      Q.   Did you own that or did you lease?

13      A.   No.  The way it worked in London is you have a

14 freehold and a leasehold.  So the Duke of Westminster

15 owns all the freeholds.  So technically no one's a real

16 owner as you know it in the United States, because you

17 can't really own the property.  You lease for a period

18 of time, if that's four years or a hundred years,

19 whenever you get your lease and they take back the

20 property.  It's a little bit different system than they

21 have over here.  Stamp duty is your taxes.  You pay all

22 your taxes up front.  You don't pay your taxes every

23 year, that sort of thing.

24      Q.   So you were there, you said, five to seven

25 years?



WILLIAM DAVID WILCOX, JR.                          March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                          18

1       A.   Something like that and then I went over to 42

2    Eaton Square.

3       Q.   That's in London also?

4       A.   Mm-hmm.

5       Q.   And how long were you there?

6       A.   We're still there.  So I don't know.  We still

7    have it.

8       Q.   And you said that's not an ownership as we

9    would know it over here.  It's more of a tenancy?

10      A.   No, it's an ownership, but you asked a

11   specific question, what do I own in terms of David

12   Wilcox, and I do not own that property.  I didn't own

13   Grosvenor Gardens, did not own Ability Towers, did not

14   own Lispenard Street, did not own Crown Estates.

15      Q.   Okay.  Who owns 42 Eaton Square?

16      A.   A corporation in Switzerland.

17      Q.   What corporation is that?

18      A.   It's TBI, a pretty complex structure, but it's

19   TBI at the top.

20      Q.   Do you have an ownership interest in TBI?

21      A.   I believe that's private information that I

22   don't need to share.

23      Q.   I think you can answer.  I mean, if you know,

24   you can answer the question.

25           MR. LUBLINER:  Go ahead.  I'll give latitude.



WILLIAM DAVID WILCOX, JR.                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                      19

```
 1        I don't necessarily see the relevance, but...
 2   BY MS. BURNETT:
 3        Q.   You can answer.
 4        A.   Do I have an ownership in TBI?
 5        Q.   Mm-hmm.
 6        A.   No.
 7        Q.   How many people are owners in TBI?
 8        A.   Private information.  I'm not able to share
 9   that.
10        Q.   Okay.  I just want to go on record, you're
11   refusing to answer the questions about TBI, correct?
12        A.   Correct.
13        Q.   Okay.  Is it the same company that owns
14   Grosvenor Gardens, is that TBI also?
15        A.   No.
16        Q.   What company owns that?
17        A.   The Duke of Westminster, called Grosvenor
18   Estates.
19        Q.   And the property at 53 Lispenard, second
20   floor, who owns that?
21        A.   I don't know.  It's a long time ago.  I don't
22   know if it's changed hands or not.  It's a U.S.
23   property.  I would have to find my lease and find out
24   who owns it.
25        Q.   Okay.  So from there, where did you go?  I
```



1  think you said you still own -- TBI still owns 42 Eaton

2  Squire, so you still go back and forth, I guess?

3       A.   Correct.

4       Q.   Okay.  And where did you go after 42 Eaton

5  Square?

6       A.   Well, I didn't really go because, as you just

7  stated, it's still there.

8       Q.   Well, where did you reside after you left

9  there?

10      A.   I haven't left there.  I have been there since

11 January 25th.  So this is where I've been residing quite

12 a bit during Covid.

13      Q.   Did you reside anywhere else between 42 Eaton

14 Square and moving to 303 La Pensee?

15      A.   Are you talking about 365 Houston Hill Road in

16 east Tennessee?

17      Q.   Did you reside there between those times?

18      A.   I've resided there, yeah, for quite a long

19 time.

20      Q.   How long did you reside there?

21      A.   I don't know, twenty years.

22      Q.   Is that where you grew up?

23      A.   No.

24      Q.   Where did you grow up?

25      A.   Lexington Road in Memphis, Tennessee.  The



1  number was about 5260 -- I can't remember, but it was

2  Lexington Road.  Next to the racquet club in east

3  Tennessee.

4       Q.   So is it fair to say that your family still

5  owns the house in Tennessee and you split your time, you

6  know, in some fraction between La Pensee 303, the house

7  in Tennessee and the 42 Eaton Square?

8       A.   That would be fair.

9       Q.   Okay.  Any other places?

10       A.   Well, I spend time in Montreal; I spend time

11  in California; I spend time in numerous places.  My job

12  takes me where I'm consistently in, you know, places for

13  short periods of time.

14       Q.   And in those short periods of time, do you

15  rent a place or you just --

16       A.   Usually I lease a place.

17       Q.   Okay.  So you said you leased a place in

18  California?

19       A.   I did not say I leased a place in California.

20  I said I reside sometimes in California.

21       Q.   Okay.  Do you have a lease in place in

22  California?

23       A.   I do not have a lease in California.

24       Q.   Have you ever had a lease in California?

25       A.   No.



1        Q.    So when you're in California, where do you

2    stay?

3        A.    Palm Desert.

4        Q.    Is that a hotel?

5        A.    No.

6        Q.    What is it?

7        A.    A home.

8        Q.    Who owns the home?

9        A.    A Swiss corporation.

10       Q.    Is it TBI?

11       A.    I'm not sure.  I think so, but I'm not sure.

12       Q.    Okay.  When you reside in Montreal or when you

13   stay in Montreal, where do you stay?

14       A.    Usually in a hotel.

15       Q.    Okay.  Any other places?

16       A.    A lot of times, a lot of places.  I have a

17   passport here that maybe has, I don't know, more stamps

18   than you can imagine because that's where my job takes

19   me, is different places around the world and that's what

20   we do.

21       Q.    Okay.  And I think you mentioned something

22   about South Africa.  Did you live in South Africa?

23       A.    No.  I was running the derivatives desk for

24   our area at Deutsche Bank South Africa, which covers

25   most of the continents.  We used -- we used to use,



 1  because I no longer work there, South Africa was a

 2  conduit for the rest of the economy.

 3       Q.   Did you -- when you were doing that work, when

 4  you were employed there, where did you live?

 5       A.   At the Four Seasons.

 6       Q.   Okay.  The Four Seasons where?

 7       A.   It's called whatever Cliffs.  They bought it.

 8  It's in Johannesburg.

 9       Q.   Okay.

10       A.   Then I like to spend a lot of time in Cape

11  Town too.  It's really nice there.  I don't know if

12  you've ever been, but beautiful, beautiful city.

13       Q.   Okay.  When did you start looking for a

14  place -- actually, let me ask you this:  Did you start

15  looking for a place in Palm Beach at some point in time?

16       A.   Yes.

17       Q.   Were you looking to purchase a home or to rent

18  a home?

19       A.   Either one.  Primarily to rent so I could get

20  to know the area.

21       Q.   And when did you start looking for a place?

22       A.   2018 I started looking at, what is it called,

23  Zillow, 2019.  I'm not sure, probably 2019.

24       Q.   Did you find anything --

25       A.   I'm always --



WILLIAM DAVID WILCOX, JR.                          March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                              24

1          Q.    Go ahead.

2          A.    No, I'm just always looking, you know.  And I

3    think your question is leading up to how did I find 4000

4    South Ocean, Unit 303; is that correct?

5          Q.    No, no, no.  We're going to get there.  We're

6    going to get there, but I want to ask a few more

7    questions first.

8          A.    Okay.

9          Q.    Did you find -- did you lease any place

10   between 2018 and 2021 in West Palm Beach or Palm Beach?

11         A.    In West Palm Beach, no.

12         Q.    Did you rent a place anywhere in Florida?

13         A.    I'm sure I have.  I've rented numerous places.

14   I rented a place that's very cold on the west side over

15   there that has little canal boats and whatnot.  I rented

16   over there for a little bit; yeah.

17         Q.    Did you have --

18         A.    I have -- yeah, of course you have a lease,

19   but you know, short-term, long-term.  I would have to

20   look at all of my records.

21         Q.    Okay.  Do you think you could provide us with

22   those leases?

23         A.    I can try to find them, of course.  I don't

24   know if I can find, you know, 53 Lispenard or Crown

25   Estates, I mean, but I can try.



```
 1            THE WITNESS:  Rich, if you could mark that
 2       down, I'll try to find the leases.
 3  BY MS. BURNETT:
 4       Q.   I'm really concerned about the leases in
 5  Florida only.
 6       A.   Okay.
 7       Q.   So you said you did rent some places between
 8  2018 and 2021 in Florida?
 9       A.   Yeah, like Airbnb, stuff like that, of course.
10       Q.   Did you rent for 30 days or longer in any
11  place?
12       A.   Not that I recall.  I would have to check.
13       Q.   Okay.  How did you come in contact with Roy
14  Gelber?
15       A.   Through my girlfriend, Megan Luchey, middle
16  name Danielle.
17       Q.   And how did she come to find Mr. Gelber?
18       A.   My understanding and through previous
19  depositions of questions that you've asked that have
20  validated this, is she was looking on the internet on a
21  website that's called Zillow and she found a home that
22  was in West Palm Beach somewhere.  I went and looked at
23  it.  I liked it.  I saw the lease.  They wanted me
24  responsible for the roof, all sorts of shit that was
25  absolutely crazy.
```



1          And I developed a relationship with Roy at

2   that point.  He was the listing agent.  I told him what

3   I was looking for.  He showed me numerous properties

4   over, I would say, the next week or two weeks when we

5   found La Pensee.

6          We were looking for a house.  We were not

7   looking for a condo.  He was on the system called MLS,

8   said this is 1700 -- it's about 2,000 square feet.  He

9   said would you consider this, and I said I'm desperate

10  to find something because I want to settle in Florida.

11  And so I said yes.

12         I came to the condominium the first time, I

13  think the date was -- it was like December 30th or so

14  because it was right before New Years, because we had

15  our party at Mar-a-Lago.  I saw it myself and I met Ed

16  Lepselter and Roy.  We walked through it.  I looked at

17  them and I said, How much do they want for this?  They

18  said 4,000 a month.

19         And I said, will they be willing to take a

20  discount?  And I said, I'll pay a year up front in cash.

21         And Ed Lepselter said he would work on that.

22  I said okay.  Over the next 24 or 48 hours, through Roy

23  to Ed and to Val Manzo, the owner of the 303, LLC, back

24  and forth, we came to a deal where I saved a hundred

25  dollars per month.  So it was $3,900 and I paid cash up



WILLIAM DAVID WILCOX, JR.                                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                                         27

1   front for a year.

2        Q.   Okay.

3        A.   Then the question was, Val wanted me to lease

4   it longer, so we talked about an extension.  She didn't

5   like the extension because the option didn't fall in

6   anyone's favor but myself.  So she demanded a two-year

7   lease.  Allowed me, if I wanted to, to pay the same

8   amount upfront for the second year and I would have to

9   do it before the second year started.

10           And that is how the lease came about.  I'm

11  sure you're aware of that, because there's only one

12  lease.  There's never been a six-month lease.  There

13  wasn't an e-mail on July 8th about a six-month lease.

14  It's never been produced.  Val Manzo didn't do that.  I

15  did not do that.

16       Q.   Mr. Wilcox, Mr. Wilcox, can you -- I'm going

17  to ask you just to answer my questions and we can go

18  through this piece by piece.

19       A.   Ms. Burnett, I believe I was answering your

20  question.  If you think I'm not answering your question,

21  then go ahead and insult me, but I believe that was an

22  answer to a question that you asked me.

23       Q.   I believe my question was something about how

24  you were looking for -- were you looking to rent or to

25  lease?



1        A.   I don't know the difference between renting --

2        Q.   I mean rent or to purchase, I apologize.

3    Whether you were looking to rent or to purchase.  So

4    let's just --

5        A.   I was looking --

6        Q.   Okay.

7        A.   -- for both.

8        Q.   Did you run a criminal background check on

9    Mr. Gelber?

10       A.   I did not.

11            MR. LUBLINER:  Form.

12   BY MS. BURNETT:

13       Q.   Is there a reason you didn't?

14            MR. LUBLINER:  Form.

15            THE WITNESS:  I don't understand the question.

16   BY MS. BURNETT:

17       Q.   Okay.  Just asking, did you run a background

18   check on him, and if not, why?

19            MR. LUBLINER:  Form.

20            THE WITNESS:  No, and I wouldn't be running a

21       background check on a real estate person sending me

22       to different properties.  I'm not sure of the

23       relevance of that.

24   BY MS. BURNETT:

25       Q.   Were you aware that he was involved in a



 1  federal criminal investigation which he pled guilty to

 2  one count of racketeering?

 3          MR. LUBLINER:  Form.

 4          THE WITNESS:  No.

 5  BY MS. BURNETT:

 6      Q.  You didn't hear that in any of the

 7  depositions?

 8      A.  Yes.

 9      Q.  But you weren't aware at the time?

10      A.  At the time, no.  I was made aware when this

11  lawsuit was filed, when we did background checks on the

12  relevant individuals, through my law firm.

13          MR. LUBLINER:  Don't -- don't get into what

14      you and I discussed with her.

15          THE WITNESS:  Okay.

16  BY MS. BURNETT:

17      Q.  So who have you run a background check on?

18  Who do you consider to be the relevant people?

19          MR. LUBLINER:  I'm going to instruct him not

20      to answer that question to the extent that it

21      involves legal advice and communications, work

22      product as well.

23          So if he can answer that without it infringing

24      upon any conversations I've had with him that he's

25      done independently and not with any interaction



1      with me regarding this case, he can do so.  If not,

2      I'm going to instruct him not to answer.

3           MS. BURNETT:  I'm just asking who he ran

4      background checks on.

5           MR. LUBLINER:  And I just said --

6           MS. BURNETT:  Understood.  I'm not asking for

7      any conversations he had with you, just who he ran

8      a background check on.

9           MR. LUBLINER:  A mere background, that is

10      privileged if it involved me.

11           MS. BURNETT:  Did it involve you?

12           MR. LUBLINER:  You can ask him.  To the extent

13      it involved me, I'm instructing him not to answer.

14      I don't know what he's done on his own.

15  BY MS. BURNETT:

16      Q.   Have you run any background checks on your

17  own?

18      A.   Of who?

19      Q.   That's what I'm asking you.

20      A.   Okay.  So Andrew G. Simon, I have not run a

21  background check on.  Wendy Anderson, I have not run a

22  background check on.  Andrew Marchese, I have not run a

23  background check on.  Joann Burnett, I've looked into

24  where you've went to law school and to the extent you

25  consider that a background check, I would say yes.  Val



1  Manzo, I have not run a background check.  Matthew

2  Leiva, I have not run a background check.  David Wolff,

3  I have run a background check.

4      Q.   Why did you run a background check on David

5  Wolff?

6      A.   Because he has intimidated, harassed and

7  threatened my girlfriend, Megan Danielle Luchey.  He

8  said inappropriate things and he believes that we live

9  in 1956.

10     Q.   Okay.  So you ran a background check on David

11 Wolff.  Do you know what time period?

12     A.   I don't understand the question.

13     Q.   When did you perform the background check on

14 David Wolff?

15     A.   When the HOA and Joann Burnett forged

16 documents claiming that I had a six-month lease at

17 Unit 303, that's when I ran a background check.

18     Q.   So you're saying I forged leases?

19     A.   I didn't say you forged leases.  I said you

20 were party to saying I had a six-month lease and if you

21 didn't know that those documents were forged, you

22 certainly knew after, when we turned over the documents.

23 You certainly know now.

24     Q.   Okay.  So who else have you performed a

25 background search -- background check on?  Did you



1   perform a background check on Robert Rosati?

2        A.   I'm not sure who Robert Rosati is.

3        Q.   Bob Rosati?

4        A.   Bob Rosati, the treasurer that lives in 203?

5        Q.   Yes.

6        A.   I did not.

7        Q.   Did you run a background check on Laurie

8   Marchel?

9        A.   I did.

10        Q.   When?

11        A.   I'm not sure of the time period.

12        Q.   What was the purpose of running a background

13   check on her?

14        A.   So I'm not going to repeat myself from the

15   previous answer.

16             THE WITNESS:  Wendy, if you can just note that

17        my answer is the same as before.

18   BY MS. BURNETT:

19        Q.   Are you saying Laurie Marchel forged a lease?

20        A.   I'm saying the board previously interacted

21   with Mary McFadden and Mac Residential Services to claim

22   I had a six-month lease with La Pensee 303, LLC.  The

23   documentation turned over from Mary McFadden and Mac

24   Residential shows already the two different second

25   pages.  Those did not come from us.  In your letters,



WILLIAM DAVID WILCOX, JR.                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                          33

 1  you claim that they did.  You claim that this was a
 2  six-month lease.
 3          You filed a lawsuit, then you amended a
 4  lawsuit.  And I want to know who Mark McFadden is, and
 5  then you removed that individual and then you amended
 6  the complaint again and you did not rely on the
 7  fraudulent forged documents.
 8      Q.   Okay.  Did you run a background check on John
 9  Lawson?
10      A.   I did.
11      Q.   What period of time?
12      A.   I'm not sure.  Around --
13          THE WITNESS:  So sorry, the same answer,
14      Wendy, as I had before.  I ran background checks on
15      David Wolff, Laurie Marchel and John Lawson, same
16      answer.
17  BY MS. BURNETT:
18      Q.   Okay.  We're going to -- I'm going to need you
19  to not say, you know, go back and pull my answer.
20  You're going to have to answer the questions
21  individually.
22      A.   Okay.  I was threatened, harassed and a
23  lawsuit was filed against the owner of 303, LLC with
24  fraudulent documents that Becker & Poliakoff relied upon
25  in filing a lawsuit to evict me and my girlfriend, Megan



1   Danielle Luchey.

2          Then there was an amendment to add Megan

3   Danielle Luchey as a party and some unknown Mark

4   McFadden.  There was then another amendment that no

5   longer relied on the six-month lease.  Laurie Marchel

6   proceeded to tell individuals in the building that I had

7   a six-month lease.  It's incredibly confusing when those

8   documents that were relied on and so reliable that you

9   filed a lawsuit with forged documents and then you're no

10  longer relying on them.

11         So I'm not sure what sort of answer that you

12  want from me, but when you defraud a state court and you

13  defraud me, you defraud my girlfriend, you defraud the

14  owners of La Pensee 303 -- La Pensee, LLC 303 --

15      Q.   Okay.  Mr. Wilcox, I'm going to ask you --

16      A.   -- I'm obviously going to run a background

17  check on people committing fraud.

18      Q.   Okay.  Did you run a background check on Nora

19  Andraos?

20      A.   Absolutely.

21      Q.   What did you find about anybody when you

22  performed these background checks?

23      A.   Numerous things that were highly concerning

24  and things such as Nora that weren't addressed that led

25  to her son's death, bless his soul.



1        Q.   Have you run a background check on anybody

2    else in the building?

3        A.   Benjamin Ripstein.

4        Q.   Why did you do that?

5        A.   He sent me a letter threatening defamation, as

6    John Lawson forwarded a note that I sent that said there

7    are numerous problems and there is someone that's

8    violent in the building who showed up at my door

9    claiming that I had a party, throwing up over a balcony.

10   John Rahal was there, John Lawson was there and Benjamin

11   Ripstein, intimidating, harassing and threatening me.

12        He then sent me a defamation letter claiming

13   that he wasn't a criminal.  Not only is he one, he sent

14   a letter that's produced in Mary McFadden's

15   documentation where he used a vinverify.com report to

16   try to claim he was not a criminal.

17        Again, this is unbelievable how you can even

18   be representing anyone right now.

19        Q.   Mr. Wilcox, did you run a background check on

20   anyone else in the building?

21        A.   Not that I recall.

22        Q.   When you were meeting with Mr. Gelber, how

23   many properties did he show you?

24        A.   I can't recall.  Maybe three, maybe four.

25        Q.   Okay.  And you said you told him you really



1  preferred to rent instead of purchase, correct?

2      A.   It was about what property was available.  So

3  no, not correct.

4      Q.   Did you give him any specifics about the

5  property you were looking for?  How many bedrooms?  How

6  many baths?

7      A.   Yeah, at least two, at least two baths.

8  Something that was nice that could accommodate me.

9      Q.   And again, during what time frame was this

10 that he showed you the three or four properties?

11     A.   December.

12     Q.   December of 2018?

13     A.   My girlfriend -- yes.  My girlfriend

14 predominantly looking at the properties.  Before I was

15 doing a lot of traveling at the time and so she was

16 trying to narrow down what she knew that we would both

17 like.

18     Q.   Okay.  And who was going to be renting the

19 unit or renting the property?

20     A.   I don't understand.

21     Q.   When you were meeting with Mr. Gelber and he

22 was showing you properties, who was it that was going to

23 rent the unit or the home?

24     A.   What is the question you're trying to derive?

25 A corporation?  An individual?  Two individuals?  What



WILLIAM DAVID WILCOX, JR.                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                        37

```
 1   is your question?
 2        Q.   Who was going to rent or purchase the
 3   property?  Was it going to be you individually, you and
 4   Megan Luchey?  A company?
 5        A.   It came down to the property and we didn't
 6   know until we found the property.
 7        Q.   So what was the consideration?
 8             MR. LUBLINER:  Form.
 9             THE WITNESS:  I don't understand the question.
10   BY MS. BURNETT:
11        Q.   What did it matter about the property?  Why
12   would it matter what type of property it was as to who
13   was going to sign a lease?
14             MR. LUBLINER:  Form.
15             THE WITNESS:  I have no idea how to explain
16        your question.  What you do mean, it's about the
17        property?
18             You know, if you buy a motorcycle, you have to
19        have a motorcycle license.  If you buy an SUV, you
20        have to have a Florida driver's license.  If you
21        buy -- there's many reasons why you would consider
22        who is the renter or who's the owner, you know,
23        what sort of corporation you might put it in from a
24        liability perspective, from an insurance
25        perspective.
```



WILLIAM DAVID WILCOX, JR.                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                          38

```
 1   BY MS. BURNETT:
 2        Q.   So at the time --
 3        A.   So I don't understand --
 4        Q.   At the time you were looking you had no idea
 5   who was going to sign a lease or sign a contract for
 6   purchase?
 7        A.   No.  I didn't know until I found the property.
 8        Q.   Okay.  And how do you know Ms. Luchey?
 9        A.   How I do know Ms. Luchey?
10        Q.   Mm-hmm.
11        A.   She's my girlfriend.
12        Q.   I understand that.  How did you meet her?
13        A.   Through friends.
14        Q.   How long ago did you meet her?
15        A.   A couple years ago.
16        Q.   How long have you been dating?
17        A.   Well, that would be a couple years.
18        Q.   Two years?  Three years?
19        A.   Somewhere around then.  I'm not exactly sure.
20        Q.   Did you ever live together before residing in
21   La Pensee 303?
22        A.   No.
23        Q.   Does she reside in La Pensee 303?
24        A.   Yes.
25        Q.   Full-time basis?
```



1          A.   Define full-time.

2          Q.   Does she spend seven days a week there every

3     week?

4          A.   I don't spend seven days a week here.  So I

5     don't understand how full-time.  People leave.  They

6     come and go.

7          Q.   Where do you -- other than La Pensee 303,

8     where do you reside?

9          A.   I've already answered that question.

10         Q.   So you're saying the only places that you go

11    then are to Montreal, California, London?

12         A.   Yeah, and Tennessee.

13         Q.   Do you have another place in Florida?

14         A.   Do I?  No.  I've answered that question

15    already.

16         Q.   Do you or a corporation that you own, or own

17    some ownership interest in, have a place in Miami,

18    Florida?

19         A.   I don't believe so, but I would have to check

20    my corporation.

21         Q.   Do you ever spend time in Miami?

22         A.   Absolutely.

23         Q.   And where do you stay when you go to Miami?

24         A.   Usually the Four Seasons in Surfside.

25         Q.   So you don't have a lease or anything like



 1  that on a place in Miami?

 2      A.   Not that I'm aware.

 3      Q.   Okay.  Was anyone else going to live in the

 4  home or the condominium unit that you were going to

 5  lease or rent -- I mean, lease or purchase?

 6           MR. LUBLINER:  Form.

 7  BY MS. BURNETT:

 8      Q.   Pardon me?

 9      A.   Megan Luchey.

10      Q.   Yeah, other than the two of you?

11      A.   No.

12      Q.   And are you familiar with Valerie Manzo?

13      A.   She's on the call; yes.

14      Q.   How do you know --

15      A.   She is the owner.  I've rented a property from

16  her.

17      Q.   Did you know her before this lease --

18      A.   No.

19      Q.   -- with La Pensee 303?

20      A.   No.

21      Q.   Did you know Mr. Gelber prior to that?

22      A.   Well, I just told you, Gelber I met through my

23  girlfriend, Megan, in December.

24      Q.   And did you know Mr. Lepselter prior to --

25      A.   No.



WILLIAM DAVID WILCOX, JR.                          March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                              41

1      Q.   -- entering into this?

2      A.   No.  I met him two times in my entire life.

3      Q.   Did you review the association's governing

4   documents prior to purchasing -- I'm sorry -- prior to

5   entering into the lease agreement?

6      A.   Absolutely.  That was part of the conditions

7   that Bob Rosati went through in my interview call to

8   become a resident here.

9          MS. BURNETT:  Okay.  Give me just one second

10         here.  Do you know what?  Can we take a break for

11         ten minutes, or if you want to take a lunch break,

12         we can do that, just so I can get these documents

13         pulled up correctly.

14         MR. LUBLINER:  Well, what do you want to do?

15         Obviously, I don't want to -- it's up to David, of

16         course.  He's also under the weather.  But is

17         everyone's plans to just go straight through or did

18         you want to take a lunch break since we started at

19         11?

20         MR. SIMON:  Can we off the record for this,

21         for the conversation about lunch breaks?

22         MR. LUBLINER:  What?

23         MR. SIMON:  Can we go off the record?

24         MR. LUBLINER:  No, I want it on the record.

25         MR. SIMON:  Oh, okay.  I want to at least take

```
 1        a break.  It doesn't have to be now.  It is up to

 2        Mister --

 3             MR. LUBLINER:  Okay.  So if everyone wants a

 4        lunch break and Joann needs it, I think it makes

 5        sense to do it now anyway.

 6             MR. SIMON:  Well, Mr. Wilcox, how do you feel?

 7        You're the witness.

 8             THE WITNESS:  I would rather take a ten-minute

 9        break and we can take a lunch break around 1:00 or

10        whenever Ms. Burnett is ready.  Is that okay? since

11        we started late.

12             MS. BURNETT:  Well, it just kind of seems like

13        it makes more sense to do it all at one time.

14             MR. LUBLINER:  Why don't we just take a half

15        hour now?

16             MS. BURNETT:  That's good.

17             THE VIDEOGRAPHER:  Okay.  Going off video

18        record.  The time is 11:59 a.m.

19             (A break was had.)

20             THE VIDEOGRAPHER:  Going back on video record.

21        The time is 12:32 p.m.

22   BY MS. BURNETT:

23        Q.   Mr. Wilcox, I just want to pick up kind of

24   from where we left off, but I do have one other question

25   for you before we look at some documents.
```



WILLIAM DAVID WILCOX, JR.                                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                                          43

```
 1            Have you ever been employed by the U.S.
 2   government?
 3       A.   From a contracting perspective, not
 4   employment.
 5       Q.   What does that mean?
 6       A.   I'm a metals trader.  There's specific, as you
 7   read from Joe Biden, there's specific needs for the DOD,
 8   the DOE and the DOJ from what we do.
 9       Q.   So what do you get from the United States
10   government?
11       A.   That's a very complicated question.  You're
12   not being specific.  So I'd like you to be specific in
13   the question that you ask.
14       Q.   Okay.  Well, you said that you are in -- did
15   you say you are employed as --
16       A.   No.  I said our corporation is in contractual
17   arrangements, which means you have to be a fairly
18   qualified person with, as you would say, background
19   checks to be able to do business in that manner.
20       Q.   So what is your involvement with the
21   Department of Justice, the Department of Defense -- I
22   forget what else you said.
23       A.   So there's a specific need which falls into
24   the category of national security for the United States
25   to secure all of you for battery metals and rare earth
```



 1  elements.  And Evolution Metals is a corporation that is
 2  working to solve that need from a national security
 3  perspective.
 4       Q.   So are you -- you have -- your company has
 5  contracts with the DOJ?
 6       A.   I am prepared -- I am prepared to provide one
 7  redacted document for you.
 8            THE WITNESS:  Rich, would you like to share
 9       that document at this time?
10            MR. LUBLINER:  No.
11            THE WITNESS:  Okay.  So I'm prepared to
12       provide it at a later date --
13            MR. LUBLINER:  That's nonresponsive.  Answer
14       what she's asking.
15            THE WITNESS:  Okay.  So what is your question
16       again?
17  BY MS. BURNETT:
18       Q.   Is your corporation, does it have a contract
19  with the U.S. government?
20       A.   Define U.S. government.
21       Q.   Department of -- I'll go with the agencies
22  that you listed:  The Department of Defense, the
23  Department of Justice.
24       A.   My answer is we have a contractual relation
25  with various departments in the government.



1        Q.   Do you consider your company an employee of
2    the government?
3             MR. LUBLINER:  Form.
4             THE WITNESS:  No.
5    BY MS. BURNETT:
6        Q.   Do you consider yourself an employee of the
7    government?
8        A.   Please define employee versus contractor.
9        Q.   Do you consider yourself -- well, let's do
10   this in two parts.  Do you consider yourself an
11   independent contractor with the government, yourself?
12       A.   So if my corporation has a contractual
13   relation with them, I fall under that umbrella.
14       Q.   So you would be an independent contractor with
15   the DOJ, Department of Defense?
16       A.   You would have to ask them how you define
17   that.
18       Q.   Are you personally paid?
19            MR. LUBLINER:  Form.
20            THE WITNESS:  So I've answered the question
21       again.  My corporation has a contractual relation
22       with the government.
23   BY MS. BURNETT:
24       Q.   And is your corporation paid from Department
25   of Justice, Department of Defense?



WILLIAM DAVID WILCOX, JR.                                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                                       46

```
 1        A.   I'm not able to disclose any of this

 2   information, as I'm sure you would be aware.

 3        Q.   Okay.

 4        A.   It's a matter of security.

 5        Q.   Fair enough.  Okay.  We're going to take a

 6   look at some documents now.  I apologize.  For some

 7   reason it went all the way to the bottom of this

 8   document.

 9        A.   There's a little button at the bottom, if you

10   know what page it is.  You're at page 80 right now,

11   page 79.  If you know what page it is, you can skip

12   right to it.  Far left.  You're on the right.  There you

13   go, click in there.  There you go.

14        Q.   Thank you.

15        A.   I'm there to help.

16        Q.   For some reason it keeps going to the bottom.

17             Okay, here we go.  Can you see this document?

18        A.   I can see this document.  I've seen it before.

19        Q.   Can you tell me what it is?

20        A.   It's a contract for lease, something that I

21   didn't understand at the time, but it's an altered

22   document which Roy Gelber explained to me when we were

23   putting contracts to lease to different properties.

24        Q.   So what did you understand it to be when you

25   signed it?
```



1      A.   It's an offer document saying that this is a

2  conditional document of leasing.   This is the terms that

3  I would like to have.

4      Q.   Okay.   And what were the lease terms that you

5  were hoping for?

6      A.   What I offered was the cash up front, which

7  turned out to be $3,900 a unit.   Val declined -- well, I

8  should say 303, LLC, and we entered into a two-year

9  agreement, which is the only contract that exists.

10      Q.   Mr. Wilcox, I'm going to ask you to answer

11  just my questions, okay?

12           What is the lease term on this document?

13      A.   This is not a lease.

14      Q.   If you look at No. 4 -- I understand this is

15  not a lease.   This is an offer to lease.   I understand

16  that.   At Paragraph No. 4, what does it say the lease

17  term is?

18      A.   January 25th, 2021, and ends on January 24th,

19  2022.

20      Q.   And you offered this to La Pensee 303, LLC to

21  rent this unit, correct?

22      A.   I offered it, correct.

23      Q.   Okay.   And is that your signature?

24      A.   No, but I'm not challenging the document.

25      Q.   Is it a computer-generated signature, maybe?



1        A.   I don't think so, because that's a very

2   strange J and M, so no.  But I'm not challenging the

3   document.  But no, that's not my signature.

4        Q.   Does this maybe refresh your recollection?

5        A.   That's also not my signature.  I've never seen

6   IP address, signer session, certificate, I've never seen

7   that.

8        Q.   You've never seen that document?

9        A.   Not this document, no.  Session info, that's

10  not my signature.  I don't know what this is.

11       Q.   But you're saying you did -- this is your

12  authorization?

13       A.   That is not my authorization.  I'm saying the

14  document above was the contract for lease that I

15  offered.  That is not my signature.  You know what my

16  signature looks like.  I'm not challenging the document

17  at this stage.  I'm just noting, please, for the record,

18  that's not my signature.

19       Q.   And this document right here that shows the

20  session information, the signer information and it says

21  David -- William David Wilcox, Jr., the signature that

22  would be applied, the timestamps for the documents, that

23  doesn't show you that perhaps you signed this by

24  DocuSign or a similar type of document signing platform?

25       A.   How would I sign that DocuSign when the



 1  signatures look different?  That's not my signature and

 2  it's not a DocuSign.

 3       Q.   It's Constellation 1.

 4            THE WITNESS:  Ed, this is David.  I've never

 5       seen Constellation 1 before ever.  I don't know

 6       what that is.

 7  BY MS. BURNETT:

 8       Q.   So you're saying this is not verifying your

 9  signature on that document and your initials?

10            MR. LUBLINER:  Form.

11            THE WITNESS:  Okay.  So Ms. Burnett, I'm going

12       to answer the same question only one more time.

13       I've never seen this document.  Please stop asking

14       the same question.

15  BY MS. BURNETT:

16       Q.   Could you go down here, see where my mouse is?

17       A.   I can see where your mouse is.

18       Q.   Can you read that?

19       A.   "Signing completed by William David Wilcox,

20  Jr." in brackets "wdavidwilcox@gmail."  It says,

21  "January 3rd, 2021, 3:57:39 p.m." and it's got an IP

22  address.  The IP address matches Roy Gelber's address.

23  I've never seen this document before.

24       Q.   Are you saying Mr. Gelber may have attached

25  your signature to this document without your knowledge?



WILLIAM DAVID WILCOX, JR.                                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                                        50

1        A.    I absolutely did not say that.

2        Q.    How did that signature get there?

3        A.    Well, it sounds like you need to tell me.  I

4    don't know how a six-month lease ended up in a lawsuit.

5        Q.    Mr. Wilcox, I'm going to move to strike your

6    answer as nonresponsive.

7              How did your signature get on this document?

8        A.    That is not my signature for the sixth time.

9        Q.    How did your name get on this document?

10       A.    Ms. Burnett, Ms. Burnett, I told you that's

11   not my signature, I'm counting six times.  I

12   respectfully ask for you to stop asking the same

13   question.

14       Q.    Do you recognize this document?

15       A.    I've never seen this document; no.  Additional

16   security, if they smoked, dog security of a thousand.

17   No, this is not something that I've seen before.

18       Q.    This wasn't produced to you by your Realtor?

19       A.    It wasn't produced how?

20       Q.    Through your Realtor.

21             MR. LUBLINER:  Form.

22             THE WITNESS:  Well, I have not seen it.

23   BY MS. BURNETT:

24       Q.    Pardon me?  I missed that answer.

25       A.    I have not seen this or do not recall this.



1      Q.   Okay.  Have you ever seen this e-mail?  It's

2    an e-mail from Edward Lepselter to Roy Gelber dated

3    January 5th, 2021, 10:09 a.m. with a subject line

4    "Realtor for La Pensee rental, reply, fees, new Florida

5    lease to follow"?  Have you ever seen this?

6      A.   No.

7      Q.   Do you know who drafted the lease agreement?

8           MR. LUBLINER:  Form.

9           THE WITNESS:  No.  From previous depositions I

10          understand from Ed Lepselter that Ms. Manzo, who

11          owns La Pensee 303, LLC, was the drafter, but I am

12          not confirming.  I do not know that firsthand.

13   BY MS. BURNETT:

14     Q.   Okay.  Who did you think was drafting the

15   lease?

16          MR. LUBLINER:  Form.

17          THE WITNESS:  Please rephrase the question.

18   BY MS. BURNETT:

19     Q.   Who did you think drafted the lease agreement

20   for La Pensee 303?

21          MR. LUBLINER:  Form.

22          THE WITNESS:  I'm not sure who drafted the

23          lease.

24   BY MS. BURNETT:

25     Q.   Did you think one of the Realtors drafted it?



1        A.    Same answer as before.

2        Q.    Are you familiar with a Florida Bar lease

3   agreement?  It's a standard form agreement.

4        A.    No.

5        Q.    Okay.  I mean, if you read this e-mail, it

6   says, "The landlord will work on the lease and get it to

7   us as soon as possible."

8            Do you see that?

9        A.    That's what it says.  I've never seen --

10        Q.    Does that indicate to you -- okay.  Does that

11   indicate to you that the landlord was going to draft the

12   lease?

13            MR. LUBLINER:  Form.

14   BY MS. BURNETT:

15        Q.    If you know.

16        A.    I'm not sure.  I'm not sure.

17        Q.    Okay.  Did you draft the lease agreement?

18        A.    No.

19        Q.    This is an e-mail from Val Manzo to Ed

20   Lepselter with a copy to Tom DeMarinis dated

21   January 5th, 2021, 6:05 p.m. and it says, "Here are the

22   proposed lease amendments and rules and regs by La

23   Pensee."

24            Do you see that?

25        A.    I see that.



1    Q.   Have you ever seen this e-mail before?

2    A.   No.

3    Q.   How did you receive a copy of the lease

4  agreement?

5         MR. LUBLINER:  Form.

6         THE WITNESS:  From Roy Gelber.

7  BY MS. BURNETT:

8    Q.   Did you receive more than one version?

9    A.   There's not more than one version.  There was

10  a negotiation that went on after I received the first

11  lease.

12    Q.   Did you make changes to that lease that was

13  sent to you?

14    A.   I marked it by hand, which I'm sure you've

15  seen and I needed a provision for my service animal or I

16  would not --

17    Q.   I understand.  I'm just asking you if you

18  marked it up.

19    A.   Ms. Burnett, I'm answering your question.

20    Q.   That's not my question.  My question is, did

21  you write on the --

22    A.   Well, then I misunderstood the question and

23  you need to be more clear when you ask a question.

24    Q.   Mr. Wilcox, there's really no need for you to

25  be combative today.  We could get through this so much

1    more quickly if you just answer the questions.

2         A.   I'm not combative and I take that offensively,

3    that you're calling me that.

4         Q.   Have you ever seen this agreement, standard

5    lease agreement?

6         A.   Perhaps.

7         Q.   I'll scroll through it slowly so you can take

8    a look.  If you need me to slow down or stop at a

9    certain part, just let me know.

10              Do you recall seeing this document?

11        A.   I don't recall.  It looks similar to a

12   document that was worked on to complete the final and

13   only lease amongst myself and La Pensee 303, LLC for a

14   two-year lease.

15        Q.   So would it be fair to say that this was

16   version one?

17              MR. LUBLINER:  Form.

18              THE WITNESS:  It's not because I'm not sure.

19   BY MS. BURNETT:

20        Q.   Okay.  And just so we're clear, there's a

21   lease term here.  What's the lease term on this

22   document?

23        A.   This lease term says January 25th, 2021, and

24   ending on January 24th, 2022.

25        Q.   Okay.  Do you recall if you signed this lease



```
 1   agreement?
 2        A.   No.  I haven't signed any lease agreement that
 3   wasn't two years.  There's only one copy of a lease that
 4   was signed.  It's a two-year lease.
 5        Q.   Okay.  Did Megan sign the lease?
 6        A.   She did not.
 7        Q.   Is there a reason why she didn't sign the
 8   lease?
 9        A.   I didn't feel she needed to sign it from a
10   liability perspective.  We had her originally on the
11   lease because of Covid and they were demanding that she
12   be on the lease originally, and that turned into a
13   resident application.  And then Mary McFadden and Bob
14   Rosati said she did not have to sign the lease.
15        Q.   So I think earlier you were mentioning that
16   you have a service dog on the -- within the lease
17   application itself there was a provision for a service
18   dog, correct?
19        A.   Correct.
20        Q.   Do you have a service dog?
21        A.   I do.
22        Q.   How many service dogs do you have?
23        A.   One.
24        Q.   And that dog's name is Zeus?
25        A.   Zeus Vaughn Feverhaus.
```



 1        Q.   And what task is Zeus trained to perform for

 2   you?

 3             MR. LUBLINER:  Form, and that's going to

 4        reveal -- hold on.  That's going to reveal

 5        confidential medical information.  I am going to

 6        inform him not to answer.

 7             MS. BURNETT:  I'm not asking him for a

 8        diagnosis or anything.  These are questions that

 9        are required under the ADA if you were to take the

10        animal into a place of public accommodation.

11             MR. LUBLINER:  If you were asking a question

12        as to whether or not the service animal could be

13        approved, I may agree with you, but that

14        determination was already made by the board.

15             MS. BURNETT:  By the Court?

16             MR. LUBLINER:  By the board.

17             MS. BURNETT:  I'm asking what the task the

18        animal is trained to perform.  I'm not asking for a

19        diagnosis and I'm not asking for medical

20        information.

21             THE WITNESS:  Rich, I'm prepared to answer if

22        you want me to.

23             MR. LUBLINER:  Go ahead.  You can answer.

24             THE WITNESS:  Cardiac alert.

25



1  BY MS. BURNETT:

2       Q.   Is the dog with you all the time?

3       A.   He's sitting right behind me right now.  Do

4  you want me to move the camera to him?

5       Q.   No.  Is the dog with you all the time?

6       A.   As much as he can be.  He is a helper.  He's

7  not something that makes sure that I can still breathe

8  every second, just like any service animal.

9       Q.   Do you take the dog to work with you?

10      A.   I do.  I take I am everywhere that I'm able to

11 because he assists me, as you know, under the ADA.

12      Q.   Have you ever been without the animal on

13 vacation, things like that?

14      A.   Very unusually, but when I go into Africa and

15 things, yes, I don't have my helper with me.  When I go

16 to Aspen, when I go to Surfside, anywhere I go,

17 typically he is with me.

18      Q.   Is the dog trained to detect drugs?

19      A.   He is.

20      Q.   Who trained him for that?

21      A.   He worked on -- Apache Ring Club, Feverhaus,

22 K9 Services Unlimited, myself.  We work every -- we work

23 two times a week as much as we can, Wednesday and

24 Saturdays.

25      Q.   To detect drugs?



1      A.   To do a lot of things, not just drugs.  It's

2    called tracking.

3      Q.   So what is it that this dog does aside from

4    being your cardiac arrest or alert dog?  What else does

5    the dog do?

6           MR. LUBLINER:  Form.

7           THE WITNESS:  As many things as we can.

8    BY MS. BURNETT:

9      Q.   What does that mean?  What are some of those

10   things?

11     A.   We do agility work; we do tracking work; we do

12   obedience work; we do protection work; we do reviews of

13   the cardiac alert.  We do everything that we can.

14     Q.   Do you have two dogs?

15     A.   No.

16     Q.   Have you ever had two dogs?

17     A.   Yes.

18     Q.   When?

19     A.   I had Bosco in two -- he died, what, a year

20   ago, year and a half ago.  I had Hershey.  So I had him

21   for 14 years.  I had Hershey before that, an English

22   springer spaniel.  He died of DCM I think at nine, and

23   that was around 2012.  And at the time I had Hershey and

24   Riley, which was -- it's the only time I've had two

25   dogs.



1      Q.   Have you had two dogs recently?

2      A.   No.

3      Q.   Have you had two dogs at La Pensee recently?

4      A.   No.

5      Q.   Give me one second.  I'm going to show you

6   this video.  Just take a look at it and tell me what you

7   see when it's done.

8           THE VIDEOGRAPHER:  All I see is the e-mail.

9           MS. BURNETT:  How about now?

10          THE WITNESS:  No.

11          MS. BURNETT:  You can't see it?

12          MR. LUBLINER:  No.

13          THE WITNESS:  No.

14          MS. BURNETT:  All right.  Hang on a second.

15      Give me two seconds.

16          THE WITNESS:  Should we take a lunch break

17      while Ms. Burnett figures this out or should we

18      move on?  I mean, we're incredibly killing time

19      here.

20          MS. BURNETT:  I'm going to find the video.

21      I've got to find the video.  Now I've clicked out

22      of it.  If you want to take a break I'm happy to

23      take a break.

24          THE WITNESS:  Should we break for lunch?

25          MS. BURNETT:  So what time do you want to come



 1        back?  Are we off the record?

 2             THE VIDEOGRAPHER:  No, we're still on the

 3        record.

 4             MS. BURNETT:  Let's go off the record.

 5             THE VIDEOGRAPHER:  Okay.  Going off video

 6        record.  The time is 12:59 p.m.

 7             (A break was had.)

 8             THE VIDEOGRAPHER:  Going back on video record.

 9        The time is 1:46 p.m.

10   BY MS. BURNETT:

11        Q.   Okay.  I'm going to attempt to do this one

12   more time.  I have no idea why this is doing this.  Why

13   don't we try a different one.

14             Do you see that?

15        A.   I can see that.

16        Q.   Did you see that, Mr. Wilcox?

17        A.   I was attempting to see it, but it was very,

18   very fuzzy.

19             (Video played.)

20             THE WITNESS:  Let's see, one, two.  Is that

21        Bob Rosati's balcony?

22   BY MS. BURNETT:

23        Q.   No, that's your -- that's Balcony 3 of 303?

24        A.   Okay.  Well, I can't make out much from that

25   video.



WILLIAM DAVID WILCOX, JR.                                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                                         61

```
 1        Q.   You don't see two dogs on the balcony?

 2        A.   No, I do not.

 3        Q.   Do you see any dogs?

 4        A.   I see a shadow of a dog on the left -- well,

 5   it looks like a dog.

 6        Q.   And you don't see the dog on the right?

 7        A.   No.  I don't know what you're referring to.

 8        Q.   This right here?

 9        A.   It looks like a shadow to me.  Where was this

10   video edited and made and who made it?  Is this a

11   forged -- is this another forged video like the lease?

12        Q.   Yeah, Mr. Wilcox, that's what it is.

13        A.   Sorry, I didn't catch that.  Could you repeat

14   that, please, or have the court reporter repeat it,

15   please?

16        Q.   No, Mr. Wilcox, it's not a forgery.  It's not

17   something that was put together.  It was a video that

18   was taken of the balcony of La Pensee 303?

19        A.   Okay.  So you understand that's hard to

20   believe when you filed a lawsuit with a fraudulent

21   lease --

22        Q.   Mr. Wilcox, I'm going to move to strike your

23   response.  There's no question pending.

24        A.   Okay.  So I don't agree there's two dogs

25   there.  I would like to see where the video came from
```



WILLIAM DAVID WILCOX, JR.                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                          62

1  and I want to see the editing and quality.  It looks

2  like another forgery to me.  So you can strike whatever

3  you want.

4          MS. BURNETT:  Again, I move to strike that as

5      nonresponsive.

6  BY MS. BURNETT:

7      Q.  Give me two seconds because I'm pulling this

8  other video up again.  Can you see this video?

9          MR. LUBLINER:  No.

10          THE WITNESS:  No.

11  BY MS. BURNETT:

12      Q.  Okay.  Two seconds.  Do you see this now?

13      A.  No.

14          MR. SIMON:  Joann, every time you've asked,

15      there's been no share screen situation.  So that

16      could be the reason why we're not seeing it each

17      time you asked.

18          MS. BURNETT:  It doesn't say share screen?

19          MR. SIMON:  No.  What I recommend is you have

20      the video up on your side and then you press share

21      screen and then from there play the video.

22          THE VIDEOGRAPHER:  There should be a green box

23      at the bottom of the screen on the Zoom link, on

24      the Zoom box.  It should be a -- right in the

25      middle where it says chat where participants should



1    be.

2         MS. BURNETT:  How about now?

3         THE VIDEOGRAPHER:  Nothing.

4         MS. BURNETT:  Okay.  Tell me what you were

5    saying again.

6         THE VIDEOGRAPHER:  There should be a green box

7    that says share screen.

8         MS. BURNETT:  I've clicked that.

9         THE VIDEOGRAPHER:  Nothing pops up?

10        MR. LUBLINER:  There you go.

11        MS. BURNETT:  Oh, my goodness, okay.

12        (Video played.)

13        THE WITNESS:  Why did the video just start

14   blurring out, Ms. Burnett?  Has this video been

15   altered?

16   BY MS. BURNETT:

17        Q.   Not to my knowledge.

18        A.   Well, it just started blurring and I just --

19        THE WITNESS:  Rich, did you see that?

20        MR. LUBLINER:  Let her ask a question.

21        THE WITNESS:  Okay.  The screen just moved

22   again.  The lights just went off.

23        The video just came from being blurry and

24   altered and the car moved a little bit.

25        Rich, I just want to note this video is



1        fraudulent.

2   BY MS. BURNETT:

3        Q.   So Mr. Wilcox, as we sit here today, it's your

4   contention that that is a fraudulent video?

5        A.   Correct, the same as the lease that you filed

6   that was six months.  That video's been altered and you

7   know it.  You can see the cars and the movement

8   changing.  That is my statement here today.

9        Q.   Okay.  So it's your statement that you have

10  not had two dogs on La Pensee condominium property?

11       A.   I do not own two dogs.  I do not have two

12  dogs.  I have one service animal.

13       Q.   Okay.  And in support of your request for an

14  accommodation, did you provide this document right here

15  in support of your request for an accommodation for a

16  service animal?

17       A.   I don't understand the question.

18       Q.   Did you provide this document to the

19  association in support of your request for an

20  accommodation for a service animal?

21            MR. LUBLINER:  Form.

22            THE WITNESS:  Ms. Burnett, you have an e-mail

23       up from Ed Lepselter to Val Manzo.  I have no idea

24       what question you're referring to.

25            Could you please be specific in your question?



```
 1  BY MS. BURNETT:
 2       Q.   Do you not see the ID for Zeus?
 3       A.   Now I do.  I didn't see it before.
 4       Q.   Is this an ID that you provided to the
 5  association in support of your request for an
 6  accommodation for a service animal?
 7       A.   Yes.
 8       Q.   Is this a document or an ID that you purchased
 9  from usserviceanimals.org?
10       A.   I'm not sure where it came from because it
11  came from Feverhaus.  That's how they organize it for
12  when you're training your animal to perform a service
13  under the ADA.
14       Q.   They registered your animal with
15  usserviceanimals.org?
16       A.   I don't know what that is, so you would have
17  to tell me.
18       Q.   How do they get your information?
19       A.   Feverhaus Kennels got my information.  I say
20  chipped my dogs -- sorry, dog.  My dog is tagged.  My
21  dog has a registration card so you can show it when you
22  go into a place, as you said earlier, they can ask you
23  one question, what service does the dog provide.  I've
24  already provided that answer to you, so I would like to
25  understand what your next question is, please,
```



WILLIAM DAVID WILCOX, JR.                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                         66

```
 1   Ms. Burnett.
 2        Q.   Did you specially purchase this identification
 3   card from usserviceanimals.org?
 4        A.   Not that I recall.
 5        Q.   Have you ever gone on that website?
 6        A.   Not that I recall.
 7        Q.   So you did not purchase this identification
 8   card.  You're claiming this came from --
 9             THE WITNESS:  Okay.  Rich, Rich, I'm getting
10        the same question over and over.
11             MR. LUBLINER:  Just -- yeah, I mean, he
12        said -- he did say it three times, that he didn't
13        purchase it, so...
14             MS. BURNETT:  Rich, you can object, but I'm
15        not going to have Mr. Wilcox doing this throughout
16        this deposition.
17             MR. LUBLINER:  He's answered your question.
18             THE WITNESS:  Correct.
19             MR. LUBLINER:  You may not like the answer,
20        but I think he's answered it.
21             MS. BURNETT:  I can ask the question and you
22        can object, as I said.  He needs to answer the
23        question.
24             MR. LUBLINER:  I think he did multiple times.
25        But go ahead, ask him.
```



 1  BY MS. BURNETT:

 2       Q.   Where did this come from?  Where did this

 3  identification tag come from?

 4       A.   I said Feverhaus Kennels and I do not recall

 5  any of the rest of information on how this was provided.

 6       Q.   How did you go about obtaining Zeus?

 7       A.   A very long process with Feverhaus Kennels,

 8  which is known as the number-one working line of

 9  Dobermans in the country.  Most of them, the sires are

10  from Russia and Moscow, at Sant Kreal, which is the

11  number-one working line of Dobermans in the world.

12       Q.   And when did you obtain him?

13       A.   He was born in March of, March 12th, 2020, and

14  I must have obtained him after his initial training,

15  sometime around July.

16       Q.   So he was fully trained in four months?

17       A.   No.  It's an active, continuous training that

18  you do with these dogs.  You never stop.  If you want me

19  to give you an education lesson on how working dogs

20  work, I'd be happy to go through it.

21       Q.   Mr. Wilcox, again, I'm going to ask you to

22  answer my questions.  I'm not answering yours.

23            MR. MARCHESE:  Joann, are you marking any of

24       those videos or documents that we've been showing?

25            MS. BURNETT:  I'm going to mark, yeah --



1        actually, let me do the video of the two dogs on

2        the balcony as 1, the video of the two dogs being

3        brought into the car as 2, and then 3 is going to

4        be a compilation of documents provided by Edward

5        Lepselter, and it's the documents that we've been

6        going through so far.

7              (Plaintiff's Exhibit Nos. 1, 2 and 3 were

8    marked for identification.)

9    BY MS. BURNETT:

10       Q.   Did you ever attempt to obtain a copy of the

11   lease, the fully signed, executed lease agreement from

12   Mr. Gelber?

13             MR. LUBLINER:  Form.

14             THE WITNESS:  No.

15   BY MS. BURNETT:

16       Q.   Did you ever obtain a copy of the fully

17   executed lease agreement from Mr. Lepselter?

18             MR. LUBLINER:  Form.

19             THE WITNESS:  I don't understand that

20       question.

21   BY MS. BURNETT:

22       Q.   Did you ever receive a copy of the fully

23   executed lease agreement from Mr. Lepselter?

24             MR. LUBLINER:  Form.

25             THE WITNESS:  I don't understand the question.



```
 1   BY MS. BURNETT:
 2        Q.   Did Mr. Lepselter ever send you a copy of the
 3   fully executed lease agreement?
 4             MR. LUBLINER:  Form.
 5             THE WITNESS:  Send via what method?
 6   BY MS. BURNETT:
 7        Q.   Any method at all.
 8        A.   Not that I'm aware.
 9        Q.   Did you ever receive a copy of the fully
10   executed lease agreement from Val Manzo?
11             MR. LUBLINER:  Form.
12             THE WITNESS:  Yes.
13   BY MS. BURNETT:
14        Q.   And when was that?
15        A.   When I moved in, we signed the rest of the
16   signatures on the document that was submitted to the
17   HOA.  It was pending signatures and move-in checklist.
18   We signed and executed it on the 24th.  The move-in date
19   was the 25th.  The 24th a Sunday.  There was a conflict.
20   So we came around 5:00.  Roy Gelber was not here.  Megan
21   was present.  I was present.  Ed Lepselter was present.
22             We did a walk-around on FaceTime video.  We
23   identified issues in the condo.  We marked them,
24   including getting the windows cleaned.  We had a very
25   pleasant conversation.  We executed key copies of the
```



 1  lease.  I took one.  They took one.

 2      Q.   Did you ever send a copy of the fully executed

 3  lease agreement to the association?

 4      A.   No.

 5      Q.   Is there a reason that you didn't?

 6      A.   It wasn't my requirement.  It was submitted

 7  along with a resident application, $150 per person to do

 8  a full background check on myself and Megan; that Mary

 9  McFadden came back and said there was an issue with

10  Megan's credit.  And Val Manzo advised Mary and advised

11  me she did not care because I was paying for the first

12  year up front in cash and she would evaluate the second

13  year in terms of her risk taking on the liability

14  because of Megan.

15           MS. BURNETT:  Give me one minute.

16  BY MS. BURNETT:

17      Q.   Do you know if Roy Gelber ever had a copy of

18  the fully executed lease agreement?

19      A.   Through the previous depositions from what has

20  been stated, no.  I was not --

21      Q.   I'm asking for your -- I'm asking for your

22  independent knowledge, not what you've heard from

23  Mr. Gelber or from Mr. Lepselter.

24      A.   No.

25      Q.   And are you aware that Mr. Gelber's firm never



 1  had a copy of the fully executed agreement?

 2              MR. LUBLINER:  Form.

 3              THE WITNESS:  I was not until the depositions.

 4  BY MS. BURNETT:

 5      Q.   Is there a reason why Mr. Gelber wouldn't have

 6  been provided with a copy of the lease agreement?

 7              MR. LUBLINER:  Form.

 8              THE WITNESS:  Why would I know that?

 9  BY MS. BURNETT:

10      Q.   I'm asking you if you know why he doesn't have

11  a copy of it?

12              MR. LUBLINER:  Form.

13              THE WITNESS:  No.

14  BY MS. BURNETT:

15      Q.   He was your Realtor, correct?

16              MR. LUBLINER:  Form.

17              THE WITNESS:  Correct.

18  BY MS. BURNETT:

19      Q.   Is there a reason why your Realtor would not

20  have a copy of the lease agreement in which he was

21  involved in the transaction?

22              MR. LUBLINER:  Form.

23              THE WITNESS:  I have no idea and no.

24  BY MS. BURNETT:

25      Q.   Okay.  Do you see the e-mail on this screen



WILLIAM DAVID WILCOX, JR.                                          March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                                              72

 1  here?

 2       A.   July 21st, 2021, 2:00.

 3       Q.   Is this -- is that that your e-mail address,

 4  wdavidwilcox@gmail.com?

 5       A.   That's a personal e-mail address of mine; yes.

 6       Q.   Did you send an e-mail to Roy Gelber and to

 7  Richard Lubliner?

 8       A.   Well, it would appear so, but I would have to

 9  review if this document is authentic or not.

10       Q.   Okay.  As you -- what you see on the screen

11  here, are you saying that you're happy -- "Roy is happy

12  to speak with you and confirm the rigorous approval

13  process for the 12-month lease with extension," do you

14  see that?

15       A.   I see that.

16       Q.   Did you write that?

17       A.   I perhaps did and I've reviewed this document

18  before in the production and what I believe is I was on

19  a plane coming out of Africa and I could not remember

20  that it wasn't an extension until I reviewed the

21  documents from Val Manzo where she did not want an

22  extension because it gave me the exclusive right to get

23  out of it and she demanded a two-year lease, which is

24  the only lease that was signed.

25       Q.   So as we sit here today, you're telling us you



```
 1   had no idea whether you had a two-year lease or whether

 2   you had a one-year lease with an option to renew?

 3              MR. LUBLINER:  Form.

 4              THE WITNESS:  That's not correct.  You just

 5         altered what I said.  That's not correct, Joann.  I

 6         said if this is my writing, which it's possible it

 7         is, I was tired and confused and needed to review

 8         the document.  I reviewed the document.  There's

 9         only one lease that was signed.  And furthermore, I

10         remembered why when I reviewed the e-mails with Val

11         Manzo about it has to be a two-year lease because

12         he is the one with the advantage if it's an

13         extension.

14              We signed a two-year lease.  I paid one year

15         up front.  I received a hundred-dollar discount for

16         the first year, which amounted to 3900, and now I'm

17         paying $4,000 a month on the 25th of each month.

18              MS. BURNETT:  Okay.  I'm going to mark this

19         e-mail as Exhibit 4.  Is that where I'm at right

20         now?

21              (Plaintiff's Exhibit No. 4 was marked for

22   identification.)

23   BY MS. BURNETT:

24         Q.   And what, again, was the date of that e-mail?

25   July 21st, 2021; is that correct?  Mr. Wilcox, is that
```



 1  the correct date?

 2       A.   Yes, July 21st, 2021.

 3       Q.   And you believe you were in Africa then?

 4       A.   I'm 99 percent sure I had just landed in

 5  Lisbon from Africa and I was on my way to London because

 6  you were sending me threatening letters at the time and

 7  I was trying to get all the documents when I was away.

 8       Q.   Do you have any documentation that would

 9  support that you were in Africa at that time?

10       A.   Of course.  I have plane tickets, et cetera.

11       Q.   Could you provide that, please?

12       A.   I could tell you that much from that time

13  period.

14       Q.   Could you provide those documents, please?

15       A.   Of course.

16       Q.   Not right this second, but --

17       A.   Why can't we do it this second?

18       Q.   Oh, if you have them, okay.  I'm happy to look

19  at them if you have them handy.

20       A.   Okay.  Just give me a second.  July 21st,

21  Wednesday, 2021, yes, I was -- here you go.  You can

22  challenge the exact time, 2021, 18.  How do I get

23  everyone's e-mail to send it, or do I send it to Rich?

24            MR. LUBLINER:  Why don't you send it to me and

25       I'll forward it.



1          THE WITNESS:  Okay.  It just went to you on
2      text, Rich.  It's TP1368.  I was headed into --
3          MR. LUBLINER:  All right.  Hold on.  Hold on.
4      Let me send this to my e-mail.  I'll forward it to
5      everyone on this chain.
6          THE WITNESS:  I can get the exact time, et
7      cetera, and I can get where I was right before
8      that.  I think I must have been in Lisbon that day
9      and I came from Africa two days before.  So that
10     e-mail was sent on that day.
11          (Off the stenographic record.)
12          THE WITNESS:  You can see on the top of the
13     screen shot the reverse order.  July 18th I left
14     Newark to Lisbon and July 21st I left Lisbon to
15     London.  So I wasn't in Africa right before that.
16     I think I went to Africa right after that.  But you
17     see where I was there now.  And I believe on that
18     trip I was at Four Seasons in Lisbon for those
19     nights.  If you want me to get the receipt from
20     that too, I'm happy to get that.
21  BY MS. BURNETT:
22     Q.   I'm just looking at it.  Just give me two
23  seconds.
24     A.   No problem.
25     Q.   Okay.  Give me just a minute.  I'm trying to



WILLIAM DAVID WILCOX, JR.                                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                                        76

```
 1   pull something else up.
 2          MR. LUBLINER:  I think it's safe to assume
 3      we're not finishing today.  Are we stopping at 5
 4      today, hard stop?
 5          MS. BURNETT:  That's fine with me.
 6          MR. SIMON:  Yeah, considering we're not
 7      finishing, might as well --
 8          MR. LUBLINER:  I don't think -- I don't know
 9      if Joann will still be asking questions or not, but
10      clearly, we're not going to finish.
11          MR. SIMON:  Maybe at 4:50 we could discuss
12      dates of availability.
13          MR. LUBLINER:  That's fine.
14          MR. SIMON:  Yeah.
15          MR. LUBLINER:  Hafele does not have -- there's
16      no such thing as a conflict with Hafele.
17          MR. SIMON:  I'm sorry, what was that?
18          MR. LUBLINER:  With Judge Hafele, there is no
19      conflict.
20          MR. SIMON:  Oh, oh.
21          MR. LUBLINER:  It's whatever he has.
22          MS. BURNETT:  Can we go off record for a
23      second?
24          (Off the stenographic record.)
25          THE VIDEOGRAPHER:  Counsel, we're still on
```



 1    record.  Do you want to go off video record?

 2           MS. BURNETT:  No, that's okay.

 3           MR. SIMON:  Yes.

 4           MS. BURNETT:  Okay.  Yeah, yeah, go off.

 5           THE VIDEOGRAPHER:  Go off video record?  All

 6    right.  Stand by.

 7           THE WITNESS:  Can I take a break for a half an

 8    hour whatever when you guys do this?

 9           MS. BURNETT:  No.

10           MR. LUBLINER:  I don't think she needs a half

11    hour.

12           THE WITNESS:  Okay.  Well, I mean, we're just

13    sitting here and there's nothing happening.

14           MS. BURNETT:  Okay.  We can go back on the

15    record.

16           THE VIDEOGRAPHER:  We never went off video

17    record.

18           MS. BURNETT:  Okay.  Can everyone see what's

19    on the screen?

20           MR. LUBLINER:  Yes.

21  BY MS. BURNETT:

22      Q.   Mr. Wilcox, do you know what this is?

23      A.   It's your second filing after you filed two

24  leases with six-month leases, and then you didn't rely

25  on it for the second release and chose to ignore why the



1  six-month lease disappeared.  So yes, I know what it is

2  in state court.

3      Q.   And have you ever seen this document before,

4  standard lease agreement?  It's Exhibit A to the second

5  amended complaint.

6      A.   I've seen the only document that I put a

7  signature on, which is the a two-year lease.  That

8  appears to be the document that came through when I

9  reviewed where there was a scanning error on page 2.

10 That appears to be the real lease.  If we scroll down

11 and we get to the bottom, that's my handwriting.

12     Q.   Okay.

13     A.   My handwriting.

14     Q.   If we keep scrolling, that's still your

15 handwriting?

16     A.   Yep, service animal --

17          MR. LUBLINER:  Form.

18          THE WITNESS:  -- Covid.

19 BY MS. BURNETT:

20     Q.   Is that your signature?

21     A.   That's my signature.  That's the date.  That's

22 when we submitted it to the association.  This

23 document's not fully signed.  It's pre-signed for

24 January 25th so we can fill out the remaining checklist,

25 et cetera, and that document is the only document to be



 1  signed right here.  And then there's a deposit receipt
 2  and there's only one deposit receipt because I paid one
 3  year up front.  There would be not be a second deposit
 4  receipt because I hadn't paid it yet.
 5      Q.   Okay.  But it says, "This document
 6  acknowledges the receipt of 50,700 for a 12-month lease
 7  term."
 8      A.   That's what it says.
 9      Q.   And did -- are you the one that made that
10  change from this --
11      A.   That's not my handwriting and a receipt of the
12  12 months would be accurate but not reflective of the
13  lease term.  This is a receipt for a payment of $48,600
14  for the actual lease and the total with the security
15  deposit, another 3900, which is whatever, $51,000.  This
16  is a deposit receipt.  It's not a lease term, which is
17  why I believe Val Manzo, who was marking up the document
18  with me, wrote a 12-month lease term.  Because you
19  wouldn't have paid $50,700 for a 12-month -- a 24-month
20  lease term.  This is a deposit receipt.
21      Q.   Right, and it says --
22      A.   And you know this is a deposit receipt.
23      Q.   -- a 12-month lease term, right?  It says a
24  12-month lease term?
25      A.   The wording says this.



WILLIAM DAVID WILCOX, JR.                                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                                        80

```
 1         Q.   Okay.
 2         A.   The intention of the receipt, no matter how
 3   unclear it might be, between the two parties it was
 4   extremely clear, including Bob Rosati, who did the
 5   interview who approved Megan and I.
 6         Q.   Mr. Wilcox, again --
 7         A.   I answered your question.
 8         Q.   Mr. Wilcox, I'm going to move to strike again.
 9   My question was:  Does it say a 12-month lease?
10         A.   I can't read the handwriting.
11         Q.   Pardon me?
12         A.   I couldn't read it.
13         Q.   You couldn't read where it said a 12-month
14   lease?
15         A.   You asked me a question.  I couldn't read it.
16   You just don't like my answers.  I'm giving you an
17   answer, Ms. Burnett, and you just do not like it.  You
18   want a different answer.
19         Q.   Have you ever seen this version of the
20   standard lease agreement?
21              MR. LUBLINER:  Form.
22              THE WITNESS:  There's only one lease that I
23       ever signed.  When you negotiate --
24   BY MS. BURNETT:
25         Q.   I'm not asking if you signed it.  I'm asking
```



1   if you've seen it?

2       A.   I don't know if I've seen it.  I do not know

3   if I've seen it.  There are fraudulent documents in

4   here.  I do not know.  You know they're fraudulent.  We

5   know they're fraudulent.  You're perpetuating the fraud

6   still.

7            MS. BURNETT:  Again, I'm going to move to

8       strike everything that Mr. Wilcox just said.

9   BY MS. BURNETT:

10      Q.   You would agree, though, that this does have a

11  one-year lease term?

12      A.   No.

13      Q.   January 25th to January -- on this document?

14           MR. LUBLINER:  Form.

15           THE WITNESS:  I have a two-year lease.

16  BY MS. BURNETT:

17      Q.   This particular document, what does it say the

18  lease term is?

19      A.   Ms. Burnett, just because you don't like my

20  answers doesn't mean you can continually ask the same

21  questions.

22           MS. BURNETT:  Rich, if we continue on like

23      this, I'm going to the judge.  This is ridiculous.

24      Would you like to instruct your client?

25           MR. LUBLINER:  He can answer the question to



1        the extent he understands it.  I think there's an

2        issue with respect to when you're using the word or

3        verbiage, "this lease" and "lease term."

4            So maybe if you were more specific, because

5        there are multiple leases, there are multiple

6        versions.  He can't tell what -- which lease is

7        which by showing the first page.

8            MS. BURNETT:  And that's why I scrolled

9        through it.

10           MR. LUBLINER:  But you didn't, because it's

11       still -- for example, there's a lease that has a

12       page 2 attached at the very end.  So I -- and I

13       don't -- I'm speaking -- I honestly don't know what

14       version this is.

15   BY MS. BURNETT:

16       Q.   Does this look like the same lease that you

17   executed without the mark-ups?

18       A.   I'm not sure.  I would have to do a

19   comparison.

20       Q.   Okay.

21       A.   By scrolling through this I can't answer

22   questions that way.

23       Q.   Are you opposed to an in-person deposition?

24       A.   No.

25       Q.   So for the continuation of this deposition, we



WILLIAM DAVID WILCOX, JR.                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                       83

 1 | could all be face to face and provide --
 2 |         MR. LUBLINER:  I'm not going to let him answer
 3 |     that.  There's a standing order in place that
 4 |     you're aware of.
 5 |         MS. BURNETT:  Pardon me?
 6 |         MR. LUBLINER:  There is a standing order in
 7 |     place, I'm sure as you're aware of, with respect to
 8 |     the right to a Zoom or not in-person deposition.
 9 |     So I'm not going to have him answer that question
10 |     now, but we can discuss it.
11 |         MS. BURNETT:  Okay.
12 | BY MS. BURNETT:
13 |     Q.  Would you agree with me that the association
14 | was sent a copy of the lease agreement without a page 2?
15 |     A.  I have no idea.  I wasn't a part of that.
16 |     Q.  This first amendment to standard lease
17 | agreement, have you ever seen this?
18 |         MR. LUBLINER:  Form.
19 |         THE WITNESS:  I'm unsure what I'm looking at.
20 | BY MS. BURNETT:
21 |     Q.  Have you seen this?
22 |     A.  That's my actual --
23 |         MR. LUBLINER:  Form.
24 |         THE WITNESS:  -- signature.  I'm not sure what
25 |     I'm looking at.



 1   BY MS. BURNETT:

 2        Q.   Okay.  I'm going to go through it so you can

 3   actually just read it for yourself.

 4        A.   Okay, I've read it.  Okay.

 5        Q.   Is that part of -- is that part of the lease

 6   agreement you signed?

 7        A.   I don't recall, but that looks like a real

 8   document, but I just don't recall.  It looks -- I take

 9   things on the side with things that I look at.  As

10   you'll see, it looks -- that's my cell phone number;

11   that's my signature.  It looks all real to me.

12        Q.   Okay.

13        A.   Slow down.  This is William Wilcox, Megan

14   Luchey, application, okay, and then scroll down a bit.

15   That's Megan's signature, Megan's application making her

16   a resident with 150-dollar application fee,

17   non-refundable.

18        Q.   Okay.

19        A.   Which was cashed, which we produced.

20        Q.   Okay.  And do you know where this page of this

21   lease came from?

22        A.   Well, according to the production from Mary

23   McFadden, it came from Mary to you and it looks like

24   David Wolff was a part of that, per the e-mail chains.

25             So that's the only thing I know, the page 2



1  thing and then the July 8th e-mail, which hasn't been
2  produced through the extension of the six months.  This
3  is, obviously, a Word document that's been taken from
4  one of the draft agreements and slapped on the back of a
5  lease and then Megan's application above it because
6  there was a claim that Megan wasn't a resident at that
7  period in time.
8       Q.   Do you know --
9       A.   As you're aware, there's not a lawsuit under
10  what has been done in this case.
11       Q.   Do you know if Roy Gelber -- when Mary
12  McFadden made a request to Roy Gelber for a copy of the
13  lease, do you know if he sent her a copy of the lease?
14       A.   He sent her -- from our deposition, from
15  reading his information, he forwarded everything he
16  could find, which he did not have a copy of the lease,
17  per his acknowledgement on a deposition, per his
18  documents produced.  He produced a Word document version
19  that someone took, edited and slapped these things
20  together and then filed a fraudulent lawsuit.
21       Q.   So it looks like maybe this page 2 came from
22  the original version -- or the original draft of the
23  lease agreement?
24       A.   There's no original --
25            MR. LUBLINER:  Form.



1          THE WITNESS:  There's no original version.

2      People negotiate a lease.  There's one signed

3      version of the lease for two years.  This is why

4      you amended your complaint twice and that's why

5      there's a second amended complaint.

6  BY MS. BURNETT:

7      Q.   Mr. Wilcox --

8      A.   I'm sorry.  I mean, that's the truth.  You

9  know.  Why did you have to amend your complaint and not

10 rely on the six-month lease anymore?  You're going to

11 say you don't have to answer, but --

12     Q.   Mr. Wilcox, move to strike.

13          MS. BURNETT:  And Rich, I am going to go to

14      the judge.

15          MR. LUBLINER:  Okay.  Do what you've got to

16      do.

17          MS. BURNETT:  I will.  If anybody else wants

18      to go forward like this, feel free.

19          MR. LUBLINER:  So you're stopping?

20          MS. BURNETT:  I am going to go to the judge

21      and have the judge tell him to answer the questions

22      properly and without all of his verbiage and

23      additional language.  He's here for a deposition,

24      not for a diatribe.

25          MR. LUBLINER:  Okay.  So you're stopping your



 1  questioning?

 2       MS. BURNETT:  Yes.

 3       MR. LUBLINER:  Okay.

 4       MS. BURNETT:  And I'm seeking sanctions.

 5       THE VIDEOGRAPHER:  Anyone else have any other

 6  questions?

 7       MR. SIMON:  Yes, and -- but --

 8       MR. MARCHESE:  So let's talk about this.  Can

 9  we go -- can we take this off the screen and go off

10  the record, or stay on the record and just talk

11  this through so we can finish?  We'll figure out

12  what to do.

13       Joann, can you stop sharing the screen?

14       THE VIDEOGRAPHER:  Ms. Burnett, you need to

15  stop sharing your screen.

16       MR. MARCHESE:  Okay.  All right, Rich, so --

17       THE VIDEOGRAPHER:  We're still on the record,

18  by the way.

19       MR. SIMON:  Thank you, Matthew.

20       MS. BURNETT:  Are we going off the record or

21  are we staying on?

22       MR. MARCHESE:  We'll stay on the record.

23       So Rich, what would you like us to do, given

24  Joann's position regarding her motion?

25       MR. LUBLINER:  Well, that's up to you as to



1  whether or not -- I'm not sure if you cross-noticed

2  or did not cross-notice, but I wouldn't argue that

3  you have a right to ask questions, of course, as a

4  party in the case.

5          MR. MARCHESE:  Yeah, we did cross-notice and

6  so --

7          MR. LUBLINER:  And same with Andrew Simon.  So

8  it's really up to you.  I mean, I'm not withholding

9  him.  He's here.  He's available.

10         MR. SIMON:  Correct.  Listen my --

11         THE WITNESS:  Just two questions --

12         MR. LUBLINER:  David, not now.

13         THE WITNESS:  Okay.

14         MR. SIMON:  My suggestion, Rich, and I'm not

15 making an accusation one way or the other, is just

16 to talk to David about five minutes off camera and

17 see if it can be a situation that can be resolved

18 regarding answering Joann's questions.  I know

19 there's always a need and feeling to get out as

20 much of your feelings in these things as possible,

21 but it is more so a proceeding where it's a

22 question and answer and it should be that simple.

23 But if you don't want to do that, I understand.

24         MR. LUBLINER:  I'm happy to have a

25 conversation with him.



WILLIAM DAVID WILCOX, JR.                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                        89

1       MR. SIMON:  I think that's the best first step
2   before we do anything drastic.
3       MR. LUBLINER:  I'm happy to have a
4   conversation with him.
5       MR. SIMON:  So why don't we go off for five
6   minutes.  You talk to your client and we'll come
7   back and we see where we go from there.
8       THE VIDEOGRAPHER:  Okay, going off video
9   record, then?
10      MR. SIMON:  Yes.
11      THE VIDEOGRAPHER:  Okay.  Going off video
12  record then at 2:40 p.m.
13      (A break was had.)
14      THE VIDEOGRAPHER:  Going back on video record.
15  The time is 2:46 p.m.
16      MR. LUBLINER:  Joann, if I may on the record
17  state, though, it is a little confusing even to me,
18  like, there are so many different versions of the
19  lease.  So like when you're showing the first page,
20  it's just -- if you could scroll through it before
21  you ask the question, it would be appreciated.
22      MS. BURNETT:  Understood.  And if somebody
23  just would have said, you know, can you let me read
24  it, I'd be happy to do that.
25      MR. LUBLINER:  No, I'm not casting aspersions.



WILLIAM DAVID WILCOX, JR.                                     March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                                          90

1      I'm just, you know, making a statement.

2  BY MS. BURNETT:

3      Q.   Mr. Wilcox, have you seen this lease agreement

4  before?  And I'll scroll through it so you can see it.

5  Have you seen this document before?

6      A.   This would appear to be the real lease, the

7  only executed version of the lease ever signed, fully

8  executed version of the lease.

9      Q.   And what date was this changed to 2023?

10     A.   2022, 2023 and that's VM's initials right

11 there and then the option is scratched out.

12     Q.   Right.  What date was that --

13     A.   So it's a two-year lease to 2023,

14 January 25th, 2021 and ending on January 24th, 2023.

15     Q.   What date was the 2023 added to this

16 agreement?

17     A.   Sorry, I don't understand the question.  Say

18 that again.

19     Q.   On what date was the 2022 crossed out and 2023

20 added?

21     A.   It must have been on the 7th because that's

22 the date we signed everything and nothing changed from

23 that day, as you can see from all the initial

24 signatures, et cetera, and there was a scanning error on

25 page 2 when it was originally sent.  Val Manzo and



 1  myself both have copies of this lease.  It was then

 2  again sent when she came back from her vacation to --

 3      Q.   Mr. Wilcox, Mr. Wilcox, again, I move to

 4  strike.  The question was:  On what date was 2023 added?

 5      A.   I believe it was January 7th.  From my

 6  recollection, it was January 7th, when I signed the

 7  agreement, when we made the final agreement terms.  But

 8  you can see at the bottom and you can see the signature

 9  and it has a date beside it.

10      Q.   And it's your position that was never changed

11  after a one-year lease was executed?

12      A.   Absolutely not.  Nothing was changed after

13  that.

14      Q.   This is the association's governing documents.

15  I'm just going to tell you that that's what it is.  You

16  can take my word for it or not.  This is the rental or

17  lease provision of their governing documents and it says

18  apartments can only be leased or rented -- rented or

19  leased one time in any 12-month period.

20          MR. LUBLINER:  I'm just going to go on the

21      record and state that that is not the governing

22      document that was in effect on the date that

23      Mr. Wilcox entered into the lease with 303, LLC.

24          MS. BURNETT:  It what?

25          MR. LUBLINER:  This was not -- this was



1        subsequently adopted.  This was not the document of

2        record on the date that Mr. Wilcox entered into the

3        lease with 303, LLC on January 25th, 2021.

4              MR. SIMON:  Rich, that's not for you to

5        interject and say in this depo.

6              MS. BURNETT:  I've truly never been in a

7        deposition like this before and it absolutely was

8        in effect at the time he --

9              MR. SIMON:  Hey, guys, no one should be

10        debating this right now on the record.  This is --

11        you can ask the witness as many questions as you'd

12        like on the document, but us comment -- providing

13        any commentary on it without an answer from the

14        witness is just improper.  Just would you ask

15        questions.  Let's just do that.

16   BY MS. BURNETT:

17        Q.   Mr. Wilcox, have you ever seen this provision

18   before?

19        A.   Yes.

20        Q.   Had -- did you read it?

21        A.   I read it when it was approved in June of

22   2021.

23        Q.   So when you received the governing documents

24   initially -- and I believe you said that you received

25   them and you read them prior to moving in -- you're



 1  saying this provision was not part of the declaration of
 2  condominium?
 3      A.   Yes.
 4      Q.   Okay.  Have you ever had an occasion to call
 5  the police while living at Unit 303 at La Pensee?
 6      A.   Yes.
 7      Q.   Did you make a call on February 21st -- I'm
 8  sorry, February 24th, 2021?
 9      A.   It appears that's what it says.
10      Q.   And what was the purpose of calling the
11  police?
12      A.   Well, you need to scroll down so I can see.
13           Oh, this is when Ron Lawson instructed me to
14  call the police about David Wolff using the "N" word and
15  making racial slurs against my girlfriend, Megan Luchey.
16      Q.   So you're saying John Lawson advised --
17      A.   John Lawson said --
18      Q.   -- you to call the police?
19      A.   Yes.
20      Q.   Okay.  Did -- can you explain to me how this
21  unfolded?
22           MR. LUBLINER:  Form.
23           THE WITNESS:  I don't understand the question.
24  BY MS. BURNETT:
25      Q.   Did you hear anyone make a racial slur?



1          MR. LUBLINER:  Form.

2          THE WITNESS:  No.

3   BY MS. BURNETT:

4     Q.   Pardon me?

5     A.   No.

6     Q.   Did you hear from someone else that someone

7   made a racial slur?

8     A.   Yes.

9     Q.   Who did you hear from?

10    A.   Megan Danielle Luchey.

11    Q.   And what did she tell you?

12    A.   Coming out of the elevator, David Wolff said

13  to her "N" word do not belong here.

14    Q.   He just walked into the elevator and said that

15  to her?

16    A.   He was outside of the elevator when she was

17  getting out.  He had been aggressive and threatening to

18  me during the moving time, et cetera, and this was the

19  end of it.  John Lawson said he knew; that he's made

20  statements to him before and he said to contact the

21  police.

22    Q.   And what did the police do when you called?

23    A.   They said you are unable to do anything

24  because of basically First Amendment rights, and they

25  advised me that they had a plot to get rid of me and to



WILLIAM DAVID WILCOX, JR.                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                         95

 1  make sure that me and my girlfriend did not break any
 2  rules because Deputy Hul said they had calls
 3  consistently around the breed of my dog, claiming I was
 4  running around with guns, claiming I was threatening
 5  people and he knew, Deputy Hul looked it all up, it was
 6  untrue.  We made a record of the report that's --
 7       Q.   Hang on.  When did --
 8       A.   I'm just trying to answer the question.
 9            MR. LUBLINER:  All right.  David, you guys are
10       talking over each other.  So just let her ask.  The
11       court reporter's head is going to explode.
12  BY MS. BURNETT:
13       Q.   When was the alleged racial slur made, on what
14  date?
15       A.   I don't recall.  It's probably in the report.
16       Q.   Does this help you out at all if you read it?
17       A.   Approximately two weeks ago.
18       Q.   Why would you have waited two weeks to make a
19  report?
20       A.   I wasn't going to report it at all.  John
21  Lawson instructed me to.
22       Q.   Why did Ms. Luchey not make a report?
23            MR. LUBLINER:  Form.
24            THE WITNESS:  Because she's scared.
25



WILLIAM DAVID WILCOX, JR.                         March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                         96

```
 1   BY MS. BURNETT:

 2       Q.   She's scared of David Wolff?

 3       A.   Absolutely.

 4       Q.   So what did you do in response to this?

 5            MR. LUBLINER:  Form.

 6            THE WITNESS:  I don't understand the question.

 7   BY MS. BURNETT:

 8       Q.   If the police told you there was nothing they

 9   could do, what did you do in response?

10            MR. LUBLINER:  Form.

11   BY MS. BURNETT:

12       Q.   Did you take any action?

13       A.   No.  The next time David Wolff approached me

14   to my face, he started yelling slurs at me, et cetera.

15   I think he was intoxicated.  And he said I needed to get

16   the fuck out of here and people that date, you know,

17   another race don't belong here.

18       Q.   So now you're saying he made an additional

19   slur?

20       A.   Absolutely.

21       Q.   Okay.

22       A.   Not now saying it.  John Lawson knows.  John

23   Lawson's heard it.

24       Q.   And did you happen to make another report on

25   April 28th, 2021?
```



```
 1              MR. LUBLINER:  Form.
 2              THE WITNESS:  I'm not sure what this is, but
 3         I'll read it.
 4    BY MS. BURNETT:
 5         Q.   Okay.  Just tell me --
 6         A.   I've read this before -- can I answer the
 7    question fully or do you want yes or nos?
 8         Q.   Let me do yes and nos right now.
 9         A.   Okay.
10         Q.   You recall making this complaint?
11         A.   Yes.
12         Q.   And what was the complaint about?
13         A.   My neighbor above me, 403, which is Nora
14    Andraos, they were using drugs and it was disturbing me,
15    my dog and it was reeking into the building, and I
16    called the police and they said there was nothing they
17    could do about it.  They could smell it, et cetera.
18              In the report they wrote 203 instead of 403.
19    It's an incorrect statement in the report, which is just
20    a clerical error.  The same individual passed away from
21    a heroine overdose a little bit after this.
22         Q.   Did you tell the police that your neighbor was
23    doing cocaine?
24         A.   Not 403.  You could hear them on the balcony
25    doing cocaine and smoking marijuana.
```



1    Q.   Did you ever do anything to try to clarify the
2  unit number?
3    A.   Yes, absolutely.
4    Q.   What did you do?
5    A.   I told them, I never got the report until John
6  Lawson or you guys pulled this up.  I told them -- they
7  only went to 403.  They did not go to 203.  This is the
8  same unit where there was a death that happened with a
9  heroine overdose.
10   Q.   So as you sit here today, if John Lawson said
11 that the police went to his unit, you would say he's
12 lying?
13   A.   Where does it say they went to John Lawson's
14 unit?
15   Q.   No, I'm asking you if he said that.
16        MR. LUBLINER:  Form.
17        THE WITNESS:  On this day?
18 BY MS. BURNETT:
19   Q.   Yeah.
20   A.   I don't know where they went, but it doesn't
21 say that in here.  It says they went to 203 instead of
22 403.  And if you ask Nora Andraos, they went to her
23 apartment where they were doing drugs.  Her son
24 ultimately passed away from a heroine overdose.
25   Q.   Mr. Wilcox, what does it say here, if you read



 1  through here?

 2          MR. LUBLINER:  Joann, I couldn't hear the

 3      question because you were banging at the end.  I

 4      just heard "what does it say here?"

 5  BY MS. BURNETT:

 6      Q.   If you read through the rest of the report,

 7  where does it say the police officer went and who did he

 8  speak with, or she?

 9      A.   It says he went to 203.

10      Q.   But you're saying he went to 403?

11      A.   Yes, and Nora Andraos will tell you.  She's

12  the owner of 403, unless she wants to lie.

13      Q.   It says, "I asked Wilcox if he had any prior

14  neighbor issues with the people on the balcony and he

15  told me he had some prior verbal altercations with them

16  before."  And you had prior altercations with Mister --

17  I think it was Rosati.  Is it Mr. Rosati's unit that's

18  in 203?

19      A.   At that 203 I've never spoken to Mr. Rosati

20  since the interview that Megan and I had to move in.  I

21  have never had a verbal altercation with him, never been

22  to his unit.  I've spoken to him maybe once.  He likes

23  to wave to me over the balcony below us.  Never been to

24  his unit, never had an altercation with him.

25      Q.   Have you had an altercation with Ms. Andraos'



WILLIAM DAVID WILCOX, JR.                          March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                              100

 1  son?

 2      A.   No.  I had never even met him.  He was just

 3  doing drugs all the time.

 4      Q.   So why does it say they had a prior verbal

 5  altercation with him before?

 6           MR. LUBLINER:  Form.

 7           THE WITNESS:  I don't know.

 8  BY MS. BURNETT:

 9      Q.   This says you became --

10      A.   Just to clarify, I never met Nora Andraos'

11  son.  I don't even know his name.

12      Q.   This says you became very agitated when you

13  were told that nothing could be done; is that correct?

14      A.   Yeah, because I was agitated that they were

15  doing drugs and ultimately I'm the one responsible

16  trying to stop the kid from overdosing in their whole

17  unit.

18      Q.   Mr. Wilcox --

19      A.   It's pretty bad --

20      Q.   Mr. Wilcox, again, move to strike everything

21  that you said after yes or no.

22           Now, this sounds like the police officer, the

23  sergeant became -- it says you "became upset with me for

24  walking away from him and demanded I come back."

25           Did you demand that he come back?



WILLIAM DAVID WILCOX, JR.                              March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                                   101

```
1         A.    I don't recall this.
2         Q.    And that you required that a supervisor come
3   out?
4               MR. LUBLINER:  Form.
5               THE WITNESS:  I don't recall.
6   BY MS. BURNETT:
7         Q.    Did you become enraged?
8         A.    I don't recall.
9         Q.    Do you see down here that it says that you
10  smelled a strong odor of marijuana coming from the
11  second floor, Unit 203?
12        A.    I see what it says; yes.
13        Q.    And originally you said they were snorting
14  cocaine, but then you said they were smoking marijuana?
15        A.    No.
16        Q.    No what?
17        A.    You said to answer yes or no.  I'm really
18  confused, Ms. Burnett, because when I answer more than
19  yes or no, you move to strike.
20        Q.    Did you originally tell the police that there
21  were people on the balcony of the second floor unit --
22        A.    No.
23        Q.    -- doing cocaine?
24              Did you tell them there were people on the
25  fourth floor unit doing cocaine?
```



1        A.   Yes.

2        Q.   Did you then change your story and say people

3    on balcony of 203 were smoking marijuana?

4        A.   No.

5        Q.   Did you change your story and say people on

6    the fourth floor were smoking marijuana?

7        A.   No.

8        Q.   So what was your initial report to the police?

9        A.   Cocaine and marijuana in 403, emitting a smell

10   and a disturbance loud from having a party.

11       Q.   And this says that you -- it was documented

12   with communication in CAD.  "He could see the subjects

13   snorting drugs from the roadway."

14            You could see people snorting cocaine from the

15   roadway?

16       A.   Have you seen the tables on the balconies when

17   a head goes down to snort cocaine?  I'm not sure what

18   your question is.  Yes.

19       Q.   And how do you know they were snorting

20   cocaine?  How do you know someone didn't just put their

21   head down?

22       A.   I guess I don't.

23       Q.   Okay.  So you have no idea if someone was

24   snorting cocaine?

25       A.   No.  I guess someone just died in the same



1    unit from doing drugs.

2         Q.   Well, it's not the same unit because this all

3    says 203, second floor.

4         A.   It's 403.  Ms. Burnett, it's 403.  We've

5    established that.  You did the yes or no --

6         Q.   I don't think we have established that,

7    Mr. Wilcox.  That's why I'm asking.

8              So what action did you take to have this

9    report amended?

10             MR. LUBLINER:  Form.

11             THE WITNESS:  I didn't have any report

12        amended.

13   BY MS. BURNETT:

14        Q.   So you understand this says 203, second floor?

15             MR. LUBLINER:  Joann, I think he's answered

16        it, but you can ask one more time.  We understand

17        there's a discrepancy.  He said he said 403.  The

18        report says 203.  I think we all acknowledged that.

19        He explained it.

20   BY MS. BURNETT:

21        Q.   Did you make another complaint on July 15th of

22   2021 to the police?

23        A.   I'm not sure.  I'm not sure.  I don't recall.

24        Q.   Do you see the document?

25        A.   Yes, Palm Beach it was -- yeah, this was



WILLIAM DAVID WILCOX, JR.                                          March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                                              104

```
 1   Lauren Marchel and John Rahal's dogs, Colt and Ruger,

 2   and it lunged at me twice.  We got videos of it, et

 3   cetera, and the dogs weren't tagged.  And then, you

 4   know, they tried to flip the story.  My dog was pretty

 5   clear.  I'm sure you have the video because we turned it

 6   over, so...

 7        Q.   How big are those dogs?

 8        A.   Probably 40 pounds and pretty aggressive.

 9        Q.   Was it one dog or two?

10        A.   They bark.  They're two, Colt and Ruger.

11        Q.   No, no, on the elevator that day, was there

12   one dog or two?

13        A.   Only one.

14        Q.   And how big is your dog?

15             MR. LUBLINER:  Form.

16             THE WITNESS:  I don't have a dog.  I have a

17        service animal.

18   BY MS. BURNETT:

19        Q.   How big is your service dog?

20        A.   He's roughly 70 pounds.

21        Q.   Have you seen this police report before?  It's

22   dated 9/6/21.  It looks like the --

23        A.   I have not.

24        Q.   -- complainant is John M. Lawson.  You have

25   seen this?
```



WILLIAM DAVID WILCOX, JR.                                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                                        105

1        A.   I have not.

2        Q.   And do you know what this was about?

3        A.   Yeah.  He made up that I was outside and

4   yelling curse words at him and that I was eating here.

5   I've got a video document with the deputy that said

6   there's nothing there.  They made up a story.

7             He wrote an e-mail that Mary McFadden turned

8   over that says I'm requesting a restraining order to

9   David Wolff, as if David Wolff is a judge.  Wrote that I

10  was calling him a motherfucker and other things when I

11  was inside with my beautiful girlfriend having a

12  beautiful pasta, on my third glass of wine, all

13  documented on video.  John Lawson is lying again.  And

14  this is after --

15       Q.   So if there were witnesses -- if there were

16  witnesses to this event, you'd say everyone was lying?

17       A.   It didn't happen, Joann.  We have the video.

18  It's in your possession.  You asked for it in your

19  document request.

20       Q.   What video are you saying?  The video of you

21  speaking with the police officer?

22       A.   Correct.  When I was inside the unit, not

23  outside at any time.  There's no witnesses because it

24  did not happen.  She said it did not happen.  John

25  Lawson said he demanded a thing, this Paul Brusser guy



1   is some little collusion guy with Ben Ripstein and then

2   they called Robyn Balston (phonetic) to call them to

3   check on John.  It doesn't even make any sense.

4        Q.   So you're saying this is all a conspiracy

5   theory against you?

6        A.   It's not a conspiracy.  It's a straight lie.

7   It's not a conspiracy.  Ask the police officer that

8   came.

9        Q.   How would the -- how would the police officer

10  be able to determine and tell you whether something

11  happened or not if she wasn't there and she was just

12  getting witness accounts?

13       A.   Because she did an investigation in reference

14  to a disturbance investigation.  She checked everything.

15  The story that John wrote David Wolff doesn't match the

16  police report.  You have a copy of it from Mary

17  McFadden.  It was turned over.  There are two different

18  versions of what happened.

19       Q.   So why don't you tell me, what are the two

20  different versions?

21       A.   This guy's on a balcony at one point at 3605

22  wherever and then he says Jesse Jackson in the other

23  version is that he was already there on the side of the

24  street.  Read the two documents.  You'll see they don't

25  match.  John Lawson just made it up, per usual.  And



WILLIAM DAVID WILCOX, JR.                          March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                          107

```
 1   obviously, like it's so obvious it's made up.  I'm
 2   inside the condominium.  They have nothing.  Like, it's
 3   all a lie, Joann.  You know it is.
 4           MS. BURNETT:  Again, move to strike.
 5           THE WITNESS:  Can I make one comment, Joann?
 6   BY MS. BURNETT:
 7      Q.   No.
 8      A.   Jesse Jackson --
 9      Q.   No.
10           MS. BURNETT:  Again, I move to strike.
11      There's not a pending question.  Madam Court
12      Reporter, am I on Exhibit 5 now?
13           THE COURT REPORTER:  I think you are.
14           MS. BURNETT:  I'm going to mark that motion to
15      amend with the second amended complaint attached as
16      Exhibit 5.
17           (Plaintiff's Exhibit No. 5 was marked for
18   identification.)
19   BY MS. BURNETT:
20      Q.   Let me get to another set of documents.
21      A.   While you're doing that, I'm just going to run
22   to the restroom quickly.  I'll be back in two minutes.
23           Okay, I'm back.
24      Q.   Okay.  I'm going to show you some documents
25   and I believe these are documents that you produced,
```



1  yes.  I'm going to show you an e-mail thread and you

2  tell me if this is your e-mail address.  This is an

3  e-mail from Mary McFadden to David Wilcox at

4  Wdavidwilcox@gmail.com, cc Valerie Manzo, "Subject:

5  Garbage in hallway."

6            Is this an e-mail you recall receiving?

7      A.   Yes.

8      Q.   And was Mary simply asking you to remove some

9  trash from the hallway?

10      A.   I mean, that's what it says.

11      Q.   Were you offended by this e-mail?

12      A.   After she had harassed me and called me, et

13  cetera, I don't know if that was before or after this.

14  I think it was before, so I think I was really offended

15  because there was no pizza box sitting on the floor.  It

16  was sitting on top of a tea box that was being delivered

17  that day from Costco.

18      Q.   So is this your response to Mary,

19  February 9th, 2:26 p.m.?

20      A.   Yeah.  Hi, I don't think it was there --

21            (Reporter interruption.)

22            MR. LUBLINER:  Or you could read it to

23      yourself.

24            THE WITNESS:  Yeah, it's on the -- it's on the

25      screen there, man.  I'm sorry, as you can see, my



1        English is not as good as probably most people's

2        here.

3   BY MS. BURNETT:

4        Q.   You're having trouble with a disrespectful and

5   I assume obnoxious tenant.  Who are you referring to?

6        A.   I can't remember here.  I think it was Nora

7   Andraos, but I can't remember, or it was Laurie Marchel.

8   I can't -- I honestly can't recall.

9        Q.   Okay.  And then this is Mary's response back

10  to you and I can show you the top of that e-mail as

11  well.

12       A.   Uh-huh.  Todd works for me, which can --

13  scroll up, please.  Yes, I thought she was in 403 -- or

14  she is in 403, it was Nora.

15       Q.   And you're saying what kind of a problem were

16  you having with Nora?

17       A.    In the beginning when we moved in, lots of

18  people were harassing us, getting very close.  I have

19  obviously health conditions, as you can see in my lease,

20  and I wanted -- you know, obviously, there's a

21  two-person limit in the elevator.  She got in, said

22  nasty things to me and Megan, and I said, I want you

23  away from us, like I did on two others because I didn't

24  want to get Covid and I've got preexisting conditions.

25  I think it's pretty clear that it's written right here.



WILLIAM DAVID WILCOX, JR.                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                       110

 1        Q.   And then you just out of the blue make a

 2    comment that you're speculating that she may have made a

 3    comment under her breath about Megan's skin color?

 4        A.   Correct.

 5             MR. LUBLINER:  Form.

 6    BY MS. BURNETT:

 7        Q.   Why?  Why would you speculate that that's what

 8    she said?

 9             MR. LUBLINER:  Form.

10             THE WITNESS:  I don't understand the question.

11    BY MS. BURNETT:

12        Q.   Well, couldn't she have been saying anything

13    under her breath, but that's what you went with?

14             MR. LUBLINER:  Form.

15             THE WITNESS:  That's what we both heard.

16    BY MS. BURNETT:

17        Q.   What did you hear?  Because it says right

18    here, "I couldn't hear what was under her breath."

19        A.   Yeah, because we didn't want to say anything

20    at the time.  We wanted this stuff to stop.  And

21    furthermore, down the road, a couple weeks later,

22    through a conversation with Val and -- Val Manzo and Tom

23    DeMarinis about leaving because of all of this.  You

24    know, Megan never came to the property when I looked at

25    it, Joann.  And so when we showed up, no one ever knew



 1   the color of her skin.  We did an interview with Bob

 2   Rosati over the telephone.  I think there's a consistent

 3   theme here.

 4        Q.   So this is on February 9th and you moved into

 5   the building on the 25th, January 25th?

 6        A.   Well, that's when we got the keys, but moving

 7   was -- you know, because of Covid, because of having to

 8   arrange moving things -- or moving to approximately I

 9   would say three weeks, we had stuff that was damaged.

10   There was trucks back and forth.  It really bothered

11   David Wolff because, you know, you have to use the

12   elevator, blah, blah, blah.

13        Q.   So what date did you say you actually moved

14   in, approximate date?

15        A.   We got the keys on the 24th, but the lease

16   started the 25th because I can't remember, there was a

17   conflict on the 25th to get the keys from Ed Lepselter.

18   Roy Gelbert didn't join us on the 24th.  We did the

19   walk-through, did the pictures, had a beautiful

20   conversation with Val and Tom welcoming each other.

21   They agreed to get the windows washed, which were dirty

22   and we --

23        Q.   Mr. Wilcox, again, I don't mean to cut you

24   off, but my question was:  What date did you move in?

25        A.   Define "move in," please.



```
 1        Q.   When did you actually begin occupying the
 2   unit?
 3        A.   Twenty-fifth of January.
 4        Q.   You slept there?
 5        A.   I don't recall.  Maybe.
 6        Q.   Okay.  So --
 7        A.   Probably not.
 8        Q.   Are you saying you think you moved in a few
 9   days later?  You moved your furniture in a few days
10   after the 25th?
11        A.   Ms. Burnett, I'm not trying to be difficult.
12   I do not recall exactly.
13        Q.   Okay.  And that's fine.  That's absolutely
14   fine.  But you said you did -- now you're saying you did
15   hear her say something, Nora say something.  What did
16   Nora say?
17        A.   I don't recall.
18        Q.   But you're sure it was something to do with
19   the color of Megan's skin?
20        A.   Correct.
21        Q.   And Mary responded and she said, "Wow, I'm
22   shocked.  I guarantee you it has nothing to do with skin
23   color."
24             Did you ever have a conversation with Mary
25   about that?
```



1      A.   Many times.  She would scream at me saying

2   that we were throwing parties, wasn't true.  People

3   throwing up off balconies, said you're going to be

4   convicted, January 25th, your dog is as big as the size

5   of the building, even though she approved it with

6   doctor's --

7      Q.   Mr. Wilcox, Mr. Wilcox --

8      A.   I'm answering your question.

9      Q.   No, my question was:  Did you have a

10  conversation with Mary about this particular statement,

11  the color of Megan's skin?

12     A.   Yes.

13     Q.   And what did she say?

14     A.   Yes.  She called me a liar and said that I

15  should leave the property; that I shouldn't live here.

16     Q.   On February 9th, so you've been here --

17     A.   Correct.

18     Q.   -- a week or two weeks?

19     A.   Yes.

20     Q.   Mary McFadden told you to get off the

21  property?

22     A.   Yes.

23     Q.   Okay.  So, and then in response to this, it's

24  still on February 9th, 2021, at 4:04 p.m., you respond

25  to Mary and you say at the very end of this e-mail, "But



 1  | the racist shit will be over before it starts, I assure
 2  | you.  I'm not allowing that to her, period."
 3  |         You're saying the -- you've already had two
 4  | encounters with people who were racist?
 5  |     A.   Yeah.
 6  |     Q.   Within a week of moving in, two weeks of
 7  | moving in?
 8  |     A.   Within hours of arriving.
 9  |     Q.   Within hours of arriving.  So what was the
10  | very first racist encounter you had?
11  |     A.   Well, not me specifically, but John Lawson, on
12  | the 24th, looking at Megan up and down and then
13  | complaining that we were moving in, which was not true,
14  | to try to already plot us getting out because I had a
15  | chair in my hand, an antique chair I bought in Miami, on
16  | the 24th and we were getting the keys.  And there's one
17  | of the e-mails in there Mary sent and then Mary told me
18  | that John Lawson's crazy.  That was the 24th of the
19  | month.
20  |     Q.   Mary told you that John Lawson is crazy?
21  |     A.   Correct, on the 24th, when she called me
22  | because I said we're not moving in.  She said you're
23  | moving in and I said, No, we're not.  That's not true.
24  | He took one look at Megan.  They don't -- you know,
25  | there's certain people -- you know, you can argue this,



WILLIAM DAVID WILCOX, JR.                           March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                              115

 1  but you know, you did what you did, they did what they

 2  did.  He was a resident here when he filed a lawsuit

 3  against her and called her a guest and extended her

 4  occupancy.  It's very hurtful.

 5      Q.   Have you ever seen this e-mail before?  It is

 6  a February 13th, 2021, e-mail, 11:53 a.m., Mary McFadden

 7  wrote, and it looks like she's writing to this to Val

 8  Manzo, I'm assuming because it says "Val."

 9           Have you seen it this e-mail before?

10      A.   I have.  I didn't see it at the time.  Val

11  never forwarded it to me, but when I read it, Val has

12  informed me she's asked -- you know, there's a camera.

13  No footage has ever been there.  She then said she's

14  going to accuse me of a felony after she's already said

15  the animal is approved.  She also said it's a Doberman

16  puppy locked in the building.  She's not sure she knew

17  the weight and the breed of the dog and the age.  She

18  knew the service that the dog provided when she approved

19  it.

20      Q.   Did you have a party on February 12th?

21      A.   No.

22      Q.   You had no people come over?

23      A.   No.

24      Q.   So if there's Ring doorbell footage showing

25  people entering your unit, that's altered as well?



1              MR. LUBLINER:  Cross -- form.

2              THE WITNESS:  Yes, there's no Ring doorbell

3        footage, right?  I didn't have a party.  There's no

4        one throwing up off the balcony that came from this

5        unit.  Perhaps it came from 403 where they partied,

6        but it wasn't mine.

7    BY MS. BURNETT:

8        Q.   And what did you say in response to this?

9        A.   I didn't get that e-mail, so I didn't respond

10   to it.

11       Q.   So you were never made aware that someone was

12   complaining about someone throwing up off your balcony?

13       A.   John Lawson, John Rahal and Ben Ripstein

14   practically kicked my door in threatening me that

15   morning when I was asleep.  I ran to the door thinking

16   the crane had crashed that was doing work on Laurie

17   Marchel's unit.  And I was in my underwear and I said,

18   What on earth is going on?  They made all these

19   accusations.

20              After it cooled off for a minute -- because

21   there's three people, I only know who one is because I

22   didn't know anyone here by face -- I invited them to

23   come into the unit.  They did not.  I went over and I

24   looked.  There was no vomit.  They said it had to come

25   from yours because there's vomit on the two balconies



```
 1   below.
 2            I don't know what they're talking about.  I've
 3   heard that it was food next to a styrofoam box, like a
 4   take-away.  I've heard different stories.  But Laurie
 5   Marchel, who wasn't here, insisted it was vomit.  And
 6   there were people threatening me at my door.  Ben
 7   Ripstein further threatened me later on, which makes me
 8   highly uncomfortable.  So I don't know what you --
 9       Q.   Was there vomit on your balcony?
10       A.   Say it again.
11       Q.   Was there vomit on your balcony?
12       A.   There was not.  I didn't see any vomit.
13       Q.   So if 403 -- if someone threw up off 403, it
14   would have hit your balcony and the two below, correct?
15       A.   Well, it wouldn't, Joann, because that would
16   mean you would know the physics of where the vomit's
17   going if they projectiled, if they did whatever, if it's
18   really vomit.  So I can't opine on something that's not
19   a realistic -- you know, we're in a fantasy world right
20   now.
21       Q.   Okay.
22       A.   Where is the Ring doorbell?
23       Q.   Did you talk to Liza Dunn about the vomit?
24       A.   Yes, I did.
25       Q.   And what did she tell you?
```



WILLIAM DAVID WILCOX, JR.                        March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                          118

1        A.   She said it was food.

2        Q.   You said it was food from where?

3        A.   She didn't know.  Stuff blows off of Rosati's

4   balcony, the door mat flew off the other day.  You know,

5   things -- when the wind hits hard here off the balconies

6   right over here, stuff moves.  Stuff happens.  Someone

7   could have left food out there.  I don't know, but it

8   didn't have anything to do with me.

9        Q.   Did Ms. Dunn inform you that she's the one

10   that notified management that there was vomit?

11        A.   No, she did not.

12        Q.   And then did she later tell you that it wasn't

13   vomit, it was food?

14        A.   She never told me it was vomit.

15        Q.   Okay.

16        A.   I know I can't ask you, but I would really

17   like to get the footage of the person vomiting off of

18   the balcony, as it says, and then the felony, although

19   Mary McFadden is the one that has legal issues, not me.

20        Q.   Mr. Wilcox, there's not a pending question.

21        A.   Oh, okay.  I thought there was.  Sorry.

22        Q.   Did you receive a copy of this e-mail

23   February 13th e-mail, 2021?

24        A.   I did not.  I did not.

25        Q.   Did Valerie Manzo or Todd DeMarinis forward



WILLIAM DAVID WILCOX, JR.                                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                                        119

1   you this e-mail?

2        A.    No.

3        Q.    And did Val Manzo or Tom DeMarinis speak to

4   you about this incident?

5        A.    Absolutely, and they said they asked for

6   evidence and video.  They asked for any material of this

7   to be sent and nothing was ever sent.  That's what I was

8   informed by Ms. Manzo and Mr. DeMarinis.  And they said,

9   obviously, if you're doing something wrong, we will take

10  the appropriate action to you, but we have seen nothing

11  to validate anything other than hearsay.

12       Q.    Did you receive any complaints about your dog

13  barking?

14       A.    All the time.  When I was in Aspen with the

15  dog with Megan we were sitting at the beautiful Jerome

16  Hotel and I received a complaint my dog was barking.

17  Nora Andraos -- Zeus was with me.  I took a picture and

18  sent it to Mary.

19            I received complaints -- sorry, my phone is

20  doing the Zoom because I can't talk through it.  Someone

21  tried to call.

22            I received -- me and Megan were at Surfside

23  doing a staycation at the Four Seasons of the dog

24  barking.  I received -- and obviously, Zeus was with me.

25  I received -- at Prime 112 or whatever it was, we were



1  sitting there having dinner one night down in Miami, I

2  received a call.  I was in Orlando at Disney World and

3  we were at whatever you call the eating thing.  So many

4  times I received calls and it was Laurie Marchel and

5  John Rahal's dogs in Unit 302 who were barking.

6          I sent Ring doorbell cameras showing the

7  incident, showing that they were barking, showing I

8  wasn't there and it still never stopped because they

9  wanted it to be me, obviously.

10          Zeus doesn't bark.  Zeus has been sitting

11  right here beside me the entire time.  Zeus is trained

12  better than most humans, and if he's going to be

13  barking, there's going to be something that is going on

14  that shouldn't be going on, it's going to be notifying

15  me, which is, obviously, what we discussed before that.

16      Q.   Did you take Zeus on all of those trips with

17  you that you just mentioned?

18      A.   Yes.

19      Q.   Okay.

20      A.   He flies either on my plane or he flies, you

21  know, United first class and we sit in the front and he

22  goes right there as a service animal.  The one to Aspen

23  we took a commercial flight out of Fort Lauderdale and

24  then we took a private plane from there to Aspen to make

25  things quick.



WILLIAM DAVID WILCOX, JR.                          March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                              121

1          He's with me all the times that he can, you

2  know, because he's a helper.  He's not a requirement in

3  my life, but he's a helper.  And, you know, when I go

4  places, you know, over to Europe and whatnot, it just

5  depends on the stay and longevity.  He didn't go with me

6  to Argentina last week just because I was here, here,

7  here.  I wish he could have come, but there's certain

8  limitations sometimes even with a helper.

9      Q.   So you're saying he's not medically necessary?

10  It's a preference?

11          MR. LUBLINER:  Form.

12          THE WITNESS:  Not true.  I never said that.

13  BY MS. BURNETT:

14      Q.   You said he's a helper.  I don't have to --

15  let me ask the court reporter to read that back.

16          MS. BURNETT:  Madam Court Reporter, could you

17      repeat that statement.

18          (A portion of the record was read by the

19  reporter.)

20          MS. BURNETT:  Thank you very much.

21  BY MS. BURNETT:

22      Q.   So I think that -- the exact language was

23  "he's not a requirement in my life"?

24      A.   Not true.

25      Q.   Those were your words.



WILLIAM DAVID WILCOX, JR.                          March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                             122

1        A.   Not true.  Then I misspoke.

2        Q.   So is he medically necessary?

3        A.   Yes.

4             MR. LUBLINER:  Form.

5             THE WITNESS:  Protected under ADA.

6   BY MS. BURNETT:

7        Q.   I'm sorry.  I missed all of that.

8        A.   Yes, and he's protected under the ADA.

9        Q.   Did you receive a letter from Mary McFadden

10  advising you that you were not permitted to have glass

11  bottles out by the pool?

12       A.   Yes, when it was a plastic bottle.

13       Q.   And did you come up -- did you say --

14       A.   Let me correct my statement for the record.

15  Val Manzo received a notice from Mary.  Val Manzo

16  forwarded me that notice.

17       Q.   And then I believe there was an e-mail from

18  you that said, oh, wait, I remember that it was --

19  someone reminded me that it wasn't glass, it was

20  plastic.

21            Do you recall that?

22       A.   Correct, yes.  That was Lou Halvatzis who gave

23  me the plastic beer bottle when they were at the pool

24  with everyone else.

25       Q.   Okay.



1      A.   And on that day specifically, there was lots

2   of glass, but not mine and it's evidenced in the picture

3   that you can see because a bottle of Tito's isn't made

4   in plastic.

5      Q.   Have you ever had your dog off leash on

6   property?

7      A.   Todd Davis cranked a backpack blower when I

8   was talking to Liza before I had him leashed.  It was my

9   fault.  He got spooked and ran up the stairs to the back

10  of the pool, did not do anything to anyone.  I leashed

11  him and then immediately there's this attempted

12  eviction, blah, blah, blah, because there's a grand

13  conspiracy.

14          So your answer is no, Todd shouldn't have been

15  doing that and I believe it was intentional to scare my

16  dog.

17     Q.   And I'm sorry, I missed this.  What did you

18  say Todd did?

19     A.   Todd has a backpack blower.  Do you know what

20  a backpack blower is to blow leaves?  Are you familiar

21  with that?

22     Q.   Oh, yes, okay.

23     A.   Do you know what happens when you crank up a

24  backpack blower around a dog that's not used to a

25  backpack blower around the dog?  It spooks it.  I didn't



1  know he was cranking it up.  I was standing talking and

2  it spooked the dog.  The dog didn't do anything to

3  anyone.

4       Q.   Was the dog already on the pool deck, though?

5       A.   No.  He had just gotten out of my car and he

6  sprinted up to the pool deck.  There's stairs -- have

7  you been to the property yet?  You're a pretty good

8  representative of the property.  I'm surprised you

9  haven't been there.

10            So where I park in the garage, the stairs are

11 right there and he just got spooked.  And when I went up

12 to leash him, he usually comes right up to me.  He went

13 a little bit farther.  I put him on the leash and walked

14 away.  That's the only time on property, ever.  So you

15 can call it he was off the leash, but you can also call

16 it as an intentional act.  It was accidental on my part

17 of the handle.

18      Q.   Did you have an incident with mothballs?

19      A.   There's no incident with mothballs.  Do you

20 want me to say yes or no or give an explanation, please?

21      Q.   Do you have moths in your unit?

22      A.   Yes.

23      Q.   Do you currently have moths?

24      A.   I've seen two or three more; yes.

25      Q.   Do you know of anybody else in the building



```
 1    that has moths?

 2         A.    Yes.

 3         Q.    Who?

 4         A.    Liza Dunn.

 5         Q.    Only Liza Dunn?

 6         A.    I don't talk to very many owners, so you would

 7    have to ask all of them.

 8         Q.    And where is Liza Dunn's unit in comparison to

 9    303?

10         A.    103, two down.

11         Q.    Are you friends with Liza Dunn?

12         A.    She parks next to me.  Please define "friend."

13         Q.    Pardon me?

14         A.    Please define "friend."

15         Q.    A friend.

16         A.    I don't understand the question.

17         Q.    You don't understand what a friend is?

18         A.    Correct.  I have different types of friends.

19         Q.    Is she any kind of a friend?

20         A.    Yes.  Any kind, yes.

21         Q.    Is she an acquaintance only?

22         A.    I think she's more than an acquaintance.  But

23    I don't have very many friends that I would call

24    "friend" friends.  But I believe she's, you know,

25    someone that's more than an acquaintance; yes.
```



WILLIAM DAVID WILCOX, JR.                                March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                                    126

1        Q.   Do you go out to dinner together?  Do you go
2   to one another's units?
3        A.   I've never been out to dinner with her, no.
4   I've been to her unit over Christmas, which she was very
5   kind to have me over when I was alone.  I may have been
6   to her unit one other time.  I don't know if she's ever
7   been here or not.  I don't think she has.  And maybe one
8   time we shared -- Megan, myself and her husband shared a
9   bottle of wine.  You know, at the pool, we shared four
10  glasses of wine one time maybe six months ago.
11       Q.   Have you ever run a criminal background check
12  on Liza Dunn?
13       A.   Yes.
14       Q.   For what reason?
15       A.   Because someone getting close to me as an
16  acquaintance and everything going on in this building,
17  you know, I like to know who I'm around.
18       Q.   Did you find anything out when you did her
19  criminal background check?
20       A.   No.
21       Q.   Did you -- are you aware of her husband?  Do
22  you know his name?
23       A.   Yes.
24       Q.   What's his name?
25       A.   Jonathan Flom.



WILLIAM DAVID WILCOX, JR.                        March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                        127

1      Q.   And did you run a background check on him?

2      A.   No.  He told me.

3      Q.   He told you what?

4      A.   That he was involved in a conviction in the

5    Southern District of New York and, you know, he

6    explained his side of it.  And I listened and you know,

7    that was the end of it.

8      Q.   So what's the difference between Ben Ripstein

9    having a NOLO 12 years ago as opposed to Jonathan Flom's

10   conviction in a Ponzi scheme?

11           MR. LUBLINER:  Form.

12           THE WITNESS:  Ben Ripstein came to my door

13       threatening me, has threatened me previously.  He

14       has done something violent.  Jonathan Flom was

15       convicted of, you know, effectively mail fraud,

16       like $5,500 and spent two years in some little

17       resort up in the middle of Florida.  I think those

18       are two different classes of people no matter how

19       the criminal justice systems looks at them, you

20       know, individually.  And that's a personal opinion.

21       Jonathan has never threatened me.  Jonathan has

22       been nothing but civil, nice and friendly.

23   BY MS. BURNETT:

24       Q.   Have you notified anybody in the building of

25   Mr. Flom's conviction?



1       A.   Everyone knows.  I didn't have to notify

2   anyone.

3       Q.   Does he wear an ankle bracelet?

4       A.   No.

5       Q.   He doesn't?

6       A.   No.  I asked him.

7       Q.   Pardon me?

8       A.   That was something that I -- I asked him after

9   our deposition where you asked that question because I

10  was curious and I listened.  The answer is no.

11      Q.   Okay.  Did he, do you know?

12      A.   When he first came out of his conviction,

13  apparently, he had one and then they appealed it.  I

14  don't know how quickly that was.  I didn't ask the

15  detail on that.  But yes, at one point he had one, but

16  then it went away.

17      Q.   Okay.

18      A.   Is my understanding, again.

19      Q.   Okay.  I just want to go back to this e-mail

20  here, February 9th, 2021, 4:04 p.m. from you to Mary

21  McFadden, and it says -- the second line of this says,

22  "I sent you a copy of contract, all approved by

23  association."

24           I thought you told me earlier you never sent

25  her a copy of the contract?



WILLIAM DAVID WILCOX, JR.                                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                                        129

1        A.   I must have miswritten or I must have meant

2   something different.  You know, sometimes when you type,

3   just like it said mov instead of move -- I'm not sure.

4   This was a long time ago and I -- "I sent you copy of

5   contract, all approved by association."  I can look

6   again, but obviously, I turned over 677 pages of

7   documents.  I tried to turn over every single thing.  I

8   can look again, but I think that's just a missed typo

9   type thing.

10       Q.   So what do you think you were trying to say?

11       A.   That I don't want people around me without

12  masks and taking precautions per the CDC guidelines when

13  Covid was rampant through the building and people like

14  John Lawson aren't even wearing masks.

15       Q.   I just mean about the second line.  What did

16  you think you meant to say there?

17       A.   Covid precautions.  I don't know what I think

18  I meant to say there.  I think I meant to say you know

19  that the contract that was approved has all these Covid

20  requirements in it, which you've read on the side of the

21  contract.  I think that's what I meant.  I'm not sure,

22  though.

23            THE COURT REPORTER:  Joann, before we go on,

24       can I have just have a two-minute restroom break?

25            MS. BURNETT:  Absolutely.



WILLIAM DAVID WILCOX, JR.                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                          130

```
 1          THE VIDEOGRAPHER:  Going off video record, the
 2      time is 3:47 p.m.
 3           (A break was had.)
 4          THE VIDEOGRAPHER:  Going back on video record.
 5      The time is 3:49 p.m.
 6  BY MS. BURNETT:
 7      Q.   Hang on.  I'm not sure what I just did here.
 8      A.   Are we back on or are we waiting on the
 9  Andrews?
10          THE VIDEOGRAPHER:  We are on record.
11          MR. SIMON:  I'm here.
12          THE WITNESS:  Mr. Marchese is missing.
13          MR. MARCHESE:  I'm back.  Go ahead.
14  BY MS. BURNETT:
15      Q.   Have you ever seen this e-mail?  It's from
16  Mary McFadden to Valerie Manzo dated Monday,
17  February 22nd, 2021, 7:11 p.m., "Subject:  Tenant."
18      A.   No.
19      Q.   You've never seen this?
20      A.   No.
21      Q.   So does that mean that that's a document --
22      A.   Not that I recall.
23      Q.   Pardon me?
24      A.   Not that I recall.
25      Q.   Does that mean this is a document that Valerie
```



WILLIAM DAVID WILCOX, JR.                           March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                               131

 1  Manzo or Megan Luchey produced?
 2      A.   Well, I don't know how Megan Luchey could have
 3  produced it, but I don't know.  It looks like it's
 4  between Mary and Val.
 5      Q.   So you think it would have been produced by
 6  Val?
 7      A.   I can't speculate.
 8      Q.   Okay.  This is regarding the -- hang on one
 9  second.
10           Did you have an altercation with Bob Rosati?
11      A.   No.
12      Q.   And you say that Mary's referring -- she's
13  advising Val that she received a text message from Bob
14  Rosati, right?
15      A.   That's what it says.
16      Q.   It says, "Everyone is frightened of your
17  tenant," correct?
18      A.   Again, that's what it says.
19      Q.   It says, "He yelled at John Lawson that Bob
20  Rosati called my girlfriend a slur," correct?
21      A.   This is coming from -- I'm sorry, I'm
22  confused.  Is this coming from John Lawson who made up
23  the Jesse Jackson comment or --
24      Q.   No.
25      A.   -- is this coming from Bob -- I'm really



WILLIAM DAVID WILCOX, JR.                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                        132

 1  confused, sorry.

 2      Q.   This is February 22nd.  So it's going back to

 3  maybe a month into your lease, not even.

 4      A.   Okay.  So I'm confused.  You want me to opine

 5  on an e-mail that I'm not privy to based on hearsay of a

 6  person that I've never had an altercation with?

 7      Q.   No.  I'm asking you, it says you "yelled at

 8  John Lawson that Bob Rosati called my girlfriend a

 9  slur."  Did that occur?

10      A.   No.

11      Q.   So you're saying Mr. Lawson didn't say --

12  Mr. Lawson's making that up?

13      A.   Yes.

14      Q.   Did you ever accuse Bob Rosati of making a

15  racial slur?

16           THE WITNESS:  Okay, so I think that's the

17      third time, Rich.  I'm going to say no.  It's the

18      same question.  If you'd like to go to the judge on

19      this, I'm happy to do it.  You're asking questions

20      that the answers will not change.

21  BY MS. BURNETT:

22      Q.   Okay.  I'm just asking.

23      A.   But you're asking the same question.

24           MR. LUBLINER:  Go ahead.

25



WILLIAM DAVID WILCOX, JR.                          March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                              133

```
 1   BY MS. BURNETT:
 2       Q.   This allegation that you then proceeded to the
 3   second floor to accuse Bob Rosati, John followed him up
 4   there to witness, that's a lie as well?
 5             MR. LUBLINER:  Form.
 6             THE WITNESS:  What are you -- what part are
 7         you saying is a lie that you want me to say yes or
 8         no on?  Did I go --
 9   BY MS. BURNETT:
10       Q.   The very last sentence.
11       A.   "He then proceeded to go to the second floor
12   to accuse Bob" -- okay, there's multiple things.  "He"
13   is referring to me, I assume.  "Go to the second floor,"
14   not true.  I didn't accuse Bob Rosati of anything and
15   John Lawson was up there as a witness.
16             Like, I just don't know what you want me to
17   say.  No, it did not happen.  It's fabricated, just like
18   the forged leases.
19       Q.   Okay.  So this text that she forwards where it
20   says, "Hi, Mary, John has apparently reported to you the
21   confrontation between 303 and me."  And so she's -- this
22   is Bob Rosati's text.  So Bob Rosati made this up as
23   well, correct?
24       A.   Where does -- so there's a couple things here.
25   Where does it say it's Bob Rosati's text?
```



WILLIAM DAVID WILCOX, JR.                                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                                        134

```
 1        Q.   The first line.
 2        A.   "I received a text message" -- oh, so dot,
 3   dot, dot, means hi Mary, okay.  That didn't happen.  So
 4   no.  "This guy is out of control with closeup
 5   in-your-face abuse and false accusations."  Wow, it
 6   sounds like what they're doing to me.  Were they writing
 7   what they were trying to do to me?  Can you opine on
 8   that?
 9        Q.   That's what they're saying, that this was you.
10        A.   No, no.  They forged leases.  They made --
11             MS. BURNETT:  Again, move to strike.  Move to
12        strike.
13             THE WITNESS:  All of this, no.
14   BY MS. BURNETT:
15        Q.   So the witness that they say from across the
16   street that witnessed this, that person is also lying?
17        A.   Well, they have to be.  Who is she?
18        Q.   It was referring to someone named Marie.
19        A.   Why is it in -- why is it in a different font?
20   What is this, Maria tenant reply?
21        Q.   You produced this.
22        A.   She witnessed -- well, that means that it came
23   from Val's e-mails.  I'm trying to figure out if this
24   was sent to Val, why is the font different?  Where did
25   it come from?  And then she witnessed 303 shouting and
```



1  pointing to our balcony to Liza's husband.

2         So I was talking to Jonathan Flom and they

3  feel violated because I do that and immediately deal

4  with the mayor?  Shouldn't Jonathan Flom be upset?

5         Joann, I'm just telling you, I'm not trying to

6  be difficult.  I do not understand where you're trying

7  to go with this.  These statements are false.  There's

8  no evidence to back up a single thing of this.  It did

9  not happen.

10     Q.   Did you run a background check on Mary

11  McFadden?

12     A.   Yes.

13     Q.   For what purpose?

14     A.   Because she was harassing me and I felt that

15  she had criminal tendencies by forging leases and I

16  found out, in fact, that she had been writing bad checks

17  since 1983 and she lied to DBPR.  And I mean, you know,

18  you hire someone, if someone's going to fraudulently try

19  to-- she was the one, quote, why don't you just file a

20  lawsuit against him and told Roy Gelberg, we don't care,

21  we know what we're doing, we've got Becker.

22         So I think you should be proud of yourself on

23  that.  You guys have a good reputation of being able to,

24  you know, just throw someone on the street with a forged

25  document.



1          MS. BURNETT:  Again, move to strike.

2   BY MS. BURNETT:

3       Q.   Did you file a DBPR complaint against Mary

4   McFadden's license?

5       A.   Yep, absolutely.

6       Q.   Do you know what the status of that is?

7       A.   No.  They called maybe two weeks ago, a week

8   ago.  It's with attorneys looking to either prosecute or

9   not prosecute in Tallahassee.  The initial report was

10  done by a Ms. Angela something.  I turned over the

11  documents.  I'm at the point, but there will be more

12  documents that will come out and I'll be happy to turn

13  them over to you at that time.  You're obviously welcome

14  to get those documents on the record because it's a

15  public records request in Florida.

16      Q.   Do you know who Nicholas Hiller is?

17      A.   No.  That name doesn't ring a bell at all.

18      Q.   So this wasn't a background check that you had

19  done on someone?

20      A.   Oh, I remember this.  So this was Wisconsin,

21  correct?  They accidentally produced someone else's

22  background at the same time they produced Ben

23  Ripstein's.  So we had to put it as a file, but that's

24  what it is.  And they've actually sent me a note.  I

25  could give that to you as well.  They -- you know, when



1  you pull the court records, it's a small courthouse in

2  Wisconsin.  Yeah, I remember that now.

3       Q.   Okay.  Did you send an e-mail to John Lawson

4  on Sunday, June 27th, 2021, at 1:20 p.m., and copy

5  Todd -- Tom DeMarinis and Val and it says, "Subject:

6  More video today"?

7       A.   Yeah, and there's more video beneath that

8  because the videos I think on June 27th, I was out of

9  town.  I was getting a call from Mary my dogs were

10 barking and the dogs were emanating from 302, as they

11 always were.  And also there's a one-dog rule, plus

12 service animals or pets that obviously -- emotional

13 support animals that don't count as dogs.  And there's

14 also -- was a weight limit, now there's not a weight

15 limit because so many unit owners have two dogs in here.

16 Lots of them are over 20 pounds.

17           So you don't even know the rule anymore.  But

18 the big rule is you can't have your dogs barking

19 non-stop and being aggressive.  As Sabrina Benjamin said

20 in her deposition, her dog was aggressive.  That means

21 no matter the size, it shouldn't be on property.

22      Q.   Have you turned over -- I've seen throughout

23 your production that you mentioned quite a few videos of

24 dogs barking and I only saw two or threes videos in your

25 production.  Are there more than that?



1        A.   I tried to turn over everything that I have.

2   If I can find more, I will send more, but they're all on

3   my Ring cameras and then I moved to a more secure,

4   sophisticated system called E-U-F-Y.  So on the turnover

5   I don't know how much I lost because they were in the

6   cloud, et cetera.  But I could look for more.  I can ask

7   my -- Mr. Rich here.  We can go back through them and we

8   can mark that.  If I can find more, I'm happy to turn it

9   over to you.

10       Q.   Okay.  And then you say the e-mail right above

11  it, you're sending an e-mail to John Lawson Sunday,

12  June 27th.  "The additional videos are too large in file

13  size.  They're being down-converted so I can send over

14  e-mail by my IT group at company.  I'll have them ready

15  by Monday."

16            Did you send those videos to Mr. Lawson?

17       A.   I think I did, but I think it came directly

18  from my IT group.  So that might have missed the

19  production.  I can again go try to find that.  But I

20  mean, they're all there.  If you've watched the videos,

21  it's all the same.  But I will get as much as I can for

22  you.

23            I tried to defend myself, Joann, because

24  everyone was saying it's my dogs -- sorry.  I thought

25  that by showing this, then people would stop accusing



1  me.  It made it worse.

2        Q.   Okay.  And then right above that another

3  e-mail from you to John Lawson Sunday, June 27th, 2021.

4  This one at 3:22 p.m.  "More video today," and you have

5  some additional videos there.

6             Were you at your unit at this point in time?

7        A.   What's the date?

8        Q.   June 27th.

9        A.   One second, ma'am.  That's 2021, June.  I

10 think I was.  I'm not positive, but I think I was.

11       Q.   Okay.  The other e-mails might help you out.

12       A.   I think that's why -- say it again.

13       Q.   No, the other e-mails that -- we'll go --

14 we'll look at a couple other e-mails and I think they

15 might help you figure that out.

16       A.   Okay.

17       Q.   You were referring to a dirty, smelly mat

18 outside.  Whose dirty smelly mat?

19       A.   It's very clear.  It's Laurie Marchel's.  It's

20 next to the elevator.  There's material that's a fire

21 hazard.  It's well-known that that's not supposed to be

22 going on in this building.  Mary was always going around

23 except to her unit.  And they're quite -- you know, when

24 you have your feet without socks and shoes, you know,

25 it's quite a nasty thing.  You know, it's very



WILLIAM DAVID WILCOX, JR.                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                        140

1  unhygienic and the mat is very hygienic too, you know.

2  And it's just not a way to live with this -- with

3  foulness like that.

4      Q.   Where was the mat placed?  Is it outside her

5  door, her front door?

6      A.   It's in front of the elevator and you're not

7  allowed to have mats per the rules.

8      Q.   She placed --

9           (Reporter interruption.)

10 BY MS. BURNETT:

11     Q.   You say, "Have you fired Mary McFadden, as you

12 agreed yet?"

13          When did John Lawson agree to fire Mary

14 McFadden?

15     A.   Weeks before.

16     Q.   He just brought up in conversation to you I'm

17 going to fire Mary McFadden?

18     A.   Because he said the building wasn't running

19 properly and it was Mary McFadden's fault.

20     Q.   When did you have this discussion with John

21 Lawson?

22     A.   Maybe A week or two before when Todd was

23 painting the, what do you call it, the fire sprinklers

24 red all over the place and she had gotten the wrong type

25 of paint and it was dripping everywhere.  I don't know



WILLIAM DAVID WILCOX, JR.                March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303             141

```
 1   if you can find -- it was when that happened.
 2        Q.   So how did that encounter with you and John
 3   Lawson happen?
 4        A.   I don't know.  He's a weird person.  Some days
 5   he wants to tell you that, you know, people talk behind
 6   his back at the trashcan and other days, you know, he
 7   wants to support someone that's being a racist.  I don't
 8   understand personalities.  I can't opine on that, Joann.
 9        Q.   Do you know if it was by e-mail, if it was by
10   phone, face to face?
11        A.   No, by -- it was by a conversation.  And I
12   think he ultimately fired her now, right?  Because he's
13   told everyone that he finally got rid of Mary -- found a
14   reason to get rid of Mary McFadden.
15        Q.   When did you hear that?
16        A.   In December --
17        Q.   And who did you hear that from?
18        A.   -- I think her official resignation.  Laurie
19   Marchel and John Lawson told, I don't know, a few
20   people.  Things go around a 24-unit condominium fast.
21        Q.   So she resigned, she wasn't fired?
22        A.   I don't know.  You know more than we know
23   because it's blacked out in the production, but I don't
24   think that she has the ability of taking a license
25   forward given she's writing bad checks since day three.
```



WILLIAM DAVID WILCOX, JR.                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                        142

1          Q.   Okay.

2          A.   I mean, you would know more.  You were

3     representing her.

4          Q.   I don't represent Mary, just for the record.

5          A.   And you never have?

6          Q.   No.

7          A.   Okay.

8          Q.   You say, "See you at 6 p.m. downstairs today.

9     Multiple owners will be present.  I have much more video

10    and we'll be recording ourselves and in front of La

11    Pensee cameras so no one will be able to fabricate."

12               What did you want to talk to John Lawson

13    about?

14         A.   All of the issues that are going on:  Multiple

15    dogs, the threats, the non-stop Mary McFadden

16    harassment, the racial slurs, the dirty mats, the danger

17    in the fire lights not being on, Ben Ripstein

18    threatening and harassing people and how he was able to

19    pass a criminal background check to be in here and

20    people not know, sending me a defamation letter saying

21    he was going to sue me for defamation, when, in fact, he

22    was defaming me.  Lots of things.

23         Q.   So you just --

24         A.   I can't even remember the whole list.

25         Q.   So you just ordered John to show up?



WILLIAM DAVID WILCOX, JR.                              March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                              143

1        A.   No, I didn't order John to show up.  He said

2   on the telephone he would show up.  He called me that

3   day.

4        Q.   He called you?

5        A.   Yes.

6        Q.   In response to your e-mails?

7        A.   John used to call me until, you know, I was

8   upset with him one day and, you know, I said, you know,

9   you're not doing anything about it.  I said this is

10  enough.  And then, you know, when you filed the lawsuit

11  against me, he said they made me do it, I'm sorry.  You

12  know, I was like what?  You're the president of the

13  association.  You want to file a lawsuit predicated by

14  fraud?

15       Q.   So then on June 27th, 2021, at 6:10 p.m., you

16  sent Jonathan an e-mail saying, "It's now 6:10 and you

17  failed to show as agreed.  We've called you four times

18  on your mobile and landline and left messages.  We

19  expect a full apology letter and action to be taken

20  immediately on all listed items, and furthermore rules

21  to be enforced for everyone."

22            Do you think that's a little overboard?

23       A.   Not at all.  Would you not expect everyone to

24  have the same rules enforced for everyone?  Isn't that

25  how law and order works?



 1        Q.   No, no, no, I mean the demand that he show up,
 2   that you called --
 3        A.   No, he said he was going to show up and then
 4   he didn't show up.  There was no demand.  We called him
 5   and we were waiting.
 6        Q.   I'm going to play you an audio.
 7        A.   An audio of what?
 8        Q.   Of a conversation that you had with John
 9   Lawson.
10        A.   So this was in a communal place knowing that I
11   was being recorded?  If not, you're breaking --
12        Q.   I don't know that.
13             THE WITNESS:  Rich?  You're on mute.
14             MR. LUBLINER:  We'll see what she has.
15             THE WITNESS:  If they recorded me and it was a
16        private conversation, I assume we'll be able to
17        file a new lawsuit, correct, Rich?
18             MR. LUBLINER:  Let's see what she says.
19   BY MS. BURNETT:
20        Q.   Did you put in writing to Mr. Lawson that you
21   record every conversation you have?
22        A.   No.  Any public conversation that I have,
23   obviously, I attempt to record in communal areas, which
24   is why I have Mary McFadden, which is why I have Todd
25   Davis, which I have your voice, et cetera, when in it's



WILLIAM DAVID WILCOX, JR.                          March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                              145

 1  in communal areas because it's not a private

 2  conversation, it's not privileged.

 3          If doors are closed and they're considered a

 4  privileged conversation, under Florida law, you are not

 5  able to record a conversation.  If you play a

 6  conversation today that has been recorded without my

 7  consent, I will be taking legal action against you,

 8  Becker & Poliakoff, et cetera.

 9          So I would advise you to strongly think about

10  what you have and what you're doing.  That is not a

11  threat by any means.  I'm happy to go in front of the

12  judge on this.  Please don't smile and laugh and try to

13  belittle people.  You're an officer of the court.

14      Q.   I am an officer of the court, you're right.

15          Did you put in writing that you record all of

16  your conversations?

17      A.   I do not recall.  I would never record a

18  conversation with John Lawson that was not in a communal

19  or public place, or anyone else, because I would not

20  break the law.  If he has put something or someone's put

21  something, there could be a misprint.  Now, Ms. Burnett,

22  I would --

23      Q.   Have you recorded any conversations with any

24  board members?

25      A.   In a public area, yes.  Outside, where Deputy



WILLIAM DAVID WILCOX, JR.                                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                                        146

 1  Hul said I was allowed to record them, yes.

 2       Q.   Have you recorded any telephone conversations?

 3       A.   No.

 4       Q.   Have you recorded any Zoom conferences?

 5       A.   No.

 6       Q.   Okay.  Have you texted with any of the board

 7  members?

 8       A.   Maybe in the beginning, but I doubt it.  I

 9  mean maybe Lawson once.  I don't know if he knows how to

10  work text.  And I don't really text, so I don't think

11  so.

12       Q.   Have you texted with Laurie Marchel?

13       A.   No.

14       Q.   Have you texted --

15       A.   I don't even have her phone number.

16       Q.   Okay.  Have you texted with Bob Rosati?

17       A.   No.  I barely know who he is.  I spoke to him

18  one time when he approved our residency, Megan's

19  residency and occupancy and two-year lease.

20       Q.   I think in here -- I just want to see where

21  this starts.

22       A.   I'm going to use just a quick restroom break.

23  I'll be back in two minutes.

24       Q.   Can you hang on? because we could wrap this up

25  very quickly.



```
 1              MR. LUBLINER:  No, I guess not.

 2              MR. SIMON:  Joann, I would just let the

 3         witness take a comfort break.

 4              MS. BURNETT:  Not a problem.

 5              (Off the stenographic record.)

 6              MS. BURNETT:  Are we still on the record?  We

 7         back on the record?

 8              THE WITNESS:  Yeah, I'm here.

 9    BY MS. BURNETT:

10         Q.   This is an e-mail from Valerie Manzo to you

11    dated Thursday, July 15th, 2021, at 9:48 a.m.  Subject

12    is "8:37 a.m. main elevator lobby, Zeus and other dog

13    plus tires."  And Val says, "Okay, received.  If you

14    filed report with sheriff regarding tires, send over a

15    copy."

16              What report about tires is she referring to?

17         A.   So I and Megan have had three or four screws

18    in our tires so far.  Lou Halvatzis has had screws in

19    his tires.  You're aware of this, Ms. Burnett.  We

20    requested all the videotape and obviously, we haven't

21    received any of it, which needs to be turned over.

22              And someone's putting screws in my -- I drive

23    a 2021 RST.  It's a special car because it's got those

24    special tires on it.  They're extremely expensive and

25    you don't get screws in the side walls.  You get nails
```



1  in the inner tread and they're about eight-ply.  This

2  has happened multiple times, just like everything else.

3  No one wants to help because it's happening.  So I think

4  you know what the tires are about, to be honest with

5  you.

6       Q.   I'm asking you questions about this.  Have you

7  filed a report with the police regarding your tires?

8       A.   I think I did.  I filed a report that day.

9  The cops had to come about the dogs.  The dogs weren't

10 registered in Palm Beach County, which they could have

11 been taken.  There's -- I mean, there are a lot of

12 problems and there are a lot of things that happen.  I

13 just don't recall.  The police are here every single

14 day.  They even --

15      Q.   I think this is the third time you've said

16 "dogs" plural.

17      A.   I'm sorry.  I don't know why I'm saying dogs

18 plural.  Dog.  You know, I'm from Tennessee and my

19 English is probably not as good as yours.

20      Q.   So you're saying that you don't know plural

21 from singular?

22      A.   I'm just saying my education level probably

23 isn't at the level that yours is.

24      Q.   Well, we went through your education.  You got

25 the equivalent of an MBA.



WILLIAM DAVID WILCOX, JR.                          March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                              149

1        A.   Okay, but I'm from Tennessee.

2        Q.   So people from Tennessee --

3        A.   My English is a little bit different than

4   yours.  So if you hear things differently, I mean,

5   that's just part of life.

6             MR. SIMON:  There's no need to defame an

7        entire state, Mr. Wilcox.

8             THE WITNESS:  Correct, because I think that's

9        where Ms. Burnett is going and it's offensive.

10            MS. BURNETT:  Absolutely not.

11            THE WITNESS:  Well, I don't know why you keep

12       on saying that, you know, my pronunciations aren't

13       in line with yours.

14   BY MS. BURNETT:

15       Q.   Pronunciations?  I'm asking you because there

16   is an issue about you having two dogs.  You said --

17       A.   I don't have two dogs.

18       Q.   -- dogs three times?

19       A.   I don't have two dogs, Ms. Burnett.  You can

20   claim that there's an issue.  You can forge leases.  You

21   can do whatever you want --

22            MS. BURNETT:  Again, Rich, Rich.

23            MR. LUBLINER:  All right.  Let's just answer

24       questions and get this moving.  Now you're both

25       sort of engaging each other.  So let's just --



```
 1   BY MS. BURNETT:
 2        Q.   Do you have a police report regarding tires
 3   being -- nails in tires?
 4        A.   I don't recall.  I would have to look.  I
 5   turned over everything through my legal representation
 6   that I could find for you.
 7        Q.   Can you look for that again, see if you have a
 8   police report?
 9             THE WITNESS:  Rich, can we mark that for me
10        looking for it, please?
11             MR. LUBLINER:  Sure.
12   BY MS. BURNETT:
13        Q.   Now, you mentioned the sheriff came for your
14   dog or dogs and they weren't registered.  What was that
15   about?
16        A.   That's -- sorry, now you're saying it is dogs
17   plural.  It's John Rahal and Laurie Marchel have two
18   dogs that aren't registered.  One was lunging at my dog.
19   This is July 15th.  And they're not -- so you have to
20   have tags in Palm Beach County.  They're not tagged.
21   They don't have rabies vaccinations.  They're dangerous
22   dogs.  Animal Control had to come.
23             So now you're right.  I was saying dogs
24   plural.  It's just I don't like to be attempted to be
25   tricked.  There are two dogs living in Unit 302 that are
```



1    dangerous that bark non-stop that are aggressive.

2        Q.    Now, you said something about they were coming

3    to -- they could have taken your dogs away?

4        A.    Their dogs away.  Where are you reading that?

5        Q.    I'm not reading it.  I'm trying to under --

6    sometimes it's difficult to understand over Zoom.

7        A.    Take their dogs away, Laurie Marchel and John

8    Rahal because they're not registered in Palm Beach

9    County tags, his residence, her residence, his residence

10   in Florida.  The dogs are supposed to be residents here

11   and they were not tagged.  They could have taken them

12   away, dogs plural.  Names are Colt and Ruger, again, for

13   the record.

14       Q.    Did you call the sheriff's office and report

15   them?

16       A.    Absolutely.  Absolutely.  They were lunging at

17   my dog on video.  You were sending me an e-mail that

18   day, Ms. Burnett.  You know what happened.

19       Q.    Mr. Wilcox, with all due respect, this -- the

20   point of a deposition is to try and bring out testimony.

21   It doesn't have anything to do with what I know or don't

22   know.  This is establishing a record for the Court.

23            Did you file a report with -- or I'm sorry,

24   did Ms. Luchey --

25            THE WITNESS:  Rich?



1           MR. LUBLINER:  He said no like fifty -- he

2      said he doesn't --

3   BY MS. BURNETT:

4      Q.   No, no, and I apologize.  What I was trying to

5   say is, did Ms. Luchey file a report?

6      A.   Four times.

7      Q.   Did Ms. Luchey file a report regarding

8   tires -- nails in her tires?

9      A.   You need to ask her.

10     Q.   Do you know if anybody else filed reports

11  concerning nails in their tires?

12     A.   You need to ask anybody else if they filed

13  reports.

14     Q.   Do you know if Lou Halvatzis filed a police

15  report regarding nails in his tires?

16     A.   You need to ask Lou Halvatzis if he filed a

17  report.

18     Q.   And how many times are you saying you had

19  nails in your tires?

20     A.   Three that I know of.

21     Q.   Did you make a report with your insurance

22  company, or a claim?

23     A.   No, cash.

24     Q.   So there's -- do you have any receipts for

25  those tires?



1       A.   Yes.  I don't know if I have all three, but I

2  do have some receipts; yes.

3       Q.   Can you provide those?

4       A.   From Pompano -- I can try to get them.

5  They're Pompano Beach GM, wherever I bought that car,

6  Chevrolet -- it's in Pompano.  Mike Morano -- no, that's

7  in West Palm.  I don't remember.  I'll try to get it.

8            THE WITNESS:  Rich, we can mark it down.

9  BY MS. BURNETT:

10      Q.   Was it always the same tire?  Different tires?

11      A.   Different tires.  Usually next to where the

12 wall is where you can't see because the beautiful camera

13 that seems to kind of project things.

14      Q.   I'm sorry, I missed that.  What were -- what

15 is that?

16      A.   So if you look where I park, there's the

17 concrete structure that holds up.  So if I park inwards,

18 it was usually on that side.  If I reverse the car, it

19 was on the other side.

20      Q.   Okay.  On this e-mail, it's from you to Mary

21 McFadden, Val Manzo, cc Tom DeMarinis, John Lawson,

22 dated Tuesday, June 22nd, 2021, 7:31 p.m., "Dogs barking

23 nuisance and unattended small children."

24            What were you complaining about in this

25 e-mail?



WILLIAM DAVID WILCOX, JR.                                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                                      154

1        A.   Mary -- this was the one I was at Prime 112.

2   I'll try to go get you the receipt of my AmEx, if you

3   want to, with Zeus and with Megan having a beautiful

4   dinner and I got a call from Mary McFadden screaming at

5   me saying my dog was barking.  And I said, Are you

6   fucking out of your mind?  And I went to my Ring

7   doorbell camera and I pulled the camera and I said, Here

8   it is with the timestamp.  We're not here.  We're in

9   Miami.

10        And I said if Zeus was home, he would be

11  disturbed too.  This is a fucking nuisance and you're

12  blaming me every single time.  I'm sending you the

13  videos and you don't want to do anything about it

14  because you and Laurie Marchel are in cahoots to want to

15  blow out the wall to connect these two units.

16        Does that answer your question, Ms. Burnett?

17        Q.   You're also talking about children.  What

18  was --

19        A.   Yeah.

20        Q.   -- the issue the children?

21        A.   Did you watch the videos?  They're running

22  around screaming unattended.  They're like

23  four-year-olds.  That's irresponsible.  They could hurt

24  themselves and they shouldn't be doing that.  I think

25  that the most irresponsible -- are you kidding me?  What



 1   if they open a door go out of an elevator, run into the
 2   street and get hit?
 3        Q.   Do you have -- did you produce the video --
 4        A.   For the record, is that a real question?  Are
 5   you out of your fucking mind?
 6             MR. LUBLINER:  David, whoa, whoa, whoa.
 7             MR. SIMON:  Yeah, David that's totally
 8        inappropriate.
 9             MR. LUBLINER:  David, let's take it down a
10        notch.
11             THE WITNESS:  I mean, she doesn't care about
12        small children, she --
13             MR. SIMON:  No, no, David, David, David,
14        you're a witness.  Let's just answer the --
15             MR. LUBLINER:  Just let her ask her questions
16        and just answer them.
17   BY MS. BURNETT:
18        Q.   It says, "Attached is an example video right
19   now."
20             Did you turn that video over?
21        A.   Yes.
22        Q.   Do you know which one that is?
23        A.   I don't understand the question.
24        Q.   So it's the one -- I saw a video with children
25   running through the hallway and dogs -- I did hear dogs



WILLIAM DAVID WILCOX, JR.                                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                                        156

 1  barking.  It's that video that you're referring to?

 2       A.   I don't --

 3       Q.   I just want to confirm that we have the videos

 4  that you're referring to.

 5       A.   Yes.

 6       Q.   You sent an e-mail June 27th, 2021, at

 7  7:08 p.m. to John Lawson, cc Valerie Manzo, Tom

 8  DeMarinis, Mary McFadden, Laurie Marchel, Nora, Bob

 9  Rosati and Valentina Craver.  Why is Valentina Craver

10  copied on that e-mail?

11       A.   The e-mail addresses I could find from unit

12  owners that I know in this building, board members and

13  other unit owners.

14  BY MS. BURNETT:

15       Q.   But that's only one other -- it's all the

16  board, Mary, and then one unit owner?

17       A.   One is Halvatzis.  Is he not --

18       Q.   Oh, yeah, I didn't see that.  So it's two

19  board -- I mean --

20       A.   Is Beach House North a board member?  It's

21  just factually incorrect, that statement.

22       Q.   Who is Beach House North?

23       A.   That's Liza Dunn.

24       Q.   Why did you copy Liza Dunn on the e-mail?

25       A.   Same answer as before.



WILLIAM DAVID WILCOX, JR.                          March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                            157

1        Q.   Which is?

2             THE WITNESS:  Madam Court Reporter, can you

3        repeat back my previous answer for Valentina

4        Craver.   Thank you.

5    BY MS. BURNETT:

6        Q.   No, Mr. Wilcox, please answer the question.

7    Why did you copy Liza Dunn on the e-mail?

8             THE WITNESS:  Madam Court Reporter, could you

9        please read back --

10            MR. LUBLINER:  David, just let her.

11            THE WITNESS:  Those are the e-mails I had for

12       unit owners in the building.

13   BY MS. BURNETT:

14       Q.   So you only have three unit owners' e-mails?

15       A.   At the time those were the unit owners I had

16   to put on the e-mail.

17       Q.   Are you friends with Valentina Craver?

18       A.   No.

19       Q.   Are you friends with -- is that Mr. Halvatzis

20   or is that Misses?  Is that Lou Halvatzis?

21       A.   I'm not sure.  It's the only e-mail I could

22   find.

23       Q.   Okay.  Are you friends with him?

24       A.   I don't understand the question.

25       Q.   Are you acquaintances?  Do you hang out?  Do



WILLIAM DAVID WILCOX, JR.                           March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                              158

1  you do things together?

2      A.   You've asked three different things.  Which

3  answer do you want?

4      Q.   Do you go to dinner together?

5      A.   I've been to dinner, Megan and I, with Lou,

6  Terry, Denisa, Megan, twice.  I've been to dinner with

7  Dean, who's Lou's son once.

8      Q.   Do you socialize with Valentina Craver in the

9  same manner?

10     A.   No.

11     Q.   These -- are these images that you took right

12  here?

13     A.   I have no idea what I'm looking at.

14     Q.   It's what you turned over in your production.

15     A.   Well, you would have to go to where the

16  document is where it came from.  I don't know.  It looks

17  like Ring doorbell cameras.

18     Q.   So do you think these are videos you may have

19  turned over?

20     A.   Well, I can't see them, number one.  Yes,

21  that's Laurie Marchel breaking the rules, taking trash

22  out beyond -- yes, it says trash nuisance.  That's what

23  it is.  Her breaking another rule again because the

24  rules only apply to non-board members and people they

25  like.



WILLIAM DAVID WILCOX, JR.                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                          159

1      Q.   Taking trash out, what was the violation?

2      A.   Yeah, it's a rule.  If you've ever read the

3   handbook, Joann, you can't take trash out past, I

4   believe it's 8 p.m.  So it's a rule and it disturbed the

5   peace.

6      Q.   In response to the -- Val's questioning if

7   she -- if you had filed any police reports regarding the

8   nails in the tires, you responded on July 15th, 2021, at

9   9:53, "I'm sorry, police and lawyers are handling and

10   cannot share more at this time."

11          What were the police and the lawyers doing at

12   this point in time about the tires?

13          MR. LUBLINER:  If you could answer that

14       without violating conversations that you had with

15       me or other counsel at the time, you can go ahead

16       and do so.

17          THE WITNESS:  I can't.

18          MR. LUBLINER:  If not, I'm going to instruct

19       you not to answer.

20          THE WITNESS:  Yeah, I can't.

21   BY MS. BURNETT:

22      Q.   Did you have conversations with the police?

23      A.   Same answer.

24          MR. LUBLINER:  You can answer the conversation

25       about the police.  Just not anything to do with



WILLIAM DAVID WILCOX, JR.                        March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                           160

```
 1       lawyers.
 2             THE WITNESS:  Yes, I've had conversations with
 3       the police.
 4  BY MS. BURNETT:
 5       Q.   And who did you speak with?
 6       A.   I don't recall.
 7       Q.   Did you make a phone call?  Did you call the
 8  police?
 9       A.   Did you think I waved them down?  I'm
10  confused.  I'm sure I called the --
11       Q.   Did you call the police?  Did you e-mail the
12  police?  Did you do anything -- what did you do?
13       A.   I don't recall.
14       Q.   So what action were the police taking?
15       A.   I don't recall.
16       Q.   Did your lawyers -- and I don't want to know
17  anything that you spoke to your lawyers about, but did
18  your lawyers send out any letters to anyone regarding
19  this?
20             THE WITNESS:  Rich?
21             MR. LUBLINER:  You can answer yes or no,
22       nothing else.
23             THE WITNESS:  Yes.
24  BY MS. BURNETT:
25       Q.   Do you know who the letters were sent to?
```



```
1              THE WITNESS:  Rich?

2              MR. LUBLINER:  Let's see.  You're asking who

3        the letters were sent to.  If I could talk to him

4        for a minute, I might be able to clear this up.  Is

5        that all right with you?

6              MS. BURNETT:  Yes.

7              THE VIDEOGRAPHER:  Going off video record.

8        The time is 4:36 p.m.

9              (Off the record.)

10             THE VIDEOGRAPHER:  Okay.  Going back on video

11       record.  The time is 4:37 p.m.

12             All right, continue.

13             THE WITNESS:  Are we good?  Okay.

14       Ms. Burnett, your question was did my lawyers

15       respond to anything around nails and tires, et

16       cetera.  Yes, Lubliner Law sent a preservation of

17       records request around cameras to the association.

18   BY MS. BURNETT:

19       Q.   I think we may have talked about this e-mail

20   already.

21             MR. LUBLINER:  You did.

22             MR. MARCHESE:  You did.

23             THE WITNESS:  We did.

24   BY MS. BURNETT:

25       Q.   This is an e-mail from you to Ed Lepselter
```



1  with a cc to Megan Luchey, Val Manzo, Tom DeMarinis,

2  dated August 18, 2021.  The subject line is "Final

3  signed Wilcox lease with first amendment, walk-through

4  checklist, receipt to be signed by both of us for

5  execution by landlord/tenant on 1/25/21."

6          What were you referring to when you said,

7  "This would be very helpful for all of us if you could

8  find a copy of the e-mail"?

9      A.   So you would stop harassing us and Laurie

10 Marchel would stop claiming that it was a six-month

11 lease.

12     Q.   How would it be helpful for all of us?  How

13 would it be helpful to Ed Lepselter?

14     A.   Because all of us were going to have to be in

15 the middle of a lawsuit that would be fraudulently filed

16 based on the six-month lease because we can't find our

17 documents.

18     Q.   So none of you could find your lease agreement

19 at that time?

20     A.   No.  Val Manzo sent it over when you requested

21 it and you still filed a lawsuit and claimed that she

22 was committing fraud.

23     Q.   I'm asking -- my question is this:  Why are

24 you asking him, Edward Lepselter, for a copy of the

25 lease if you already have the lease, or are you asking



WILLIAM DAVID WILCOX, JR.                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                      163

 1 | him for verification that it was sent to the
 2 | association?
 3 |      A.   Ms. Burnett, you've got to be really clear
 4 | when you ask a question.  You're being incredibly vague
 5 | and there's no way that I can answer a question that is
 6 | that vague.  Please ask specific questions for specific
 7 | answers.
 8 |      Q.   Were you asking Edward Lepselter if he had
 9 | confirmation of sending the lease over with page 2?
10 |      A.   "On January 19th, Val sent you our lease not
11 | missing page 2.  Did you forward that to Mary McFadden
12 | or anyone else at La Pensee?  It would be very helpful
13 | if you find a copy of the e-mail.  You had identified to
14 | Val that" -- okay.  This is where Val had sent, when she
15 | came back from vacation, a copy of the lease that didn't
16 | have a scanning error on page 2, which is the same
17 | carbon copy as what was sent to the association with the
18 | page 2 with a scanning error.  My question was:  Did you
19 | send it, Ed, to the association? because that kills the
20 | entire argument of the page 2.
21 |           What was forwarded to us was a fraudulent
22 | version that clipped the deposit receipt and the move-in
23 | checklist and then another fraudulent version that you
24 | guys --
25 |      Q.   Mr. Wilcox, Mr. Wilcox --



```
 1        A.    I'm answering your question.

 2        Q.    This is not answering my question and again,

 3   I'm moving to strike.

 4              How did Edward Lepselter respond to this

 5   e-mail?

 6        A.    I don't know if he did respond.

 7        Q.    Did he ever tell you --

 8        A.    I don't think --

 9        Q.    Did he ever tell you if he provided that

10   lease?

11        A.    If he did, we produced it.  I do not know.

12   The lease is the lease.

13        Q.    This is a January 19th, 2021, e-mail,

14   6:46 p.m. from Ed Lepselter to Tom DeMarinis and it

15   says, "Good evening, Ed.  Here you go.  The private

16   agreement between us regarding post-lease possession is

17   deliberately not enclosed."

18              What does that mean?

19        A.    When they -- LL -- three -- La Pensee, LLC

20   303, whatever it's called, that Val Manzo owns, her

21   corporation, we had had a discussion about moving the

22   lease into my corporation's name.  We never took that

23   forward.  It was a private agreement.  It had to be

24   approved by the association.  So we didn't submit it.

25              We never moved it.  We never acted on it.
```



WILLIAM DAVID WILCOX, JR.                                   March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                                      165

```
 1   It's not validated.  Signatures were never even

 2   executed.  That was something that I told them that I

 3   would like to do from a taxation perspective and we

 4   never did it.

 5       Q.   Is there a reason you didn't do it?

 6       A.   Yeah, because I moved in and the place was

 7   insane.

 8       Q.   Well, Mr. Wilcox, I have a question for you.

 9   If you have such horrible things to say about La Pensee,

10   why do you stay there?

11       A.   Wow.  You have a vague question of why do I

12   stay there and you don't think you're going to move to

13   strike the answer.  I'm not answering that question.

14       Q.   You had the opportunity to leave.  I've seen

15   e-mails where --

16       A.   Ms. Burnett, I'm not answering the question.

17            MR. LUBLINER:  David, go ahead and answer --

18       let her finish and then see what the question is.

19   BY MS. BURNETT:

20            ***** CERTIFIED QUESTION *****

21       Q.   I've seen e-mails where La Pensee 303 agreed

22   to let you out of your lease and you've chosen to stay

23   there despite all of these horrible things that you've

24   alleged.

25            Why would you do that?
```



 1        A.   I did not allege them.  You fraudulently filed

 2   a lawsuit in state court.  Do not ask me a question that

 3   you're going to strike that you don't want the answer

 4   to.  I've had enough of it, Joann.

 5             MR. SIMON:  Joann, just certify the question

 6        and move on.

 7             MS. BURNETT:  Okay.  Certify the question.

 8             THE WITNESS:  I guess you needed help from

 9        Andrew Simon to be able to do that.

10             MS. BURNETT:  It's 4:45 and I think with

11        Mr. Wilcox getting so belligerent and things like

12        that, I think we're going to call it --

13             THE WITNESS:  Don't make that accusation.

14             MR. LUBLINER:  Hold on.

15             THE WITNESS:  Rich, let's go to the judge.

16        She's out of control.

17             MS. BURNETT:  I want to go on the record as

18        saying that all of the --

19             MR. LUBLINER:  David, David, let her -- let's

20        wrap it up.  Let's wrap it up.

21             MS. BURNETT:  I want to go on record as saying

22        that the entire first part of the deposition where

23        I did not get correct answers or I get evasive

24        answers, I either will be taking those to the judge

25        or I will re-ask them at the next continuation of



1   this deposition.

2       I also -- and I'm not done questioning him.  I

3   still have a plethora of documents to go through.

4       THE COURT REPORTER:  Do we want to go off the

5   record now?  We're not concluding?

6       MR. LUBLINER:  That's fine with me.

7       THE VIDEOGRAPHER:  Anyone else have anything

8   else to say before going off video record?

9       MS. BURNETT:  I don't.

10      THE VIDEOGRAPHER:  Okay.  All right.  Before

11  going off video record, Counsel, will you be

12  ordering transcript or video of this?

13      MR. LUBLINER:  Not at this time.

14      THE VIDEOGRAPHER:  Okay.  Anyone else?

15      MS. BURNETT:  I will let you know.

16      THE VIDEOGRAPHER:  Okay.  Anyone else?

17      MR. MARCHESE:  We'll let you know.

18      THE VIDEOGRAPHER:  Okay.  Understood.  Going

19  off video record.  The time is 4:47 p.m.

20      (Witness excused.)

21      (Deposition was concluded at 4:47 p.m.)

22

23

24

25



```
 1              DEPOSITION ERRATA SHEET
 2    Our Assignment No.  J8479639
 3    Case Caption:  La Pensee vs. La Pensee 303, et al.
 4
 5        DECLARATION UNDER PENALTY OF PERJURY
 6
 7        I declare under penalty of perjury that I have
 8    read the entire transcript of my Deposition taken in the
 9    captioned matter or the same has been read to me, and
10    the same is true and accurate, save and except for
11    changes and/or corrections, if any, as indicated by me
12    on the DEPOSITION ERRATA SHEET hereof, with the
13    understanding that I offer these changes as if still
14    under oath.
15
16        Signed on this _____ day of _____, 20__.
17
18        _____
19        WILLIAM DAVID WILCOX, JR.
20
21
22
23
24
25
```



```
 1                 DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3    _____

 4    Reason for change:_____

 5    Page No._____Line No._____Change to:_____

 6    _____

 7    Reason for change:_____

 8    Page No._____Line No._____Change to:_____

 9    _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23

24    SIGNATURE:_____DATE:_____

25            WILLIAM DAVID WILCOX, JR. Job# J8479639
```



WILLIAM DAVID WILCOX, JR.                          March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                          170

```
 1              DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23

24   SIGNATURE:_____DATE:_____

25          WILLIAM DAVID WILCOX, JR. JOB # J8479639
```



WILLIAM DAVID WILCOX, JR.                                    March 04, 2022
LA PENSEE CONDO vs LA PENSEE 303                                        171

1                        CERTIFICATE OF OATH

2    STATE OF FLORIDA

3    COUNTY OF PALM BEACH

4

5        I, the undersigned authority, certify that William

6    David Wilcox, Jr. personally appeared before me and was

7    duly sworn on the 4th day of March, 2022.

8

9        Witness my hand and official seal this 1st day of

10   August, 2022.

11

12

13

14

15    _____

16    Wendy Beath Anderson, RDR, CRR, CRC
      Notary Public State of Florida
      My Commission Expires:  9/23/2025
17    My Commission No.:  HH 178324

18    Job #J8479639

19

20

21

22

23

24

25



1                      CERTIFICATE OF REPORTER

2     STATE OF FLORIDA

3     COUNTY OF PALM BEACH

4

5           I, Wendy Beath Anderson, Certified Realtime
      Reporter and Notary Public in and for the State of
6     Florida at Large, do hereby certify that I was
      authorized to and did stenographically report said
7     deposition of WILLIAM DAVID WILCOX, JR.; that a review
      of the transcript was not waived; and that the foregoing
8     transcript is a true record of my stenographic notes.

9           I FURTHER CERTIFY that I am not a relative,
      employee, or attorney, or counsel of any of the parties,
10    nor am I a relative or employee of any of the parties'
      attorney or counsel connected with the action, nor am I
11    financially interested in the action.

12          The foregoing certification of this transcript
      does not apply to any reproduction of the same by any
13    means unless under the direct control and/or  direction
      of the certifying reporter.

14

15

16          Dated this 1st day of August, 2022.

17

18    _____

19          Wendy Beath Anderson, RDR, CRR, CRC

20          Job #J8479639

21

22

23

24

25

